**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| PT. ZINUS GLOBAL INDONESIA, | **NON-CONFIDENTIAL VERSION** |
| Plaintiff, | |
| and | **Court No. 21-00277 (Consol.)** |
| BROOKLYN BEDDING, LLC ET AL., | |
| Consolidated Plaintiff, | |
| | **Business Proprietary Information Removed from pages: 22-26 and 43-45** |
| v. | |
| UNITED STATES, | |
| Defendant, | |
| and | |
| PT. ZINUS GLOBAL INDONESIA and BROOKLYN BEDDING, LLC ET AL., | |
| Defendant-Intervenors. | |

<u>**MEMORANDUM IN SUPPORT OF PT. ZINUS GLOBAL INDONESIA'S**</u>
<u>**MOTION FOR JUDGMENT UPON THE AGENCY RECORD**</u>

ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 942-5000
Fax: (202) 942-5999

J. David Park
Henry D. Almond
Daniel R. Wilson
Leslie C. Bailey
Kang Woo Lee
Gina M. Colarusso

*Counsel to PT. Zinus Global Indonesia*

Phyllis L. Derrick
Eric Johnson

*Consultants to PT. Zinus Global Indonesia Plaintiff*

Dated: November 9, 2021

TABLE OF CONTENTS

I.      STATEMENT PURSUANT TO RULE 56.2.................................................1

        A.      Administrative Determination Under Review ...........................................1

        B.      Issues Presented for Review ...................................................................1

II.     STATEMENT OF FACTS ...............................................................................2

III.    SUMMARY OF ARGUMENT .........................................................................8

IV.     STANDARD OF REVIEW.............................................................................10

V.      ARGUMENT ...................................................................................................12

        A.      Commerce's Use of a Quarterly Ratio Sales Methodology to Determine
                the Quantity of Subject CEP Inventory Sales is Unsupported by
                Substantial Evidence...............................................................................12

                1.      *Commerce Unreasonably Refused to Use Zinus' FIFO Methodology*...... 15

                2.      *Should the Court Sustain Commerce's Use of a Quarterly Ratio Sales
                        Methodology, it Should Instruct Commerce to Recalculate the Ratios to
                        Include Only Those Units that Actually Entered U.S. Inventory During
                        the POI* .......................................................................................... 21

        B.      Commerce's Constructed Value Profit Calculations Are Unsupported by
                Substantial Evidence and Contrary to Law.............................................26

                1.      *Commerce's Use of Emirates' Financial Statements as a Source of CV
                        Profit and Selling Expenses Was Unsupported by Substantial Evidence
                        and Otherwise Not in Accordance with Law*............................................. 28

                2.      *Commerce Erroneously Rejected the Financial Statements of PT Graha
                        and PT Ecos Jaya*........................................................................ 31

                3.      *There are Ample Profit Cap Sources; Commerce is Therefore Obligated
                        to Apply a Profit Cap* .............................................................. 34

        C.      Commerce's Adjustments to U.S. Price Are Unsupported by Substantial
                Evidence and Contrary to Law ...............................................................36

                1.      *Commerce Applied and Relied on "Facts Available" Without Adhering
                        to the Governing Statutory Requirements*.................................... 39

                2.      *Commerce Erroneously Overlooked Record Data When Calculating a
                        Price Adjustment that Included BPM's 2019 Sales Deductions* ............... 41

                3.      *Commerce Erroneously Relied on Zinus US' Company-Wide Sales and
                        Sales Deduction Information Rather Than the Information Specific to
                        Mattresses Submitted in Zinus' Response* .................................. 45

VI.     CONCLUSION ................................................................................................47

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### <u>Federal Cases</u>

*Agro Dutch Indus. v. United States*
31 CIT 2047 (2007) ............................................................................................40

*Auer v. Robbins*,
519 U.S. 452 (1997).............................................................................................12

*Bowles v. Seminole Rock & Sand Co.*,
325 U.S. 410 (1945).............................................................................................12

*Çelik Fabrikalari T.A.Ş. v. United States*,
308 F. Supp. 3d 1297 (Ct. Int'l Trade 2018) ......................................................40

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
467 U.S. 837 (1984)......................................................................................11, 12

*Consol. Edison Co. of New York v. N.L.R.B.*,
305 U.S. 197 (1938).............................................................................................11

*Encino Motorcars, LLC v. Navarro*,
136 S. Ct. 2117 (2016)........................................................................................12

*Gerald Metals, Inc. v. United States*,
132 F.3d 716 (Fed. Cir. 1997).............................................................................18

*Geum Poong Corp. v. United States*,
193 F. Supp. 2d 1363 (Ct. Int'l Trade 2002) ......................................................31

*Hoogovens Staal Bv v. United States*,
24 CIT 44 (2000) .................................................................................................41

*Husteel Co. v. United States*,
471 F. Supp. 3d 1349 (Ct. Int'l Trade 2020) ......................................................28

*Husteel v. United States*,
98 F. Supp. 3d (Ct. Int'l Trade 2015) ............................................................34, 35

*Maverick Tube Corp. v. United States*,
107 F. Supp. 3d 1318 (Ct. Int'l Trade 2015) ..............................................29, 35, 36

*Mid Continent Steel & Wire, Inc. v. United States*,
203 F. Supp. 3d 1295 (Ct. Int'l Trade 2017) ......................................................27

*Mid Continent Steel & Wire, Inc. v. United States,*
    941 F.3d 530 (Fed. Cir. 2019)................................................................31, 32, 35

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983)......................................................................................25

*NEXTEEL Co., Ltd. v. United States*
    392 F. Supp. 3d 1276 (Ct. Int'l Trade 2019) ..........................................30

*Nippon Steel Corp. v. United States,*
    458 F.3d 1345 (Fed. Cir. 2006)................................................................11

*Robert Bosch LLC v. Pylon Mfg. Corp.,*
    659 F.3d 1142 (Fed. Cir. 2011)................................................................12

*Seah Steel Corp. v. United States,*
    513 F. Supp. 3d 1367 (Ct. Int'l Trade 2021) ..........................................35

*Sterling Fed. Sys., Inc. v. Goldin,*
    16 F.3d 1177 (Fed. Cir. 1994)..................................................................12

*Timex V.I. v. United States,*
    157 F.3d 879 (Fed. Cir. 1998)..................................................................11

*Universal Camera Corp. v. N.L.R.B.,*
    340 U.S. 474 (1951)..................................................................................11

*USX Corp. v. United States,*
    655 F. Supp. 487 (Ct. Int'l Trade 1987) ................................................18

*Vinh Hoan Corp. v. United States,*
    317 F. Supp. 3d 1295 (Ct. Int'l Trade 2018) ..........................................20

**Federal Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)........................................................................10

19 U.S.C. § 1677b(e)........................................................................................6

19 U.S.C. § 1677b(e)(2)....................................................................................6

19 U.S.C. § 1677b(e)(2)(A)............................................................................27

19 U.S.C. § 1677b(e)(2)(B)(iii) ................................................................*passim*

19 U.S.C. § 1677e(a)..................................................................................39, 40

19 U.S.C. § 1677m(d)..................................................................................40, 41

## Administrative Determinations

*Antidumping Duties; Countervailing Duties,*
    62 Fed. Reg. 27,296 (Dept. Comm., May 19, 1997) ..............................................34

*Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic
    of Turkey, and the Socialist Republic of Vietnam: Antidumping Duty Orders
    and Amended Final Affirmative Antidumping Determination for Cambodia,*
    86 Fed. Reg. 26,460 (Dept. Comm., May 14, 2021) ...................................... passim

*Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic
    of Turkey, and the Socialist Republic of Vietnam: Initiation of Less-Than-
    Fair-Value Investigations, Utility Scale Wind Towers from Canada,
    Indonesia, and the Socialist Republic of Vietnam: Initiation of Countervailing
    Duty Investigations,*
    85 Fed. Reg. 23,002 (Dept. Comm., Apr. 24, 2020)..................................................2

*Mattresses from Indonesia: Final Affirmative Determination of Sales at Less Than
    Fair Value,*
    86 Fed. Reg. 15,899 (Dept. Comm., Mar. 25, 2021) ...................................... passim

*Mattresses from Indonesia: Preliminary Affirmative Determination of Sales at
    Less Than Fair Value, Postponement of Final Determination, and Extension
    of Provisional Measures,*
    85 Fed. Reg. 69,597 (Dept. Comm., Nov. 3, 2020)....................................... passim

## Other Authorities

Statement of Administrative Action (SAA) Accompanying the Uruguay Round
    Agreements Act, H.R. Doc. No. 103-316, vol 1 (1994) ...................................32, 33

## I.      STATEMENT PURSUANT TO RULE 56.2

### A.      Administrative Determination Under Review

PT. Zinus Global Indonesia ("Plaintiff" or "Zinus"), an Indonesian producer and exporter of mattresses, brings this action to contest certain aspects of the final determination and resulting antidumping duty order in the antidumping duty investigation on *Mattresses from Indonesia* of the U.S. Department of Commerce ("Commerce"), issued on March 25, 2021. *See Mattresses from Indonesia: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 15,899 (Dept. Comm., Mar. 25, 2021) ("*Final Determination*"), P.R. 292, and accompanying Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Mattresses from Indonesia, dated March 18, 2021 ("*Final Decision Memo*"), P.R. 284; *Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: Antidumping Duty Orders and Amended Final Affirmative Antidumping Determination for Cambodia*, 86 Fed. Reg. 26,460 (Dept. Comm., May 14, 2021) ("Order"), P.R. 307.

### B.      Issues Presented for Review

1.      Whether Commerce's determination to reject Zinus' reported FIFO-based U.S. inventory sales reporting methodology and instead apply a quarterly ratio calculation to identify subject U.S. sales was contrary to law and unsupported by substantial record evidence. As discussed in **Section V.A.1**, Commerce unreasonably diverged from Zinus' reasonable and accurate reporting in favor of a quarterly ratio methodology that inserted inaccuracies and distortions into the agency's calculations.

2.      Whether Commerce incorrectly used as the starting point in its U.S. inventory ratio calculations shipments from Indonesia, rather than the mattresses actually in inventory in the United States. As set forth in **Section V.A.2**, because mattresses that were still in transit from

Indonesia to the United States as of the end of the period of investigation could not have been sold from U.S. inventory during the period of investigation, Commerce's calculations were inaccurate and unsupported by substantial record evidence.

3.      Whether Commerce's determination to use the financial statement of a mattress producer in India is unsupported and contrary to law. As detailed in **Section V.B**, as the statute has a clear preference for profit and selling expense information pertaining to production and sales in the country under investigation (Indonesia) and the record contained suitable sources from Indonesia, Commerce's determination to use the financial statements of an Indian producer was contrary to law. Moreover, Commerce had no reasonable basis to avoid calculating a profit cap, as required by the statute.

4.      Whether Commerce's determination to make certain adjustments to U.S. price to account for the sales activities and expenses associated with an affiliated party, BPM, with no sales or role in the sales of subject merchandise was unsupported by substantial record evidence and contrary to law. As discussed in **Section V.C**, Commerce's determination to pull in expenses from a company with no involvement in the sale of subject merchandise amounted to an impermissible application of facts available, was contrary to law, and unsupported by substantial record evidence.

## II.   <u>STATEMENT OF FACTS</u>

On April 24, 2020, Commerce initiated an antidumping duty investigation on Mattresses from Indonesia. *See Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations, Utility Scale Wind Towers from Canada, Indonesia, and the Socialist Republic of Vietnam: Initiation of Countervailing Duty Investigations*, 85 Fed. Reg. 23,002 (Dept. Comm., Apr. 24, 2020) ("Initiation Notice"), P.R. 43. Commerce initiated its investigation based on a

*NON-CONFIDENTIAL VERSION*

petition filed by Brooklyn Bedding, Corsicana Mattress Company, Elite Comfort Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises, Inc., Leggett & Platt, Incorporated, the International Brotherhood of Teamsters, and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO ("USW") (collectively, the "Petitioners").  Commerce's period of investigation ("POI") was January 1, 2019, through December 31, 2019.  On May 13, 2020, Commerce selected Zinus for individual examination as the sole mandatory respondent, as the largest producer/exporter of mattresses in Indonesia.  *See* Memorandum to Jeffrey I. Kessler from James Maeder, *Decision Memorandum for the Preliminary Affirmative Determination and Postponement of Final Determination in the Less-Than-Fair-Value Investigation of Mattresses from Indonesia* (Oct. 27, 2020) ("Preliminary Decision Memo"), P.R. 226.

On May 14, 2020, Commerce issued an antidumping duty questionnaire to Zinus.  On June 18, 2020, Zinus filed its initial section A questionnaire response, in which Zinus explained that its U.S. warehouse locations do not maintain records that permit the company to definitively determine the country of origin for prior sales.  Zinus therefore used a first-in-first-out ("FIFO") methodology to assign a country of origin, and thus segregate its U.S. CEP inventory sales into subject mattresses (mattresses produced in Indonesia) and non-subject mattresses (mattresses produced elsewhere).  *See* Zinus' Section A Response (June 18, 2020) ("Section A Response"), P.R. 97, C.R. 36, at A-5.  On the basis of this methodology, Zinus included in its U.S. sales database CEP inventory sales that the FIFO methodology identified as Indonesian origin.  Zinus reported all other CEP inventory sales in a separate, non-subject sales database.

Also in Zinus' initial section A questionnaire response, it explained that its U.S. affiliate Best Price Mattresses, Inc. ("BPM") (now known as Mellow, Inc.), wholly owned by PT. Zinus

Global Indonesia's Korean parent company, Zinus Inc. ("Zinus KR"), was not involved in the development, manufacture, sale, and/or distribution of the merchandise under investigation.  *See id.*, P.R. 97, C.R. 36 at A-9.  In Zinus' initial questionnaire response and in subsequent supplemental questionnaire responses it demonstrated repeatedly, with supporting documentation, including BPM's financial statements, that its U.S. affiliate BPM did not manufacture, sell, and/or distribute merchandise under investigation (*i.e.*, mattresses produced in Indonesia).  *See* Zinus' Section D Response (Jul. 6, 2020) ("Section D Response"), P.R. 115, C.R. 86, at Exhibit D-18; Zinus' Section C Response (Jul. 13, 2020) ("Section C Response"), P.R. 120, C.R 118, at Exhibit C-2a; Zinus' Supplemental Section A Response (Aug. 20, 2020) ("Supp. Section A Response"), P.R. 165, C.R. 154, at Exhibit SA-4c; Zinus' Supplemental Section C Response (Part 2) (Sept. 28, 2020) ("Supp. Section C Response (Part 2)"), P.R. 199, C.R. 213, at Exhibit SC-5a and Exhibit SC-12; and Zinus' Post-Preliminary Supplemental Response (Dec. 14, 2020) ("Post-Preliminary Supp. Response"), P.R. 256, C.R. 271.  These materials demonstrated that BPM is not involved in sales of the subject merchandise, that the companies did not pay commissions on behalf of one another, and that the companies did not transfer price deductions among one another.

Leading up to the Preliminary Determination, the Department asked for additional information and clarification concerning Zinus' reporting, to which Zinus fully responded.  In particular, in the September 21, 2020, supplemental Section C response, Zinus provided additional detail and explanation as to why its records did not permit the retrospective identification of the country of origin for sales out of U.S. inventory.  *See* Zinus' Supplemental Section C Response (Part 1) (Sept. 21, 2020) ("Supp. Section C Response (Part 1)"), P.R. 193, C.R. 167, at SC1-10 – SC1-11.  In the second portion of that supplemental Section C response,

*NON-CONFIDENTIAL VERSION*

Zinus provided additional explanation in response to the Department's questions as to why the FIFO methodology was the most appropriate method to report CEP inventory sales. *See* Zinus' Supp. Section C Response (Part 2) at SC2-7 – SC2-8, P.R. 199, C.R. 213. In response to the Department's request, Zinus also provided an updated version of the monthly breakdown by model of mattresses imported for sale out of U.S. inventory, which Zinus initially provided in its supplemental section A response, to include the percentage of imports of each model by source. *See* Zinus' Second Supplemental Section C Response (Sept. 28, 2020) ("Second Supp. Section C Response"), P.R. 200, C.R. 214, at Exhibit SC2-1. That is, Zinus identified the imports by source country, month, and model.

In response to allegations from the Petitioners that Zinus' FIFO methodology undercounted subject CEP inventory sales, Zinus thoroughly explained that the correct starting point for the CEP inventory analysis is Zinus' inventory in the United States during the POI, not the number of mattresses Zinus KR sold to Zinus, Inc. ('Zinus US') in the POI, as Petitioners suggested, which necessarily includes a quantity of mattresses still in transit (*i.e.*, en route from Indonesia via ocean freight to the United States). *See* Supp. Section C Response (Part 2) at Exhibit SC-5C, P.R. 199, C.R. 213. Moreover, Zinus' responses addressing (1) Zinus KR's total sales to Zinus US and (2) Zinus US's imports of Indonesian-origin units for U.S. warehousing demonstrated how the reported quantities reconciled to Zinus KR's and Zinus US' financial statements, respectively. Further, Zinus provided a detailed, line-item-specific list of all merchandise in transit as of December 31, 2019. *See id*. at Exhibit SC-5C, item 4. This listing included the purchase order number, product code, and quantity in pieces accounting for each of the mattresses in transit on December 31, 2019. The exhibit also included U.S. Customs and Border Protection Entry Summary Form 7501 documentation for selected shipments showing

*NON-CONFIDENTIAL VERSION*

that the merchandise sold by Zinus KR to Zinus US did not enter the United States until January

2020 (*i.e.*, after the POI).

 As Zinus reported that it had no viable home market, Commerce calculated normal value

on the basis of constructed value in accordance with 19 U.S.C. § 1677b(e).  *See* Letter from

Zinus "Notification of Non-Viable Home Market" (May 28, 2020), P.R. 82.  In order to

determine the appropriate amounts for profit and selling expenses, pursuant to 19 U.S.C. §

1677b(e)(2), Commerce gathered relevant information from interested parties including Zinus

and Petitioners.  *See* Letter from Commerce "Request for Constructed Value Profit and Selling

Expense Comments and Information," (Jul. 31, 2021), P.R. 129.  These materials consisted

primarily of financial statements of companies that produce mattresses in Indonesia (and

elsewhere) and companies that produce merchandise in Indonesia in the same general category

of products as mattresses.  *See* Zinus' Submission of Constructed Value Profit and Selling

Expense Information and Comments (Aug. 17, 2020) ("Zinus CV Profit Submission"), P.R. 156-

63, C.R. 137-44; *see also* Mattress Petitioners' Submission Concerning CV Profit and Selling

Expenses (Aug. 17, 2020), P.R., 154, C.R. 136.

 On November 3, 2020, Commerce published its preliminary determination in the

investigation.  *See Mattresses from Indonesia: Preliminary Affirmative Determination of Sales at*

*Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional*

*Measures*, 85 Fed. Reg. 69,597 (Dept. Comm., Nov. 3, 2020) ("Preliminary Determination"),

P.R. 225, and accompanying Preliminary Decision Memo, P.R. 226.  Commerce calculated a

preliminary ad valorem dumping margin of 2.61 percent for Zinus.

 With respect to the identification of reportable CEP inventory sales, Commerce

preliminarily determined not to use Zinus' FIFO methodology and instead used a quarterly ratio

sales methodology proposed by Petitioners to determine the universe of Zinus' CEP sales. This methodological decision was a significant factor resulting in the above de minimis 2.61 percent preliminary dumping margin Commerce calculated for Zinus. *See* Preliminary Decision Memo at 9-10, P.R. 226; *see also* Commerce Memorandum "Preliminary Determination Margin Calculation for PT Zinus Global Indonesia" (Oct. 27, 2020) ("Preliminary Calc. Memo"), P.R. 229, C.R. 258, at 1-3. Commerce's methodology first identified a ratio of subject and non-subject CEP inventory sales on the basis of the overall inventory quantities reported in Zinus' Exhibit SC2-1, and then increased the number of Indonesian mattresses to include those mattresses that were in transit from Indonesia to the CEP inventory warehouses (*i.e.*, mattresses which had not entered the United States as of the end of the period of investigation). *See* Preliminary Calc. Memo at 2, P.R. 229, C.R. 258, and Attachment 1, P.R. 229, C.R. 259.

In the Preliminary Decision Memorandum Commerce stated that "questions remain about the accuracy of {Zinus' FIFO} methodology" and that it would "continue to examine this issue for purposes of the final determination." Preliminary Decision Memo at 10, P.R. 226. Subsequent to the preliminary determination, Commerce issued an additional supplemental questionnaire to Zinus, as well as a questionnaire in lieu of verification. These questionnaires did not pose any questions or seek any additional documentation specific to the FIFO methodology or shipments in transit at the end of the POI.

With respect to the constructed value profit ("CV profit") source for the Preliminary Determination, Commerce used the financial statement of Emirates Sleep Systems Private Limited, a mattress producer with production facilities in India. *Id.* at 13.

On March 25, 2021 Commerce published its *Final Determination*, in which it calculated a final antidumping margin of 2.22 percent for Zinus. *See Final Determination*, P.R. 292; *Final*

*Decision Memo*, P.R. 284.  In the *Final Determination*, Commerce continued to apply the quarterly ratio sales methodology proposed by Petitioners rather than utilizing Zinus' FIFO methodology.  *Final Decision Memo* at 8-9, P.R. 284.  Commerce also continued to use the intercompany sales figure inclusive of product in transit (rather than product in U.S. inventory) and did not make an adjustment to account for the number of units in transit at the end of the POI.  *Id*.  With respect to CV profit, Commerce also continued to use the financial statement of Emirates Sleep Systems Private Limited as the basis of the CV profit and selling expense calculations.  *Id*. at 20-25.

Commerce also made certain adjustments to U.S. price that "take{} into consideration the sales deduction experience of both companies {i.e., Zinus US and BPM} during the POI."  *Final Decision Memo* at 15.  Commerce described the adjustment as follows:

> Specifically, we combined Zinus US's and BPM's 2019 (i.e., POI) sales deductions, net of discounts and returns, and divided by the companies' combined gross sales, as reported in their respective financial statements.  We then applied this ratio to the gross unit price of all sales made by Zinus US (i.e., all CEP sales).  To avoid double counting reported expenses to the extent possible, we did not adjust these U.S. prices for certain rebates.  We did not make a similar adjustment for EP sales because we did not have the information on the record with which to do so.

*Id*.

On May 14, 2021, Commerce published the Antidumping Duty Order.  *See Antidumping Duty Order,* 86 Fed. Reg. 26,460 (Dept. Comm., May 14, 2021).  After the publication of the Antidumping Duty Order in the Federal Register, Zinus timely filed this appeal to this Court on June 10, 2021.  *See* Summons, ECF No. 1.

### III.   SUMMARY OF ARGUMENT

This case comes before the Court after the Commerce Department took a number of steps in its investigation with one goal in mind:  to derive an antidumping duty margin with respect to

Zinus' U.S. sales of mattresses from Indonesia, where no margin should exist. If properly calculated, Commerce would have, and should have, calculated a margin of zero percent or *de minimis*. Rather than assign the zero percent margin Zinus' data and the record called for, Commerce instead disregarded facts, invented methodologies, and otherwise took a variety of steps to generate a margin of 2.22 percent, just above the two percent *de minimis* threshold. While Commerce retains some latitude in assessing the facts and rendering its calculations, Commerce overstepped its bounds in three key respects in this investigation. As discussed below, Commerce's determination was unsupported by substantial evidence and contrary to law in three key respects.

First, from the outset of the investigation, Zinus notified Commerce that it could not identify the country of origin for its prior sales made out of inventory held in the United States. As Zinus explained, its records do not maintain a link between the mattress-specific sales information and the country of origin due to comingled inventory and the information its accounting system records and maintains for prior sales. As a result, Zinus employed a "first in first out" (or "FIFO") methodology to identify the country of origin on a model- and warehouse-specific basis. Following this methodology, Zinus separately reported all sales from U.S. inventory identified as Indonesian-origin and also separately reported all sales identified as originating from other countries.

Rather than accept this reporting, Commerce instead adopted a back-of-the-envelope allocation methodology, suggested by Petitioners, whereby Commerce calculated an overall ratio, by calendar quarter, to approximate the share of U.S. inventory sales which were of product produced in Indonesia. Commerce's determination was unsupported by the record and contrary to law, as (1) Commerce had no reasonable basis to diverge from Zinus' reporting and

instead rely on a less accurate and less precise methodology, and (2) in calculating the quarterly ratios Commerce unreasonably and without any record support, used figures pertaining to Zinus' shipments from Indonesia (rather than Zinus' U.S. inventory entries) as the starting point in the calculations.

Second, Commerce unreasonably used the financial statement of an Indian mattress producer as the basis of constructed value profit under 19 U.S.C. § 1677b(e)(2)(B)(iii). The record contained information pertaining to a variety of viable profit sources in Indonesia. Commerce's determination to use the financial statements of an Indian producer, in favor of superior options from Indonesia, including information pertaining to producers of mattresses and products in the same general category as mattresses was unsupported by the record evidence and contrary to law. Further compounding the problem, Commerce elected not to apply the statutory profit cap, despite the variety of record sources available to it.

Third, Commerce determined to pull in expenses incurred by an affiliated U.S. entity, BPM, which had no sales and no role in sales of subject merchandise. In doing so, Commerce essentially resorted to facts available without characterizing its determination as premised on facts available and without any statutory basis to do so. Moreover, Commerce's determination that it was appropriate to include expenses incurred by BPM was unsupported by substantial record evidence, as Zinus' submissions leave no doubt as to the fact that the company simply was not involved in sales or expenses associated with mattresses from Indonesia.

## IV. <u>STANDARD OF REVIEW</u>

The Court will hold Commerce's determinations unlawful in an antidumping duty proceeding where they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

*NON-CONFIDENTIAL VERSION*

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938). Importantly, "{t}he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951). The substantial evidence standard of review essentially asks whether, given the evidence on the record as a whole, the agency's conclusion was reasonable. *See Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006).

Commerce acts contrary to law where it acts arbitrarily or based on an impermissible interpretation of its statutory authority. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc*., 467 U.S. 837, 842–43 (1984). When reviewing Commerce's interpretation of the antidumping statute, the Court first determines "whether Congress has directly spoken on the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the {C}ourt, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* Where, on the other hand, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.

However, the Court does "not fulfill {its} duty to say what the law is . . . by merely agreeing to Commerce's interpretation of the statutory provision at issue if it is reasonable, regardless of whether {the court thinks} it correct." *Timex V.I. v. United States*, 157 F.3d 879, 881 (Fed. Cir. 1998) (citations omitted). "Rather, before granting an agency's statutory interpretation such great deference . . . {the Court} must first carefully investigate the matter to determine whether Congress's purpose and intent on the question at issue is judicially ascertainable." *Id.* As the Federal Circuit has explained, where "the statute's text does not

explicitly address the precise question, {the Court does} not at that point simply defer to the agency. {The Court's} search for Congress's intent must be more thorough than that." *Id*. at 882. "Beyond the statute's text, those tools include the statute's structure, canons of statutory construction, and legislative history." *Id*. (citation omitted). Further, as the Supreme Court has explained, *Chevron* deference is inappropriate where an agency has, without proper explanation, reversed course from a longstanding interpretation of the statute, on which parties have come to rely. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126–27 (2016). Likewise, the Court will not uphold Commerce's interpretation of its regulations if the interpretation is "plainly erroneous or inconsistent with the regulation." *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945); *see also Auer v. Robbins*, 519 U.S. 452, 461 (1997).

When reviewing an agency decision for abuse of discretion, the Court examines whether the decision: "1) is clearly unreasonable, arbitrary or fanciful; 2) is based on an erroneous conclusion of law; 3) rests on clearly erroneous fact findings; or 4) follows from a record that contains no evidence on which the {agency} could rationally base its decision." *Sterling Fed. Sys., Inc. v. Goldin*, 16 F.3d 1177, 1182 (Fed. Cir. 1994) (quoting *Gerritsen v. Shirai*, 979 F.2d 1524, 1529 (Fed. Cir. 1992)); *see also Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1147–48 (Fed. Cir. 2011) (noting that "A clear error of judgment occurs when" an agency action is "arbitrary, fanciful, or clearly unreasonable.").

## V.     ARGUMENT

### A.     Commerce's Use of a Quarterly Ratio Sales Methodology to Determine the Quantity of Subject CEP Inventory Sales is Unsupported by Substantial Evidence

Commerce's decision to reject Zinus' First-In-First-Out ("FIFO") methodology in favor of a quarterly ratio sales methodology to determine the quantity of Zinus' subject Constructed Export Price ("CEP") inventory sales is unsupported by substantial evidence and contrary to law.

Throughout the underlying investigation, beginning with Zinus' initial Section A questionnaire response, Zinus explained that its U.S. warehouse locations do not maintain records that permit the company to definitively determine the country of origin for sales made during the POI.  Thus, Zinus used a FIFO methodology to assign a country of origin, and thus segregate its U.S. CEP inventory sales into subject mattresses, *i.e.*, mattresses produced in Indonesia, and non-subject mattresses (mattresses produced elsewhere).  *See* Zinus' Section A Response at A-5, P.R. 97, C.R. 36.

Prior to Commerce's Preliminary Determination, Zinus provided detailed explanations as to why its records did not permit the retrospective identification of the country of origin for sales out of U.S. inventory and why the FIFO methodology was the most appropriate method to report CEP inventory sales.  *See* Zinus' Supp. Section C Response (Part 1) at SC1-10, P.R., 193, C.R. 167.  Pursuant to Commerce's request, Zinus further provided a monthly breakdown by model of mattresses imported for sale out of U.S. inventory.  Zinus identified the imports by source country, month, and model.  *See* Zinus' Second Supp. Section C Response at Exhibit SC2-1, P.R. 200, C.R. 214.  The monthly import data essentially confirmed the reasonableness of Zinus' FIFO reporting methodology.

Despite the overwhelming record evidence, Commerce concluded without reasonable explanation that "Zinus' reported FIFO-based sales methodology does not accurately or appropriately capture a sufficient number of sales of subject merchandise."  *Final Decision Memo* at 9, P.R. 284.  The basic problem with this conclusion -- that the FIFO-based methodology is inaccurate and/or does not capture a "sufficient number" of sales -- is that there is no evidence to support it.

Commerce ultimately concluded that the quarterly ratio sales reporting methodology devised by petitioners and applied in the Preliminary Determination was "preferable" over the company's own reporting.  *Id*.  In defense of the quarterly ratio sales methodology, Commerce stated that "{b}ecause it applies quarterly ratios grounded in purchase data to the full universe of Zinus US's sales from inventory during the POI, it is neutral in terms of determining which sales to report as subject merchandise sales.  Therefore it is less susceptible to manipulation." *Id*. (citing Petitioners' Pre-Preliminary Comments (Oct. 9, 2020), P.R. 2010, C.R. 219, at 15-17). Such determination is unreasonable and unsupported by substantial evidence.  Zinus' FIFO country of origin identification and segregation methodology was reasonable, accurate, and fully supported by the record, and superior to the quarterly ratios Commerce utilized.  The Court should reject Commerce's conclusory finding to the contrary.

Not only did Commerce rely on petitioners' quarterly ratio sales methodology over the respondent company's own reporting, it also adopted and utilized petitioners' proposed adjustment to increase the number of Indonesian mattresses.  Commerce, of course, can adopt suggestions from the domestic industry, but can only do so where the suggestions are supported by record evidence and are in accordance with law.  Commerce's reliance on petitioners' proposed methodology in this instance did not satisfy that standard.  In the *Final Determination*, Commerce did not even address Zinus' argument that the ratios (if relied upon) must exclude Zinus KR's sales that were still in transit from Indonesia to the United States.  As discussed below, should the Court find reasonable and sustain Commerce's use of the quarterly ratios to determine the quantity of Zinus' subject CEP inventory sales, it should instruct Commerce to revise the calculations to include only mattress shipments that had reached the United States during the POI, and exclude the quantities that remained in transit as of December 31, 2019.

     1.     *Commerce Unreasonably Refused to Use Zinus' FIFO Methodology*

In rejecting Zinus' FIFO methodology, Commerce concluded that "Zinus' reported FIFO-based sales methodology does not accurately or appropriately capture a sufficient number of sales of subject merchandise." *Final Decision Memo* at 9, P.R. 284. Commerce provides no further explanation as to *how* or *why* it concluded that Zinus' FIFO methodology fails to accurately or appropriately capture a sufficient number of sales of subject merchandise. Instead, Commerce essentially concludes that it just does not believe that Zinus cannot track the country of origin for its CEP sales made from inventory. *Id*. To support its conclusion, Commerce refers to Zinus' reporting of paid warranty claims for defective and damaged merchandise on a customer-specific basis and the fact that Zinus reported that it only paid commissions on sales of non-subject merchandise during the POI. *Id*. (citing Zinus Section C Response at C-37-38,C-41, P.R. 119, C.R 117; Zinus' Post-Preliminary Supp. Response (Questions 1-4) at 4, P.R. 256, C.R. 271). While Commerce acknowledged that Zinus explained on the record how it reimburses its U.S. customers for warranty claims, it essentially claimed that Zinus must have known the country of origin of the defective merchandise to pay the warranty claims and grant commissions on sales of non-subject merchandise. *Id*. Commerce reasoned that Zinus must also be aware of the country of origin for the merchandise in its U.S. inventory. *Id*. Specifically, Commerce stated:

> We find that these two claims – Zinus' claim about lack of knowledge about the country of origin of merchandise in its inventory and Zinus US's granting of commissions on sales of non-subject merchandise -- are inconsistent. Either Zinus is aware of the country of origin of merchandise in inventory, and can grant commissions on the sales of certain merchandise based on that knowledge, or it does not, and therefore should not be able to grant commissions based on the country of origin of the merchandise.
>
> Accordingly, we find that Zinus' reported FIFO-based sales methodology does not accurately or appropriately capture a sufficient number of sales of subject merchandise. To come to any other conclusion would be inconsistent with the

> commercially realistic business practices of a multinational company engaged in the production and sale of a consumer product such as mattresses that provides commissions on certain sales from its inventory.

*Id*.

With respect to the unrelated warranty and commission issues Commerce referred to for its rationale to reject Zinus' FIFO methodology, *first*, Zinus did not report any warranty expenses during the POI, as it did not provide any warranty programs to its customers.  *See* Zinus' Section C Response at C-58, P.R. 119, C.R. 117.  Rather, Zinus granted defective allowances to its customers during the POI.  *Id*.  As explained on the very pages Commerce cited in its *Final Determination*, Zinus issued rebates and defective allowances to compensate customers for expenses incurred for damaged or defective merchandise.  *See id*. at C-37- 38, C-41 (explaining how it calculated an average defective allowance rate by customer).  Thus, it is unclear to what "warranty claims" Commerce refers or how this undermines Zinus' FIFO methodology.

*Second*, Commerce mischaracterized Zinus' reporting regarding commissions. Commerce stated that "while Zinus claims that it paid commissions only on non-subject merchandise sales during the POI, there is nothing on the record concerning how Zinus US grants commissions on sales of non-subject merchandise if it does not know the country of origin of the merchandise it sells out of inventory." *Final Decision Memo* at 9, P.R. 284.  This simply is not correct.  Zinus explained in its initial section C questionnaire response that Zinus Indonesia (*i.e.*, the mattress producing entity in Indonesia) did not use selling agents for the sales of subject merchandise.  Zinus Section C Response at C-54-55, P.R. 119, C.R. 117.  In its post-preliminary supplemental questionnaire response, Zinus thoroughly explained how record evidence confirms the accuracy of its reporting that Zinus Indonesia did not pay or incur any commission expenses

16

for sales of subject merchandise.  *See* Zinus' Post-Preliminary Supp. Response (Questions 1-4) at 1-5, P.R. 256, C.R. 271.

Zinus also explained that Zinus US' customers to whom it reported paying commissions in Commerce's prior investigation of mattresses from China simply did not purchase Indonesian mattresses during the POI, and thus did not earn commissions under the terms of the agreements based on sales of subject merchandise.  *Id*. at 4; *see also* Zinus' Response to Petitioners' Post-Preliminary Comments (Nov. 27, 2020) ("Response to Petitioner's Post-Preliminary Comments"), P.R. 243, C.R. 266, at 4-6.  In comparing the customer codes to which Zinus US paid commissions during the POI of the China investigation and the customer code list submitted in Zinus Indonesia's Section C Response, Zinus demonstrated that Zinus Indonesia did not have any sales to those customers to whom Zinus paid a commission in the China investigation.  *See* Zinus' Section C Response at Exhibit C-6. P.R. 120, C.R. 118.  This is not some great mystery where Zinus was using information to track commissions that could have been used to identify the country of origin for each sale at a granular level; rather, Zinus was able to track and identify its commissions paid based on the identity of the customer and the product code (and was able to easily cross reference at a macro level to determine that there were no commissions paid for Indonesian mattresses).

In short, there is nothing inconsistent between Zinus' inability to track the country of origin for its CEP inventory sales and its understanding that Zinus US did not grant commissions on sales of subject merchandise.  These are wholly unrelated issues and Zinus provided detailed explanations to demonstrate the accuracy of its reporting.  Commerce's provided rationale fails to address this evidence.

*NON-CONFIDENTIAL VERSION*

Moreover, Commerce's finding fails to address the merits of Zinus' FIFO methodology and the full substantial record of information submitted by Zinus to demonstrate the accuracy of its reporting as to the quantity of subject CEP inventory sales. Instead, Commerce drew unsupported conclusions from isolated (and mischaracterized) portions of the administrative record. Commerce's determination cannot be based on "isolated tidbits of data which suggest a result contrary to the clear weight of the evidence." *USX Corp. v. United States*, 655 F. Supp. 487, 489 (Ct. Int'l Trade 1987). The "substantial evidence standard requires more than mere assertion of 'evidence which in and of itself justified {the determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.'" *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (quoting *Universal Camera*, 340 U.S. at 487). Commerce's determination fails to meet this standard as it failed to consider and explain its basis for rejecting the substantial record evidence regarding the accuracy and reasonableness of Zinus' FIFO methodology.

Throughout the investigation Zinus provided detailed explanations and substantial record evidence supporting the accuracy and reasonableness of its FIFO methodology. *See* Zinus' Case Brief (Feb. 9, 2021), P.R. 275, C.R. 292, at 11-20; Zinus' Response to Petitioners' Pre-Preliminary Comments at 5-15, P.R. 221, C.R. 253; Zinus' Second Supp. Section C response at SC2-1, 7-8, and Exhibit SC2-1, P.R. 200, C.R. 214; Zinus' Supp. Section C Response (Part 1) at SC1-10, P.R. 193, C.R. 167; Zinus' Section C Response at C-2, P.R. 119, C.R. 117; Exhibits C-1A (subject merchandise sales database printouts) and C-1B (non-subject merchandise sales database printouts), P.R. 120, C.R. 118; Zinus' Section A Response at A-5, P.R. 97, C.R. 36. Zinus also demonstrated why its FIFO methodology was vastly superior to petitioners' quarterly import ratios, which do not correlate to the model- and time-specific import patters and result in

widespread distortions and inaccuracies.  *See e.g.*, Zinus' Case Brief at 15-20, P.R. 275, C.R. 292, and Attachments 1 and 2.

At no point prior to its *Final Determination* did Commerce question whether a FIFO methodology was appropriate or permissible or instruct Zinus to apply a different sales identification methodology.  Rather, Commerce merely requested that Zinus explain "why the FIFO method is the most appropriate method to report Indonesia-origin CEP inventory sales." *See* Zinus' Supp. Section C Response (Part 2) at SC2-7 (question 17) P.R. 199, C.R. 213.  Zinus explained that the FIFO methodology is consistent with inventory movement principles that seek to sell off older product first to ensure that product does not stay in inventory in perpetuity while newer product is continuously sold out first.  *See id*. at SC2-8 – SC2-9.  Zinus thoroughly explained and documented why its FIFO methodology was appropriate and accurate to determine the quantity of subject CEP inventory sales.  Yet Commerce did not address any of this information in its *Final Determination*.  Instead, it referred to isolated tidbits of information completely unrelated to the CEP inventory sales issue and relied on that unrelated information to reach its conclusion.  Commerce's explanation is insufficient to meet this Court's standard of substantial evidence.

Moreover, if Commerce truly had concerns regarding the accuracy of Zinus' methodology it should have issued additional questions to the company.  In its Preliminary Determination, Commerce stated that "{q}uestions remain about the accuracy of this methodology with respect to CEP sales reporting" and that "Commerce will continue to examine this issue for purposes of the final determination."  Preliminary Decision Memo at 10, P.R. 226; Preliminary Calculation Memo at 2, P.R. 229, C.R. 258.  Yet, subsequent to the Preliminary Determination, Commerce issued an additional supplemental questionnaire to Zinus, as well as a

questionnaire in lieu of verification, but it did not pose any questions or seek any additional documentation specific to the FIFO methodology or shipments in transit at the end of the POI. Absent further questions from Commerce, Zinus was unable to ascertain which questions, if any, may have been at issue at the time of the Preliminary Determination, nor could Zinus submit unsolicited factual information under Commerce's procedures.  Zinus was therefore left to believe that Commerce had, after ample time to fully review the record materials, no further questions as to the reasonableness and accuracy of the reporting.

Commerce's ultimate decision to affirm its Preliminary Determination to disregard Zinus' reporting as inaccurate absent further inquiries or requests for supporting documentation was unreasonable.  Rather than strive for the most accurate outcome possible, Commerce's *Final Determination* appears blatantly results-oriented.  *Vinh Hoan Corp. v. United States*, 317 F. Supp. 3d 1295, 1301 (Ct. Int'l Trade 2018), *aff'd*, 786 F. App'x 258 (Fed. Cir. 2019) ("Commerce must ground its selection of the best available information in the overall purpose of the ADD statute, calculating accurate dumping margins.") (citing *Shakeproof Assembly Components, Div. of Illinois Tool Works, Inc. v. United States*, 268 F.3d 1376, 1382 (2001); *Lasko Metal Prod., Inc. v. United States*, 43 F.3d 1442, 1443 (Fed. Cir. 1994); and *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990)).  Moreover, as explained, its decision runs counter to the substantial evidence before the agency – evidence that it did not adequately weigh in reaching its conclusion.  Thus, the Court should remand this decision to Commerce with instructions to utilize Zinus' FIFO methodology or else seek additional explanation and/or information from the company to verify the accuracy of Zinus' FIFO methodology.

2.      *Should the Court Sustain Commerce's Use of a Quarterly Ratio Sales Methodology, it Should Instruct Commerce to Recalculate the Ratios to Include Only Those Units that Actually Entered U.S. Inventory During the POI*

In applying the quarterly ratio sales methodology, Commerce's calculations were unreasonable and unsupported by substantial evidence.  In the event that this Court finds Commerce's rejection of Zinus' reporting and its decision to utilize a quarterly ratio sales methodology reasonable and supported by substantial evidence, it should, at the least, instruct Commerce to recalculate the ratios to include only those units that actually entered U.S. inventory during the POI.  That is, the sales ratios (if utilized) should be based on the total quantities that Zinus US could have theoretically sold from inventory.  Product still in transit from Indonesia to the United States could not have been sold from Zinus' US inventory.

In its *Final Determination*, Commerce explained that it had determined to use "the quarterly ratio sales reporting methodology used in the *Preliminary Determination*, along with the quantity of mattresses that Zinus US purchased from Zinus KR."  *Final Decision Memo* at 9, P.R. 284.  Commerce went on to state that the quarterly ratios were "grounded in purchase data to the full universe of Zinus US's sales from inventory during the POI."  *Id*. (citing Petitioners' Pre-Preliminary Comments at 15-17).  That is, Commerce continued to apply the quarterly ratio sales methodology proposed by Petitioners in their pre-preliminary comments, in which they first identified a ratio of subject and non-subject CEP inventory sales on the basis of the overall inventory quantities reported in Zinus' Exhibit SC2-1 and then increased the number of Indonesian mattresses to instead base the ratios on the number of mattresses sold by Zinus KR to Zinus US.  For reference, we provide below a copy of petitioners' calculations from page 16 of their Pre-Preliminary Comments, with two key elements highlighted.

As shown above, Petitioners' calculations, which Commerce adopted, are straightforward.  Petitioners calculated a ratio for each quarter in the POI to identify the proportion of total sales that were of product manufactured in Indonesia.  Throughout the case (and in this brief) Zinus argued that its FIFO-based methodology was inherently more accurate and reasonable as it accounted for specific inventory movements, differences in timing of imports of particular models, etc.  Zinus also provided Commerce with a separate, non-subject sales database so that it could confirm the accuracy of Zinus' FIFO-based reporting.  *See* Zinus' Section C Response at C-2 and Exhibit C-1B, P.R. 119-20, C.R. 117-18.  While Zinus continues to submit that the FIFO-based methodology is vastly superior to the quarterly ratios, on remand, Commerce must correct an obvious distortion in Petitioners' calculations.

Specifically, as shown above, Petitioners start with the volume of mattresses Zinus imported from Indonesia.  But, in the next row below, titled "Adjusted Indonesia," Petitioners "step up" the imported Indonesian quantity by **[    ]** percent based on information from Zinus KR's sales reconciliation -- information related to *shipments from Indonesia* and not mattresses that *entered U.S. inventory*.  This is a crucial distinction, and one that is easily identified in the

record, which shows that the difference (*i.e.*, the adjusted "step up") relates to mattresses which were in transit from Indonesia to the United States and had not yet entered U.S. inventory. Because the mattresses had not entered U.S. inventory, they should not be accounted for in any quarterly ratios intended to allocate U.S. sales from Zinus' U.S. inventory.

Commerce relied on this methodology despite substantial record evidence demonstrating its inaccuracy. As Zinus argued in its case brief, and as is fully documented in the record, any identification of CEP inventory sales must start with Zinus US's *inventory actually received in the United States during the POI*, and the difference between Zinus KR's POI sales to Zinus US ([          ] units) and Zinus US's POI receipt of mattresses in inventory in the United States ([          ] units) is simply the result of timing associated with trans-global shipments. *See* Zinus' Case Brief at 20-23, P.R. 275, C.R. 292; Zinus' Second Supp. Section C Response at 1-2, P.R. 200, C.R. 214; Zinus' Supp. Section C Response (Pt. 2) at Exhibit SC-5C, P.R. 165, C.R. 154. That is, the difference of [          ] units are those that Zinus KR had transferred title to Zinus US, but were physically still in transit from Indonesia to Zinus US as of December 31, 2019. *Id.*

Zinus fully and clearly explained the circumstances regarding the mattresses in transit in its September 28, 2020 supplemental questionnaire response. Specifically, as Zinus stated:

> The difference between the two numbers stated above results from a timing difference and how Zinus records its purchases of mattresses from Zinus KR in finished goods inventory pursuant to US GAAP. As Zinus KR sold to Zinus US on an FOB basis, Zinus KR recognizes sales on the date of shipment from the port. At that point, because title transfers, Zinus US records the purchase in a temporary account, merchandise in transit. Zinus US subsequently reclassifies the purchases from merchandise in transit to receipt in finished goods inventory when Zinus US has physically received and verifies the relevant quantities at its warehouse. Therefore, the difference between the two figures was recorded as "inventory-in-transit" by Zinus US as of December 31, 2019.

*See* Zinus' Second Supp. Section C Response at 1-2, P.R. 200, C.R. 214.

Zinus also provided a complete reconciliation of these two figures at Exhibit SC-5C of its Supp. Section C Response (Part 2), P.R. 199, C.R. 213.  In the summary of that Exhibit Zinus detailed the sales and shipments as follows:

In the schedules that follow in the exhibit, Zinus provided a complete listing of all purchase orders and models that remained in transit as of December 31, 2019 (*i.e.*, accounting for the complete difference of [          ] units).  Zinus also provided sample shipment documents and official U.S. customs entry documents with entry dates into the United States in 2020, after the POI.  Contrary to Petitioners' claims in the underlying investigation, this difference is not the result of some conceptual or theoretical accounting treatment; *the record documents establish that these mattresses did not enter Zinus US's U.S. inventory until 2020*.  These mattresses, therefore, could not have been shipped out of Zinus US's U.S. inventory during the 2019 calendar year POI.

In our view, the issue here is whether there is substantial record evidence to justify including the [          ] mattresses in transit from Indonesia to the United States in the ratio calculations.  The record confirms there is no evidence supporting Commerce's inclusion of these mattresses in the ratio calculations.  Commerce's theories and speculation cannot overcome the clear record on this point.

In particular, the record plainly demonstrates that the total number of models entered into U.S. inventory during the POI is **[          ]** units.  *See* Zinus' Supp. Section C Response (Pt. 2) at Exhibit SC-5C, P.R. 165, C.R. 154; Zinus' Second Supp. Section C Response at 1-2, P.R. 200, C.R. 214.  Regardless of methodology used, any analysis must start with, and cannot under any scenario exceed, those units that actually entered U.S. inventory during the POI, and not the **[          ]** mattresses sold by Zinus KR to Zinus US for inventory, as a substantial quantity of those mattresses – **[          ]** were in transit from Indonesia to Zinus US and could therefore not be sold out of inventory during the POI.  Thus, there was no basis for Commerce to rely on petitioners' **[     ]** percent increase factor indicated in their calculations.

Not only did Commerce fail to account for the units still in transit in applying the quarterly ratio sales methodology, but it entirely ignored Zinus' arguments and the detailed information it provided.  Commerce provided no analysis of the issue nor did it offer an explanation for its apparent decision to reject Zinus' arguments and the information provided. The Court should therefore find its decision unlawful as it failed to consider an important aspect of the issue and the evidence it had before it ran counter to its *Final Determination*.  *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

In sum, should the Court consider Commerce's decision to utilize the quarterly ratio allocation methodology over Zinus' FIFO methodology reasonable and supported by substantial evidence, Commerce must recalculate the ratios to exclude this distortive, unsupported, and inaccurate element from the calculations.  On remand the Court should instruct Commerce to correct this error.  Zinus provided the correct ratios in its case brief at page 23, which are as follows:

| Country | QTR1 | QTR2 | QTR3 | QTR4 | Total |
|---|---|---|---|---|---|
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| Total | [ | | | | ] |
| **Indonesia %** | [ | | | | ] |

At a minimum, this Court must remand the issue to Commerce to fully explain why it relied on petitioners' **[     ]** percent increase factor in calculating the quantity of CEP inventory sales and why it determined, contrary to substantial record evidence, not to exclude the units still in transit.

> **B.      Commerce's Constructed Value Profit Calculations Are Unsupported by Substantial Evidence and Contrary to Law**

In its *Final Determination*, Commerce affirmed its preliminary decision to rely on the financial statement of an out-of-country producer as a surrogate source for constructed value profit and selling expenses for Zinus.  *See Final Decision Memo* at 20-25, P.R. 284.  In doing so Commerce unreasonably cast aside a wealth of data concerning the profit experience in Indonesia, including contemporaneous financial statements related to Indonesian producers of mattresses and other products in the same general category of products as mattresses.  Commerce also failed to apply the profit cap mandated by statute.  These decisions are thus unlawful and unsupported by substantial evidence.

In the underlying investigation, Commerce based its normal value calculation on constructed value ("CV"), as Zinus Indonesia did not have a viable home or third-country market.  *See id*. at 21.  When determining expenses and profits for constructed value, the statute provides that Commerce shall use:

> {T}he actual amounts incurred and realized by the specific exporter or producer
> being examined in the investigation or review for selling, general, and
> administrative expenses, and for profits, in connection with the production and

sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country.

19 U.S.C. § 1677b(e)(2)(A).  Where the respondent does not have a viable home market or third-country market, and thus actual data is unavailable – as was the case here – section 1677b(e)(2)(B) of the statute sets forth three alternatives:

> (i) the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for selling, general, and administrative expenses, and for profits, in connection with the production and sales, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise,

> (ii) the weighted average of the actual amounts incurred and realized by exporters or producers that are subject to the investigation or review (other than the exporter or producer described in clause (i)) for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country, or

> (iii) the amounts incurred and realized for selling, general, and administrative expenses, and for profits, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise.

Commerce concluded that options (i) and (ii) were not possible, finding that "Zinus does not have sales of the general category of merchandise in the home market and there are no other respondents being investigated in this proceeding.  Thus, the only option available to Commerce is (iii), any other reasonable method." *Final Decision Memo* at 21, P.R. 284.

While there is no statutorily prescribed preference among these options, each one requires Commerce to calculate CV profit and selling expenses in a manner to approximate the respondent's experience *in the home market* - here Indonesia.  *See Mid Continent Steel & Wire, Inc. v. United States*, 203 F. Supp. 3d 1295, 1310 (Ct. Int'l Trade 2017) ("The goal in calculating CV profit is to approximate the home market profit experience of the respondents.") (citation

omitted).  This Court has emphasized also that Commerce must explain adequately why using data that is not contemporaneous with the period of review is reasonable.  *See Husteel Co. v. United States*, 471 F. Supp. 3d 1349, 1365-66 (Ct. Int'l Trade 2020) (finding Commerce's reliance on non-contemporaneous information as the only reasonable profit cap was not supported by substantial evidence when the record contained a respondent's third country sales data).

Moreover, when resorting to calculation alternative (iii), Commerce is required under the statute to apply a CV profit cap such that the amounts Commerce ultimately uses do not exceed those normally realized by exporters or producers in Indonesia.  Commerce's reliance on Emirates' 2018-2019 financial statements comes nowhere near to satisfying these requirements, nor do the Emirates' statements otherwise come close to being the best available information on the record.

   **1.**  *Commerce's Use of Emirates' Financial Statements as a Source of CV Profit and Selling Expenses Was Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law*

In evaluating each of the available alternatives under section 1677b(e)(2)(B)(iii), as Commerce described, its criteria for selecting among the CV data available on the record are:

  (1) the similarity of the potential surrogate companies' business operations and products to the respondent's business operations and products;

  (2) the extent to which the financial data of the surrogate company reflects sales in the home market and does not reflect sales to the United States;

  (3) the contemporaneity of the data to the period of investigation; and

  (4) the similarity of the customer base between the surrogate company and the Respondent.

*See Final Decision Memo* at 22, P.R. 284.  Where a selected surrogate producer does not meet the above criteria due to substantial operational and other differences with the respondent

company, this Court has rejected Commerce's CV profit determination. *Maverick Tube Corp. v. United States*, 107 F. Supp. 3d 1318, 1338-40 (Ct. Int'l Trade 2015) (finding Commerce's calculation of CV profit unsupported by substantial evidence because of material differences between the respondent company, which was modest in size and in products offered, and the selected surrogate producer, a large, multinational corporation producing primarily premium products). However, rather than actually applying these criteria, as discussed below, Commerce instead sought to disqualify any and all options within Indonesia based on trivial and irrelevant factors that have nothing to do with the framework the agency set forth.

In its *Final Determination*, Commerce acknowledged that the record contained several potential data sources including a number of audited financial statements, but claimed that after eliminating statements that were either incomplete, had a qualified opinion, did not reflect the production and sales of comparable merchandise, or were not contemporaneous with the POI, only one statement remained: Emirates. *Final Decision Memo* at 22-24, P.R. 284. Notwithstanding the fact that the company was not located in the country under investigation and the period covered by the financial statements only overlapped three months of the POI, Commerce found Emirates' financial statements represented the best available option because the company "predominantly produces and sells the comparable merchandise (*i.e.*, mattresses)," there was no indication concerning whether the company had sales in the home market at issue (Indonesia), and it has "business operations, products, and a customer base that are very similar to that of the respondent, an Indonesian mattress producer." Final Cost Calculation Memo at 2, P.R. 286, C.R. 295; *Final Decision Memo* at 23-25, P.R. 284. Commerce was undeterred by the fact that Emirates generates nearly 25 percent of its revenues through sales of services, and it disagreed that the missing annexures to Emirates financial statements deemed the information

incomplete. *Final Decision Memo* at 24-25, P.R. 284; *cf.* Zinus' Case Brief at 35-38, P.R. 275, C.R. 292.

Commerce's sole reliance on the Emirates statements in the *Final Determination* was erroneous and unsupported by substantial record evidence, as these statements are neither specific to the subject merchandise (mattresses produced in Indonesia), the respondent and foreign market, nor the period of investigation at issue here.[1]  As Commerce correctly recognized, the statute makes clear that even if relying on an alternative method under 1677b(e)(2)(B)(iii), the profit and selling expenses need to reflect (1) production and sales in the foreign country; and (2) the foreign like product, *i.e.*, the merchandise under consideration.  *See Final Decision Memo* at 23, P.R. 284.  In selecting Emirates' financial statement, Commerce satisfied neither of these elements.  Because Emirates' financial statements fail to reflect either specificity or contemporaneity, Commerce's decision to rely on them for its CV profit calculation was not tied to the goal of achieving accuracy and consequently unreasonable.  *See* Zinus' Case Brief at 33-38, P.R. 275, C.R. 292.

Moreover, where, as here, there are sources on the record that provide contemporaneous data from producers in the subject country of subject merchandise, there is no reason for Commerce to rely on information from an out-of-country producer whose business operations are not similar to the respondent.  In short, Emirates financial statements were not the best available information.

---

[1] In *NEXTEEL Co., Ltd. v. United States*, this Court upheld Commerce's use of non-contemporaneous financial statements from a prior review in its CV profit determination because these statements were specific to the subject merchandise and home market at issue there.  392 F. Supp. 3d 1276, 1289 (Ct. Int'l Trade 2019).  As explained in this section, the Emirates financial statements do not offer either of these advantages.

**2.** *Commerce Erroneously Rejected the Financial Statements of PT Graha and PT Ecos Jaya*

Commerce erroneously declined to use the financial statements of Indonesian mattress producers PT Graha Seribusatu Jaya ("PT Graha") and PT Ecos Jaya Indonesia ("Ecos"), whose information best meets the statutory criteria.  At bottom, Commerce constructed artificial justifications to disqualify PT Graha and Ecos from consideration, despite the quality of the data and financial statements, and the fact that the companies are mattress producers in Indonesia. Commerce's justifications ignore the aim of the CV profit statute and are unsupported by substantial record evidence.  In this regard, Zinus stresses that that record contained a number of viable CV profit options pertaining to profit levels in the Indonesian market.  These sources include the financial statements of PT Graha and Ecos, but also include the financial statements of mattress producer PT Innocycle, and furniture producers PT Chitose International and PT Boston Furniture Industries.  Ultimately Commerce is charged with finding a profit level appropriate for the Indonesian market and any of these alternatives are superior to the financial statement of a producer in India.  Commerce should have selected among the Indonesian data sources with the financial statements of PT Graha and Ecos as the most suitable options among the Indonesian alternatives.

In particular, this Court has confirmed that the ultimate goal in calculating CV profit "is to approximate the home market profit experience."  *Geum Poong Corp. v. United States*, 193 F. Supp. 2d 1363, 1370 (Ct. Int'l Trade 2002).  There is no question that these companies are Indonesian mattress producers, thus their information best approximates the home market profit experience of Zinus Indonesia.[2]  This should be the end of the story, but instead Commerce

---

[2] This stands in contrast to Commerce's CV profit determination in *Mid Continent Steel & Wire, Inc. v. United States*, where this Court upheld Commerce's use of third-country data only after

Footnote continued on next page

inappropriately disqualified these companies from consideration based on inconsequential considerations.

Available on the record are PT Graha's complete 2018 and 2019 financial statements; its 2019 statements are wholly contemporaneous with the entire POI. *See* PT Graha Section A Response (June 19, 2020) , P.R. 103-04, C.R. 45-49, at Exhibits A-27 through A-32. Recognizing Commerce's preference for publicly available information, Zinus provided Commerce with public calculations of profit and expense ratios using PT Graha and its affiliates' financial statements. Zinus CV Profit Submission at Exhibit 1, P.R. 157, C.R. 138. Zinus also provided Ecos's complete 2019 audited financial statement. *Id*. at Exhibit 2, P.R. 158, C.R. 139.

Commerce rejected PT Graha's 2018 financial statement because it was "not contemporaneous with the POI" and it rejected its 2019 financial statements because they were not audited. *Final Decision Memo* at 23, P.R. 284. Even if the Court finds it reasonable that Commerce rejected PT Graha's 2019 financial statement as "incomplete," given the statute's clear preference for profit and selling expense information that reflects production and sales in the foreign country and the foreign like product, *i.e.*, the merchandise under consideration, it was unreasonable for Commerce to select Emirates' 2018-19 financial statements over PT Graha's 2018 financial statements. Commerce essentially found that the three months of overlap between Emirates' – an Indian producer of like merchandise – financial statement and the POI outweighed the specificity of PT Graha's information. This simply does not adhere to the statute's intent. *See* Statement of Administrative Action (SAA) Accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, vol 1 (1994) at 843 (establishing that

---

Commerce determined that no home market surrogates sold identical or comparable merchandise. 941 F.3d 530 (Fed. Cir. 2019).

Commerce's preference under 19 U.S.C. § 1677b(e)(2)(B)(iii) is to use financial statements of a producer of identical or comparable merchandise in the home market).

With respect to Ecos, Commerce erroneously accepted Petitioners' claim that the statement was unusable because it contains a qualified opinion from its auditor related to the treatment of estimated future liabilities pertaining to post-employment benefit obligations of the company. *See Final Decision Memo* at 22-23, P.R. 284.  Commerce's determination to disqualify the profit experience associated with its Indonesian mattresses operations due to the company's accounting treatment of provisional post-employment benefit liabilities was unreasonable and unsupported by the record.

In support of its decision, Commerce stated that there "is no evidence to confirm that the qualified opinion does not impact the calculation of period costs, revenues, expenses, cash flows, profits or selling expenses." *Id*. at 23.  But, as Zinus explained in its case brief and according to note 2.1 of Ecos's financial statement, Ecos's employment benefit liabilities are understated under Indonesian GAAP, meaning that any benefit expenses classified as SG&A may be understated relative to Indonesian accounting standards.  Adjusting these would necessarily translate into a lower profit for the company and thereby lower the CV profit rate.  *See* Zinus Case Brief at 39-40, P.R. 275, C.R. 292.  If anything, then, the CV profit rate derived from this company's statement is overstated and could only serve to overstate the dumping margin.  *Id*. at 40.  Indeed, the applicable note accompanying the financial statements (note 2.l at page 8 of the statement) confirms that the only issue is that the company has not set aside a provision for any such expenses, and confirms that in any event the company "will meet its obligations."  *Id*.  Aside from this trivial item, the auditor confirms that the "financial statements present fairly in all material respects" the financial position of the company.  *Id*.  Commerce failed to address

these facts in rejecting Ecos's financial statements, thus its finding is unsupported by substantial

evidence.

**3.**    *There are Ample Profit Cap Sources; Commerce is Therefore Obligated to Apply a Profit Cap*

When calculating CV profit under 19 U.S.C. § 1677b(e)(2)(B)(iii), the statute instructs

that:

> the amount allowed for profit may not exceed the amount normally realized by
> exporters or producers (other than the exporter or producer described in clause (i))
> in connection with the sale, for consumption in the foreign country, of
> merchandise that is in the same general category of products as the subject
> merchandise

19 U.S.C. § 1677b(e)(2)(B)(iii) (this clause is commonly referred to as "the profit cap"). Where,

as here, the record contains CV profit rates that fulfill the statutory criteria, Commerce may not

decide to ignore that information in favor of using no cap. Commerce can only decline to apply

a profit cap where "the available data would render any cap based on facts available

unrepresentative or inaccurate," as Commerce's preamble to its own regulations also states.

*Husteel v. United States*, 98 F. Supp. 3d, 1315, 1348 (Ct. Int'l Trade 2015); *see also*

*Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27, 296, 27,360 (Dept. Commerce

May 19, 1997).

As discussed, the record contains profit information for sales of mattress products sold in

Indonesia. Indeed, at an absolute minimum, the potentially overstated profit rate of PT Ecos

Jaya serves as information on the record of this investigation with respect to the absolute ceiling

for profit in the Indonesian market, which, based on those statements, is 10.78 percent. Zinus

Case Brief at 42-43, P.R. 275, C.R. 292. In disregarding a 10.78 percent Indonesian profit rate

source that is, if anything, too high, in favor of a significantly higher 18.36 percent profit rate

pertaining to an Indian company, Commerce blatantly sidestepped its obligations under the

statute to apply a profit cap.  Indeed, the high 18.63 percent rate confirms that Commerce needed to apply a cap given the aberrational profit level that exceeded any level of profit shown in the record for Indonesian producers or producers of products in the same general category.

Commerce may not disregard information on the record in order to avoid its statutory obligations.  Indeed, there is nothing to suggest that the Indonesian sources on the record are "unrepresentative or inaccurate" and Commerce should therefore, at a minimum, use these Indonesian sources as the basis of the required profit cap.  Thus, Commerce's determination that it could not calculate a profit cap because "the record does not contain any information for making such a calculation" is not supported by substantial evidence.  *Final Decision Memo* at 25, P.R. 284.

Commerce is directed to apply a profit cap by statute, thus it "cannot sidestep the requirement without giving adequate explanation even in a facts available scenario."  *Husteel*, 98 F. Supp. 3d at 1348 (citing *Geum Poong Corp. v. United States*, 25 CIT 1089 (2001).  Specifically, this Court has found that if Commerce fails to apply a profit cap, it carries the burden of "articulat{ing} a reasonable justification for its decision, tied to the record in the proceeding."  *Mid Continent Steel & Wire, Inc*., 941 F.3d at 546; *see also Seah Steel Corp. v. United States*, 513 F. Supp. 3d 1367, 1398 (Ct. Int'l Trade 2021).  In *Husteel*, a "single sentence" discussion regarding Commerce's CV profit calculation fell "far short of the standard expressed in the court's prior cases."  98 F. Supp. 3d at 1349.  In *Maverick Tube Corp.*, Commerce's "single paragraph" discussion "with the crux of its explanation being that it did not have home market data for other exporters and producers in the home market of the same general category of products" was similarly inadequate.  107 F. Supp. 3d at 1339 (citation omitted).

Here, despite knowing this case precedent well, Commerce similarly chose not to provide a reasonable justification for its decision not to calculate a profit cap.  In its *Final Determination*, Commerce stated that "{n}one of the suggested financial statements reflect profit only on sales of the general category of products in the foreign country under investigation."  *Final Decision Memo* at 25, P.R. 284.  It went on to conclude that Emirates' profit information was the best available information and could be used as the facts available "profit cap."  *Id*.  This cursory explanation ignores available record sources and is very similar to that offered by Commerce in *Maverick Tube Corp*., where the court remanded for either an application of a profit cap or an adequate explanation as to why the record data could not be used to calculate a facts available profit cap.  *Id*. at 1340.  The Court should issue a similar remand order here.

In sum, Commerce erred when it failed to consider the available information from Indonesian mattress producers and producers of products in the same general category of merchandise for calculating a profit cap.  Should Commerce continue to rely on profit information for sales made outside the relevant market (Indonesia), record evidence demonstrates that Emirates' high profit rate is aberrational to the industry under consideration.

## C.      Commerce's Adjustments to U.S. Price Are Unsupported by Substantial Evidence and Contrary to Law

In the *Final Determination*, Commerce effectively applied "facts available" to calculate and apply certain adjustments to Zinus' U.S. CEP sales prices, "to ensure that all sales allowances and deductions are accounted for in the margin calculation."  *Final Decision Memo* at 14, P.R. 284.  Commerce's theory was that Zinus' affiliated U.S. mattress sales company, BPM, was granting rebates and otherwise incurring costs associated with Indonesian mattresses, even though the company itself did not sell mattresses sourced from Indonesia.  Zinus explained repeatedly throughout the investigation that BPM had no involvement in the sale or manufacture

*NON-CONFIDENTIAL VERSION*

of subject merchandise.  Nonetheless, Commerce used BPM's information to calculate a sales

deduction rate to apply to all of Zinus' US sales.  In using information from a company not

involved in production or sales of the subject merchandise, Commerce's determination is not

supported by substantial record evidence, and is contrary to law as Commerce's determination to

effectively apply facts available, without labeling the determination a "facts available"

determination, ignored the statutory framework for applying facts available.

Commerce did so solely on the basis of unfounded allegations from Petitioners regarding

"country hopping" and "shifting commission expenses to mask dumping" and in light of alleged

remaining questions, which Commerce never asked.  *See id*. at 13-14; Petitioners' Case Brief

(Feb. 9, 2021), P.R. 274, C.R. 291 at 7.  Specifically, Commerce provided the following reasons

for its conclusion:

> First, with respect to CEP inventory sales, as noted above in Comment 1, it is not
> clear how Zinus is able to identify which of the non-subject mattresses it sold
> from inventory earned commissions if it does not know the country of origin of
> the merchandise sold out of inventory. . . . However, Zinus did not explain why
> some of Zinus US's customers would agree to purchase mattresses of Indonesian
> origin on which they would earn no commissions when they could receive
> commissions from Zinus US on mattresses manufactured in other countries.

> Moreover, in its response to our Post-Preliminary Supplemental Questionnaire,
> Zinus also stated that Zinus US sold subject merchandise to corporate customers
> whose affiliates purchased non-subject merchandise from both Zinus US and
> BPM and earned commissions on these sales. Furthermore, for a particular
> customer, Zinus stated that, as of March 2019 (i.e., a month before Zinus US
> began purchasing mattresses from Zinus), it no longer paid commissions to this
> customer and that Zinus began selling Indonesian mattresses to this customer in
> November 2019. Zinus again did not explain why it ceased paying commissions
> to this customer or whether the sourcing of the mattresses had any influence on
> this decision.

> The fact that BPM's financial statements on the record show disproportionate
> changes between BPM's overall sales deductions and its revenues between 2018
> and 2019 raises further questions about the reliability of Zinus' reporting with
> respect to its sales practices regarding the payment of commissions.

*Final Decision Memo* at 14, P.R. 284.  For these reasons Commerce calculated an adjustment that "takes into consideration the sales deduction experience of both {BPM and Zinus US} during the POI."  *Id.* at 15.  Commerce "combined Zinus US's and BPM's 2019 (*i.e.*, POI) sales deductions, net of discounts and returns, and divided by the companies' combined gross sales, as reported in their respective financial statements.  {Commerce} then applied this ratio to the gross unit price of all sales made by Zinus US (*i.e.*, all CEP sales)."  *Id*.

Commerce's application of these price adjustments is unsupported by the record and contrary to law.  Specifically, the record establishes that Zinus replied in full to every request from Commerce throughout the underlying investigation, and that it fully reported all relevant sales allowances, commissions, and deductions.  Indeed, *Commerce does not dispute this.*  Yet, Commerce nevertheless did not rely on Zinus' reported information, instead creating its own variable with which to adjust U.S. prices.  Commerce thus effectively applied "facts available" without adhering to the statute, which does not permit the application of facts available where all necessary information was provided.  Although Commerce stated that "questions remain" and that Zinus allegedly "did not explain" certain aspects of its reporting related to commissions, the record demonstrates that Zinus fully responded to each of Commerce's questions during the investigation.  Commerce cannot fault Zinus for questions it never asked.

Moreover, the statute requires that Commerce provide sufficient notice of a reporting deficiency before it can resort to facts available – thus, if Commerce believed that there were any deficiencies or gaps in the record, it had an obligation to notify Zinus before resorting to facts available.  It did not do so.  Commerce has flouted the strict requirements of the facts available statute as well as this Court's clear precedent to apply unwarranted, unfounded price adjustments based on, at most, speculation.

In addition to its unlawful application of facts available, Commerce's *Final Determination* is also unsupported by substantial evidence. *First*, Commerce declined to use Zinus' submitted mattress sales and rebate information when it calculated its DEDUCT variable and failed to provide any explanation for doing so. *Second*, Commerce questioned the reliability of Zinus' reporting based on information related to BPM, but actual record evidence undermines its conclusions. Commerce also failed to explain how it reached its conclusion to apply an adjustment to Zinus' CEP sales for allegedly unaccounted sales deductions when its stated concern was exclusive to sales commissions. The resulting price adjustments cannot be sustained by this Court.

> **1.** *Commerce Applied and Relied on "Facts Available" Without Adhering to the Governing Statutory Requirements*

In its *Final Determination*, Commerce expressly acknowledged that Zinus provided all requested information:

> Zinus claimed that it only paid commissions on non-subject merchandise. In response to the petitioners' concerns on this matter, Commerce requested, via supplemental questionnaires and our in-lieu-of-verification (ILOV) questionnaire, extensive documentation on BPM, the *Mattresses from China* investigation, commission expenses incurred by Zinus, Zinus US, and Zinus KR, and the sales agreements of Zinus US and BPM. *Zinus provided all the information requested.* However, questions remain as to the commercial practicality of Zinus' reporting of its sales practices with regard to commissions and certain other sales allowances.

*Final Decision Memo* at 14 (emphasis added), P.R. 284. Commerce's determination to effectively apply facts available to Zinus (without stating it was applying facts available), while simultaneously acknowledging that Zinus provided all information requested, fails each prong of the facts available statute.

Specifically, 19 U.S.C. § 1677e(a) allows Commerce to apply facts otherwise available in instances in which "necessary information is not available on the record" or "an interested party

or any other person" a) withholds requested information; b) fails to provide requested

information by the deadlines in the form and manner requested; c) "significantly impedes a

proceeding under this subtitle," or d) provides unverifiable information.  19 U.S.C. § 1677e(a).

      This Court has been clear that Commerce may not apply facts available where

information is missing from the record because Commerce failed to ask for that information.  For

example, in *Agro Dutch Indus. v. United States*, the Court held that, if Commerce was unclear

about the information submitted by the responding party or needed more information, "it was

incumbent upon Commerce to ask relevant questions," rather than fall back on the facts available

statute.  31 CIT 2047, 2054-59 (2007).

      Clearly, Commerce's actions here are inconsistent with this Court's precedent.

Commerce does not assert that Zinus withheld requested information, failed to timely provide

requested information, impeded the proceeding in any way, or provided unverifiable information.

To the contrary, by Commerce's own admission, "Zinus provided all the information requested"

in this investigation.  *Final Decision Memo* at 14, P.R. 284.  As this threshold requirement has

not been satisfied, that should be the end of the inquiry, as the statute does not support the

application of facts available, and Commerce cannot avoid the terms of the statute simply by not

characterizing its decision as one based on facts available.

      *Even if* it were the case that Zinus had failed to provide necessary information or

otherwise satisfied 19 U.S.C. § 1677e(a), Commerce failed to observe the notice requirements of

19 U.S.C. § 1677m(d).  Section 1677m(d) establishes that Commerce cannot lawfully use facts

available without first "promptly inform{ing}" the party of the apparent deficiency and

providing an opportunity to cure or explain the deficiency.  *See Ereğli Demir ve Çelik*

*Fabrikalari T.A.Ş. v. United States,* 308 F. Supp. 3d 1297 (Ct. Int'l Trade 2018) (remanding

Commerce's final determination because it failed to address the requirements of § 1677m(d));

*Hoogovens Staal Bv v. United States*, 24 CIT 44, 58 (2000) (remanding Commerce's final results for clarification on whether it properly applied facts otherwise available).

Despite this Court's consistent precedent, Commerce did not provide Zinus notice of any reporting deficiencies throughout the investigation.  Instead, the only notice that Commerce was applying facts available arrived with the *Final Determination*.  Thus, the Court should find unlawful Commerce's decision to rely on facts available rather than the complete information Zinus provided.

> **2.** *Commerce Erroneously Overlooked Record Data When Calculating a Price Adjustment that Included BPM's 2019 Sales Deductions*

Commerce's final adjustments to Zinus' U.S. CEP sales prices were also unsupported by substantial evidence.  In calculating an adjustment to Zinus' U.S. CEP sales prices, Commerce included information from BPM, an affiliated U.S. mattress sales company, despite the fact *that BPM was not involved in the manufacture or sale of subject merchandise* – a fact that Zinus repeatedly explained throughout the investigation and demonstrated with record evidence.  *See, e.g.*, Zinus' Section A response at A-9, P.R. 97, C.R. 36; Zinus' Section C Supp. Response (Part 2) at SC2-6, Exhibit SC-12, P.R. 199, C.R. 213; and Zinus' Post-Preliminary Supp. Response at 10-12, P.R. 256, C.R. 271.  Rather than rely on the *facts* Zinus provided and fully explained, and despite acknowledging that Zinus fully responded to each of Commerce's requests, Commerce ultimately determined to rely on petitioners' unfounded and unsupported mischaracterizations. *See* Zinus' Rebuttal Brief (Feb. 17, 2021), P.R. 275, C.R. 294, at 3-19.  Despite zero evidence to support petitioners allegations of "shifting commission expenses," Commerce concluded that an adjustment must be made to account for allegedly missing sales allowances and deductions.

Commerce's decision is entirely divorced from the record evidence before it and must be rejected by this Court

In its *Final Decision Memo*, Commerce stated that it "agree{d} with the petitioners that a price adjustment in the final calculations is appropriate" *Final Decision Memo* at 13, P.R. 284 (stating that petitioners have argued that Zinus is "masking dumping" by "shifting sales deductions that would have been incurred by Zinus US for sales of Indonesian mattresses to sales of non-subject merchandise made through a different affiliated reseller, BPM, the reseller at issue in the *Mattresses from China* investigation.").  In support of its decision to apply a price adjustment to Zinus US's CEP sales using BPM's information, Commerce stated: "{t}he fact that BPM's financial statements on the record show disproportionate changes between BPM's overall sales deductions and its revenues between 2018 and 2019 raises further questions about the reliability of Zinus' reporting with respect to its sales practices regarding the payment of commissions." *Id*. at 14.  Even if this had been an accurate characterization, BPM's sales deductions and revenues between 2018 and 2019 is entirely irrelevant to the investigation of Zinus' mattresses from Indonesia.  The Court need not get past this threshold issue – there was absolutely no basis for Commerce to conclude that a sales adjustment was necessary because of the information of an affiliate not involved in the sale of subject merchandise.  Nor was there any basis for Commerce to include that affiliate's information in calculating an adjustment to US sales price.

Should the Court wish to inquire further, Commerce's explanation pertaining to BPM is belied by record evidence.  In the footnote accompanying Commerce's statement, Commerce referenced Zinus' Post-Preliminary Supp. Response (Questions 1-4)," at 11.  *Id*.  While this issue is not discussed in any further detail among any of the documents released with the *Final*

*Determination*, it is apparent that Commerce's reference was to the chart of "Total Sales of BPM by Product Group," appearing on page 11 of Zinus' Post-Preliminary Supp. Response:

Specifically, the Department's statement appears to reference the revenues figures (whether the "subtotal" line or the "total" line for 2019 and 2018), in relation to the figures appearing in the "sales deductions (*)" line. However, Zinus provided and Commerce clearly overlooked record evidence specifically related to "the payment of commissions." *See* Zinus' Submission of Zinus Xiamen's Proprietary Information from the Mattresses from the People's Republic of China Investigation (Oct. 14, 2020) at Attachment 1, P.R. 212, C.R. 222 (providing, at Zinus Xiamen's Section A Response at Exhibit A-10m, BPM's six-month financial statements for the period Jan. 1, 2018 through June 30, 2018); Zinus' Supp. Section A Response at Exhibit SA-4c, P.R. 165, C.R. 154 (providing BPM's 2019 financial statements); Zinus' Post-Preliminary Supp. Response (Questions 1-4) at Exhibit SQ-2, P.R. 256, C.R. 271. A review of that information confirms that Commerce's expressed concerns about "the reliability of Zinus' reporting with respect to its sales practices regarding the payment of commissions" are

misplaced.  Absent such concerns, Commerce's rationale for calculating a price adjustment including BPM's 2019 sales deductions vanishes.  Indeed, as the discussion of specific record evidence make clear, Commerce overlooked key record data which undermines its conclusions.

In particular, record evidence shows that, rather than rise, between 2018 and 2019 BPM's sales commissions as a percentage of total merchandise sales *fell* from [

] percent.  *See Zinus* Ministerial Error Comments (Mar. 29, 2021) ("Ministerial Error Comments"), P.R. 293, C.R. 299, at 11-14.  This demonstrated drop in BPM's commission payment percentages from 2018 and 2019 does not support Commerce's decision to combine the company-wide sales experiences of Zinus US and BPM with respect to sales commissions as Commerce did per Attachment 2 of its Final Sales Calculation Memo, particularly where uncontroverted evidence exists that BPM made no sales of Indonesian-origin merchandise during the POI.  *See*, *e.g.*, Zinus' Section A Response at A-9, P.R. 97, C.R. 36; Zinus' Supp. Section C Response (Part 2), at SC2-6 and Exhibit SC-12, P.R. 199, C.R. 213.  Further, Commerce's finding that there were "disproportionate changes" to sales deductions is also unsupported by record evidence.  This finding appears to be based on the sales deductions figure of [          ] presented in the chart at page 11 of Zinus' December 14, 2020 supplemental questionnaire response, but, as Zinus explained, the record makes clear that this figure should not have been considered for Commerce's purposes.  *See* Zinus' Ministerial Error Comments at 15-16, P.R. 293, C.R. 299.

In sum, there was absolutely no basis for Commerce to include BPM's information in calculating an adjustments to US price.  Commerce's *Final Determination* is therefore unsupported by substantial evidence and cannot be sustained by this Court.

> ***3.*** *Commerce Erroneously Relied on Zinus US' Company-Wide Sales and Sales Deduction Information Rather Than the Information Specific to Mattresses Submitted in Zinus' Response*

In the event that the Court determines it was reasonable for Commerce to include the information of an affiliated reseller *not involved* in the sale of subject merchandise when calculating a sales deduction rate, it must instruct Commerce to adjust its calculation to rely on the available mattress-specific sales information, rather than company-wide figures. As noted, Commerce made an adjustment to U.S. price that "takes into consideration the sales deduction experience of both companies {i.e., Zinus US and BPM} during the POI." *Final Decision Memo* at 15, P.R. 284. Commerce performed this adjustment as detailed in its Final Sales Calculation Memorandum:



*See* Final Sales Calculation Memo at Attachment 2, P.R. 287, C.R. 296. As indicated by the reference to the Zinus Source Documentation, the Sales and Sales Deduction values for Zinus US derive from Exhibit SC-23b of Zinus' September 28, 2020 Section C Supplemental

Questionnaire Response, and as is clear from the audit report excerpt and the rebate reconciliation presented therein, the figures are company-wide rather than specific to sales of subject and potentially subject mattresses.

Having established that Commerce has not properly applied "facts available" and has not indicated that it would decline to consider submitted information in accordance with the statute, Commerce's decision to rely on Zinus US' company-wide sales and sales deduction information rather than the information specific to mattresses submitted in Zinus' response is contrary to law and unsupported by substantial evidence. Commerce had, and should have relied on, Zinus US' reported sales of mattresses and associated rebates. On remand, the Court should instruct Commerce to recalculate the DEDUCT ratio and rely only on the mattress-specific record information. *See* Zinus' Ministerial Error Comments at 7-8, P.R. 293, C.R. 299.

## VI.    <u>CONCLUSION</u>

For the foregoing reasons, Zinus respectfully requests that this Court hold the foregoing

aspects of the *Final Determination* to be unsupported by substantial evidence and otherwise not

in accordance with law.  Zinus further requests that this Court remand the agency's

determination with instructions to Commerce to correct its errors and to provide such other relief

as this Court deems just and appropriate.

Respectfully submitted,

/s/ J. David Park
J. David Park
Henry D. Almond
Daniel R. Wilson
Leslie C. Bailey
Kang Woo Lee
Gina M. Colarusso

*Counsel to PT. Zinus Global Indonesia
Plaintiff*

Phyllis L. Derrick
Eric Johnson

*Consultants to PT. Zinus Global Indonesia
Plaintiff*

Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20001
Phone:  (202) 942-5000
Fax:  (202) 942-5999
E-mail:  David.Park@apks.com

**Dated:  November 9, 2021**

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE JENNIFER CHOE-GROVES

| | |
|---|---|
| PT. ZINUS GLOBAL INDONESIA, | ) |
| | ) |
| **Plaintiff,** | ) |
| **and** | ) |
| | ) |
| BROOKLYN BEDDING, LLC ET AL., | ) |
| | ) |
| **Consolidated Plaintiff,** | ) |
| | ) |
| **v.** | )   Court No. 21-00277 |
| | )   (Consol.) |
| UNITED STATES, | ) |
| | ) |
| **Defendant,** | ) |
| | ) |
| **and** | ) |
| | ) |
| PT. ZINUS GLOBAL INDONESIA and | ) |
| BROOKLYN BEDDING, LLC ET AL., | ) |
| | ) |
| **Defendant-Intervenors.** | ) |
| | ) |

## CERTIFICATION OF COMPLIANCE WITH CHAMBERS PROCEDURE 2(B)(1)

The undersigned hereby certifies that the attached Memorandum in Support of Plaintiff

PT. Zinus Global Indonesia's Rule 56.2 Motion for Judgment Upon the Agency Record, filed on

November 9, 2021, contains 13,981 words, exclusive of the table of contents, table of authorities,

and counsel's signature block, according to the word count function of the word-processing

system used to prepare this brief, and inclusive of the words in the embedded images, counted

manually.  The brief therefore complies with the maximum 14,000 word count limitation set

forth in the Court's Chambers Procedures.

By:     /s/ J. David Park
            J. DAVID PARK

**Dated:  November 9, 2021**