**UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE JENNIFER CHOE-GROVES**

| | |
|---|---|
| **PT. ZINUS GLOBAL INDONESIA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| **and** ) | |
| ) | |
| **BROOKLYN BEDDING, LLC ET AL.,** ) | |
| ) | |
| **Consolidated Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Court No. 21-00277** |
| ) | **(Consol.)** |
| **UNITED STATES,** ) | |
| ) | |
| **Defendant,** ) | |
| ) | |
| **and** ) | |
| ) | |
| **PT. ZINUS GLOBAL INDONESIA and** ) | |
| **BROOKLYN BEDDING, LLC ET AL.,** ) | |
| ) | |
| **Defendant-Intervenors.** ) | |
| ) | |

## **PROPOSED ORDER**

Upon consideration of the Rule 56.2 Motions for Judgment Upon the Agency Record

filed by PT. Zinus Global Indonesia's ("Zinus"), Plaintiff and Defendant-Intervenor in the

companion case *Brooklyn Bedding, LLC v. United States*, Court No. 21-00284, and Consolidated

Plaintiffs Brooklyn Bedding, et al., and the supporting memoranda of law, all responses thereto,

and all other papers and proceedings in this action, it is hereby:

**ORDERED** that Consolidated Plaintiffs Brooklyn Bedding, et al. motion is in all

respects DENIED; and it is further

**ORDERED** that Plaintiff and Defendant-Intervenor Zinus' Motion for Judgment Upon

the Agency Record is GRANTED; and it is further

**ORDERED** that the final determination and resulting antidumping duty order in the antidumping duty investigation of *Mattresses from Indonesia* of the U.S. Department of Commerce ("Commerce"), *see Mattresses from Indonesia: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 15,899 (Dept. Comm., Mar. 25, 2021), are reversed and remanded for the agency to reconsider and revise its determination as instructed by this Court in its accompanying slip opinion.

SO ORDERED

Date:_____       Signed:_____
                                                                                  Jennifer Choe-Groves, Judge

IUNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| PT. ZINUS GLOBAL INDONESIA, | NON-CONFIDENTIAL VERSION |
| Plaintiff, | |
| and | Court No. 21-00277 (Consol.) |
| BROOKLYN BEDDING, LLC ET AL., | |
| Consolidated Plaintiffs, | Business Proprietary Information removed from pages 18, 20, 24-28, 36-37, and 40-41. |
| v. | |
| UNITED STATES, | |
| Defendant, | |
| and | |
| PT. ZINUS GLOBAL INDONESIA and BROOKLYN BEDDING, LLC ET AL., | |
| Defendant-Intervenors. | |

## PT. ZINUS GLOBAL INDONESIA'S RESPONSE BRIEF IN OPPOSITION TO CONSOLIDATED PLAINTIFFS' MOTION FOR JUDGMENT UPON THE AGENCY RECORD

ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 942-5000
Fax: (202) 942-5999

J. David Park
Henry D. Almond
Daniel R. Wilson
Leslie C. Bailey
Kang Woo Lee
Gina M. Colarusso

Dated: March 2, 2022

*Counsel to PT. Zinus Global Indonesia*
*Defendant-Intervenor*

Phyllis L. Derrick
Eric Johnson

*Consultants to PT. Zinus Global Indonesia*

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................1

II.     STATEMENT PURSUANT TO RULE 56.2 .....................................................1

        A.      Administrative Determination Under Review .........................................1

        B.      Issues Presented for Review ...................................................................2

III.    STATEMENT OF FACTS ..................................................................................3

        A.      Facts Relevant to Zinus' Reporting of Zinus KR's Selling Expenses ...................3

        B.      Facts Relevant to Commerce's Use of Indonesian GTA Import Data as a
                Surrogate Market Price for its Transactions Disregarded Adjustments ................5

        C.      Facts Relevant to Zinus' Reconciliation of its Reported Sales Data ....................6

IV.     SUMMARY OF ARGUMENT ...........................................................................8

V.      STANDARD OF REVIEW ...............................................................................11

VI.     ARGUMENT ......................................................................................................13

        A.      Commerce Correctly Rejected Petitioners' Proposed Adjustment for
                "Commissions Earned by Zinus KR" ...................................................13

                1.      *Substantial Record Evidence, Including Zinus' Own Books and Records,
                        Supports Commerce's Determination That Zinus Reported All Relevant
                        Expenses and No Adjustment Was Necessary* .......................................... 14

                2.      *Petitioners Provide No Basis for Commerce to Depart From Past Practice
                        and Treat Price Mark-Ups Between Affiliates as Commissions* .............. 21

                3.      *Petitioners' Distortive Calculations Demonstrate The Overstated Nature
                        of Their Claims* ........................................................................................ 24

        B.      Commerce Did Not Err in Using Indonesian GTA Import Data as a
                Surrogate Market Price for its Transactions Disregarded Adjustments ................29

                1.      *Commerce's Use of Indonesian GTA Data in the Final Determination is
                        Consistent with the Statute* ...................................................................... 29

                2.      *Petitioners' Argument that the Indonesian GTA Data "May Be" Distorted
                        is Entirely Speculative and Not Rooted in Fact* ....................................... 35

        C.      Commerce Did Not Err As a Matter of Law by Not Requiring Additional
                U.S. Sales Reconciliation Materials for Zinus Indonesia ......................................38

VII.    CONCLUSION ...................................................................................................41

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## <u>Statutes</u>

19 U.S.C. § 1516a(b)(1)(B)(i)................................................................................11

19 U.S.C. § 1677a(a) and (b) ..............................................................................3

19 U.S.C. § 1677b(f)(2) ............................................................................. *passim*

## <u>Court Decisions</u>

*Allegheny Ludlum Corp. v. United States*,
   112 F. Supp. 2d 1141 (Ct. Int'l Trade 2000) ..........................................24

*Atl. Sugar, Ltd. v. United States*,
   744 F.2d 1556 (Fed. Cir. 1984)................................................................12

*Auer v. Robbins*,
   519 U.S. 452 (1997)..................................................................................12

*Bowles v. Seminole Rock & Sand Co.*,
   325 U.S. 410 (1945)..................................................................................12

*Caribbean Ispat Ltd. v. United States*,
   450 F.3d 1336 (Fed. Cir. 2006)................................................................31

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
   467 U.S. 837 (1984)......................................................................... *passim*

*Cinsa, S.A. de C.V. v. United States*,
   21 C.I.T. 341 (Apr. 4, 1997) ....................................................................24

*Consol. Edison Co. of New York v. N.L.R.B.*,
   305 U.S. 197 (1938)..................................................................................11

*Corus Staal BV v. United States*,
   259 F. Supp. 2d 1253 (Ct. Int'l Trade 2003) .................................. *passim*

*Dorbest Ltd. v. United States*,
   604 F.3d 1363 (Fed. Cir. 2010)...........................................................35, 38

*Hussey Copper Ltd. v. United States*,
   834 F. Supp. 413 (Ct. Int'l Trade 1993) ..................................................24

*Luoyang Bearing Corp. (Grp.) v. United States*,
   450 F. Supp. 3d 1402 (Ct. Int'l Trade 2020), *aff'd*, 844 F. App'x 368 (Fed. Cir. 2021)........35

*Mittal Steel Point Lisas Ltd. v. United States*,
    548 F.3d 1375 (Fed. Cir. 2008) ...................................................................38

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006) ...................................................................11

*Olympia Indus., Inc. v. United States*,
    7 F. Supp. 2d 997 (Ct. Int'l Trade 1998) .................................................12

*Polyethylene Retail Carrier Bag Comm. v. United States*,
    29 C.I.T. 1418 (Dec. 13, 2005) .................................................................24

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
    659 F.3d 1142 (Fed. Cir. 2011) ...................................................................13

*Sterling Fed. Sys., Inc. v. Goldin*,
    16 F.3d 1177 (Fed. Cir. 1994) .....................................................................13

*Thai Plastic Bags Indus. Co., Ltd. v. United States*,
    904 F. Supp. 2d 1326 (Ct. Int'l Trade 2013) .........................................37

## Commerce Determinations

*Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From
    France, Germany, Italy, Japan, Romania, Singapore, Sweden, and the United
    Kingdom; Final Results of Antidumping Duty Administrative Reviews and Revocation
    of Orders in Part*, 65 Fed. Reg. 49,219 (Aug. 11, 2000) .......................................23

*Certain Cold-Rolled Steel Flat Products From Brazil: Final Determination of Sales at
    Less Than Fair Value*, 81 Fed. Reg. 44,946 (July 29, 2016) ..................................33

*Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of
    Turkey, and the Socialist Republic of Vietnam: Antidumping Duty Orders and
    Amended Final Affirmative Antidumping Determination for Cambodia*,
    86 Fed. Reg. 26,460 (May 14, 2021) ......................................................................1

*Mattresses from Indonesia: Final Affirmative Determination of Sales at Less Than Fair
    Value*, 86 Fed. Reg. 15,899 (Mar. 25, 2021) ................................................ *passim*

*Notice of Final Determination of Sales at Less Than Fair Value: Certain Cut-To-Length
    Carbon-Quality Steel Plate Products from Korea*,
    64 Fed. Reg. 73,196 (Dec. 29, 1999) ....................................................................33

*Notice of Final Results of Antidumping Duty Administrative Review: Low Enriched
    Uranium From France*, 70 Fed. Reg. 54,359 (Sept. 14, 2005) ...............................33

*Notice of Final Results of Antidumping Duty Administrative Review: Stainless Steel Sheet and Strip in Coils From France,*
67 Fed. Reg. 6,439 (Feb. 12, 2002) ..........................................................................23

*Oil Country Tubular Goods From Mexico: Final Results of Antidumping Duty Administrative Review,* 64 Fed. Reg. 13,962 (Mar. 23, 1999)................................................22

*Polyethylene Terephthalate Film, Sheet, and Strip from the Republic of Korea; Final Results of Antidumping Duty Administrative Reviews and Notice of Revocation in Part,* 61 Fed. Reg. 35,177 (July 5, 1996)........................................................................22, 23

## I.    <u>INTRODUCTION</u>

Plaintiff and Defendant-Intervenor PT. Zinus Global Indonesia ("Plaintiff" or "Zinus") respectfully submits this response to Consolidated Plaintiffs Brooklyn Bedding, LLC et al.'s Rule 56.2 Motion for Judgment on the Agency Record and accompanying memorandum in support.[1]  *See* Brooklyn Bedding, LLC et al. Motion for Judgment on the Agency Record, Nov. 9, 2021, ECF No. 24 ("Pet. Br.").  Consolidated Plaintiffs challenge certain aspects of the U.S. Department of Commerce's ("Commerce") final determination and resulting antidumping duty order in the antidumping duty ("AD") investigation of mattresses from Indonesia.  We demonstrate below that Consolidated Plaintiffs' motion should be denied because the aspects of Commerce's determination that they seek to challenge are supported by substantial evidence and otherwise lawful.

## II.    <u>STATEMENT PURSUANT TO RULE 56.2</u>

### A.    **Administrative Determination Under Review**

The final determination at issue in this appeal is *Mattresses from Indonesia: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 15,899 (Dept. Comm., Mar. 25, 2021) ("*Final Determination*") (P.R. 292), and accompanying Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Mattresses from Indonesia, dated March 18, 2021 ("*Final IDM*") (P.R. 284); *Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist*

---

[1] "Consolidated Plaintiffs," from the companion case Brooklyn Bedding, LLC et al v. United States, Court No. 21-00284, consist of Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises Inc., Leggett & Platt, Incorporated, International Brotherhood of Teamsters, United Steel Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, and AFL-CIO.  They are also listed as defendant-intervenors in the above caption.  These entities are hereinafter referred to as either "Consolidated Plaintiffs" or "Petitioners."

*Republic of Vietnam: Antidumping Duty Orders and Amended Final Affirmative Antidumping Determination for Cambodia*, 86 Fed. Reg. 26,460 (Dept. Comm., May 14, 2021) ("Order") (P.R. 307).[2]

**B.      Issues Presented for Review**

1.      Whether Commerce's determination that Zinus' reporting appropriately captured relevant expenses incurred by its Korean parent company, Zinus Inc. (referred to as "Zinus Korea" or "Zinus KR"), associated with U.S. sales of the merchandise under investigation?  As established in **Section V.A**, Commerce correctly found that Zinus Korea is only minimally involved in Zinus Indonesia's production and sales, and Zinus correctly reported all relevant expenses.

2.      Whether Commerce's determination to use data sourced from the Global Trade Atlas ("GTA") pertaining to Indonesian prices in applying the transactions disregarded rule to affiliated suppliers' transactions was reasonable?

Petitioners alleged that Commerce's use of GTA Import Data from Indonesia was unreasonable because the data may be distorted and Indonesia is not economically comparable to China, the source of the affiliated supplier inputs.  As set forth in **Section V.B**, it was appropriate for Commerce to rely on Indonesian import prices for a surrogate market price for purposes of its transactions disregarded test because the data represent the best available data on the record and there is no evidence supporting Petitioners' speculation that the data are distorted.

3.      Whether Commerce's determination to not require Zinus to submit additional U.S. sales reconciliation materials was supported by substantial evidence and in accordance with law?  Petitioners ask the Court to substitute its judgment for that of Commerce as the master of its

---

[2] All citations to the administrative record take the form "P.R.__" or "C.R.__".

investigations – essentially suggesting the agency abused its discretion in evaluating what materials to request.  As detailed in **Section V.C**, Zinus fully reconciled its reported sales data and Commerce reasonably determined that no further materials were necessary to substantiate the company's reporting.

## III.   STATEMENT OF FACTS

### A.   Facts Relevant to Zinus' Reporting of Zinus KR's Selling Expenses

Throughout the underlying investigation before the Department of Commerce, Zinus repeatedly explained and made clear that Zinus KR's role and expenses incurred for U.S. sales of subject merchandise were minimal.  *See* Zinus' June 18, 2020, Section A Response ("Zinus Section A Response"), at A-14 –A-15 (P.R. 97, C.R. 36); Zinus' July 13, 2020, Section C Response ("Zinus Section C Response"), at C-49 to C-52, C-57, and C-59 (P.R. 119, C.R. 117). For all U.S. sales transactions, EP or CEP sales,[3] Zinus explained that Zinus KR's role is limited to document and invoice management – *i.e.*, receiving invoices from Zinus Indonesia and forwarding invoices to Zinus US or to the unaffiliated U.S. customer.  *See* Zinus Section A Response, at A-15 and A-19 (P.R. 97, C.R. 36); and Zinus' Aug. 20, 2020, Supplemental Section A Response ("Zinus Supp. Section A Response") at 9-10 (P.R. 165, C.R. 149).  Commerce's standard reporting requirements instruct respondents to report payments to unaffiliated parties only; thus, in response to Commerce's initial questionnaire response, Zinus reported the relevant expenses Zinus KR incurred.  *See e.g.,* Zinus Section C Response at C-45 (P.R. 119, C.R. 117). Zinus reported Zinus KR's advertising expenses on a customer-specific basis for its EP sales. *See id*. at C-57 (P.R. 119, C.R. 117).  Zinus reported rebates Zinus KR paid in the fields

---

[3] "EP" and "CEP" refer to "export price" and "constructed export price," the two types of U.S. sales prices identified in 19 U.S.C. § 1677a(a) and (b).  EP sales are U.S. sales where the price is first agreed to outside the United States and prior to importation.  CEP sales are U.S. sales made in the United States, before or after importation.

REBATE3U (sell-out rebates) and REBATE5U (defective allowance rebate).  *Id.* at Exhibit C-13 and C-15 (C.R. 119).  With respect to freight expenses, Zinus reported all applicable freight expenses, where incurred, by each Zinus entity.  *Id.* at C-42 to C-52 (P.R. 119, C.R. 117).  Zinus also reported bank charges Zinus KR incurred in the field BANKCHARU.  *See id.* at C-42 to C-59 (P.R. 119, C.R. 117).  Pursuant to Commerce's instruction, Zinus reported Zinus KR's relevant general and administrative expenses as an element of Zinus Indonesia's general and administrative expenses.  *See* Zinus' Sept. 22, 2020, Supplemental Section D Response ("Zinus Supp. Section D Response") at SD-25—SD-26 and Exhibit SD-25 (P.R. 196, C.R. 205 and 207).

In response to Commerce's supplemental section D questionnaire, Zinus revised the previously-reported general and administrative ratio to include Zinus KR's relevant salary expenses in Zinus Indonesia's G&A ratio.  *Id.*  In response to Commerce's request that Zinus "provide a schedule to identify and describe all administrative services performed by Zinus Korea or any other affiliates during the POI," Zinus explained "Zinus KR does not perform any administrative services for the subsidiary companies. However, for purposes of responding to the Department's request, Zinus has identified costs associated with Zinus KR's key management personnel."  *Id.* at SD-26 (P.R. 196, C.R. 207); *see also id.* at Exhibit SD-25 (C.R. 205).  Zinus' calculations captured and reported Zinus KR's relevant expenses and Commerce requested no further revisions.

In their administrative case brief, Petitioners argued that Zinus failed to report all of Zinus KR's selling expenses and that Commerce was wrong not to adjust U.S. prices for "commissions earned by Zinus KR."  *See* Mattress Petitioners' Feb. 9, 2021, Case Brief ("Petitioners' DOC Case Br.") at 23-36 (P.R. 274, C.R. 291).  Petitioners urged Commerce to make such an adjustment in its Final Determination.  *Id.* at 31-33.  Having reviewed Petitioners'

arguments and the record evidence, Commerce concluded that Zinus reported all relevant

expenses and that no such adjustment was necessary.  *Final IDM* at 32-33 (P.R. 284).

**B.      Facts Relevant to Commerce's Use of Indonesian GTA Import Data as a Surrogate Market Price for its Transactions Disregarded Adjustments**

Pursuant to Zinus' reporting that it obtained certain material inputs from affiliated

suppliers related to the production of the merchandise under investigation, Commerce

preliminarily calculated an adjustment in which it compared Zinus Indonesia's purchase price for

the inputs sourced from affiliated parties to a benchmark consisting of purchases of the same

input from unaffiliated parties, or, absent such unaffiliated party transactions to serve as a

benchmark, an average of Global Trade Atlas ("GTA") import values for seven countries:

Indonesia, Brazil, Malaysia, Mexico, Romania, Russia, and Turkey.  *See* Memorandum to Jeffrey

I. Kessler from James Maeder, *Decision Memorandum for the Preliminary Affirmative*

*Determination and Postponement of Final Determination in the Less-Than-Fair-Value*

*Investigation of Mattresses from Indonesia* (Oct. 27, 2020) ("Preliminary Decision Memo") (P.R.

226); Commerce Memorandum "Preliminary Determination Margin Calculation for PT Zinus

Global Indonesia" (Oct. 27, 2020) ("Preliminary Calc. Memo") (P.R. 229, C.R. 258).  In its

administrative case brief, Zinus argued that Commerce erred in relying on the GTA import unit

values, in part, its calculations.  Zinus demonstrated that Commerce has long established a clear

preference and hierarchy for data sources to analyze whether transactions with affiliated

suppliers are at arm's length, and Zinus provided data that satisfied all of those criteria.  Zinus

Feb. 9, 2021 Case Brief ("Zinus Case Br.") at 24-28 (P.R. 275, C.R. 292).

Even if Commerce determined to turn to outside sources to measure whether the

transactions were on an arm's length basis, Zinus argued that Commerce should have used only

on Indonesian import statistics.  *Id*. at 28-30 (P.R. 275, C.R. 292).  Petitioners argued that

Commerce should use only the Brazil, Malaysia, Mexico, Romania, Russia, and Turkey average GTA import data, and exclude the Indonesia GTA data, when establishing an Indonesia market price.  Petitioners' Feb. 16, 2021 DOC Rebuttal Brief ("Petitioners DOC Rebuttal Br.") at 33-39 (P.R. 276, C.R. 293).  In its Final Determination, Commerce determined that the GTA data were the "best available information source for market values" and agreed with Zinus that the "statute directs Commerce to look to the market under consideration when testing the affiliated supplier transfer price against a market price."  *Final IDM* at 18 (P.R. 284). Thus, Commerce relied only on the Indonesia GTA data provided by Zinus, and rejected Petitioners' arguments to the contrary.  *Id*. at 18-19 (P.R. 284).

### C.      Facts Relevant to Zinus' Reconciliation of its Reported Sales Data

In response to Commerce's questionnaires, starting with its initial section A questionnaire, Zinus demonstrated that Zinus Indonesia (*i.e.*, the respondent in the underlying investigation) sold all subject merchandise through its Korean parent company, Zinus Inc. ("Zinus Korea" or "Zinus KR").  *See e.g.*, Zinus Section A Response at A-1 (P.R. 97, C.R. 36). Specifically, Zinus explained, "{f}or the sales made to the United States, Zinus Indonesia invoices its parent company, Zinus KR.  Depending on the nature of the transactions, Zinus KR, in turn, invoices unaffiliated customers in the United States, or its U.S. affiliates, Zinus US or Keetsa." *Id*.  Thus, Zinus Indonesia did not report any U.S. sales because it was not the entity that sold subject mattresses to U.S. customers.

The nature of these transactions and roles of the companies, as well as the fact that Zinus Indonesia itself had no sales to U.S. customers, is documented throughout the record including in Zinus Indonesia's financial statements for the period of investigation ("POI") (calendar year 2019), which show that all of its sales were to a related party (*i.e.*, Zinus KR).  *See* Zinus Section A Response at Exhibit A-11a(1) (C.R. 37).  In its Section C Response and accompanying U.S.

sales database, Zinus added Field Number 4.1, field INVENU, to report the identity of the Zinus entity invoicing the unaffiliated customer.  *See* Zinus Section C Response at C-22 and accompanying U.S. sales database at field INVENU (P.R. 119, C.R. 93, 117). This field of the U.S. sales database demonstrates that the invoicing entity was either Zinus KR or Zinus US.  *See* Zinus U.S. Sales Database (C.R. 93).  Because these two companies were the only Zinus companies making sales of the merchandise under consideration to the United States during the POI, Zinus submitted U.S. sales reconciliations for both entities, Zinus KR and Zinus US, as part of its Section C Response.  *See id*. at Exhibits C-2A and C-2B (C.R. 118).  Both of the sales reconciliations tie the reported U.S. sales in Zinus' submitted sales databases to the audited financial statements of Zinus KR and Zinus US, respectively.

On August 10, 2020, Petitioners filed comments in response to Zinus' Section C Response claiming that "without explanation or justification, Zinus provided no U.S. sales reconciliation for mandatory respondent Zinus Indonesia."  Letter from Petitioners, "Deficiency Comments Concerning Zinus' Section C Questionnaire Response - Part 1: Reconciliation and CEP Inventory Country of Origin" (Aug. 10, 2020) ("Petitioners' Section C Comments Pt. 1") at 3 (P.R. 149, C.R. 130).  On August 20, 2020, in response to Petitioners' accusations, Zinus explained again that Zinus Indonesia does not invoice U.S. customers, thus it had no reportable U.S. sales and no reconciliation was necessary.  Letter from Zinus to Commerce "Rebuttal to Petitioners' Comments on Zinus' Section C Questionnaire Response" (Aug. 20, 2020) at 4-8 (P.R. 166, C.R. 158).  Again, Zinus explained that it reconciled its U.S. sales to the audited financial statements of the Zinus entities that made sales of subject merchandise to unaffiliated U.S. customers.  *Id*.  Commerce did not request a U.S. reconciliation for Zinus Indonesia nor did it address Petitioners unfounded claims in its *Preliminary Determination*.  On January 19, 2021,

Commerce issued a questionnaire requesting additional information from Zinus in lieu of

performing an on-site verification, to which Zinus fully responded, including reconciling its

reported quantity and value of U.S. sales during the POI.  *See* Zinus' Jan. 27, 2021 Response to

Supplemental Questionnaire in Lieu of On-Site Verification ("Zinus Supp. Verification QR")

(P.R. 269, C.R. 278-290).  During briefing before the agency, Petitioners did not raise any

arguments regarding a "missing" reconciliation for Zinus Indonesia.  Thus, in its *Final

Determination*, Commerce did not address this allegation.

## IV.     <u>SUMMARY OF ARGUMENT</u>

Zinus has appealed the Department of Commerce's *Final Determination*, and filed a Rule

56.2 Motion for Judgment on the Agency Record challenging certain aspects of that final

determination.  *See* Memorandum in Support of Pt. Zinus Global Indonesia's Motion for

Judgment on the Agency Record, Nov. 9, 2021, ECF Nos. 22 and 23 ("Zinus' 56.2 Br.").  For the

reasons established therein, the Court should remand the *Final Determination* with respect to (i)

Commerce's use of a quarterly ratio sales methodology to determine the quantity of subject CEP

inventory, (ii) Commerce's constructed value profit calculations, and (iii) Commerce's

adjustments to U.S. price.  *See* Zinus' 56.2 Br.

Petitioners have simultaneously filed a separate appeal challenging different aspects of

Commerce's *Final Determination*.  Specifically, Petitioners argue that Commerce erred when it:

(i) accepted Zinus' reporting of selling expenses incurred for U.S. sales of subject merchandise

rather than make an adjustment suggested by Petitioners for "commissions earned by Zinus KR,"

the Korean parent company minimally involved with sales of subject merchandise; (ii) relied on

Indonesian Global Trade Atlas ("GTA") import data as its surrogate market price for purposes of

its transactions disregarded adjustments rather than utilizing an average of the GTA import data

from six other non-subject countries; and (iii) abused its discretion in evaluating what materials to request from the respondent.  Petitioners' arguments are wrong on all counts.

First, Petitioners' argument regarding Zinus' selling expenses is essentially that Commerce "totally ignored…record evidence."  *See* Pet. Br. at 8-9, 11-12, and 17.  This is not true.  Commerce addressed Petitioners' claims and the purported evidence regarding selling expenses and correctly concluded that no adjustment was necessary.  Commerce's determination that Zinus reported all relevant selling expenses is supported by substantial record evidence, as is its finding that Zinus KR was minimally involved in Zinus Indonesia's production and did not earn "commissions" on intra-company resales.  Petitioners ask Commerce to depart from its practice and treat price mark-ups between affiliates as commissions but provide no reasonable basis for such an outcome.  Petitioners provide no basis for this Court to issue a remand on Commerce's well-investigated and fully supported determination *not* to adjust Zinus' own reporting to account for "commissions" earned by the Korean parent company.

Second, Petitioners allege that Commerce erred in using GTA import data from Indonesia for purposes of its transactions disregarded analysis and adjustments in the *Final Determination*. Pet. Br. at 22-32.  Petitioners assert that Commerce should have excluded Indonesian import data due to alleged distortions in that data and the incomparability of Indonesia to China, the source of the affiliated party inputs.  Petitioners allege that Commerce should have used instead an average of the GTA import data from Brazil, Malaysia, Mexico, Romania, Russia, and Turkey as a surrogate for the price of unaffiliated minor inputs for comparison to the price of minor inputs that Zinus purchased from its affiliates, as it did in its *Preliminary Determination*.  *Id*. at 26-27. Although Zinus does not endorse Commerce's transactions disregarded analysis and adjustments without reservation, in making any adjustment Commerce was correct to rely on Indonesian GTA

data.  Petitioners' arguments to the contrary are unpersuasive and rest on speculation as well as a misreading of the statute, which is explicit that the affiliated input price is to be compared to a price "in the market under consideration," in this case, Indonesia.  19 U.S.C. § 1677b(f)(2). Petitioners have not identified, nor is there any, evidence on the record to suggest that imports into the six unrelated countries on which Petitioners rely could possibly reflect values in Indonesia.

In arguing that the Indonesia GTA data "may be" distorted and thus were unreliable, Petitioners raise a new argument not made before the agency and another argument that is highly speculative and not grounded in fact.  First, Petitioners allege that "Indonesia is not economically comparable to China and thus is not an appropriate surrogate source for costs of affiliated Chinese suppliers."  *Id*. 32.  Petitioners failed to raise this argument before the agency; thus, this argument is waived for purposes of this appeal.  Second, Petitioners seek to revive the unsuccessful argument as to distortion that they raised to Commerce in their agency case brief, which Commerce considered and dismissed as unpersuasive and unfounded.  Specifically, Petitioners allege, without facts, that the use of Indonesian GTA data is potentially distortive based on the hypothetical suggestion that "Indonesian importers may be . . . confused and misclassifying their imports."  *Id*. at 33.  As demonstrated herein, Petitioners have not offered any credible evidence or justification as to why Commerce erred in using the GTA data pertaining to Indonesian imports to determine the market value for certain inputs in Indonesia (*i.e.,* the market under consideration).  Petitioners' arguments on this issue should therefore be rejected.

Third and finally, Petitioners allege that Commerce erred in not requiring Zinus Indonesia to submit a U.S. sales reconciliation between its reported U.S. sales and its audited financial

statements.  Petitioners did not raise this issue in their administrative case brief.  Accordingly, their complaint that "Commerce never specifically explained why" it did not request additional reconciliation materials is fully explained by the fact that they failed to exhaust their administrative remedies on this issue.  Pet. Br. at 33.  As such, Petitioners have waived this argument and the Court should accordingly disregard it.  However, to the extent the Court considers this issue on the merits, the record makes clear that Zinus fully supported and reconciled its reported sales data, and Commerce reasonably concluded it had all of the information and reconciliations necessary to evaluate Zinus' reported U.S. sales.  Petitioners' suggestion is an inappropriate request to the Court to substitute its judgment for that of the agency.

As demonstrated below, none of Petitioners' arguments merit action from this Court, and their baseless arguments should not distract from the legitimate concerns raised by Zinus in its affirmative appeal and Rule 56.2 motion.  For the reasons described below, and in Zinus' memorandum in support of its motion for judgment upon the agency record, the Court should reject Petitioners' unfounded assertions and grant Zinus' Rule 56.2 motion.

## V.   **STANDARD OF REVIEW**

The Court will hold Commerce's determinations unlawful in an antidumping duty proceeding where they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938).  The substantial evidence standard of review essentially asks whether, given the evidence on the record as a whole, the agency's conclusion was reasonable.  *See Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006).  As Commerce ultimately bears

the responsibility of weighing the evidence, the Court may not substitute its judgment for that of the agency. *See Corus Staal BV v. United States,* 259 F.Supp.2d 1253, 1260 (Ct. Int'l Trade 2003). Even if there is some evidence which detracts from the agency's conclusions, the Court need only determine whether the Department's conclusions are substantially supported by the record. *See, e.g., Atl. Sugar, Ltd. v. United States,* 744 F.2d 1556, 1563 (Fed. Cir. 1984); *Olympia Indus., Inc. v. United States,* 7 F. Supp. 2d 997, 1000 (Ct. Int'l Trade 1998).

Commerce acts contrary to law where it acts arbitrarily or based on an impermissible interpretation of its statutory authority. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc*., 467 U.S. 837, 842–43 (1984). When reviewing Commerce's interpretation of the antidumping statute, the Court first determines "whether Congress has directly spoken on the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the {C}ourt, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* Where, on the other hand, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.

As the Federal Circuit has explained, where "the statute's text does not explicitly address the precise question, {the Court does} not at that point simply defer to the agency. {The Court's} search for Congress's intent must be more thorough than that." *Id*. at 882. "Beyond the statute's text, those tools include the statute's structure, canons of statutory construction, and legislative history." *Id*. (citation omitted). Further, the Court will not uphold Commerce's interpretation of its regulations if the interpretation is "plainly erroneous or inconsistent with the regulation." *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945); *see also Auer v. Robbins*, 519 U.S. 452, 461 (1997).

When reviewing an agency decision for abuse of discretion, the Court examines whether the decision: "1) is clearly unreasonable, arbitrary or fanciful; 2) is based on an erroneous conclusion of law; 3) rests on clearly erroneous fact findings; or 4) follows from a record that contains no evidence on which the {agency} could rationally base its decision." *Sterling Fed. Sys.*, *Inc. v. Goldin*, 16 F.3d 1177, 1182 (Fed. Cir. 1994) (quoting *Gerritsen v. Shirai*, 979 F.2d 1524, 1529 (Fed. Cir. 1992)); *see also Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1147–48 (Fed. Cir. 2011) (noting that "{a} clear error of judgment occurs when" an agency action is "arbitrary, fanciful, or clearly unreasonable.").

## VI.   ARGUMENT

### A.   Commerce Correctly Rejected Petitioners' Proposed Adjustment for "Commissions Earned by Zinus KR"

Petitioners argue that Commerce's adjustment for Zinus KR's selling activities "fails to capture reported expenses material to the final determination margin calculations." Pet. Br. at 9. The crux of Petitioners' complaint is that Commerce failed to consider certain record evidence. Petitioners ask the Court to remand this issue because Commerce "totally ignored" record evidence that allegedly supports Petitioners' arguments for an adjustment to U.S. prices for "commissions" earned by Zinus KR for selling activities on U.S. sales. *See id*. at 8-9, 11-12, and 17. Petitioners are wrong. Commerce addressed Petitioners' claims and the purported evidence, and concluded that based on the record and its past practice, "no adjustment as prescribed by the petitioners or otherwise is necessary or required for the final determination." *See Final IDM* at 30-33 (P.R. 284). Commerce did not ignore the record evidence that Petitioners cite in their brief. Rather, as demonstrated below, Commerce thoroughly evaluated this issue during the underlying investigation and its conclusion is wholly supported by substantial evidence and

otherwise in accordance with law.  Petitioners provide no legitimate basis for this Court to

reverse Commerce's decision and as such their arguments should be rejected once more.

> 1.   *Substantial Record Evidence, Including Zinus' Own Books and Records, Supports Commerce's Determination That Zinus Reported All Relevant Expenses and No Adjustment Was Necessary*

Petitioners erroneously claim that Commerce failed to capture all of Zinus KR's "selling

expenses, fees, and commissions associated with the U.S. sales."  Pet. Br. at 12.  Petitioners' sole

basis for claiming that the Court should reverse Commerce's determination is that Commerce

"ignored" record evidence.  But Commerce analyzed this exact argument, including the evidence

referenced by Petitioners, and correctly determined that Zinus KR reported all of its relevant

expenses.  *Final IDM* at 30-31 (P.R. 284).  Specifically, Commerce concluded:

> We agree with Zinus that it is Commerce's practice to use the affiliate's actual expenses, not the affiliated party commissions, in its calculations.  Specifically, Commerce's current AD questionnaire requests a respondent to report the expenses of any affiliated selling agents instead of the commissions paid to those agents.
>
> In this investigation, Zinus reported, where applicable, Zinus KR's actual expenses incurred on behalf of U.S. sales in the U.S sales database.  In addition, Zinus reported, as requested, Zinus KR's G&A expenses (*i.e.*, salary expenses) as an element of Zinus' G&A expenses.  We find that the reporting of such expenses is also consistent with respect to Zinus KR's reportedly limited role as an invoicing party in Zinus' U.S. sales process.
>
> . . . as Zinus KR has reported all of its relevant expenses associated with the U.S. sales under investigation, we find that no adjustment as prescribed by the petitioners or otherwise is necessary or required for the final determination.

*Final IDM* at 32 (P.R. 284) (footnotes omitted) (citing, *inter alia*, *Fresh Tomatoes from Mexico;*

*Final Determination of Sales at Less Than Fair Value*, 84 Fed. Reg. 57,401 (Oct. 25, 2019) and

accompanying IDM at Cmt. 17).

In reaching this conclusion, Commerce summarized Petitioners' claim that Zinus KR

"conducts significant selling activities on all US sales and incurs significant expenses associated

with those activities; and they must be captured in the margin calculations used for the final determination." *Id*. at 30 (citing Petitioners' DOC Case Br. at 23-27).  Commerce acknowledged that "{t}he petitioners refer to selling activities, Zinus KR's 2019 annual report, a shared office location chart, Zinus KR's coordination of activities with its subsidiaries, and Zinus KR's U.S. sales reporting to support its claim." *see id.* at 30-31 (P.R. 284).  Commerce did not ignore this evidence.  It simply disagreed with Petitioners' assertion that this evidence supported Petitioners' claims of unreported selling expenses.  *See id*. at 32 (P.R. 284).  Rather, Commerce concluded (correctly) that Zinus reported, where applicable, Zinus KR's actual expenses incurred on behalf of U.S. sales and it found Zinus' explanation that Zinus KR played a limited role to be supported by the record.  *Id*. at 30-31 (P.R. 284).  Commerce's conclusions are supported by substantial record evidence.

Throughout the underlying proceeding, Zinus' reporting was clear and consistent with Commerce's instructions.  Beginning with its initial responses, Zinus explained that Zinus KR's role and expenses incurred for U.S. sales of subject merchandise were minimal.  *See* Zinus Section A Response at A-14 –A-15 (P.R. 97, C.R. 36); Zinus Section C Response at C-49 to C-52, C-57, and C-59 (P.R. 119, C.R. 117).  Specifically, this record evidence demonstrates that for both EP and CEP sales, Zinus Indonesia sells subject merchandise through Zinus KR and for all U.S. sales transactions, EP or CEP sales, Zinus KR's role is limited to document and invoice management – *i.e.*, receiving invoices from Zinus Indonesia and forwarding invoices to Zinus US or to the unaffiliated U.S. customer.  *See* Zinus Section A Response at A-15 and A-19 (P.R. 97, C.R. 36); and Zinus Supp. Section A Response at 9-10 (P.R. 165, C.R. 149).  In accordance with Commerce's standard reporting requirements, which instruct respondents to report payments to unaffiliated parties only, Zinus reported the relevant expenses Zinus KR incurred.

*NON-CONFIDENTIAL VERSION*

*See e.g.,* Zinus Section C Response at C-45 (P.R. 119, C.R. 117).  For example, Zinus reported

Zinus KR's advertising expenses on a customer-specific basis for its EP sales.  *See id*. at C-57.

Zinus reported rebates Zinus KR paid in the fields REBATE3U (sell-out rebates) and

REBATE5U (defective allowance rebate).  *Id.* at Exhibit C-13 and C-15 (P.R. 119, C.R. 118).

With respect to freight expenses, Zinus reported all applicable freight expenses, where incurred,

by each Zinus entity.  *Id.* at C-42 to C-52 (P.R. 119, C.R. 117).  Zinus reported bank charges

Zinus KR incurred in the field BANKCHARU.  *Id.* at C-42 to C-59 (P.R. 119, C.R. 117).

Moreover, pursuant to Commerce's instruction, Zinus reported Zinus KR's relevant

general and administrative expenses as an element of Zinus Indonesia's general and

administrative expenses.  In particular, Commerce requested that Zinus:

> Confirm that you have included in your reported G&A expenses an amount for
> administrative services performed on your company's behalf by its parent
> company (*i.e.,* Zinus Korea) or other affiliated party. If you have not, revise your
> G&A ratio to allocate the appropriate costs for these services to Zinus Indonesia
> and include the costs for these allocated services in the reported G&A expenses
> and recalculate the resulting G&A expense ratio.

*See* Zinus Supp. Section D Response at SD-25—SD-26 and Exhibit SD-25 (P.R. 196, C.R. 205

and 207).  In response, Zinus revised the previously-reported general and administrative ratio to

include Zinus KR's relevant salary expenses in Zinus Indonesia's G&A ratio.  *Id*.  In response to

Commerce's request that Zinus "provide a schedule to identify and describe all administrative

services performed by Zinus Korea or any other affiliates during the POI," Zinus explained:

> Zinus KR does not perform any administrative services for the subsidiary
> companies. However, for purposes of responding to the Department's request,
> Zinus has identified costs associated with Zinus KR's key management personnel.
> Zinus KR's key management prepare the operational strategies and plans for the
> entire Zinus group and review the financial results of all Zinus affiliates except for
> Keetsa. Thus, Zinus has allocated Zinus KR's key management compensation to
> all Zinus affiliates except Keetsa for response purposes. Zinus shows the allocated
> key management compensation calculation together with supporting
> documentation and the resulting revised G&A ratio in Exhibit SD-25*.

*Id*. at SD-26 (emphasis omitted) (P.R. 196, C.R. 207); *see also id*. at Exhibit SD-25 (C.R. 205).

Zinus' calculations captured and reported Zinus KR's relevant expenses.  Commerce requested

no further revisions, as none were necessary.

In their administrative case brief, Petitioners argued that Zinus failed to report all of

Zinus KR's selling expenses and that Commerce was wrong not to adjust U.S. prices for

"commissions earned by Zinus KR."  Petitioners' DOC Case Br. at 23-39 (P.R. 274, C.R. 291).

Petitioners urged Commerce to make such an adjustment in its Final Determination.  *Id*. at 31-33.

Having reviewed Petitioners' arguments and the record evidence, Commerce (again) concluded

that Zinus reported all relevant expenses and that no such adjustment was necessary.  *Final IDM*

at 33 (P.R. 284).  In repeating their arguments here, asserting that Commerce should have made

their requested revisions to Zinus' reporting, Petitioners seek to insert their judgment for that of

the Commerce Department.  There simply is no basis for such an outcome, as Commerce's

determination has proper and requisite support.  *See Corus Staal BV v. United States,* 259 F.

Supp. 2d 1253, 1259-60 (Ct. Int'l Trade 2003) (As is frequently pointed out by Commerce and

the domestic producers in other antidumping cases, "{e}ven if it is possible to draw two

inconsistent conclusions from the evidence contained in the record, this does mean that

Commerce's findings are not supported by substantial evidence . . . It is ultimately Commerce's

responsibility to weigh the evidence and the court need only determine whether a determination

has proper support.") (internal citations omitted).

Moreover, contrary to Petitioners' contentions, Zinus made clear that it (Zinus Indonesia)

did not pay or incur any commission expenses during the period of review, which is fully

consistent with Zinus Indonesia's books and records as well as Zinus KR's books and records.

*See* Zinus' Dec. 14, 2020, Post-Preliminary Supplemental Questionnaire Response ("Zinus Post-

Prelim Supp. QR") at 1 and Exhibit SQ-1 (P.R. 256, C.R. 271); *see also* Zinus' Feb. 16, 2021 DOC Rebuttal Brief ("Zinus Rebuttal Br.") at 32-38 (P.R. 277, C.R. 292).  As Zinus repeatedly explained, Zinus KR's recognition of revenue for its resales of product purchased from Zinus Indonesia and sold to the U.S., either to Zinus U.S. or to an unaffiliated U.S. customer, does not make it a commissioned agent; to the contrary, it simply means that Zinus KR earned a profit by purchasing and reselling Zinus Indonesia's product.  *See e.g.,* Letter from Zinus to Commerce, "Response to Petitioners' Pre-Preliminary Comments" (Oct. 19, 2020) ("Zinus Rebuttal Pre-Prelim Cmts.") at 25-28 (P.R. 221, C.R. 253); Letter from Zinus to Commerce, "Response to Petitioners' Post-Preliminary Comments" (Nov. 27, 2020) ("Zinus' Rebuttal Post-Prelim Cmts.") at 4-6 (P.R. 243, C.R. 266); Zinus Rebuttal Br. at 26-38 (P.R. 277, C.R. 294).  In response to Petitioners' arguments during the underlying investigation, Commerce issued a post-preliminary supplemental questionnaire focused on possible commission payments by Zinus Indonesia, Zinus KR, and Zinus US to outside parties (<u>but not</u> related to payments from one Zinus entity to another, no doubt in recognition of how misguided it was for Petitioners to focus on possible commission payments *received* by Zinus KR).  In response, Zinus reiterated that Zinus Indonesia "did not pay or incur any commission expenses."  Zinus Post-Prelim Supp. Response at 1 (P.R. 256, C.R. 271).  In the supporting Exhibit to Zinus' Dec. 14, 2020, Post-Preliminary Supplemental Questionnaire response, Zinus provided pages from Zinus Indonesia's financial statement and sub-account details.  *See id*. at Exhibit SQ-1 (C.R. 271).  These materials demonstrated that among Zinus Indonesia's various accounts, any expense remotely related to a "commission" is recorded as a **[                    ]** in the company's financial statement (see page 3 of the exhibit).  Among those **[                ]** are **[**

**]**, and other miscellaneous fees the company incurs (see page 1 and 3

18

of the exhibit). Importantly, the materials confirm that Zinus Indonesia did not pay any sales

commissions. At page 4 of the exhibit (C.R. 271), Zinus provided a screenshot of the trial

balance details showing that the Zinus Indonesia object accounts for "Sales Commission" and

"Salesman Commission" included no debits or credits. *The object accounts were empty,*

demonstrating that Zinus Indonesia did not pay any commissions.

Although Petitioners argue that the "commission" is the markup charged by Zinus KR,

the fact that Zinus Indonesia recorded no commission expenses is pivotal, as this accounting

confirms that Zinus' reporting was consistent with Zinus Indonesia's books and records, as well

as Zinus KR's books and records, as there were no commission payments between the

companies. Petitioners are essentially seeking to force their self-serving definition of

"commission" on Zinus, Commerce, and the Court, despite Commerce's reasonable review of

the record evidence showing that there were no commission payments.

Petitioners argue that Commerce ignored accounting rules adopted by Zinus KR, which

they allege stipulates that Zinus KR is structurally an agent, but Petitioners either intentionally

misstate the facts or else continue to misunderstand. Pet. Br. at 17-20. The fact that Zinus KR

recognizes the revenue from its intra-company sales in accordance with Korean International

Financial Reporting Standards ("K-IFRS") does not turn its revenues into commissions nor does

it turn Zinus KR into a commissioned sales agent. The use of the word "agent" in K-IFRS also

does not mean that there is a commission paid. The text of the K-IFRS simply indicates that for

purposes of financial statement presentation, when a company has back-to-back sales it should

only report the profit (*i.e.*, markup) as a revenue – and, to do so, the company simply eliminates

the purchase price from the cost of goods sold and likewise reduces the revenue amount by the

same amount. This standard accounting rule does not change Zinus KR's sales and accounting

ledgers that show that Zinus KR in fact had sales at the full invoice price; nor does the accounting rule transform Zinus KR into a commissioned sales agent.

For example, where Zinus KR purchases a mattress for $100, and resells it via a back-to-back transaction, for $110 (for example), Zinus records the purchase of $100, and pays the seller $100. Zinus next records a sale of $110 and receives $110 from the purchaser. Pursuant to K-IFRS 15, for purposes of financial statement reporting, Zinus does not report a cost of goods sold of $100 or a sales revenue of $110. Rather, the company reports a net revenue of $10. *See* Zinus' Sept. 28, 2020 Supplemental Section C Response (Part 2) at SC2-4 (P.R. 199, C.R. 213). This does not mean that by reporting a "sale" of $110 Zinus' reporting is inconsistent with its books and records.

Zinus demonstrated this accounting in detail in Verification Exhibit V-2B. Zinus Supp. Verification QR at Exhibit V-2B (P.R. 269, C.R. 279). In that example, Zinus KR sold **[**

**]** (exhibit page 10). Zinus KR purchased the mattresses from Zinus Indonesia at a price of $**[        ]**. Zinus KR recorded in its sales journal an amount reflecting the full transaction price charged to the customer (exhibit page 32), recorded the sale in its export sales accounts receivable journal, and booked the transaction as an Export Sale under account **[       ]** (exhibit page 34). The exhibit goes on to support payment in full from the customer. Zinus also reconciled these materials to the quantity and value reconciliation. At Verification Exhibit V-1b (exhibit page 29) (C.R. 279), Zinus identified the individual sale at issue showing the full gross unit price in the sales accounting system as an export sale, which Zinus tied to the trial balance and financial statements. That is, Zinus' normal books and records treat sales as sales and purchases as purchases.

Contrary to Petitioners' argument, the fact that Zinus adopted this principle (provided in K-IFRS, Part 15) as of January 1, 2018 does not mean that the sales practices and sales accounting changed – in fact, Zinus was easily able to translate its 2017 financial information from the former accounting principle to the new principle. *See* Zinus Section A Response at Exhibit A-11D(3) (English Translation). which includes a discussion of changes to accounting policy at 12 (C.R. 39); *id* at 74-75. As shown at page 75 of the 2018 audited financial statement, all that Zinus had to do was "step down" both its 2017 revenues and costs of goods sold to remove the purchase price it paid for back-to-back sales. This is not some radical reclassification of sales or restructuring of sales flows. It just means that for reporting revenues and costs in its financial statement, Zinus KR first must eliminate the purchase price it paid (as recorded in its books and records) from both the cost of goods sold and sales revenue.

Moreover, nothing in this reporting standard would indicate that anyone paid a "commission" to Zinus KR. There is no suggestion that Zinus Indonesia paid a commission to Zinus KR. Nor have Petitioners pointed to any such evidence. As such, Zinus' reporting is fully consistent with both companies' books and records, a fact that Commerce recognized and thus correctly determined that there was no basis for Petitioners' proposed adjustment to Commerce's calculation of U.S. prices for "commissions earned by Zinus KR."[4]

> 2. *Petitioners Provide No Basis for Commerce to Depart From Past Practice and Treat Price Mark-Ups Between Affiliates as Commissions*

Petitioners claim that the price markup on intra-company sales between Zinus KR and Zinus US amounts to commission payments that Commerce should have captured in its net price

---

[4] As Zinus argued during the underlying investigation, *see* Zinus Rebuttal Br. at 36-38 (P.R. 277, C.R. 292), Commerce had previously examined this same transaction flow in the recently concluded AD investigation of *Mattresses from China*, wherein it saw the identical relationship between Chinese production (Zinus Xiamen) and Zinus Korea, and it did not treat Zinus KR as a commission agent.

calculations to account for Zinus KR's selling activities.  *See* Pet. Br. at 11-22.  Zinus' reporting

and Commerce's *Final Determination* on this issue are consistent with well-established

Commerce precedent.  Petitioners provide no basis for Commerce to depart from its practice, nor

do they point to any precedent supporting their position that Commerce should treat affiliated

party markups as commissions.

> In its *Final Determination*, Commerce correctly concluded:

> As for Zinus KR's mark up in the price it charges to Zinus US, Commerce's
> practice is not to treat such price mark ups as commissions but rather to require
> the affiliated party charging the price mark up to report its actual expenses
> associated with the sale.  As noted above, Zinus KR reported all of its relevant
> expenses.

*Final IDM* at 32 (P.R. 284).  Commerce cited *Oil Country Tubular Goods from Mexico* as an

example of its well-established past-precedent.  *Id.* at 32, fn. 215.  Petitioners in that case argued

that Commerce should treat the markup involving an intermediate affiliated company as a

commission.  In response, Commerce stated:

> The Department does not generally treat price mark-ups between affiliates such as
> the ones in this case as commissions.  *See U.S. Steel Group*, 15 F. Supp. 2d at 903,
> and *Floral Trade Council v. United States*, Slip-Op. 99-10 (CIT January 27,
> 1999).  Instead, these are intra-company transfers which the Department treats as
> part of the general operating expenses of the company.  Thus we generally do not
> deduct them from U.S. price.  Instead, in accordance with 19 CFR 351.402(e), we
> deduct the actual expenses of the affiliated importer.

*Oil Country Tubular Goods From Mexico: Final Results of Antidumping Duty Administrative*

*Review*, 64 Fed. Reg. 13,962, 13,968 (Cmt. 4) (Mar. 23, 1999).  In *Polyethylene Terephthalate*

*Film, Sheet, and Strip from the Republic of Korea*, Commerce again determined that markups

enjoyed by affiliates do not qualify as "commissions," confirming that Commerce there did "not

consider the mark-up between the price charged by Cheil to its U.S. subsidiary and the price

charged by Cheil to Cheil's U.S. customer to be a commission within the meaning of the

antidumping law."  *See Polyethylene Terephthalate Film, Sheet, and Strip from the Republic of*

*Korea; Final Results of Antidumping Duty Administrative Reviews and Notice of Revocation in Part*, 61 Fed. Reg. 35,177, 35,181 (Cmt. 6) (July 5, 1996).  These facts are directly analogous to Zinus KR's markup on EP sales and in principle is no different than what Petitioners suggest here with respect to Zinus KR's markup on the intermediate back-to-back sales to Zinus US.

While such markups are not commissions, even if they were, consistent with Commerce's questionnaire (as stated above), Commerce does not consider the commissions, but instead looks to the affiliated party's expenses.  As Commerce has stated, "{i}t is the Commerce's practice to use the affiliate's actual expenses, not the affiliated party commissions, in its calculations." *Final IDM* at 32 (P.R. 284); *see also Notice of Final Results of Antidumping Duty Administrative Review: Stainless Steel Sheet and Strip in Coils From France*, 67 Fed. Reg. 6,439 (Feb. 12, 2002) at accompanying IDM Cmt. 4.  This is because Commerce considers "affiliated-party commissions to be intra-company transfers of funds to compensate an affiliate for actual expenses incurred in completing the sale to unaffiliated customers and we do not deduct them from CEP." *See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden, and the United Kingdom; Final Results of Antidumping Duty Administrative Reviews and Revocation of Orders in Part*, 65 Fed. Reg. 49,219 (Aug. 11, 2000) at accompanying IDM Cmt. 18.

This is not some unique situation, and Petitioners do not point to any Commerce decision where the agency has ever considered the markup enjoyed by one affiliate along the transaction chain as a "commission" for purposes of sales reporting to Commerce (indeed, our understanding is that no such example exists), nor do they advance any legal justification to warrant upending this settled reporting paradigm.  Commerce has a longstanding practice, mandated by the statute, that it is to capture the sales price to the first unaffiliated purchaser in the United States, ignoring

intermediate transactions among affiliated parties along the way.  Specifically, from the final sales price, Commerce deducts all of the applicable direct expenses incurred on the transaction (regardless of which affiliate incurred the expense), as well as those indirect expenses incurred in the United States.  Rather than report or consider payments between affiliated parties in this analysis, the Department rightly gathers information pertaining to the affiliated respondent company's sales and expenses related to the sale, and not artificial "commission" payments based on the markup charged among the affiliated companies.  This approach is so entrenched at the statutory, regulatory, policy, and practice levels as to fairly be considered a bedrock antidumping principle.  Petitioners provide no basis for Commerce to depart from its practice and a reasoned explanation would be necessary for Commerce to do so.  *See Polyethylene Retail Carrier Bag Comm. v. United States*, 29 C.I.T. 1418, 1447-49 (Dec. 13, 2005); *Allegheny Ludlum Corp. v. United States*, 112 F. Supp. 2d 1141 (Ct. Int'l Trade 2000); *Cinsa, S.A. de C.V. v. United State*s, 21 C.I.T. 341, 349 (Apr. 4, 1997); *Hussey Copper Ltd. v. United State*s, 834 F. Supp. 413, 418-19 (Ct. Int'l Trade 1993).

3.     *Petitioners' Distortive Calculations Demonstrate The Overstated Nature of Their Claims*

Petitioners argue that Commerce should, on remand, reconsider its proposed calculated commission ratio of **[       ]** percent and "discuss this evidence when determining the appropriate method for adjusting for Zinus KR's selling activities on behalf of subject merchandise."  Pet. Br. at 21-22.  For the reasons discussed above, there is no reasonable basis for the Court to remand this issue to Commerce as its determination is supported by substantial record evidence and in accordance with law.  In the event that the Court finds remand appropriate, there is absolutely no basis for utilization of Petitioners' proposed commission ratio.  *See id*. at 21.

For ease of reference, we provide Petitioners' proposed calculation included at page 21 of their Rule 56.2 Brief:



*First*, Petitioners' calculation is distortive as it overstates the applicable expenses.  The

[                    ] figure is in effect a gross profit figure, not a "fee" figure.  *Second*, Petitioners seek

to segregate the [              ] "fee revenues" into profit ([            ]) and "fees" ([                ])

components.  In essence, by splitting the revenues into "profit" and "fees" presumably

Petitioners are seeking to identify the expenses incurred (as revenues with profit removed are

expenses).  Yet, this [              ] figure is nearly equal to Zinus KR's entire selling and

administrative expenses of [                ].  *See* Zinus' Section A Response at Exhibit A-11D(1), p.

76 (C.R. 39).  In effect, Petitioners have concocted a calculation that would attribute nearly all of

Zinus KR's operating expenses to purchases and resales of Zinus Indonesia's product.  Of course,

Zinus KR is a parent company to a number of subsidiary companies with global operations, and

only a sliver of its operation expenses relate to sales of Zinus Indonesia product.

*Third*, Petitioners' calculation of the profit rate divides Zinus KR's total net profit ([                    ]) by Zinus KR's sales revenue ([                    ]), and then multiplies the resulting rate ([        ]) by the nominal gross markup on sales of Zinus Indonesia's products ([                ], to derive an absolute amount of profit [

    ].  Petitioners have no basis to assume that the overall company-wide rate is relevant here and, indeed, record evidence confirms that it is not, as discussed below.

*Fourth*, even if this issue were remanded and Commerce were to accept a company-wide overall profit rate for purposes of this analysis, the ratio is calculated using one amount in the denominator that Petitioners seek to apply to a completely unrelated amount.  As Commerce has repeatedly confirmed in discussing, for example, G&A and INTEX ratios, the ratios must be consistent with the reported data.  Here, Petitioners have used Zinus KR's *net* sales revenue -- *i.e.*, the net income residual remaining after the purchase price adjustment required by K-IFRS Part 15 discussed above – rather than the *gross* sales revenue to calculate the profit rate, and then multiplied the resulting "profit" rate by the net profit amount, not gross sales revenue.  Moreover, Petitioners then suggest that Commerce should have applied these rates to the reported gross unit prices – which are decidedly not equivalent to the net profit amounts Petitioners used in their calculations.

*Fifth*, the amounts used here are amounts related to Zinus KR's transactions.  For CEP transactions (both back-to-back and inventory), the price amounts reported on the U.S. sales files are Zinus US' sales prices to unaffiliated customers, not Zinus KR's sales prices to Zinus US, much less the net revenues Petitioners have used in their calculation.  Of course, Zinus Indonesia's sales denominator is significantly lower than U.S. price, which would result in a significant overstatement of any per-unit commission amount.  Following Zinus' U.S. sales

reconciliation at Exhibit C-2A and B, Zinus reported a total EP sales value of $**[        ]** and a CEP sales value of $**[        ]** for a total reported U.S. sales value of $**[        ]**. Applying Petitioners' suggested **[        ]** percent ratio to this sales value would result in an extended "commission" expense amount of $**[        ]**. This of course is more than the company's overall selling and general expenses, and nothing in the record or Petitioners' brief would suggest that Commerce should find a commission amount of over $**[        ]**. Quite obviously, the percentage Petitioners have proposed cannot be applied to any reported invoice price, whether EP or CEP. In this respect, Petitioners' calculation is worse than mixing apples and oranges; it is a fruit cocktail. As noted in Section V.A.1, above, Commerce did not ask for any revisions to Zinus' reporting; Petitioners' back of the envelope calculation, therefore, is tantamount to a facts available alternative laden with adverse assumptions without any statutory basis to resort to such calculations.

    To further highlight the absurdity of Petitioners' proposed calculation, below we provide an alternate calculation that Zinus provided to Commerce in its administrative case brief. This rate is calculated consistent with materials Zinus provided to calculate a G&A expense rate for Zinus KR's operations (at Exhibit SD-25) of the supplemental section D response, and appropriately considers Zinus KR's actual expenses, and total revenues.

*(In thousands of KRW)*

| Zinus KR | | | | |
|---|---|---|---|---|
| Total Gross Revenue | [        ] | a | Source: Exhibit SD-25 (C.R. 205) |
| SG&A | [        ] | b | See Exhibit A-11d (C.R. 38-39) |
| Less Management G&A | [        ] | c | See Exhibit SD-15 (C.R. 204) |
| Less Direct Expenses | | | |
| -- Advertising | [        ] | d | See Exhibit A-11d, |

*NON-CONFIDENTIAL VERSION*

| | | | |
|---|---|---|---|
| -- Logistics Expenses | [ | ] e | 2019   Unconsolidated   Audited   Financial Statement, Note 31 (C.R. 38-39) |
| -- Commissions/Fees | [ | ] f | |
| Net SG&A | [ | ] g=b-(c:f) | |
| Zinus KR DINDIRS2U | [ | ] h=g/a | |

This calculation starts from Zinus KR's overall SG&A expenses and removes expenses reported in Exhibit SD-15 as G&A expenses, as well as direct expenses (advertising and logistics).  With respect to the excluded "Commission & Service Fees" these fees are detailed at Exhibit SQ-1 of Zinus' December 14, 2020, Post-Preliminary Supplemental Questionnaire Response (C.R. 271). Zinus excluded these expenses because they include a variety of charges including reported direct expenses (bank charges) and direct expenses related to third country sales ([

]).  Accordingly, Zinus submits that it is most appropriate to exclude these expenses.

In sum, Petitioners have provided no basis on which to remand Commerce's determination that Zinus KR reported all relevant selling expenses.  Commerce did not ignore record evidence.  Rather, it thoroughly investigated this issue in the underlying investigation and its determination *not* to adjust Zinus' reporting to account for "commissions earned by Zinus KR" was supported by substantial evidence, constituent with past practice, and otherwise in accordance with law.  Should the Court nonetheless find reason to remand this issue to Commerce, it should reject Petitioners' proposed expense rate, as it is unreasonable and wholly distortive.

**B.      Commerce Did Not Err in Using Indonesian GTA Import Data as a Surrogate Market Price for its Transactions Disregarded Adjustments**

As an initial matter, Zinus does not endorse Commerce's transactions disregarded analysis and adjustments without reservation; however, in making any adjustment Commerce was right to rely on the Indonesian Global Trade Atlas ("GTA") data. *See* Zinus Case Br. at 24-29 (P.R. 275, C.R. 292). Petitioners allege that Commerce erred in using GTA import data from Indonesia as its surrogate market price for purposes of its transactions disregarded adjustments in the Final Determination. *See* Pet. Br. at 22-32. Petitioners assert that Commerce should have excluded Indonesian import data due to alleged distortions in those data and the incomparability of Indonesia to China, the source of the affiliated inputs. Petitioners allege that Commerce should have used instead an average of the GTA import data from Brazil, Malaysia, Mexico, Romania, Russia, and Turkey as a surrogate for the price of unaffiliated minor inputs for comparison to the price of minor inputs that Zinus purchased from its affiliates. *Id*. at 26-27. Petitioners' arguments are unpersuasive and rest on speculation as well as a misreading of the statute.

> 1.      *Commerce's Use of Indonesian GTA Data in the Final Determination Is Consistent with the Statute*

Pursuant to the transactions disregarded rule, Commerce conducts an assessment of minor inputs purchased from affiliated suppliers and may disregard any affiliated transactions for which the cost of the input "does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration." 19 U.S.C. § 1677b(f)(2). To assess whether the cost of the input fairly reflects an arm's length price, Commerce will compare the price paid to the company's affiliated supplier for the input to prices paid by the company to unaffiliated suppliers for the same inputs (*i.e.*, market prices). For those minor inputs which Zinus sourced from affiliated parties exclusively (*i.e.*, the company did not also

29

purchase the inputs in question from unaffiliated suppliers), the statute establishes that Commerce will compare the price paid to the affiliated supplier to "information available as to what the amount would have been if the transaction had occurred between persons who are not affiliated." 19 U.S.C. § 1677b(f)(2). The statute does not prescribe a specific methodology by which Commerce is to select the "information available" to use in that comparison. *Final IDM* at 18 (P.R. 284) ("The statute directs Commerce to test the arm's-length nature of affiliated transactions to determine whether they reflect a market value and does not specify a particular methodology for determining market values.").

In its *Final Determination*, Commerce found that Zinus had obtained ten types of minor inputs from affiliated suppliers based in China, most of which Zinus did not also purchase from unaffiliated suppliers. *Id*. at 16-17 (P.R. 284). Commerce explained that, "{w}hen market prices are not available to test affiliated party transactions, Commerce will often solicit the affiliated supplier's COP for use as a surrogate for market price." *Id*. at 17 (P.R. 284). However, as these inputs were sourced from China-based affiliated suppliers, "Commerce was unable to use the NME-based affiliated suppliers' cost of production for use as a substitute for market price," based on the assumption that the cost to produce the input in an NME does not reflect a market value. *Id*. at 17 (P.R. 284).

Commerce requested surrogate market price information to use, as "information available," as a market price for comparison to the price paid to affiliated suppliers. Specifically, Commerce requested that the parties place GTA Import Data on the record for this purpose, and obtained from the parties GTA import data for Brazil, Malaysia, Mexico, Romania, Russia, Turkey, and Indonesia. Commerce determined "that the most reasonably available information

to the parties for this purpose would be GTA import data, as it is readily available and reasonably specific to the voluminous number of affiliated NME inputs." *Id*. at 17 (P.R. 284).

As such, in the *Final Determination*, Commerce determined that the Indonesian GTA data on the record constituted the best information available for a market-determined surrogate, and disregarded the import data received for the other six countries. Commerce explained that the statute directs the agency "to look to the market under consideration when testing the affiliated supplier transfer price against a market price," which would be Indonesia. *Id*. at 18 (P.R. 284). Accordingly, Commerce found that the Indonesian GTA data "best reflect market prices for the market under consideration in those instances where market prices directly from an unaffiliated supplier are not available." *Id*. Commerce used the Indonesian GTA import data as a surrogate market price for the transactions disregarded test.

Because neither the statute nor any of Commerce's regulations directly address the methodology by which Commerce is to arrive at the surrogate market price for inputs for which an unaffiliated supplier price does not exist, the court should uphold Commerce's methodology if it is reasonable, *see Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 843 (1984), and is not arbitrarily applied. *See, e.g., Caribbean Ispat Ltd. v. United States,* 450 F.3d 1336, 1340 (Fed. Cir. 2006). Commerce's methodology here is reasonable, because it is in line with the purpose of the transactions disregarded test to determine whether an affiliated input price is fair when compared to an unaffiliated input price in the market under consideration, *i.e.,* Indonesia. There is simply no basis to overturn Commerce's statutory interpretation and reasoning on this point.

Petitioners disagree with Commerce's decision to use the Indonesian GTA data as the surrogate market price. Petitioners assert that Commerce has misread the statute, arguing that

Commerce's statutory interpretation that Indonesia is the relevant "market under consideration" for purposes of the "information available" prong of the statute is incorrect.  Petitioners contend that the statute does not impose a "market under consideration" geographical limitation.  For Petitioners, Commerce was not "required" to use Indonesian GTA data, and Commerce erred in "not provid{ing} any reasoning, analysis, or discussion as to why Indonesia was the proper market under consideration or why the market under consideration is relevant when looking for other 'information available' under the second sentence of Section 1677b(f)(2)."  Pet. Br. at 27-28.

Petitioners' argument is inconsistent with the plain language of the statute.  The statute is explicit that the affiliated input price is to be compared to a price "in the market under consideration," in this case Indonesia.  Petitioners' argument rests on a bifurcation of the first and second sentence of 19 U.S.C. § 1677b(f)(2), but there is no justification for making that bifurcation.  To the contrary, the two sentences of the provision go hand-in-hand.  That is, the first sentence provides that the affiliated input price is to be compared to a price for the input from an unaffiliated supplier "in the market under consideration," where available.  There is no dispute as to the meaning of this first sentence.  The second sentence then provides that, where such a transaction for the same input from an unaffiliated supplier in the market is unavailable, Commerce shall use a surrogate market price "based on the information available as to what the amount would have been if the transaction had occurred between persons who are not affiliated."  The second sentence necessarily follows from the first, and the "market under consideration" limitation logically applies to it as well.  Read together, the second sentence allows Commerce to craft a surrogate price based on information available from the same market, in the absence of identical inputs purchased in that market from unaffiliated suppliers.  Essentially, the statute

directs the Department to assess whether the input purchases reflected market value in Indonesia. Contrary to Petitioners' argument, the statute does not give Commerce unlimited discretion to select surrogate prices for reported data. Moreover, even if it did afford that discretion, there is nothing to suggest here that Commerce's interpretation was unreasonable.

This clear indication that the aim is to assess transaction prices in the country under investigation is not only inherent in the statute, but has been reflected consistently in Commerce's determinations. For example, in *Cut-to-Length Carbon-Quality Steel Plate from Korea*, Commerce stressed the preference for prices in the market under consideration, by emphasizing the "market under consideration" language in the first sentence of the statute. *See Notice of Final Determination of Sales at Less Than Fair Value: Certain Cut-To-Length Carbon-Quality Steel Plate Products from Korea*, 64 Fed. Reg. 73,196 (Dec. 29, 1999) ("The price that a respondent pays directly to a supplier might be preferable since the statute, at section 773(f)(2), specifically refers to transactions 'in the market under consideration.' The prices paid by the respondent in an investigation by definition represent the market under consideration.").

Similarly, in *Low Enriched Uranium from France*, Commerce emphasized, with respect to the parallel statutory provision addressing the major input rule, that "{a}ccording to the statute, the market value should represent the amount usually reflected for sales of merchandise under consideration in the market under consideration." *See Notice of Final Results of Antidumping Duty Administrative Review: Low Enriched Uranium From France*, 70 Fed. Reg. 54,359 (Sept. 14, 2005) at accompanying IDM Cmt. 3. And in *Cold Rolled Steel from Brazil*, Commerce was faced with issues related to affiliated party transactions and again stressed that Commerce was selecting a market value which pertained to the value "in the market under consideration." *See Certain Cold-Rolled Steel Flat Products From Brazil: Final Determination*

*of Sales at Less Than Fair Value*, 81 Fed. Reg. 44,946 (July 29, 2016) at accompanying IDM

Cmt. 10.

Further, Petitioners have not identified or relied on any evidence indicating that a

particular input has the same value as in any of the six alternate countries on whose input data

they would have Commerce rely.  Absent such evidence, there is no rationale for using prices for

those markets as a surrogate for the unaffiliated inputs in question.  There is nothing on the

record to suggest that imports into Brazil, Malaysia, Mexico, Romania, Russia, and Turkey could

possibly reflect values in Indonesia.  As such, pricing data for imports into these countries have

no place in determining a market value for inputs purchased and consumed in Indonesia.

Commerce interpreted the statute as "indicat{ing} that the item being tested should

reflect a market price in the country under consideration, which is Indonesia in the present case."

*Final IDM* at 18 (P.R. 284).  In light of the plain text of the statute and the objective behind the

transactions disregarded test, this is a reasonable interpretation.  Petitioners claim that

"Commerce simply asserts Indonesia is the market under consideration without providing any

explanation. Nothing in the statute compels that conclusion."  However, the proper question

under *Chevron* is not whether the statute "compels that conclusion" but whether the conclusion is

a reasonable one to draw from the statute which is silent on this issue.  In light of the plain text of

the statute, which expressly limits Commerce's inquiry to a determination of market price in the

market under consideration, *i.e.*, Indonesia, such an interpretation is reasonable.

Finally, it is not clear how Petitioners' claim that "given that the purpose of the provision

is to identify the fair market value of the purchased input, the proper market is the one in which it

is produced and sold" squares with their position that Commerce should have used import data

from six unrelated countries, none of which is the market in which the input was produced or

sold.  Nevertheless, it is clear that Commerce reasonably interpreted the statute as permitting the use of import data from Indonesia, the market under consideration, to serve as information available for the surrogate market price.

  2. *Petitioners' Argument that the Indonesian GTA Data "May Be" Distorted is Entirely Speculative and Not Rooted in Fact*

  In addition to the legal argument discussed above, Petitioners raise two unpersuasive and unsubstantiated arguments alleging that Commerce erred in relying on the Indonesian GTA Import Data.  Pet. Br. at 32-33.  Both of these arguments are baseless and must fail.

  First, Petitioners allege that "Indonesia is not economically comparable to China and thus is not an appropriate surrogate source for costs of affiliated Chinese suppliers."  *Id.* at 32.  As an initial matter, Petitioners did not raise this argument in their case brief before the agency.  It is well-established that respondents in Commerce proceedings are "procedurally required to raise" all issues and arguments in case briefs to Commerce "at the time Commerce {is} addressing the issue," to preserve such issues for appeal.  *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1375 (Fed. Cir. 2010) (citing *Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1383 (Fed. Cir. 2008)); *Luoyang Bearing Corp. (Grp.) v. United States*, 450 F. Supp. 3d 1402, 1409 (Ct. Int'l Trade 2020), *aff'd,* 844 F. App'x 368 (Fed. Cir. 2021).  Accordingly, Petitioners have waived this argument, and it is not preserved for appeal.

  Moreover, for the reasons discussed above, the economic comparability of Indonesia and China is not relevant to the inquiry under 19 U.S.C. § 1677b(f)(2).  Again, the market price for comparison in 19 U.S.C. § 1677b(f)(2) is a market price in the market under consideration, *i.e.,* Indonesia.  The statutory inquiry is not geared at the source of the affiliated input, but rather the cost a producer in the country under investigation would be expected to incur.

Second, Petitioners on appeal seek to revive the unsuccessful argument as to distortion that they raised to Commerce in their agency case brief, which Commerce considered and dismissed as unpersuasive and unfounded.  Specifically, Petitioners allege, without facts, that the use of Indonesian GTA data is potentially distortive based on the hypothetical suggestion that "Indonesian importers may be . . . confused and misclassifying their imports."  Pet. Br. at 32-33. Petitioners' assertion rests on an erroneous characterization of "Zinus Indonesia's admitted confusion as to the correct HTS category" for certain of its imports, from which Petitioners extrapolate that "other Indonesian importers may be similarly confused…. so the Indonesian GTA data cannot be reasonably relied upon, at least with respect to these products."  *Id.* at 33.

As an initial matter, and as Zinus asserted in its agency case brief in response to this argument, Petitioners' argument is entirely based on a bad faith mischaracterization of a comment Zinus provided in its Supplemental Section D Response.  It is simply incorrect to assert that Zinus expressed any "confusion" about the appropriate classification of its imports.  Rather, on page SD-13 of Zinus' Supplemental Section D Response, Zinus stated that, although Zinus imports certain mattress inputs under HTS [              ], for purposes of any comparison that the Department may make, Zinus believes that for [

          ], HTS [          ] provides more appropriate data.  Zinus Supp. Section D Response at SD-13 (C.R. 207).  Zinus explained that HTS category [          ] is a basket category and thus the data necessarily contain many disparate items of different sizes and weights, including not only mattress components but also finished mattresses.  *See id*.  As such, Zinus suggested that, instead of utilizing the basket category for any comparison to the [

                ], the more appropriate comparison would be to products within HTS classification [

].  *Id*. (C.R. 207).  Zinus provided the import statistics corresponding to this HTS category in its Supplemental Section D submission.  Again, this information was provided, not due to any "confusion" as to which HTS classification was accurate, but because it would provide the more appropriate HTS code for determining the market value of the input in question, should the Department rely on an HTS comparison methodology for determining the market value of inputs in Indonesia.

Further, Petitioners' distortion argument is expressly speculative.  Petitioners claim that "Zinus Indonesia's admitted confusion as to the correct HTS category suggests other Indonesian importers may be similarly confused and misclassifying their imports and so the Indonesian GTA data cannot be reasonably relied upon, at least with respect to these products."  Pet. Br. at 33.  Petitioners provide no support or evidence either that Zinus Indonesia actually misclassified its imports, not to mention any support or evidence that any other importers misclassified their imports.  Petitioners simply advance no support for this baseless argument, and it must fail.  *See Thai Plastic Bags Indus. Co., Ltd. v. United States*, 904 F. Supp. 2d 1326, 1332 (Ct. Int'l Trade 2013) (citing *Lucent Techs., Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1327 (Fed. Cir. 2009) ("It is well established that speculation does not constitute 'substantial evidence.'") (internal quotation marks and citation omitted).

In sum, Petitioners have not offered any credible evidence or justification as to why Commerce erred in using the GTA data pertaining to Indonesian imports to determine the market value for certain inputs in Indonesia (*i.e.,* the market under consideration).  Instead, Petitioners argue that the statute does not require Commerce to select Indonesia, the market under consideration, as the source of the surrogate pricing data.  Even if Petitioners' argument were correct, Petitioners have put forth no argument or evidence that Commerce was not permitted to

use Indonesian data or that its interpretation of the "market under consideration" language in the statute was unreasonable.  As such, Petitioners have presented no reason that would justify a remand on this issue.

### C.   Commerce Did Not Err As a Matter of Law by Not Requiring Additional U.S. Sales Reconciliation Materials for Zinus Indonesia

Finally, Petitioners allege that Commerce erred in not requiring Zinus Indonesia to submit a U.S. sales reconciliation between its reported U.S. sales and its audited financial statements.  As an initial matter, although Petitioners assert that they "repeatedly objected" to Commerce on this issue, Pet. Br. at 33, Petitioners did not raise this issue in their administrative case brief.  Accordingly, their complaint that "Commerce never specifically explained why" it did not request additional reconciliation materials is fully explained by the fact that they failed to exhaust their administrative remedies on this issue.  *Id; see, e.g., Dorbest Ltd. v. United States*, 604 F.3d 1363, 1375 (Fed. Cir. 2010).  As such, Petitioners have waived this argument and the Court should accordingly disregard it.  *See, e.g., Mittal Steel Point Lisas Ltd. v. United States,* 548 F.3d 1375, 1383 (Fed. Cir. 2008).  However, to the extent the Court considers this issue on the merits, the record makes clear that Zinus fully supported and reconciled its reported sales and Commerce reasonably concluded it had all of the information and reconciliations necessary to evaluate Zinus' reported U.S. sales.

Despite having not raised this argument in their case brief to the agency, Petitioners lay out certain "select issues that would have been clarified by the missing U.S. sales reconciliation," Pet. Br. at 38, including classification of sales type, date of sale definition, and processes used to determine EP sales.  Petitioners allege that, "{w}ithout explanation or citation to any supporting precedent, Commerce allowed mandatory respondent Zinus Indonesia to submit no U.S. sales

reconciliation of its export sales in the underlying investigation," inconsistent with Commerce's past practice. *Id.* at 35.

Petitioners attempt to frame this issue as one in which Commerce has departed from a routine practice for addressing similar situations. *Id.* at 37. Specifically, Petitioners rely on case law addressing certain agency action that has become "an established practice," such as when "a uniform and established procedure exists that would lead a party, in the absence of notification of change, reasonably to expect adherence to the agency's past action." *Id.* (quoting *United States Steel Corp. v. United States*, 348 F. Supp. 3d 1248, 1254 (Ct. Int'l Trade 2018). This is, essentially, a reliance argument. It is not clear here on what Petitioners are asserting they relied to their detriment. Instead, here Commerce was satisfied with the sales reconciliation materials Zinus provided and did not require further materials pertaining to Zinus Indonesia's sales. The situation is not analogous to the situations presented in the case law regarding specific reliance on established practice.

Moreover, while they present this case as an unprecedented and radical departure from the Commerce's standard reporting requirements, this case record includes significant documentation related to Zinus' submissions from Commerce's prior investigation of Mattresses from China. *See* Zinus' *Submission of Zinus Xiamen's Proprietary Information from the Mattresses from the People's Republic of China Investigation"* (Oct. 14, 2020) (P.R. 212, C.R. 221). The exhibit list from Zinus Xiamen's Section C questionnaire response (included at Attachment 2 to the October 14, 2020 submission) confirms that Zinus Xiamen, when reporting sales following a similar sales structure, provided sales reconciliation packages for Zinus KR and Zinus US, but not a separate reconciliation for Zinus Xiamen, the Chinese producing entity under investigation. For Petitioners to claim that this reporting and claimed absence of a sales

reconciliation pertaining specifically to the company under investigation is somehow a departure from standard practice ignores the fact that in this case Zinus followed the same sales reconciliation methodology its Chinese affiliate used in the prior investigation of Mattresses from China.

As Petitioners admit, they requested that Commerce require Zinus Indonesia to provide a detailed reconciliation, and Commerce determined that it was not necessary to do so.  That is, Petitioners would have the Court interfere in the agency's proceedings, substituting its own judgment for that of the agency.  Of course, the Court may not substitute its judgment (or Petitioners' judgment for that matter) for that of the agency.  *See Corus Staal BV v. United States,* 259 F. Supp. 2d 1253, 1260 (Ct. Int'l Trade 2003).  This situation is directly in Commerce's decision-making sphere, and it is not appropriate for the Court to interfere.

In any event, it is frankly unclear exactly what sort of sales "reconciliation" Petitioners seek in this appeal.  Zinus Indonesia did not report any U.S. sales because it was not the entity that sold subject mattresses to U.S customers.  As Zinus explained:

> For the sales made to the United States, Zinus Indonesia invoices its parent company, Zinus KR.  Depending on the nature of the transactions, Zinus KR, in turn, invoices unaffiliated customers in the United States, or its U.S. affiliates, Zinus US or Keetsa.

*See* Zinus Section A Response at A-1 to A-2 (P.R. 97, C.R. 36).  In other words, all of Zinus Indonesia's sales were made to its parent company, Zinus KR.  Thus, Zinus Indonesia had no sales to report and therefore nothing to reconcile.

Nevertheless, these facts are essentially self-reconciled in Zinus Indonesia's financial statements.  Commerce's period of investigation was calendar year 2019.  Zinus Indonesia's financial statements, provided at Exhibit A-11a(1) of the Section A response show a total 2019 sales revenue amount of **[          ]** USD and indicate that all sales were to a related party.

(*See* Note 10 on page 15) (C.R. 37-38).  Note 15 on page 18 of the 2019 financial statements

provides further detail confirming that all **[          ]** USD of the company's sales were sold

to its Korean parent company, Zinus, Inc (*i.e.*, Zinus KR).  To be clear, Zinus Indonesia's sales

reconciliation, as supported by the record, is as follows:

| Item | Amount | Source |
|------|--------|--------|
| Reported Zinus Indonesia U.S. Sales | $0 | U.S. Sales Database |
| Total Company Sales | $[          ] | Financial Statement Note 10 |
| Sales to Zinus, Inc. (*i.e.*, not reportable sales) | $[          ] | Financial Statement Note 15 |
| Remaining Balance | $0 | Reconciles to U.S. Database |

In short, on the basis of the record materials, all of Zinus Indonesia's sales were

accounted for and fully reconciled to the company's financial statement.  Whether Commerce

requested a particular exhibit or worksheet is immaterial.  In response to Petitioners' initial

complaints on this issue – which, again, are complaints not raised in their case brief – Zinus

offered this full explanation.  *See* Zinus' Aug. 20, 2022 Rebuttal to Petitioners' Comments on

Zinus' Section C Questionnaire Response at 4-5 (P.R. 166, C.R. 158).  Accordingly, Commerce

reasonably did not require more as it was satisfied with the materials Zinus provided.  The Court

need not supplant Commerce's exercise of its investigative authority on this issue.

## VII.   <u>CONCLUSION</u>

For the foregoing reasons, Zinus respectfully requests that this Court deny Consolidated

Plaintiffs' Rule 56.2 Motion for Judgment Upon the Agency Record because the aspects of

Commerce's determination that they seek to challenge are supported by substantial evidence and

otherwise lawful.

Zinus further requests that the Court grant Zinus' Rule 56.2 Motion for Judgment Upon

the Agency Record.  *See* Zinus' 56.2 Br., Nov. 9, 2021, ECF Nos. 22 and 23.  For the reasons

established therein, the Court should remand the *Final Determination* with respect to (i)

*NON-CONFIDENTIAL VERSION*

Commerce's use of a quarterly ratio sales methodology to determine the quantity of subject CEP inventory, (ii) Commerce's constructed value profit calculations, and (iii) Commerce's adjustments to U.S. price.  *See id*.

Respectfully submitted,

 /s/ J. David Park
J. David Park
Henry D. Almond
Daniel R. Wilson
Leslie C. Bailey
Kang Woo Lee
Gina M. Colarusso

*Counsel to PT. Zinus Global Indonesia*
*Defendant-Intervenor*

Phyllis L. Derrick
Eric Johnson

*Consultants to PT. Zinus Global Indonesia*
*Defendant-Intervenor*

Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20001
Phone:  (202) 942-5000
Fax:  (202) 942-5999
E-mail:  David.Park@apks.com

**Dated:  March 2, 2022**

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE JENNIFER CHOE-GROVES

| | |
|---|---|
| PT. ZINUS GLOBAL INDONESIA,<br><br>                  **Plaintiff,**<br>    **and**<br><br>BROOKLYN BEDDING, LLC ET AL.,<br><br>          **Consolidated Plaintiffs,**<br><br>    **v.**<br><br>UNITED STATES,<br><br>                  **Defendant,**<br><br>    **and**<br><br>PT. ZINUS GLOBAL INDONESIA and<br>BROOKLYN BEDDING, LLC ET AL.,<br><br>         **Defendant-Intervenors.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    **Court No. 21-00277**<br>)    **(Consol.)**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## CERTIFICATION OF COMPLIANCE WITH CHAMBERS PROCEDURE 2(B)(1)

The undersigned hereby certifies that the attached Response Brief in Opposition to

Consolidated Plaintiffs' Motion for Judgment Upon the Agency Record, filed on March 2, 2022,

contains 12,828 words, exclusive of the table of contents, table of authorities, and counsel's

signature block, according to the word count function of the word-processing system used to

prepare this brief, and inclusive of the words in the embedded images, counted manually.  The

brief therefore complies with the maximum 14,000 word count limitation set forth in the Court's

Chambers Procedures.

                               By:    /s/ J. David Park
                                          J. DAVID PARK

**Dated:  March 2, 2022**