# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| PT ZINUS GLOBAL INDONESIA, )<br><br>Plaintiff, )<br><br>v. )<br><br>UNITED STATES, )<br><br>Defendant, )<br>)<br>and )<br>)<br>BROOKLYN BEDDING, LLC, *et al.*, )<br>Defendant-Intervenors, )<br>) | Consol. Ct. No. 21-00277<br>**PUBLIC VERSION** |

## DEFENDANT'S RESPONSE TO PLAINTIFFS' <u>MOTIONS FOR JUDGMENT ON THE AGENCY RECORD</u>

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

L. MISHA PREHEIM
Assistant Director

OF COUNSEL:
DAVID RICHARDSON
Senior Counsel
Department of Commerce
Office of the Chief Counsel
  for Trade Enforcement & Compliance

KARA M. WESTERCAMP
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 305-7571

March 2, 2022

Attorneys for Defendant

# TABLE OF CONTENTS

**PAGE**

RULE 56.2 STATEMENT ................................................................................................ 2

    I.    The Administrative Determination Under Review ................................................ 2

    II.   Issues Presented For Review ............................................................................... 2

STATEMENT OF FACTS ............................................................................................... 3

    I.    Initiation Of Investigation .................................................................................. 3

    II.   Preliminary Determination................................................................................... 6

    III.  Final Determination ........................................................................................... 8

SUMMARY OF ARGUMENT ...................................................................................... 13

ARGUMENT .................................................................................................................. 15

    I.    Standard Of Review.......................................................................................... 15

    II.   Commerce's Use Of A Quarterly Ratio Sales Methodology To Determine
        The Quantity Of Indonesian Mattresses Sold During The Period Of
        Investigation Is Supported By Substantial Evidence And In Accordance
        With Law .......................................................................................................... 17

         A.   Because Zinus U.S. Did Not Trace Country Of Origin In Its
              Warehouses, It Was Reasonable For Commerce To Use A Quarterly
              Ratio Sales Methodology To Determine The Quantity Of Subject
              Constructed Export Price Inventory......................................................... 17

         B.   The Court Should Reject Zinus Indonesia's Various Arguments
              With Respect To The FIFO Methodology And Including Merchandise
              In Transit................................................................................................. 22

    III.  Commerce's Adjustments To Zinus U.S.'s Reporting Of Sales Deductions Is
        Supported By Substantial Evidence And In Accordance
        With Law .......................................................................................................... 27

         A.   It Was Reasonable For Commerce To Apply A Sales Deduction Because
              Zinus U.S. Cannot Distinguish Between "Subject" And "Non-Subject
              Merchandise" With Its Constructed Export Price Sales .......................... 27

i

B.    The Court Should Find That Zinus Indonesia's Various Arguments
      Challenging The Adjustment To The Sales Deduction Are Unavailing... 31

IV.   Substantial Evidence Supports Commerce's Determination To Use Emirates
      Sleep's Financial Statements Because They Were The Best Available
      Information ......................................................................................................... 34

      A.    Legal Framework ...................................................................................... 35

      B.    Commerce's Determination That The Emirates Sleep Financial
            Statements Were The Best Available Information Is Supported By
            Substantial Evidence................................................................................. 36

      C.    The Court Should Reject Zinus Indonesia's Various Arguments
            Challenging The Emirates Sleep Financial Statements ........................... 40

            1.    The Emirates Sleep Financial Statements Satisfied Commerce's
                  Financial Statements Criteria ....................................................... 40

            2.    Commerce Properly Declined To Use The Graha And Ecos
                  Financial Statements Because They Were Not Contemporaneous,
                  Not Audited, Or Had A Qualified Audit Opinion......................... 44

            3.    Commerce's Use Of The Emirate Sleep Financial Statements To
                  Calculate The Profit Cap Is Supported By Substantial Evidence
                  And In Accordance With Law ....................................................... 46

V.    Whether Commerce's Decision To Limit The Selling Expenses
      Attributable To Zinus Korea To Its Actual Selling Expenses Is Supported By
      Substantial Record Evidence And Is Otherwise In Accordance with Law .......... 48

VI.   Commerce's Decision To Use Indonesian GTA Import Data To Value
      Certain Zinus Indonesia Input Purchase Transactions Is Supported By
      Substantial Evidence And In Accordance With Law ........................................... 53

      A.    Legal Framework ...................................................................................... 53

B.      Substantial Evidence Supports Commerce's Decision That
Indonesian GTA Import Data Were The Best Available Source Of
Information For Valuing The Inputs Purchased From Non-Market
Economy Affiliates ................................................................................. 54

C.      Commerce's Selection Of Indonesia GTA Data, Pursuant To
19 U.S.C. § 1677b(f)(2), Is In Accordance With Law ............................. 56

VII.     Brooklyn Bedding Failed To Exhaust Its Administrative Remedies
Regarding No Sales Reconciliation Between Zinus Indonesia And Zinus
Korea ........................................................................................................... 61

CONCLUSION ........................................................................................................... 63

# TABLE OF AUTHORITIES

**CASES**                                                                                          **PAGE(S)**

*Atar, S.r.l. v. United States*,
   703 F. Supp. 2d 1359 (Ct. Int'l Trade 2010) *rev'd on other grounds*,
   730 F.3d 1320 (Fed. Cir. 2013) ................................................................. 46

*Boomerang Tube LLC v. United States*,
   856 F.3d 908 (Fed. Cir. 2017) .................................................................. 62

*Bowles v. Seminole Rock & Sand Co.*,
   325 U.S. 410 (1945) ................................................................................. 16

*Catfish Farmers of Am. v. United States*,
   641 F. Supp. 2d 1362 (Ct. Int'l Trade 2009) ........................................... 58

*Changzhou Trina Solar Energy Co. v. United States*,
   352 F. Supp. 3d 1316 (Ct. Int'l Trade 2018) ........................................... 56

*Chevron, U.S.A., Inc. v. NRDC*,
   467 U.S. 837 (1984) ................................................................................. 16

*Consolo v. Fed. Mar. Comm'n*,
   383 U.S. 607 (1966) ................................................................................. 15

*Corus Staal BV v. United States*,
   502 F.3d 1370 (Fed. Cir. 2007) ............................................................... 62

*CP Kelco U.S., Inc. v. United States*,
   949 F.3d 1348 (Fed. Cir. 2020) ............................................................... 46

*Dillinger France S.A. v. United States*,
   350 F. Supp. 3d 1349 (Ct. Int'l Trade 2018) ........................................... 61

*Fujitsu Gen. Ltd. v. United States*,
   88 F.3d 1034 (Fed. Cir. 1996) ........................................................ passim

*Golden Dragon Precise Copper Tube Grp., Inc. v. United States*,
   2016 WL 4442163 (Ct. Int'l Trade Aug. 23, 2016) ........................... 43, 45

*Goldlink Indus. Co. v. United States*,
   431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) ........................................... 16

*Hangzhou Spring Washer Co. v. United States*,
   387 F. Supp. 2d 1236 (Ct. Int'l Trade 2005) ..................................... 16, 43

*Home Meridian Int'l, Inc. v. United States,*
    865 F. Supp. 2d 1311 (Ct. Int'l Trade 2012) .......................................... 42

*Husteel Co. v. United States,*
    471 F. Supp. 3d 1349 (Ct. Int'l Trade 2020) ................................... 41, 42

*Inland Steel Indus., Inc. v. United States,*
    188 F.3d 1349 (Fed. Cir. 1999).................................................................. 56

*INS v. Elias-Zacarias,*
    502 U.S. 478 (1992) .................................................................................. 16

*JTEKT Corp. v. United States,*
    675 F. Supp. 2d 1205 (Ct. Int'l Trade 2009) .......................................... 32

*Maverick Tube Corp. v. United States,*
    107 F. Supp. 3d 1318 (Ct. Int'l Trade 2015) .......................................... 46

*McCarthy v. Madigan,*
    503 U.S. 140 (1992).................................................................................. 62

*Mid Continent Steel & Wire, Inc. v. United States,*
    203 F. Supp. 3d 1295 (Ct. Int'l Trade 2017) .......................................... 41

*Mittal Can., Inc. v. United States,*
    461 F. Supp. 2d 1325 (Ct. Int'l Trade 2006) .......................................... 16

*NSK Ltd. v. United States,*
    510 F.3d 1375 (Fed. Cir. 2007)................................................................ 25

*PAM, S.p.A. v. United States,*
    582 F.3d 1336 (Fed. Cir. 2009)................................................................ 15

*Qingdao Sea-Line Trading Co. v. United States,*
    766 F.3d 1378 (Fed. Cir. 2014)........................................................ 42, 61

*QVD Food Co. v. United States,*
    721 F. Supp. 2d 1311 (Ct. Int'l Trade 2010) .......................................... 40

*Rebar Trade Action Coal. v. United States,*
    337 F. Supp. 3d 1251 (Ct. Int'l Trade 2018) .......................................... 53

*Rhone Poulenc, Inc. v. United States,*
    899 F.2d 1185 (Fed. Cir. 1990)................................................................ 61

*Risen Energy Co. v. United States,*
477 F. Supp. 3d 1332 (Ct. Int'l Trade 2020) ............................ 41

*Seah Steel Vina Corp. v. United States,*
269 F. Supp. 3d 1335 (Ct. Int'l Trade 2017) ............................ 44

*Sichuan Changhong Elec. Co. v. United States,*
460 F. Supp. 2d 1338 (Ct. Int'l Trade 2006) ....................... 42, 43

*SKF USA Inc. v. United States,*
491 F. Supp. 2d 1354 (Ct. Int'l Trade 2007) ............................ 32

*SKF USA, Inc. v. United States,*
537 F.3d 1373 (Fed. Cir. 2008) ........................................ 59

*Stanley Works (Langfang) Fastening Sys., Ltd. v. United States,*
279 F. Supp. 3d 1172 (Ct. Int'l Trade 2017) ............................ 61

*Thai Plastic Bags Indus. Co. v. United States,*
746 F.3d 1358 (Fed. Cir. 2014) ..................................... 26, 27

*Thai Plastic Bags Indus. Co. v. United States,*
895 F. Supp. 2d 1337 (Ct. Int'l Trade 2013) ....................... 58, 60

*United States v. Eurodif S.A.,*
555 U.S. 305 (2009) ................................................. 15, 55

*Wuhan Bee Healthy Co. v. United States,*
374 F. Supp. 2d 1299 (Ct. Int'l Trade 2005) ............................ 46

*Yangzhou Bestpak Gifts & Crafts Co. v. United States,*
716 F.3d 1370 (Fed. Cir. 2013) ........................................ 24

*Zenith Radio Corp. v. United States,*
437 U.S. 443 (1978) ................................................... 55

*Zhejiang DunAn Hetian Metal Co., Ltd. v. United States,*
652 F.3d 1333 (Fed. Cir. 2011) ........................................ 40

## **STATTUES**

19 U.S.C. § 1516a(b)(1)(B) ............................................. 17

19 U.S.C. § 1677a(b) .................................................. 26

19 U.S.C. § 1677b(a) ............................................... 17, 35

19 U.S.C. § 1677b(e) ................................................................................ 6, 58

19 U.S.C. § 1677(b)(e)(2)(B)(iii) ............................................................. 36, 47

19 U.S.C. § 1677b(f)(2) .......................................................................... passim

19 U.S.C. § 1677b(f)(2)–(3) ........................................................................ 53

28 U.S.C. § 2637(d) .................................................................................... 62

## REGULATIONS

19 C.F.R. § 351.309(c)(2) ........................................................................... 62

19 C.F.R. § 351.401(b) ............................................................................... 62

19 CFR § 351.401(g)(2) .......................................................................... 26, 29

## ADMINISTRATIVE DETERMINATIONS

*Silicon Metal From Brazil*,
    83 Fed. Reg. 9,835 (Dep't of Commerce Mar. 8, 2018) ............................ 18

*Certain Oil Country Tubular Goods from the Republic of Koreas*,
79 Fed. Reg. 41,983 (Dep't of Commerce July 18, 2018) ........................... 37

*Fresh Tomatoes from Mexico*,
    84 Fed. Reg. 57,401 (Dep't of Commerce Oct. 25, 2019) .......................... 49

*Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey,*
*and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations*,
    85 Fed. Reg. 23,002 (Dep't of Commerce Apr. 24, 2020) .......................... 3

*Mattresses from Indonesia*,
    85 Fed. Reg. 69,597 (Dep't of Commerce Nov. 3, 2020) ............................ 6

*Mattresses From Indonesia*,
    86 Fed. Reg. 15,899 (Dep't of Commerce Mar. 25, 2021) .......................... 2

*Pure Magnesium from Israel*,
    66 Fed. Reg. 49,349 (Dep't of Commerce Sept. 27, 2001) ........................ 36

*Certain Color Television Receivers from Malaysia*,
    69 Fed. Reg. 20,592 (Dep't of Commerce Apr. 16 2004) ........................... 36

# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

_____
)
PT ZINUS GLOBAL INDONESIA, )
)
Plaintiff, )
)
v. )
)
UNITED STATES, )
)
Defendant, ) Consol. Ct. No. 21-00277
) PUBLIC VERSION
and )
)
BROOKLYN BEDDING, LLC, *et al.*, )
)
Defendant-Intervenors, )
_____)

## DEFENDANT'S RESPONSE TO PLAINTIFFS'
## MOTIONS FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the United States Court of International Trade, defendant, the

United States, respectfully responds to the motions for judgment on the administrative record

filed by plaintiffs, PT Zinus Global Indonesia (Zinus Indonesia), and Brooklyn Bedding, LLC,

Corsicana Mattress Company, Elite Comfort Solutions, FXI, Inc., Innocor, Inc., Kolcraft

Enterprises Inc., Leggett& Platt, Incorporated, International Brotherhood of Teamsters, United

Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service workers

International Union, and AFL-CIO (collectively, Brooklyn Bedding). Plaintiffs challenge the

final determination of the United States Department of Commerce (Commerce) in the

antidumping duty investigation covering mattresses from Indonesia. As explained below, the

motions should be denied because Commerce's determination is supported by substantial evidence and is otherwise in accordance with law.

**RULE 56.2 STATEMENT**

## I.      The Administrative Determination Under Review

The administrative determination under review is Commerce's antidumping duty investigation covering mattresses from Indonesia.  *See Mattresses From Indonesia*, 86 Fed. Reg. 15,899 (Dep't of Commerce Mar. 25, 2021) (final LTFV determ.), and the accompanying Issues and Decision Memorandum (IDM) (P.R. 284),[1] and Ministerial Error Analysis Memorandum (Ministerial Error Memo) (P.R. 301).  The period of investigation is January 1, 2019, through December 31, 2019.

## II.      Issues Presented For Review

1.      Whether substantial evidence supports Commerce's decision to apply a quarterly ratio sales methodology by country of origin of mattresses in inventory to determine the quantity of Indonesian mattresses sold during the period of investigation

2.      Whether Commerce's adjustments to Zinus U.S.'s reporting of sales deductions is supported by substantial evidence and in accordance with law.

3.      Whether Commerce's selection of the Emirates Sleep financial statements as the source of constructed value profit and selling expenses is supported by substantial evidence and is otherwise in accordance with law.

4.      Whether substantial evidence supports Commerce's decision to limit the selling expenses attributable to Zinus Korea to the amount reported.

---

[1] Citations to public documents from the administrative record are identified as "P.R. ___," while citations to confidential record documents are identified as "C.R. ___."

5.      Whether substantial evidence supports Commerce's decision to value certain of Zinus

Indonesia's input purchase transactions with Global Trade Atlas (GTA) import data from

Indonesia, excluding imports from non-market economy countries.

6.      Whether Brooklyn Bedding failed to exhaust its administrative remedies regarding the

lack of a sales reconciliation between Zinus Indonesia and Zinus Korea.

## STATEMENT OF FACTS

### I.      Initiation Of Investigation

On April 20, 2020, Commerce initiated the less than fair value investigation of mattresses

from Indonesia.  *Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the*

*Republic of Turkey, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value*

*Investigations*, 85 Fed. Reg. 23,002 (Dep't of Commerce Apr. 24, 2020) (P.R. 43).  Commerce

selected Zinus Indonesia as the single mandatory respondent.  Respondent Selection

Memorandum at 5 (P.R. 66).  Zinus Indonesia was a new mattress manufacturing company in

Indonesia, having been established in August 2018, and only began manufacturing and selling

mattresses during the period of investigation.  *See* Section D Questionnaire Response at D-3

(P.R. 114) (Section D Response); Section A Response at Exhibit 11-A(a)(1) (C.R. 38).

In Commerce's initial questionnaire, it instructed Zinus Indonesia to report, among other

things, its ownership, corporate structure, affiliates, sales process, and the quantity and value of

its U.S. sales.  Section A Questionnaire (P.R. 67).  The questionnaire specifically identified

which U.S. sales are relevant for the dumping calculation, explaining that the U.S. price to be

reported was the "price at which the subject merchandise is first sold to a person not affiliated

with the foreign producer or exporter."  *Id.* at Appendix 1, Glossary, Export Price and

Constructed Export Price.

Zinus Indonesia reported in its Section A questionnaire response that it was 99.9 percent owned by a Korean parent company, Zinus, Inc. (Zinus Korea). Section A Questionnaire Response at A-1 and Exhibit A-3 (P.R. 97) (Section A Response). Zinus Korea has many wholly-owned affiliates around the world, including a wholly-owned subsidiary in the United States, Zinus, Inc. (Zinus U.S.), which, along with Zinus Korea, made sales of Zinus Indonesia mattresses to unaffiliated United States customers during the period of investigation.[2, 3] *Id*.

Prior to selecting Zinus Indonesia as a mandatory respondent, Commerce had familiarity with the operations of Zinus Korea and Zinus U.S., because they had already been participating in the antidumping duty investigation covering mattresses from the People's Republic of China (China). *See* Zinus Indonesia Submission of China Case Documents (C.R. 221) (China Case Documents); Zinus China Section A Response at A-5 to A-6 (C.R. 222). Zinus Korea has mattress manufacturing facilities in China, Zinus Xiamen, Inc. and Zinus Zhangzhou (collectively, Zinus China)[4], and Zinus Korea has an affiliate, Best Price Mattresses, Inc. (BPM) in the United States which is involved in the sales of Zinus Korea's Chinese-manufactured mattresses. *See id.*

---

[2] Another affiliate, California corporation Keetsa, wholly-owned by a family member of the largest shareholder of Zinus Korea, imported and distributed subject Indonesian mattresses during the period of investigation. Section A Response at A-1. However, because the quantity of sales was so insignificant, Commerce did not require the reporting of these sales and therefore they are not relevant to the issues in this case. Letter Granting Exemption from Reporting Keetsa Sales (P.R. 110).

[3] Zinus KR also wholly owns BPM, Zinus (Xiamen) Global Trading, Inc. (Zinus Trading), Zinus Zhangzhou, Zinus Canada Inc., Zinus Japan K.K., and Zinus Australia Pty, Ltd., which Zinus Indonesia asserted were not involved in Zinus Indonesia's mattress production, distribution, and/or sales. Section A Response at A-9 and Exh. A-3.

[4] Section A Response at Exh. A-3 (P.R. 98); *see also* Zinus Indonesia Section C Response at C-68 (C.R. 119).

In reporting the quantity and value of its mattress sales, Zinus Indonesia explained that it did not make any sales directly to unaffiliated parties, rather, it invoiced all of its production to Zinus Korea.  Section A Response at A-8.  Therefore, Zinus Indonesia had no direct United States, home market, or third country sales to unaffiliated customers.  *Id*. at A-3.

Then, Zinus Korea made export price sales of Zinus Indonesia mattresses directly to the first unrelated customer in the United States and to its affiliate, Zinus U.S.  *Id.* at A-3, A-5 to A-7.  Zinus Korea also sold [          ] to Zinus U.S.  *See* Section A Response at A-5; Zinus China Section A Response at A-5.  Zinus U.S. made constructed export price sales (Constructed export price sales) of Indonesian mattresses and also [                    ] to the first unrelated U.S. customer.[5]  *See* Section A Response at A-5; Zinus China Section A Response at A-5.  Zinus Indonesia also explained that it purchased significant inputs for making its mattresses from affiliated suppliers in China (Zinus Trading).  Section A Response at A-9.

In their pre-preliminary determination comments, Brooklyn Bedding argued that Zinus Korea was "country hopping" from China to Indonesia in order to evade the results of the antidumping duty order covering Zinus China's mattresses, by having its Chinese affiliates provide many of the inputs necessary to make mattresses in Indonesia.[6]  Brooklyn Bedding Pre-Preliminary Determination Comment at 2-3 (P.R. 210) (Brooklyn Bedding Pre-Prelim. Comments).  It also argued that Commerce had the authority to address serial dumping.  *Id*. at 3.

---

[5] Zinus U.S. sold mattresses from four countries including Indonesia, [          ].  Zinus China Section A Response at Exhibit A-5.

[6] Brooklyn Bedding submitted the preliminary determination in the antidumping duty investigation covering mattresses from China in which Zinus China received a dumping margin of 97.78 percent.  Preliminary Determination in Mattresses from China (P.R. 197).

## II. **Preliminary Determination**

For the preliminary determination, Commerce reviewed the record evidence and was concerned about Zinus Indonesia's inability to identify the country of origin of its sales from the warehouses. *See Mattresses from Indonesia*, 85 Fed. Reg. 69,597 (Dep't of Commerce Nov. 3, 2020) (prelim. LTFV determ.) (P.R. 225), and accompanying Preliminary Determination Memorandum at 9-10 (PDM) (P.R. 226). Commerce explained that this impugned the accuracy of the quantity of the Indonesian mattresses sold based on the first-in, first-out (FIFO) accounting method Zinus U.S. used to identify sales of Zinus Indonesia mattresses. *See id.* Commerce determined that because Zinus U.S does not keep track of the country of origin, it would identify sales of Zinus Indonesia mattresses by first dividing the period of investigation into quarters and then determine the number of Indonesian mattresses that Zinus U.S. purchased. *Id*. at 10. In order to calculate the number of mattresses Zinus U.S. purchased from Zinus Indonesia, Commerce included those mattresses in transit to the United States and available for sale, relative to the total number of all mattresses purchased during the quarter and applied that quarterly ratio to Zinus U.S. inventory sales in each quarter. *Id*.

Because Zinus Indonesia did not have any home market or third country sales to be used as normal value, Commerce used constructed value as normal value in accordance with 19 U.S.C. § 1677b(e*). Id.* at 13. The determination of constructed value includes a profit and selling expense component, and both Brooklyn Bedding and Zinus Indonesia placed competing financial statements on the record containing that information. *Id.* at 12-13. After eliminating the data from financial statements that were "incomplete, had a qualified audit opinion, did not reflect the production and sales of comparable merchandise or were not contemporaneous," Commerce was left with the data from an Indian producer of mattresses, Emirates Sleep Systems

Private Limited (Emirates Sleep), to be used to calculate constructed value profit and selling expenses. *Id.*; *see also* Preliminary Cost Memorandum at 2 (P.R. 231).

Pursuant to 19 U.S.C. § 1677b(f)(2), Commerce disregarded the cost for certain inputs because they were purchased from two affiliated Chinese suppliers, a non-market economy country, and there were no purchases from unaffiliated market economy suppliers with which to compare them. PDM at 12; Preliminary Cost Memorandum at 1-2. Commerce used the average of GTA data from seven countries (Indonesia, Brazil, Malaysia, Mexico, Romania, Russia, and Turkey) with which to value the cost of 10 types of inputs (*i.e.,* [██] individual raw material codes). Preliminary Cost Memorandum at 1-2 and Attachment 2a; *see also* Section D Supplemental Questionnaire Resp. at SD-7 (P.R. 196, C.R. 204) (Section D Supp. Response).

Finally, in the preliminary determination, Commerce calculated constructed export price based on Zinus U.S.'s expenses as reported. PDM at 10. Specifically, Commerce increased the starting price by the amount of billing adjustments and made deductions for rebates (as appropriate), movement expenses, and selling expenses. *Id.*

Based on its preliminary dumping calculations, Commerce issued an affirmative preliminary finding of dumping and calculated a preliminary ad valorem dumping margin of 2.61 percent.

The parties then submitted case and rebuttal briefs commenting on the preliminary determination. *See* Zinus Indonesia Admin. Case Br. (Zinus Indonesia Admin. Br.) (P.R. 275, C.R. 292); Zinus Indonesia Admin. Rebuttal Case Br. (Zinus Indonesia Admin. Rebuttal Br.) (P.R. 277, C.R.294); Brooklyn Bedding Admin. Case Br. (Brooklyn Bedding Admin. Br.) (P.R. 274, C.R. 291); Brooklyn Bedding Admin. Rebuttal Case Br. (Brooklyn Bedding Admin. Rebuttal Br.) (P.R. 276, C.R. 293).

**III.**    **Final Determination**

     In the final determination, Commerce found that mattresses from Indonesia were being dumped in the United States at a rate of 2.61 percent. *Final Determination*, 86 Fed. Reg. at 15,899. Commerce addressed a number of issues that the parties raised in their administrative case briefs.

     *Determining The Quantity Of Constructed Export Price Sales From Inventory*

     To perform a dumping calculation, a respondent must identify its U.S. sales to the first unaffiliated customer in the United States. In the final determination, Commerce found that the inability of Zinus U.S. to track the country of origin of Zinus U.S. inventory sales to the first unaffiliated customer was inconsistent with its ability to grant warranty and commissions on sales of non-subject merchandise. *See* IDM at 8-9. This raised concerns about whether Zinus Indonesia was reporting the appropriate number of United States constructed export price sales from warehouses. *See id.* For example, Zinus U.S. claimed that it gave warranties on a customer-specific basis, but "there is nothing on the record concerning how Zinus U.S. is able to seek reimbursement from its own suppliers when warranty claims are made if it does not know the country of origin of the defective merchandise." *Id*. at 9. Likewise, "while Zinus {Indonesia} claims that it paid commissions only on non-subject merchandise sales during the {period of investigation}, there is nothing on the record concerning how Zinus U.S. grants commissions on sales of non-subject merchandise if it does not know the country of origin of the merchandise it sells out of inventory." *Id.* Thus, Commerce determined that "these two claims—Zinus {Indonesia's} claim about lack of knowledge of country of origin of merchandise in its inventory and Zinus U.S.'s granting of commissions on sales of non-subject merchandise— are inconsistent." *Id.* That is, "{e}ither Zinus {Indonesia} is aware of the country of origin of

merchandise in its inventory, and can grant commissions on the sales of certain merchandise based on that knowledge, or it does not, and therefore should not be able to grant commissions based on the country of origin of the merchandise." *Id.*

Commerce also found that Zinus U.S.'s FIFO methodology did not "accurately or appropriately capture a sufficient number of sales" relative to the "universe of Zinus U.S.'s warehouse sales" from inventory. *Id.* at 8-9. As Zinus U.S. did not track the country of origin in its warehouses, it had no way to know which of the sales were sales of Indonesian mattress or mattresses from another country not subject to the instant investigation. *Id.* Commerce found that the "quarterly ratio sales reporting methodology" was "preferable" to the FIFO methodology because "it is neutral in terms of determining which sales to report as subject merchandise sales" and "less susceptible to manipulation." *Id.* at 9. In addition, Commerce also included the Zinus Indonesian mattresses which had been purchased by Zinus U.S. during the period of investigation, but had not actually been imported, because the record showed Zinus U.S. made more constructed export price inventory sales during the period of investigation than were contained in the warehouse, meaning that some mattresses in transit to the United States were sold. *See id.*

*Determination Of Constructed Value Profit And Selling Expenses*

In the final determination, Commerce continued to rely on the profit and selling expense data from the financial statements of the Indian company, Emirates Sleep. *Id.* at 20-25. Brooklyn Bedding and Zinus Indonesia submitted a total of eight financial statements for consideration, with six financial statements relevant to this litigation: Emirates Sleep, and five Indonesian companies, Inocycle, Chitose, Boston, PT Graha Seribusatu Jaya (Graha), and PT Ecos Jaya Indonesia (Ecos). *Id.* at 21-22. Commerce determined that the "{constructed value}

profit and selling expenses" of Emirates Sleep "constitute the best source for {constructed value} profit and selling expenses data on the record of this proceeding." *Id.* at 20.

Commerce then explained why the Emirates Sleep financial statements were superior to that of the other companies. *See id.* at 22-25. Both Chitose and Boston produced and sold products that were not comparable to mattresses. *Id.* at 23. Ecos's financial statements had a qualified opinion related to the "estimated future liabilities pertaining to post-employment benefits obligations of the company," and Commerce explained that "there is no evidence to confirm that the qualified opinion does not impact the calculation of period costs, revenues, expenses, cash flows, profits, or selling expenses." *Id.*

Commerce also found that Graha's financial statements were not audited and not contemporaneous with the period of investigation. *Id.* Commerce declined both parties' invitations to run Graha's margin calculations to determine its profit and selling expenses, because while Graha did voluntarily submit questionnaire responses, Commerce did not individually investigate Graha as a voluntary respondent. *Id.* As such, it did not evaluate and determine whether there were any deficiencies in Graha's responses. *Id.* Finally, Commerce declined to use Innocycle's financial statements because even though it "is an Indonesian producer of mattresses, only six percent of its revenue is from mattresses, so it is clearly not predominantly a mattress producer as Emirates is." *Id.*

Thus, Commerce determined that the Emirates Sleep financial statements data best met the criteria used in selecting among the financial statements on the record, because they reflect a net profit, are complete, fully translated, contemporaneous, audited without qualification, and represent manufacture of the foreign like product. *Id.* While Commerce prefers financial statements to be from the country under investigation, the data must be reliable and audited

without qualification. *Id*. at 23-24. Commerce considered that the Emirates Sleep financial statements were only contemporaneous with three months of the period of investigation, but that its practice is to consider contemporaneous financial statement data that overlap with the period under investigation. *Id*. Moreover, "Emirates {Sleep's} financial statements show that 76.71 percent of the company's activities relate to manufacturing of mattresses" and its "business operations, products, and {} customer base are very similar to that of {Zinus Indonesia}, an Indonesian mattress producer." *Id*. at 24-25. As a result, Commerce used Emirates Sleep's financial statements to establish the constructed value profit and selling expenses, and profit cap. *Id*. at 25.

*Zinus U.S. And BPM Sales Deductions Allocated Over Their Combined Sales*

In the final determination, Commerce combined the sales deductions (commissions and certain other sales allowances, net of discounts and returns) of both Zinus U.S. and BPM, and allocated them over the gross sales of both companies to calculate a sales adjustment ratio, which was then applied to the gross unit price of all sales made through Zinus U.S. *See id.* at 13-15. Commerce found that Zinus Indonesia's explanation of the difference in the Zinus sales practices concerning Zinus Indonesia's sales deductions and BPM's sales deductions was internally inconsistent. *Id.* at 13-14. While Zinus Indonesia claimed it only paid commissions on non-subject merchandise, Commerce found, and Zinus Indonesia admitted, that Zinus U.S. did not track the country of origin of its mattress sales; thus, Zinus Indonesia could not know which sales were non-subject for the purposes of allocating commissions. *Id*. at 14.

Moreover, Commerce found that Zinus Indonesia's explanation did not account for the fact that certain unaffiliated customers receive commissions and would have no incentive to buy any Indonesian mattresses given that commissions were given on BPM and Zinus U.S. sales of

mattresses from other countries.  *Id.*  While Zinus Indonesia argued that Zinus U.S. stopped

paying commissions near the end of the first quarter of the period of investigation, 2019,

Brooklyn Bedding and Commerce noticed that BPM's sales deductions showed

"disproportionate changes" between its sales deductions and its revenues from 2018 to 2019.  *Id.*

Based on this record evidence, Commerce combined the sales deductions of both companies and

allocated them over their "combined gross sales," and then "applied this ratio to the gross unit

price of all sales made by Zinus U.S. (*i.e.*, all {constructed export price} sales)."  *Id.* at 15.

*Transactions Disregarded*

In the final determination, where appropriate, Commerce disregarded the transaction

values for 10 types of material inputs which Zinus Indonesia purchased from non-market

economy-based affiliated suppliers, and instead used the value derived from GTA data of

imports of these inputs into Indonesia, excluding imports from non-market economy countries.

*Id*. at 16-18.  Commerce explained that when determining constructed value and cost of

production, it can reject using values in the respondent's books and records for affiliated

transactions which do not fairly reflect the value usually reflected in sales of the merchandise

under consideration, in the market under consideration.  *Id*. at 17.  Moreover, if there are no other

transactions available for consideration, the value shall be based on "information available" on

the record.  *Id.*

In this case, the record evidence showed that Zinus Indonesia purchased many material

inputs from affiliated suppliers.  *See id.*; *see also* Section D Supp. Response at SD-6 to SD-13

and Exhibits SD-8 and SD-9.  Thus, Commerce did not have a market price against which to test

the affiliated party purchases for many inputs.  When market prices are not available to test

affiliated party transactions, Commerce will often solicit the affiliated supplier's cost of

production for use as a surrogate for market price.  *Id.* at 18.  However, because there were "no comparable transactions with unaffiliated suppliers, the only information available that can reasonably be used to test the arms-length nature of the transfer prices from affiliates is the publicly available GTA data."  *Id.*

Therefore, Commerce first "compared the affiliated party transfer prices to prices paid to unaffiliated parties for the same input."  *Id.* at 19.  Where prices paid to an unaffiliated party were not available, Commerce "determined the market price using Indonesia GTA data," excluding those imports into Indonesia from non-market economy countries.  *Id.* at 18-19.

*Allocation Of Zinus Korea's Selling Expenses*

In the final determination, consistent with its long-standing practice, Commerce used the reported actual expenses of Zinus Korea as an affiliated selling agent of Zinus Indonesia for Zinus Indonesia's margin calculation.  *Id*. at 32-33.  Commerce found that the record evidence demonstrated that Zinus Korea reported all of its actual relevant expenses and was consistent with Zinus Korea's limited role in selling the Indonesian mattresses.  *Id.* at 32.

Both Zinus Indonesia and Brooklyn Bedding now challenge these determinations.  As we demonstrate below, Commerce's decisions are supported by substantial record evidence and are otherwise in accordance with law.

## SUMMARY OF ARGUMENT

First, substantial evidence supports Commerce's decision to apply a quarterly ratio sales methodology by country of origin of mattresses in inventory to determine the quantity of Indonesian mattresses Zinus U.S. sold during the period of investigation.  Zinus Indonesia's affiliated reseller, Zinus U.S., did not track the country of origin in the ordinary course of business for its constructed export price sales.  To account for the number of Indonesian

mattresses Zinus U.S. sold, Commerce applied a quarterly ratio sales reporting methodology, which captured the full universe of Zinus U.S.'s sales from inventory during the period of investigation.

Second and relatedly, substantial evidence supports Commerce's adjustments to Zinus U.S.'s reporting of sales deductions. Despite its inability to trace country of origin of mattress sales, Zinus U.S. claimed that it gave commissions on only "non-subject" merchandise, that is, mattresses not manufactured or produced by Zinus Indonesia. However, Commerce determined that there was substantial evidence on the record that showed Zinus U.S. and Best Price Mattresses, another affiliate, shifted the costs of commissions and other sales deductions.

Third, Commerce reasonably chose to use Emirates Sleep's financial statements because those statements constituted the best available information on the record, despite only overlapping the period of investigation by three months. Commerce also reasonably explained why it did not use the financial statements of two Indian companies, because those financial statements were either not contemporaneous, not audited, or had qualified auditor opinions.

Fourth, substantial evidence supports Commerce's decision to limit the selling expenses attributable to Zinus Korea to the amount reported. Although Brooklyn Bedding argued that more of Zinus Korea's selling expenses should be attributable to Zinus Indonesia, consistent with its practice, Commerce used Zinus Korea's actual expenses.

Fifth, substantial evidence supports Commerce's decision to value certain of Zinus Indonesia's input purchase transactions with GTA import data from Indonesia, excluding imports from non-market economy countries. Zinus Indonesia purchased 10 minor inputs from affiliated companies in China, and, pursuant to the transactions disregarded rule, 19 U.S.C. § 1677b(f)(2), Commerce determined that the best information was Indonesian GTA data because Indonesia

was the "market under consideration." Commerce is entitled to deference for this reasonable interpretation of the statute.

Sixth and finally, Brooklyn Bedding failed to exhaust its administrative remedies regarding the lack of a sales reconciliation between Zinus Indonesia and Zinus Korea. In any event, as Commerce explained in the final determination, it obtained the relevant U.S. sales reconciliations from Zinus U.S. and Zinus Korea, the *only* sellers of Zinus Indonesia mattresses to the first unaffiliated purchasers. There was no such requirement to also obtain a sales reconciliation for sales between Zinus Indonesia and Zinus Korea.

## ARGUMENT

## I.    Standard Of Review

In reviewing Commerce's antidumping duty determinations, "the Court of International Trade must sustain 'any determination, finding or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with the law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)).

"The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009). Substantial evidence means "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009). Further, even if the Court may draw two inconsistent conclusions from the record evidence, that possibility "does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Moreover, when Congress has entrusted an agency to administer a statute in fact-intensive inquiries, the agency's conclusions should be reversed only if the record contains evidence "so compelling that no reasonable factfinder" could reach the same conclusion. *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992). "{T}he Court may not substitute its judgment for that of {Commerce} when the choice is between two fairly conflicting views, even though it could justifiably have made a different choice had the matter been before it de novo." *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006) (citation omitted). Commerce is accorded particular deference in antidumping and countervailing duty determinations. *See, e.g.*, *Fujitsu*, 88 F.3d at 1039 ("Antidumping and countervailing duty determinations involve complex economic and accounting decisions of a technical nature, for which agencies possess far greater expertise than courts.").

When "determining whether Commerce's interpretation and application of the {statute} is in accordance with law, this Court must consider 'whether Congress has directly spoken to the precise question at issue,' and, if not, whether the agency's interpretation of the statute is reasonable." *Hangzhou Spring Washer Co. v. United States*, 387 F. Supp. 2d 1236, 1240 (Ct. Int'l Trade 2005) (quoting *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842-43 (1984)). When "the statute leaves a gap for the agency to fill," and when an agency's regulation "fills that gap, the Court owes *Chevron* deference to the agency, and will overturn its regulation only if it is unreasonable, arbitrary, or capricious." *Mittal Can., Inc. v. United States*, 461 F. Supp. 2d 1325, 1330 (Ct. Int'l Trade 2006). Similarly, an agency's interpretation of an ambiguous term in its regulation "becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945).

## II. Commerce's Use Of A Quarterly Ratio Sales Methodology To Determine The Quantity Of Indonesian Mattresses Sold During The Period Of Investigation Is Supported By Substantial Evidence And In Accordance With Law

In the final determination, Commerce identified the quantity of Zinus Indonesia mattresses sold to the first unaffiliated customer in the United States from warehouses in the United States by applying quarterly ratios, calculated based on the proportion of Indonesian mattresses Zinus U.S. purchased from Zinus Korea, to the total universe of Zinus U.S.'s inventory sales, during each quarter of the period of investigation. *See* IDM at 9. Commerce included in this calculation Zinus Indonesia mattresses purchased by Zinus U.S., but which were in transit and had not yet entered the United States. *See id.* Zinus Indonesia argues that Commerce should have used the FIFO methodology, and at the very least, should not have included in the quarterly ratio calculation Zinus Indonesia mattresses that were in transit. *See* Zinus Indonesia Br. at 12-26. As we demonstrate below, these arguments are meritless.

### A. Because Zinus U.S. Did Not Trace Country Of Origin In Its Warehouses, It Was Reasonable For Commerce To Use A Quarterly Ratio Sales Methodology To Determine The Quantity Of Subject Constructed Export Price Inventory

In assessing a respondent's dumping margin, Commerce compares "the export price or constructed export price and normal value." 19 U.S.C. § 1677b(a). "In general," the respondent's "normal value" is based on home market sales, third country sales, or constructed value." *Id.* § 1677b(a)(1). In this case, the normal value is constructed value because the respondent had not home market or third country sales. The statute, in relevant part, defines constructed export price sales as "the price at which the subject merchandise is first sold (or agreed to be sold) before or after the date of importation . . . to" an unaffiliated purchaser in the United States. *Id.* § 1677a(b). Inherent in such a calculation, *i.e.*, the difference between the U.S. price and normal value, is the identification and reporting of United States sales of the

subject merchandise during the period under investigation. Without the proper identification of sales in the United States during the period under investigation, Commerce's ability to calculate margins can be severely impacted.

Here, for the Zinus U.S. constructed export price inventory sales from warehouses, Zinus Indonesia reported that it could not identify the country of origin of the mattresses once they entered the warehouses because there was no way to trace through any of the Zinus companies' books and records the country of origin after the mattresses enter the warehouses and are then sold to the first unaffiliated customer in the United States. *See* Section A Response at A-6 to A-7; IDM at 8-9. In such situations, Commerce still has to perform a dumping calculation and will apply a methodology of sorting out the country of origin of commingled merchandise of different origins which it determines could reasonably reflect the quantity of sales from each country. *See, e.g.*, *Silicon Metal From Brazil*, 83 Fed. Reg. 9,835 (Dep't of Commerce Mar. 8, 2018) (final LTFV determ.), and accompanying IDM at Comment 2.

Zinus Indonesia reported that Zinus U.S., for purposes of responding to Commerce's questionnaire, used the FIFO methodology to report quantities sold. Section A Response at A-6 to A-7. It is important to emphasize that the FIFO method was not the method Zinus U.S. typically used in its books and records, but was *only* for purposes of responding to the questionnaire. Rather, Zinus U.S. uses the [                    ] for its books and records for inventory valuation. Zinus Admin. Case Br. at 13. Zinus Indonesia reported that using the FIFO methodology resulted in reporting a "small overall proportion of the U.S. sales." Section A Response at A-7. Of a total quantity of [        ][7] mattresses from different countries

---

[7] Section C Questionnaire Response, Exh. C-2B at 2 (C.R. 97).

(including Indonesia) which matched the product codes for the Indonesian mattresses and were in Zinus U.S.'s inventory during the period of investigation, the Zinus U.S. FIFO methodology only attributed  [⬛⬛⬛]⁸ mattress sales from the warehouses to Indonesian origin even though, during the period of investigation, Zinus U.S. had purchased [⬛⬛⬛]⁹ Zinus Indonesia mattresses from Zinus Korea which were available for sale.

In addition to Zinus Indonesia's inability to specifically trace the country of origin of the Zinus U.S. constructed export price sales from warehouses, Commerce also expressed concern that, although Zinus U.S. claimed it could not identify the country of origin of the mattresses it sold out of warehouses, Zinus U.S. still paid commissions to certain unaffiliated customers for sales during part of the period of investigation and granted warranty claims.  *See* IDM at 8-9. Both of these expenses require a knowledge of country of origin to determine the sales for which commissions are paid and the supplier from which to recoup the warranty expenses.  *Id*.  This inconsistency was part of the basis that Commerce relied on when rejecting Zinus U.S.'s FIFO methodology for identifying sales of Indonesian origin.  *Id*. at 9.

Ultimately, however, Commerce compared the results of the FIFO methodology with the results of the quarterly ratio methodology and determined that the quarterly ratio methodology better reflected the actual mix of the countries of origin of the mattresses in inventory.  *Id.*  Zinus U.S. can track the country of origin of the mattresses that it purchased from its suppliers through Zinus Korea and the country of origin of the mattresses that entered its warehouse.  *See* PDM at 9-10; IDM at 8-9.  But Zinus U.S. cannot "trace sales back to inbound shipments to the warehouse," or in other words, once mattresses are in the warehouses, it cannot trace the quantity

---

⁸ Section A Response at Exh. A-1.

⁹ Section C Questionnaire Response, Exh. C-2A, at 1 (C.R. 96).

of mattresses that it actually sold from each of the countries from which Zinus U.S. sourced mattresses. *See* IDM at 8. The FIFO methodology, however, assumes that the mattresses that arrived at the warehouse first were sold first and artificially assigns the country of origin of the inventory sales to unaffiliated parties based on the mattresses that entered the warehouse the earliest.

Commerce had significant concerns with applying this methodology. Prior to the period of investigation, Zinus U.S. "only purchased mattresses from Chinese affiliate, Zinus Xiamen," "meaning the country of origin was clear prior," which was confirmed "by the auditor's notes to Zinus U.S's 2018 financial statement." *Id.* Given that Zinus Indonesia did not start manufacturing and selling mattresses until the second quarter of the period of investigation, combined with the fact that Zinus U.S. was already selling significant quantities of affiliate mattresses from other countries, the FIFO methodology skewed the potential sales of Zinus Indonesia mattresses downward because the other, larger shipments of identical mattresses from other countries must be allocated to sales *before* the Indonesian shipments, which did not enter the warehouse until a later date, can be allocated to sales. *See id.*

Second, because the FIFO methodology focuses on mattresses that are already imported and stored in the warehouses, it disregards a significant amount of inventory in transit, *i.e.*, the Zinus Indonesia mattresses already purchased by Zinus U.S. and thus available for sale, but in shipping containers. *Id.* at 9. To exclude the mattresses in transit would artificially reduce the number of Zinus Indonesia mattresses subject to the investigation, but the record shows that during the period of investigation, Zinus U.S. actually sold *more* mattresses meeting the specifications of the Zinus Indonesia mattresses out of inventory than were contained in the

warehouse, meaning that some inventory was sold while in transit to the United States.[10]

Accordingly, Commerce determined that the "reported FIFO-based sales methodology does not accurately or appropriately capture a sufficient number of sales of subject merchandise." *Id.* And to "come to any other conclusion would be inconsistent with the commercially realistic business practices of a multinational company engaged in the production and sale of a consumer product such as mattresses that provides commissions on certain sales from its inventory." *Id.*

In contrast, Commerce explained that the quarterly ratio methodology captured all available inventory of mattresses (both in warehouse and in transit) which Zinus U.S. had purchased in each quarter of the period of investigation and attributed Indonesian origin to inventory sales according to the ratio of Indonesian mattresses in Zinus U.S.'s inventory during each quarter. *Id.* This methodology results in a quantity of Indonesian mattresses which reflects the actual quantity of Indonesian mattresses available for sale in Zinus U.S. inventory during each quarter of the period of investigation.

Therefore, Commerce found that the quarterly ratio methodology was "grounded in purchase data to the full universe of Zinus U.S. sales from inventory during the period of

---

[10] The quantity of mattresses in the Zinus U.S. warehouse during the period of investigation was [ ▮▮▮▮ ]. This amount was calculated by examining the list of all the mattresses that Zinus U.S. reported as being in its warehouse during the period of investigation and summing the quantity of mattresses whose product codes matched those which were manufactured in Indonesia. Exhibit SA-5 provides subtotals for mattresses from four countries, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Section A Supplemental Questionnaire Response at Exh. SA-5 (C.R. 154). The quantity of Zinus U.S. constructed export price inventory sales during the period of investigation equaled [ ▮▮▮▮ ]. *See* Section C Response at Exh. C-2B at frm. 39 (C.R. 97) (Exhibit C-2B contains a reconciliation section entitled "4. Reconciliation of Sales Quantity and Amount to the Sales Database (Exhibit C.1A/1B." Table 4.1 is the CEP Inventory Sales reconciliation subsection which notes the quantity of sales of mattresses, exclusive of product codes which have never been produced by Zinus Indonesia during the period of investigation.); *see also* Section A Supplemental Questionnaire Response at Exh. SA-5 (C.R. 154).

investigation" and was "neutral in terms of determining which sales to report as subject merchandise sales" because it assigns each mattress sold out of the warehouses a country of origin based on the quantity percentage by country in inventory in that quarter. *Id.* Commerce also found that the quarterly ratio methodology was "less susceptible to manipulation." *Id.* This decision is supported by substantial evidence and should be sustained.

### B. The Court Should Reject Zinus Indonesia's Various Arguments With Respect To The FIFO Methodology And Including Merchandise In Transit

Zinus Indonesia makes several arguments that Commerce should have used the FIFO methodology because it was "vastly superior" to the quarterly ratio methodology. *See* Zinus Indonesia Br. at 13-14, 18-19. In the alternative, to the extent the Court sustains use of the quarterly ratio methodology, Zinus argues that "in transit" purchases that did not enter Zinus U.S.'s inventory during the period of investigation should be excluded. *Id.* at 21-26. The Court should reject these arguments.

First, Zinus Indonesia argues that "the monthly import data essentially confirmed the reasonableness of Zinus' FIFO reporting methodology." Zinus Indonesia Br. at 13-14. But as explained above, this statement does not address *how* the FIFO methodology operates and distorts the data, *i.e.*, allocating the origin of the sales to the larger number of entries of non-Indonesian mattresses before getting to the smaller amount of Indonesian entries. *See* IDM at 8-9. This also ignores record evidence that Zinus Indonesia did not begin manufacturing mattresses until the second quarter of the period of investigation; thus, the FIFO method, as Commerce explained, "does not accurately or appropriately capture a sufficient number of sales of subject merchandise." *Id.* at 4, 8-9; *see also* 19 CFR § 351.401(g)(2) ("Any party seeking to report an expense or a price adjustment on an allocated basis must demonstrate to the Secretary's

satisfaction that the allocation is calculated on as specific a basis as is feasible, and must explain why the allocation methodology used does not cause inaccuracies or distortions.").

Relatedly, Zinus Indonesia challenges Commerce's determination that an inability to track country of origin further undermines use of the FIFO-methodology, focusing on warranties and commissions paid on a customer-specific basis. *See* Zinus Indonesia Br. at 15-17. Zinus Indonesia claims that it had no "warranty expenses," but that it had "defective allowances." *Id*. at 16. As an initial matter, whether the expense for a defective mattress is called a "warranty expense" or a "defective allowance" is irrelevant; it is an expense for a defective mattress which should be attributable to the manufacturer who is responsible for the defect. *See* IDM at 9. And, as Commerce explained in the final determination, Zinus Indonesia "reported that it pays warranty claims for defective and damaged merchandise on a customer-specific basis." *Id.* But Commerce reasonably explained that "there is nothing on the record concerning *how* Zinus U.S. is able to seek reimbursement from its own suppliers when warranty claims are made if it does not know the country of origin of the defective merchandise." *Id.* (emphasis added).

Similarly, Zinus Indonesia argues that it "did not use selling agents for the sales of subject merchandise," and that Zinus U.S. "did not have any sales to those customers to whom Zinus {U.S.} paid a commission in the China investigation." *See* Zinus Indonesia Br. at 16-17. Although Zinus Indonesia claimed it paid no commissions and there were no commissions paid, such a statement is without record support if Zinus U.S. had no way to know the country of the mattresses it sold from warehouses because its system cannot track country of origin. *See* IDM at 8-9. Indeed, whether Zinus Indonesia paid commissions is not the issue, as Commerce explained that there was nothing on the record to show "*how* Zinus U.S. grants commissions on

sales of non-subject merchandise if it does not know the country of origin of the merchandise it sells out of inventory." *Id.* at 9 (emphasis added).

In addition, Zinus Indonesia argues that at no point did Commerce question whether the FIFO methodology was "appropriate or permissible or instruct" it to apply a different methodology. Zinus Indonesia Br. at 19. This is inaccurate. Brooklyn Bedding raised the FIFO issue in its pre-preliminary determination comments, and it was an issue on which the parties commented extensively. *See, e.g.*, Brooklyn Bedding Pre-Prelim. Comments at 3-17. Any implication that Commerce was "hiding the ball" here is meritless. Second, Commerce actually issued a supplemental questionnaire to determine whether "Zinus U.S. and another affiliated U.S. reseller, {BPM}, commingled merchandise before the {period of investigation}, and if so, how they tracked the country of origin of their sales." IDM at 8. The response Zinus Indonesia gave Commerce is that merchandise is not tracked once it is in inventory in the United States. *Id.* at 8-9. Indeed, in the final determination, Commerce "encourage{d} Zinus {Indonesia} to revisit its reported U.S. inventory practices so that this issue does not arise in any future segments of the proceeding, if this investigation results in an antidumping duty order." *Id.* at 9.

Further, Zinus Indonesia argues that Commerce's selection of the quarterly ratio methodology is an impermissible "results-oriented" action. Zinus Indonesia Br. at 20. Because, as explained above, the quarterly ratio methodology Commerce selected better reflects the quantity of mattresses in Zinus U.S.'s inventory available for sale during the period of investigation than the FIFO methodology does, it is supported by substantial evidence. *See* IDM at 8-9; *see also Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013) ("Because the agency employed a methodology similarly derived from the relevant statutory language, this court affords the appropriate deference due to Commerce.").

In contrast, Zinus Indonesia's FIFO methodology of forcing attribution of sales to large shipments of mattresses from other countries before attributing any sales to shipments from the new company, Zinus Indonesia is distortive, and it is the FIFO methodology that is an impermissible results-oriented methodology. IDM at 9. Zinus Indonesia had the burden to show that its preferred FIFO methodology was not distortive or inaccurate, 19 C.F.R. § 351.401(g)(2), but this methodology artificially limited the number of sales of Zinus Indonesia mattresses to be investigated and attributed a lower proportion of Indonesian mattresses to Zinus U.S.'s constructed export price inventory sales compared to the percentage of Indonesian mattresses Zinus U.S. purchased and had available for sale during the period of investigation. *See* IDM at 9 (explaining the "reported FIFO-based sales methodology does not accurately or appropriately capture a sufficient number of sales of subject merchandise"); *see also NSK Ltd. v. United States*, 510 F.3d 1375, 1382 (Fed. Cir. 2007) ("Regardless of whether a more specific reporting basis is feasible, the simple fact is that Koyo failed to demonstrate that its allocation methodology does not cause inaccuracies or distortion.").

At bottom, both methodologies are imperfect and result in estimates of the constructed export price sales from warehouses attributable to Zinus Indonesia mattresses. Zinus U.S. has effectively prevented any determination of the actual count by not keeping records "in the ordinary course of business" of the country of origin of its sales from warehouses to unaffiliated parties. *See* IDM at 8-9. Despite the lack of records, Commerce found that the quarterly ratio methodology provided a more reasonable estimate because it allocated a proportionate amount of mattresses in inventory to mattresses of Indonesian origin in each quarter of the period of investigation based on Zinus U.S.'s purchase data. *Id.* at 9. "Commerce's methodology is 'presumptively correct,' and {Zinus Indonesia} has not shown that Commerce lacked authority"

to use the quarterly ratio methodology. *Thai Plastic Bags Indus. Co. v. United States*, 746 F.3d 1358, 1368 (Fed. Cir. 2014) (quoting *Fujitsu*, 88 F.3d at 1038).

Finally, Zinus Indonesia argues that if the Court finds the quarterly ratio methodology to be reasonable, it should exclude the Zinus Indonesia mattresses that, while purchased by Zinus Indonesia during the period of investigation, had not yet been imported into the United States by the end of the period of investigation. Zinus Indonesia Br. at 21-26. Zinus Indonesia argues that the only Zinus Indonesia mattresses that should be included in the calculation of the ratio are those that "Zinus U.S. could have theoretically sold." *Id*. at 21.

There is no requirement that a product be imported before it is sold to be included in a constructed export price sales database. The statute's definition of what constitutes a constructed export price sale describes a constructed export price sale as a sale to an unaffiliated party, "*before* or after importation." 19 U.S.C. Section 1677a(b) (emphasis added). Zinus U.S. purchased and owned, during the period of investigation, the Zinus Indonesian mattresses that were in the warehouses and in transit on the water, so they were available for sale during the period of investigation whether or not they had yet been imported.[11] Further, record evidence shows that the quantity of Zinus U.S. inventory of Indonesia mattresses sold *exceeded* the quantity of such mattresses in the Zinus U.S. warehouse during the period of investigation, meaning that these mattresses must have been in-transit. *See* Section C Response at Exh. C-2B (C.R. 97); Section A Supplemental Questionnaire Response at Exh. SA-5 (C.R. 154).

---

[11] In fact, Zinus U.S. makes other types of constructed export price sales which never go into warehouses but are shipped directly from Zinus Indonesia after Zinus U.S. makes the sale. *See* Section C Response at Exh. C-2B. None of those period of investigation sales were excluded from Zinus Indonesia's constructed export price reporting even though the subject merchandise was imported after it was sold to the unaffiliated customer.

Therefore, this Court should sustain Commerce use of the quarterly ratio methodology to determine the quantity of Zinus U.S. sales attributable to Zinus Indonesia mattresses because record evidence supports a finding that it better reflects the proportion of Zinus Indonesia mattresses in Zinus U.S. inventory (both in warehouse and in transit) available for sale during the period of investigation than the FIFO methodology. *See Thai Plastic Bags*, 746 F.3d at 1368; *Fujitsu*, 88 F.3d at 1038.

III.    **Commerce's Adjustments To Zinus U.S.'s Reporting Of Sales Deductions Is Supported By Substantial Evidence And In Accordance With Law**

In the final determination, to calculate the sales deductions for commissions and other sales allowances, Commerce combined the commissions and certain other sales allowances of two United States affiliates of Zinus Korea, BPM and Zinus U.S., and divided that number by the companies' combined gross sales, which resulted in a sales deduction attributable to Zinus U.S.'s sales. *See* IDM at 15. Zinus Indonesia argues that BPM does not sell subject merchandise, meaning Indonesian mattresses, and its expenses have nothing to do with the manufacture or sale of *Indonesian* mattresses. Zinus Indonesia Br. at 36-46. Further, Zinus Indonesia likens this sales deduction as "effectively" application of facts available. *Id.* at 39-41. As we demonstrate below, Commerce's decision to combine the commissions and certain other selling allowances to calculate the sales deductions for Zinus U.S. is supported by substantial record evidence and is otherwise in accordance with law.

A.    **It Was Reasonable For Commerce To Apply A Sales Deduction Because Zinus U.S. Cannot Distinguish Between "Subject" And "Non-Subject Merchandise" With Its Constructed Export Price Sales**

As an initial matter, the difference between "subject merchandise" and "non-subject merchandise" is that "subject merchandise" covers Zinus Indonesia mattresses which meet the scope description in the initiation notice, whereas "non-subject merchandise" includes mattresses

*equivalent* (perhaps, identical) to the Zinus Indonesia mattresses, but manufactured by other Zinus Korea affiliates. *See* IDM at 14. Put another way, whether a mattress is "subject" or "non-subject" merchandise comes down to its country of origin, which, as Commerce explained in the final determination, Zinus U.S.'s "inventory management and sales systems do not track the country of origin for its {constructed export price} inventory sales in the normal course of business." *Id.* at 8.

This inability to trace country of origin is critical to Commerce's determination that the record evidence supports a finding that expenses were shifted between Zinus Korea's two affiliates, BPM and Zinus U.S., to lower the dumping margins in the Indonesian mattress investigation. *See id.* at 13 ("Specifically, {Brooklyn Bedding} allege{s} that Zinus {Indonesia} was masking dumping of Indonesian mattresses during the {period of investigation} by shifting sales deductions that would have been incurred by Zinus U.S. for sales of Indonesian mattresses to sales of non-subject merchandise made through a different affiliated reseller, BPM, the U.S. reseller at issue in the *Mattresses from China* investigation."). Indeed, Zinus Indonesia and BPM are affiliates, sell the same merchandise as well as other products [███████████],[12] and Zinus Korea directs the sales of all mattresses from all countries to the United States. *See id.* at 13-14.

In the final determination, Commerce found that commissions and certain other sales allowances were being shifted from Zinus U.S. to BPM. *See id.* at 13-15. Because Commerce questioned how Zinus U.S. could only pay commissions on non-subject merchandise, without knowing *whether* any particular mattress was subject or non-subject merchandise (based on country of origin) once it entered Zinus U.S.'s warehouses, Commerce requested additional

_____

[12] *See* IDM at 14; Post-Prelim. Supp. Response at 4-5.

information from Zinus Indonesia.  *Id.* at 13-14 & n.60.  Although Commerce acknowledged that Zinus Indonesia "provided all the information requested," Commerce still questioned "the commercial practicality of Zinus U.S.'s reporting of its sales practices with regard to commissions and certain other sales allowances."  *Id.* at 14.

Commerce determined that this shifting of sales allowances manifested in terms of Zinus U.S. eliminating its commissions or other sales allowances on its sales of subject merchandise during the period of investigation, but at the same time, BPM's commissions and other sales allowances ███████ ] almost [ ██████ from the previous year with [ ██████████ ███████ ].  *Id.*; *see also* Post-Preliminary Supplemental Questionnaire Response, Part 1, at 11 (P.R. 256, C.R. 271) (Post-Prelim. Supp. Response).  As Commerce noted, Zinus Indonesia "did not explain why some of Zinus U.S.'s customers would agree to purchase mattresses of Indonesian origin on which they would earn *no* commissions when they could receive commissions from Zinus U.S. on mattresses manufactured in other countries."  IDM at 14 (emphasis added).

Another suspicious change in commission allowances, which supported a finding that expenses were being shifted, was that "Zinus U.S. sold subject merchandise to corporate customers whose affiliates purchased non-subject merchandise from both Zinus U.S. and BPM and earned commissions on these sales."  *Id.*; Post-Prelim. Supp. Response at 4-5.  But for a "particular customer," as of March 2019 (*i.e.*, a month before Zinus U.S. began purchasing mattresses from Zinus Indonesia), Zinus U.S. "no longer paid commissions to this customer" despite "selling Indonesian mattresses to this customer in November 2019."  IDM at 14.  There was no forthcoming explanation as to why Zinus U.S. "ceased paying commissions to this customer or whether the sourcing of the mattresses had any influence on this decision."  *Id.*

Commerce analyzed this record evidence in light of Zinus U.S.'s contradictory claims concerning the granting of commissions given that it could not identify the country of origin of the mattresses that were sold from its warehouse to attribute commissions to the proper sales. *Id.* Moreover, Zinus U.S.'s claim that it granted commission on some mattresses, just not the *Indonesian* mattresses, goes against commercial common sense. *Id.* Commerce found that it did not make sense that a customer would ever purchase a Zinus Indonesian mattress for which it could not receive a commission when it could buy the same mattress produced by Zinus in another country and receive a commission. *Id.* It only makes commercial sense if the commissions were increased on Zinus mattresses and products produced in other countries. As a result, Commerce found that some of BPM's [ ], during the same time period, in commissions and selling allowances should be attributable to Zinus Indonesia mattress sales. *Id.*

Then, to calculate the amount that should be attributed to Zinus Indonesia mattresses, Commerce took a conservative approach and did not attribute the entire BPM [ ] to Indonesian mattresses because BPM sold other mattresses and other products. *Id.* at 14-15. Rather, Commerce simply combined both Zinus U.S.'s and BPM's total sales deductions (inclusive of commissions and sales allowances)[13] and allocated them over the gross sales of both companies, which reasonably assigned a proportionate amount of expenses based on the combined gross sales. *Id.* at 15.

This decision is supported by substantial evidence and should be sustained.

---

[13] To avoid double counting, Commerce adjusted the totals to remove certain rebates. IDM at 15.

**B.     Zinus Indonesia's Various Arguments Challenging The Adjustment To The Sales Deduction Are Unavailing**

Zinus Indonesia challenges Commerce's determination based on several arguments that, as we explain below, are meritless.  First, Zinus Indonesia argues that BPM had nothing to do with the manufacture and sale of Zinus Indonesia mattresses so the BPM sales adjustment expenses should not be attributed to Zinus Indonesia.  *See* Zinus Indonesia Br. at 36-37.  And to believe otherwise is "pure speculation."  *Id.* at 37-38.

While BPM was not directly involved in the manufacture and sales of Zinus Indonesia mattresses, as the record evidence shows and as explained above, BPM was part of the Zinus group of companies' scheme to shift Zinus Indonesia mattress commissions and sales allowances to BPM's sales.  *See* IDM at 14-15.  Moreover, substantial record evidence supports the shifting of these expenses to BPM, because Zinus U.S. claims that it grants commissions for *non-subject* merchandise, but the record evidence shows Zinus U.S. does not and cannot know the country of origin of the mattresses sold to the first unaffiliated purchaser.  *Id.* at 14.  Thus, it was appropriate for Commerce to combine BPM's commissions and other sales allowances when calculating Zinus Indonesia's commissions and sales allowances.  *See id.* at 14-15.

Second, Zinus Indonesia argues that the adjustment to the sales reductions was, in effect, an unlawful resort to "facts available" which circumvented the statutory requirements to apply facts available.  *See* Zinus Indonesia Br. at 38-41.  This completely misinterprets what Commerce did in the final determination.

While Brooklyn Bedding argued for facts available in the underlying proceeding, Commerce did not, in fact, resort to facts available.  *See* IDM at 10-11, 14-15.  Zinus Indonesia had provided the requested expenses, as Commerce acknowledged in the final determination, but Commerce determined based on record evidence that the expenses were not properly allocated.

*See id.* at 14-15. Rather than resort to facts available, Commerce simply applied a different allocation methodology which is not a facts available determination.

As Commerce explained, "it was appropriate to make an adjustment to the prices of Zinus's {constructed export price} sales to ensure that all sales allowances and deductions are accounted for in the margin calculation." *Id.* at 14. It is wholly within "Commerce's expertise and discretion to update its methodology for both increased accuracy and ease of use," *SKF USA Inc. v. United States*, 491 F. Supp. 2d 1354, 1362 (Ct. Int'l Trade 2007), which is what Commerce did here. Put another way, it was Commerce's "objective of seeking to allocate {sales deduction} expenses by a more accurate methodology," *JTEKT Corp. v. United States*, 675 F. Supp. 2d 1205, 1242 (Ct. Int'l Trade 2009), rather than any purported application of facts available when Commerce made the relevant adjustments. *See* IDM at 14-15.

Third, Zinus Indonesia argues that Commerce overlooked the 2018 and 2019 data it reported with regard to Zinus BPM and Zinus U.S. sales, and that this data shows that expenses were not shifted. *See* Zinus Indonesia Br. at 41-44. To the contrary, Commerce analyzed the expense data and determined it was not properly allocated between the companies based on its finding of expense shifting and simply reallocated it with the adjustment to sales deductions. *See* IDM at 14-15.

Indeed, Zinus Indonesia's own chart supports Commerce's determination, because it shows [██████████████████████████████████] from 2018 to 2019, but an [██████] in BPM's [██████████████████████████] ] from 2018-2019. Zinus Indonesia Br. at 43. Commerce did not use the full expense amount listed in the chart because it removed [██████████████████████████████] to avoid double-counting, so that it only included [██████████████████████████] which resulted in a [██████████████████

█████ ] in BPM's adjusted sales deductions.  *See* IDM at 15; *see also* Post-Prelim. Supp. Response at Exh. SQ-2.

While Zinus Indonesia argues that BPM's commissions as a percentage of both total merchandise sales and total revenue also fell between 2018 and 2019 as support for the purported trustworthiness of BPM's commissions reporting, Zinus Indonesia Br. at 44, the sales deductions ████████████████████ ]) [ █████ ] over [ ███████ ] while revenues and sales only [ █████ ] by approximately [ █████ ] during that same time period.  *See id.* at 43. Moreover, commissions are only a portion of BPM's total sales deductions, and Zinus Indonesia point to no record evidence confirming the total amount of 2018 commissions for BPM, nor are we aware of any.

Finally, Zinus Indonesia argues that Commerce should not have relied on Zinus U.S.'s company-wide sales and should have relied only mattress-specific sales information.  Zinus Indonesia Br. at 45-46.  Zinus Indonesia does not explain how Commerce could have done this alternative calculation in practice because Commerce used the total sales deductions and the total sales of both companies (Zinus U.S. and BPM) to put them on the same basis.  *See* IDM at 15. Based on the foregoing analysis, to artificially limit the denominator to *only* Zinus U.S. sales of Zinus Indonesia mattresses would distort the allocation of the sales deductions; moreover, the country of origin issue would again be an important limitation.  *See id.*  Because Commerce determined that there was substantial evidence of expense shifting from Zinus U.S. to BPM, Commerce used the expenses and sales of all products from both companies as the basis to reallocate a proportionate amount of BPM's commissions and sales allowances to the Zinus U.S. sales.  *See id.* at 14-15; *see also Fujitsu*, 88 F.3d at 1039 ("Antidumping and countervailing duty

determinations involve complex economic and accounting decisions of a technical nature, for which agencies possess far greater expertise than courts.").

Because substantial evidence supports Commerce's decision to combine the sales deductions of Zinus Korea's two United States selling affiliates, Zinus U.S. and BPM, and allocate these sales deductions over total gross sales to account for expense shifting between the companies, the Court should sustain Commerce's decision.

## IV. Substantial Evidence Supports Commerce's Determination To Use Emirates Sleep's Financial Statements Because They Were The Best Available Information

In the final determination, Commerce selected the financial statements from Emirates Sleep, an Indian company, as the best available information from which to derive the profit ratio and selling expenses for the calculation of Zinus Indonesia's constructed value. *See* IDM at 21-25.

As an initial matter, there were a total of eight financial statements available on the record for consideration.[14] *Id.* at 21-22. In addition to Emirates Sleep, there were five Indonesian financial statements: (1) Graha, an Indonesian mattress producer that requested to be treated as a voluntary respondent which Commerce did not individually investigate; (2) Ecos, an Indonesian mattress and other sleep product producer; (3) Innocycle, an Indonesian producer of non-woven and staple fiber and materials recycler; (4) Chitose, an Indonesian producer of furniture for home, schools restaurants and hospitals; and (5) Boston, an Indonesian producer of wood furniture and special construction or repairs. *Id.* at 21-22.

Zinus Indonesia challenges the use of the Emirates Sleep financial statements because, it argues, the financial statements from Graha and Ecos were better sources of information. Zinus

---

[14] Financial statements from Serbian and Malaysian companies were also placed on the record. IDM at 22. Zinus Indonesia does not challenge their exclusion from consideration.

Indonesia Br. at 26-36.  As we demonstrate below, substantial evidence supports Commerce's determination that there were significant flaws in the Indonesian financial statements which rendered them unusable, and that the Emirates Sleep financial statements were the best available information.  IDM at 22-23.

### A.   Legal Framework

In assessing a respondent's dumping margin, Commerce compares "the export price or constructed export price and normal value."  19 U.S.C. § 1677b(a).  "In general," the respondent's "normal value" is based on home market sales, third country sales or constructed value."  *Id.* § 1677b(a)(1).  In this case, normal value is constructed value because Zinus Indonesia had neither home market nor third country sales.  When the preferred method of calculating a constructed value profit and selling expenses based on the respondent's own home market and third country sales is unavailable, the statute provides three alternative methods for Commerce to calculate constructed value profit and selling expenses (with no particular hierarchy among the alternatives):

> (i)      the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review . . . for profits, in connection with the production and sale, for consumption in the foreign country, of merchandise that is in the same general category of product as the subject merchandise;

> (ii)      the weighted average of the actual amounts incurred and realized by exporters or producers that are subject to the investigation or review (other than the exporter or producer described in clause (i)) . . . for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country; or

> (iii)      the amounts incurred and realized . . . for profits, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by the exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in the

> same general category of products as the subject merchandise (*i.e.*, the "profit cap").

IDM at 21; *see also* 19 U.S.C. § 1677(b)(e)(2)(B); Uruguay Round Agreements Act, Statement of Administrative Action (SAA), H.R. Doc. No. 103-316 (1994) at 840 ("at the outset, it should be emphasized, consistent with the Antidumping Duty Agreement, new section 773(e)(2)(B) does not establish a hierarchy or preference amount these alternative methods. Further, no one approach is necessarily appropriate for use in all cases.").

Commerce could not use options (i) and (ii) because Zinus Indonesia does not have home market or third country sales and there are no other Indonesian mandatory respondents in the investigation. IDM at 21; *id.* at 20 (explaining that Zinus Indonesia sold all of its mattresses to Zinus Korea); Section A Response at A-8. Thus, Commerce used the only remaining option, which is any other reasonable method. *Id.*; *see also* 19 U.S.C. § 1677(b)(e)(2)(B)(iii).

**B.**     **Commerce's Determination That The Emirates Sleep Financial Statements Were The Best Available Information Is Supported By Substantial Evidence**

In the final determination, Commerce applied its long-standing practice to evaluate financial statements, which includes considering the following four criteria: (1) the similarity of the potential surrogate companies' business operations and products to respondent's business operations and products; the financial statements must reflect a net profit; (2) the extent to which the financial data of the surrogate company reflects sales in the home market and do not reflect sales to the United States; (3) the contemporaneity of the data to the period of investigation; and (4) the extent to which the customer base of the surrogate company and that of the respondent are similar (*e.g.*, original equipment manufacturers versus retailers). IDM at 22.[15]  Concomitant

---

[15] *See e.g.*, *Pure Magnesium from Israel*, 66 Fed. Reg. 49,349 (Dep't of Commerce Sept. 27, 2001) (LTFV determ.), and accompanying IDM at Comment 8 (establishing the first three criteria); *Certain Color Television Receivers from Malaysia*, 69 Fed. Reg. 20,592 (Dep't of

with the four criteria, Commerce evaluates financial statements for data reliability and relevance by ensuring that financial statements: (1) show a net profit, because a new start-up company or a failing company would not reflect healthy and normal company operations; (2) are complete, including an auditor's report showing an unqualified opinion and all accompanying footnotes were provided; and (3) are fully translated. *Id.*

Based on the above four criteria, Commerce determined not to use the financial statements of Ecos, Graha, Chitose, and Boston. *Id.* at 22-23. For example, Commerce determined that the Ecos financial statements were not useable because they have a qualified auditor's opinion. *See id.* at 22; Zinus Letter, "Mattresses from Indonesia: Constructed Value Profit and Selling Expense Information and Comments" (Zinus CV Profit Submission) (P.R. 156); Zinus CV Profit Submission at Exhibit II, frm 7 (P.R. 158). Commerce requires the use of an unqualified audited financial statement because having gone through an audit by an independent entity without qualification provides Commerce with the assurance that, in the absence of contravening record evidence, the financial statements are accurate and in accordance with the Generally Accepted Accounting Principles (GAAP) of the country in which the producer is located. *See id.* at 22-23. Likewise, Commerce determined that the 2019 contemporaneous financial statements of Graha were not audited. *Id.* at 23. Commerce then rejected the financial statements of Chitose, a producer of furniture for homes, schools, restaurants and hospitals, and Boston, a producer of wood furniture and specialty construction and repairs, because they both produce and sell products not comparable to mattresses. *Id.*

---

Commerce Apr. 16 2004) (LTFV determ.), and accompanying IDM at Comment 26 (establishing the fourth criterion); *Certain Oil Country Tubular Goods from the Republic of Koreas*, 79 Fed. Reg. 41,983 (Dep't of Commerce July 18, 2018) (LTFV determ.), and accompanying IDM at Comment 1 (recent example of application of all four criteria).

Thus, Commerce considered whether to use the remaining financial statements from Innocycle and Emirates Sleep. *Id.*

Commerce explained there is a preference that the profit and selling expenses reflect both "production and sales in the foreign country" and be like the "merchandise under consideration." *Id.* While Innocycle was an Indonesian producer of mattresses, "only six percent of its revenue is from mattresses, so it is clearly not predominantly a mattress producer as Emirates {Sleep} is," with 76.71 percent of its revenues from manufacturing mattresses. *Id.* at 23-24; *see also* Zinus Indonesia Constructed Value Profit Submission at Exh. 3 (Innocycle Financial Statement), "Operating Overview Per Business Segment, at frm. 2 and 53-55 (P.R. 159); Brooklyn Bedding Constructed Value Profit Submission, at Attachment 2 (Emirates Financial Statement), Note 14 (P.R. 154).

Commerce considered that Emirates Sleep's financial statements were only contemporaneous with the first three months of the period of investigation, but explained that because "periods of investigation and review do not normally coincide with the calendar year or other fiscal years typically adopted by companies, Commerce regularly accepts as contemporaneous a statement that overlaps the {period of investigation} by some amount." IDM at 24. And in this instance, Commerce explained that it agreed with Brooklyn Bedding that "as long as the financial statement period overlaps the {period of investigation}, {Commerce} consider{s} it contemporaneous{.}" *Id.*

Next Commerce explained that Emirates Sleep's business operations were similar to Zinus Indonesia's, and that it was not "disqualify{ing}" for 23.29 percent of the company's revenues to relate to marketing. *Id.* The expenses of "marketing, promotion, and trading activities related to mattresses and sleep systems is a completely appropriate activity for a

company engaged in the manufacturing and sale of mattresses" and Zinus Indonesia had pointed to no evidence that the "expenses related to these revenues are missing from the calculation of profit on the Emirates {Sleep} financial statements." *Id.* Moreover, Commerce explained that in its calculation of selling expenses for constructed value, it "did not include the retail, marketing and advertising service or commission costs, but rather only included transportation expenses as a selling expense." *Id.*

Commerce likewise rejected Zinus Indonesia's argument that the Emirates Sleep financial statements were incomplete, instead explaining it determined that the statements were complete "because they include the full audit report, each of the financial statements, and all of the accompanying footnotes." *Id.* at 25. Although there were some missing annexures, Commerce explained that "{n}one of the annexures refer to information that would bring into question any of the amounts on the income statement which affect the profit or selling expenses." *Id.*

With respect to calculating the "profit cap," or the "amount realized by exporters or producers in connection with the sale, for consumption in the foreign country, of the merchandise in the same general category of products as the subject merchandise," Commerce also determined to use the Emirates Sleep financial statements "for determining the profit cap as facts available." *Id.* Although Zinus Indonesia argued that Commerce could use the Indonesian financial statements it had submitted, Commerce explained that "{n}one of the suggested financial statements reflect profit only on sales of the general category of products in the foreign country under investigation." *Id.*

Therefore, Commerce found that the Emirates Sleep financial statements were the best information on the record to use for constructed value profit and selling expenses, because they

was contemporaneous, reflected a net profit, audited without qualification, complete, fully translated, represented a manufacturer that predominantly produced mattresses, and did not reflect sales predominantly to the United States. *Id.* at 23-24; *see also Zhejiang DunAn Hetian Metal Co., Ltd. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011) (explaining a reviewing court determines not whether "the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information."); *QVD Food Co. v. United States,* 721 F. Supp. 2d 1311, 1316-17 (Ct. Int'l Trade 2010) (explaining that when Commerce is presented with a choice between imperfect alternatives, it may find a non-contemporaneous financial statement to be the best available information on the record). This decision is supported by substantial evidence and should be sustained.

**C.      The Court Should Reject Zinus Indonesia's Various Arguments Challenging The Emirates Sleep Financial Statements**

Zinus Indonesia argues that the Emirates Sleep financial statements are flawed for various reasons, and, relatedly, that Commerce erroneously rejected the financial statements of Graha and Ecos. *See* Zinus Indonesia Br. at 26-34. Further, Zinus Indonesia argues that there were "ample profit cap sources," and Commerce erred when it failed to consider information from Indonesian mattress producers. *Id.* at 34-36. These arguments lack merit, as we explain below.

**1.      The Emirates Sleep Financial Statements Satisfied Commerce's Financial Statements Criteria**

First, Zinus Indonesia argues that Commerce did not satisfy the requirements of the statute because the Emirates Sleep financial statements were not from the country under consideration and were not completely contemporaneous. Zinus Indonesia Br. at 27-28. Citing

*Mid Continent Steel & Wire, Inc. v. United States*, 203 F. Supp. 3d 1295, 1310 (Ct. Int'l Trade 2017), Zinus Indonesia argues that using the Emirates Sleep financial statements does not "approximate the respondent's experience *in the home market* – here Indonesia."  Zinus Indonesia Br. at 27 (emphasis in original).  Likewise, citing *Husteel Co. v. United States*, 471 F. Supp. 3d 1349, 1365-1366 (Ct. Int'l Trade 2020), Zinus Indonesia argues that "Commerce must explain adequately why using data that is not contemporaneous with the period of review is reasonable."  Zinus Indonesia Br. at 28.

*Mid-Continent* and *Husteel* are readily distinguishable.  While Commerce's statutory goal and preference is to use home market profit and selling expenses when available, Zinus Indonesia points to no authority, and nor are we aware of any, that Commerce *must* use unreliable data when more reliable data is available on the record.  *Mid Continent* does not address the situation in this case, namely that the Indonesian data that are on the record, the Graha and Ecos financial statements, were not reliable because they were either not audited, not contemporaneous, or the audit was qualified, as Commerce explained in the final determination. *See* IDM at 22-23.  While in *Mid Continent* "Commerce failed to explain this departure{,}" "when it prioritized third-country data from a producer of comparable merchandise over home-market data{,}" 203 F. Supp. 3d at 1310, here, Commerce adequately explained the basis for its determination that the home-market data were unreliable.  *See* IDM at 2-23; *see, e.g.*, *Risen Energy Co. v. United States*, 477 F. Supp. 3d 1332, 1341 (Ct. Int'l Trade 2020) ("SunPower might prefer that Commerce ignore the GasWorld data when determining whether the GTA data is reliable, but the court cannot say that it is unreasonable for Commerce to consider the disparities between the two datasets.").

Likewise, unlike the respondent in *Husteel*, 471 F. Supp. 3d at 1361, Zinus Indonesia has *no* home market or third country sales and so the data simply does not exist for Commerce to consider using.  IDM at 20-21.  Moreover, in *Husteel*, Commerce used "the profit and selling expense information from the first administrative review" instead of contemporaneous financial statements on the record, *Husteel*, 471 F. Supp. 3d at 1364, but here, Commerce used the Emirates Sleep financial statements that Brooklyn Bedding had placed on the record.  IDM at 22-23.

Although contemporaneity is an important factor in Commerce's selection of surrogate value, Commerce will rely on less contemporaneous data if that data is more accurate or reliable than the available contemporaneous data.  *See, e.g.*, *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014) (sustaining Commerce's determination to use a non-contemporaneous surrogate value because the data's product specificity outweighed the importance of contemporaneity); *Home Meridian Int'l, Inc. v. United States*, 865 F. Supp. 2d 1311, 1319 (Ct. Int'l Trade 2012) (stating that "Commerce frequently uses non-{period of review} values for a variety of reasons" and that "Commerce cannot create a blanket rule that prevents it from comparing the merits of contemporaneous and non-contemporaneous data, and thereby prevents Commerce from determining the best available information"); *Sichuan Changhong Elec. Co. v. United States*, 460 F. Supp. 2d 1338, 1358-59 (Ct. Int'l Trade 2006) (holding that Commerce was not unreasonable in choosing non-contemporaneous, but more reliable data, as the surrogate value).

Moreover, Zinus Indonesia's contemporaneous argument is a red herring because, as Commerce explained in the final determination, the Emirates Sleep financial statements overlap the period of investigation by three months, and it is Commerce's practice to consider a financial

statement sufficiently contemporaneous if it overlaps with the period under consideration. IDM at 24; *see also Golden Dragon Precise Copper Tube Grp., Inc. v. United States*, 2016 WL 4442163, at *5 (Ct. Int'l Trade Aug. 23, 2016) ("It is 'well-established' that Commerce considers data that overlap any portion of the {period of review} to be contemporaneous."). As Commerce explained in the final determination, "{b}ecause {its} periods of investigation and review do not normally coincide with the calendar year or other fiscal years typically adopted by companies, Commerce regularly accepts as contemporaneous a statement that overlaps the {period of investigation} by some amount." IDM at 24. In other words, Commerce determined that the Emirates Sleep financial statements *were contemporaneous* with the period of investigation. *See id.*

Finally, Zinus Indonesia argues that the Emirates' financial statements are "not specific to the subject merchandise (mattresses produced in Indonesia), the respondent and foreign market, nor the period of investigation . . ." Zinus Indonesia Br. at 30. This assertion is contradicted by the record.

The subject merchandise is mattresses, and Commerce explained in the final determination that Emirates Sleep "primarily manufactures all types and kinds of mattresses, bases, and other sleep related products and systems" and Commerce also determined that the data were contemporaneous. IDM at 23-24. Commerce was also not required to use unreliable Indonesian data, and "Commerce has the statutory discretion to give greater weight to one over the other, provided it offers a reasoned explanation{.}" *Hangzhou Spring Washer Co. v. United States*, 387 F. Supp. 2d 1236, 1250 (Ct. Int'l Trade 2005). Commerce is well within its authority to resort to any third country data that better meets the criteria in the statute as "any reasonable method." *See Sichuan Changhong Elec.*, 460 F. Supp. 2d at 1358-59. Thus, the Court should

decline Zinus Indonesia's attempt to insert a requirement that no matter how unreliable or unrepresentative the data may be, Commerce must use it, if it is from the country under investigation. *See* Zinus Indonesia Br. at 30. The law does not require such an outcome.

**2. Commerce Properly Declined To Use The Graha And Ecos Financial Statements Because They Were Not Contemporaneous, Not Audited, Or Had A Qualified Audit Opinion**

Zinus Indonesia argues that Commerce based its rejection of the Graha and Ecos financial statements on "inconsequential considerations." Zinus Indonesia Br. at 31-33. It also argues that these financial statements were better data than Emirates Sleep's data because "their information best approximates the home market profit experience of Zinus Indonesia." *Id.* at 31. We explain below why Commerce reasonably declined to use the Graha and Ecos financial statements because the Emirates Sleep data were the best available source of information.

First, with respect to Graha's two financial statements, Commerce explained that the "2018 financial statements are not contemporaneous with the {period of investigation} and Graha's 2019 financial statements are not audited." IDM at 23. Contemporaneity is one of the criterion Commerce considers in evaluating financial statements and it was reasonable for Commerce to decline to use the 2018 Graha financial statements that had no overlap with the period of investigation. *Id.* at 22. It was also reasonable for Commerce to reject the 2019 Graha financial statements because they were not audited. *Id.* In other words, no independent third party examined Graha's financial statements for accuracy or consistency with Indonesian GAAP. *See, e.g.*, *Seah Steel Vina Corp. v. United States*, 269 F. Supp. 3d 1335, 1350-51 (Ct. Int'l Trade 2017) (holding Commerce reasonably discarded another surrogate producer's financial statements that had not been audited). Therefore, it was reasonable for Commerce to reject

Graha's financial statements in favor of Emirates Sleep's contemporaneous and audited financial statements. IDM at 23.

Turning to Ecos, Zinus Indonesia argues that Commerce was equally unreasonable in rejecting Ecos's financial statements because its audit was qualified. Zinus Indonesia Br. at 33. Zinus Indonesia claims that Ecos's audit qualification only affected Ecos's selling, general, and administrative (SG&A) expenses, which may be understated, potentially affecting Ecos's profit rate. *Id.* at 33.

As an initial matter, "{i}t is within Commerce's discretion to prefer a financial statement that has not been the subject of an auditor's qualified opinion to one that has had questions raised about its suitability." *Golden Dragon*, 2016 WL 4442163, at *5. Here, the "qualified opinion relates to estimated future liabilities pertaining to post-employment benefit obligations of the company." IDM at 23. Specifically, the independent auditor's basis for a qualified opinion was: "As explained in note No.2.l financial statements, the Company *has not calculated the estimated liabilities post employment employee benefits* as required under Financial Accounting Standards Entities Without Public Accountability (SAK-ET AP) chapter 23 on 'Employee Benefits' and our audit did not include aspects of taxation." Zinus Indonesia Constructed Value Profit Submission at Exh. 2 (Ecos Financial Statements) (P.R. 158) (emphasis added).

Contrary to Zinus Indonesia's characterization, the Ecos financial statements note (2.l) does not say that the expense may be "understated," rather, the auditor opinion was qualified because "the company has not calculated the estimated liabilities post-employment employee benefits as required." IDM at 23. Commerce explained that "{t}his qualification could very well impact the current costs recognized by the company, either increase or decrease them, had the company followed the requirements of the GAAP of Indonesia." *Id.* "As such, there is no

evidence to confirm that the qualified opinion does not impact the calculation of period costs, revenues, expenses, cash flows, profits or selling expenses and proves that the Ecos qualified financial statement should not be used." *Id.*; *see e.g.*, *Wuhan Bee Healthy Co. v. United States*, (2005) 374 F. Supp. 2d 1299, 1308 (Ct. Int'l Trade 2005) ("Here, Commerce was justified in finding that Coorg's financial statement was not the best available information on the record. First, Coorg's financials contained irregularities such as missing information (the 'Depreciation Fund') and discrepancies with the auditor's report ('Entire welfare fund not deposited').").

In sum, the financial statements of Emirates Sleep, Graha, and Ecos were all imperfect. However, Emirate Sleep's financial statements were contemporaneous because they overlapped the period of investigation by three months and otherwise satisfied Commerce's surrogate value criteria. IDM at 22-25. Because it is Commerce's practice to disqualify financial statements that have not been audited or have a qualified auditor's opinion, Commerce declined to use the Graha and Ecos financial statements and determined that Emirates Sleep's financial statements were the best available information on the record. *See id.* The Court should find that "Commerce sufficiently explained its reason for choosing between {three} flawed financial statements." *CP Kelco U.S., Inc. v. United States*, 949 F.3d 1348, 1359 (Fed. Cir. 2020).

### 3. Commerce's Use Of The Emirate Sleep Financial Statements To Calculate The Profit Cap Is Supported By Substantial Evidence And In Accordance With Law

Finally, in the final determination, Commerce used Emirates Sleep's financial statements to calculate the constructed value profit cap. IDM at 25. Once again, Zinus Indonesia argues that Commerce was required to use Indonesian profit cap data from flawed Indonesian financial statements because they are from the home country. *See* Zinus Indonesia Br. at 34-36. For the same reasons Commerce did not use the Indonesian financial statements for constructed value

profit, it reasonably declined to use the Indonesian financial statements for the profit cap, and used the Emirates Sleep data instead.  IDM at 25.

Zinus Indonesia argues that as facts available, Commerce should use the Indonesian financial statements and that Commerce "may not disregard information on the record in order to avoid its statutory obligations."  Zinus Indonesia Br. at 35.  Citing *Maverick Tube Corp. v. United States*, 107 F. Supp. 3d 1318 (Ct. Int'l Trade 2015), Zinus Indonesia argues that Commerce "similarly chose not to provide a reasonable justification for its decision not to calculate a profit cap."  *Id.* at 35-36.

However, unlike in *Maverick Tube*, Commerce did *not* "fail{} to provide an adequate explanation as to why it dispensed with the profit cap requirement," 107 F. Supp. 3d at 1339, because Commerce actually calculated a profit cap using Emirate Sleep's profit information.  IDM at 25.  Although Zinus Indonesia may prefer that Commerce use the Indonesian financial statements as facts available, that would have been necessary only if there had been no other useable data on the record.  *See Atar, S.r.l. v. United States*, 703 F. Supp. 2d 1359, 1364 (Ct. Int'l Trade 2010), *rev'd on other grounds*, 730 F.3d 1320 (Fed. Cir. 2013) ("But even the exception for absence of record data does not allow Commerce to ignore the profit cap requirement entirely when determining constructed value profit.  Where the record lacks data on profit normally realized by other companies on sales of the same general category of products, Commerce still must attempt to comply with the profit cap requirement through the use of facts otherwise available.").  Commerce reasonably explained, however, why it was not necessary to resort to the Indonesian financial statements for facts available.  IDM at 25.

"When establishing a profit cap, the law specifies that {Commerce} use the profit on sales in the foreign country for the 'merchandise in the same general category of products as the

subject merchandise.'" *Id.*; *see also* 19 U.S.C. § 1677b(e)(2)(B)(iii). In the final determination, Commerce "disagree{d} with Zinus {Indonesia} that any of its submitted financial statements meet the specific criteria in the law for the profit cap." IDM at 25. Graha's financial statements, for example, "may reflect the production and sale of merchandise in the same general category of products as the subject merchandise, {but} its financial statements" suffered from being not contemporaneous, not audited, and, "as voluntary respondent, Graha's sales may be made predominantly to the United States," *not* to the home country. *Id.* at 25 n.153. Here, because Commerce determined that Emirates Sleep was "the best available option for calculating {constructed value} profit, {Commerce} likewise consider{ed} it the best option for facts available." *Id.* at 25.

Therefore, because Commerce's decision to use Emirates Sleep's financial statements for constructed value profit, selling expenses, and the profit cap is supported by substantial evidence and otherwise in accordance with law, this Court should sustain Commerce's constructed value profit and selling expense calculations.

## V. Commerce's Decision To Limit The Selling Expenses Attributable To Zinus Korea To Its Actual Selling Expenses Is Supported By Substantial Evidence And Is Otherwise In Accordance with Law

In the final determination, Commerce used Zinus Korea's actual selling expenses reported by Zinus Indonesia as part of the calculation of Zinus Indonesia's selling expenses. *Id.* at 30-33. Brooklyn Bedding argues that the reported amount of Zinus Korea's selling expenses was too small and that more of Zinus Korea's selling expenses are attributable to Zinus Indonesia mattress sales, which Commerce has ignored. Brooklyn Bedding Br. at 8-22. As we demonstrate below, the record supports the amount of Zinus Korea selling expenses attributable

to the Zinus Indonesia mattress sales and record evidence does not support Brooklyn Bedding's arguments.

Commerce's practice in accounting for the selling expenses of a mandatory respondent's affiliates is to use the *actual* expenses that the affiliate incurs. IDM at 32 (citing *Fresh Tomatoes from Mexico*, 84 Fed. Reg. 57,401 (Dep't of Commerce Oct. 25, 2019) (final LTFV determ.), and accompanying IDM at Comment 17. The reason Commerce limits the affiliate's selling expenses to its actual expenses is that any additional amount, which could, for example, be labeled as profit or commission between affiliates, is a transfer of money between affiliates rather than a reimbursement for any actual expense. *See* IDM at 32. As such, any amount of money above the amount of actual incurred expenses being transferred between affiliates is subject to manipulation and would distort the dumping calculation if included as part of selling expenses. The requirement of reporting only the actual selling expenses of the affiliate is included in the questionnaire. Initial Questionnaire at C-21 (P.R. 67); *see also* IDM at 32.

Commerce followed its practice and used the actual reported selling expenses of Zinus Korea related to its sales of Zinus Indonesia mattresses. IDM at 32-33. These expenses were reported in the United States sales database as advertising expenses (ADVERTU), rebates (REBATE3U, REBATE5U), and bank charges (BANKCHARU). *Id.* at 32 n.213. As we demonstrate below, Brooklyn Bedding has not identified any record evidence that the numbers reported are distorted or inaccurate.

Brooklyn Bedding primarily argues, however, that Commerce failed to consider an extensive list of record evidence of activities in which Zinus Korea participated. Brooklyn Bedding Br. at 9-16. The only point that this recitation of activities proves is that Zinus Korea is a large company with affiliated manufacturing and sales facilities all over the world. *Id.* It

shows that Zinus Korea had 24,972,916 won in selling and general administrative expenses in 2019, with selling expenses comprising [          ] of this amount. *Id*. at 12-13. It also shows that of this selling expense amount, [          ] were reported in the United States sales database as Zinus Korea's selling expense with regard to Zinus Indonesia mattress sales. *Id*. at 13.

By their calculations, the Zinus Korea selling expense (*i.e.*, fees and commissions) rate that should be attributable to Zinus Indonesia products is [          ]. *Id.* at 20-22. But as Commerce explained in the final determination, "it is Commerce's practice to use the affiliate's actual expenses, not the affiliated party commissions, in its calculations." IDM at 32; *id.* ("As for Zinus {Korea's} mark up in the price it charges to Zinus U.S., Commerce's practice is not to treat such price mark ups as commissions but rather to require the affiliated party charging the price mark up to report its actual expenses associated with the sale."). Zinus Korea's expenses, including those Commerce does not typically include in its calculations of affiliate party selling expenses, does not constitute record evidence that the amount of actual selling expenses Zinus Korea reported is inaccurate. *See id.*

Moreover, Brooklyn Bedding fails to identify *any* record evidence indicating that the reported actual selling expenses of Zinus Korea are inaccurate. It does not point to a single record document that indicates Commerce missed or excluded any actual selling expenses attributable to Zinus Korea's sales of Zinus Indonesia mattresses. Rather, its argument amounts to pure speculation: because Zinus Korea is a huge company with many manufacturing and sales affiliates, the amount reported as attributable to Zinus Indonesia mattresses must be too small. Because Commerce used Zinus Korea's actual expenses reported from Zinus Korea's books and records and Brooklyn Bedding has not identified any record evidence suggesting that even a

single won is missing, this Court should sustain Commerce's decision.  *See* IDM at 32-33; *Fujitsu*, 88 F.3d at 1038.

Undeterred, Brooklyn Bedding argues that Commerce failed to address its list of Zinus Korea's selling activities.  *See* Brooklyn Bedding Br. at 12-16.  But Commerce is not required to specifically address every selling activity of Zinus Korea which Brooklyn Bedding identified. Rather, as Commerce explained in the final determination, it relied on reported actual affiliated company selling expenses that Zinus Korea "incurred on behalf of U.S. sales in the U.S. sales database."  IDM at 32.  If Brooklyn Bedding had identified, which it did not, any anomalies in the reported actual selling expenses, other than a general suspicion that the expenses seem too small, Commerce would have addressed those anomalies in the final determination.  *See id.*

Relatedly, Brooklyn Bedding quibbles with Commerce's finding that Zinus Korea's selling activity was "limited," arguing that the record does not support this finding.  Brooklyn Bedding Br. at 16-17.  It is true that Zinus Korea purchased all of Zinus Indonesia's mattresses and sold them either directly to unaffiliated U.S. customers or to Zinus U.S., which in turn sold them to unaffiliated U.S. customers.  However, when considering all of the activities Commerce considers as selling activities in its level of trade analysis, Commerce explained that Zinus Korea's role in the U.S. sales process was limited.  IDM at 32.  As Commerce explained in the final determination, Zinus Korea had a "limited role as an invoicing party in Zinus U.S.'s sales process."  *Id.*

Zinus Indonesia listed all of the selling functions of itself, Zinus U.S., and Zinus Korea in a chart in its Section A Response.  Section A Response at Exh. A-7a (P.R. 98, C.R. 37).  The chart in that response identified 11 separate selling functions, with Zinus Korea's role limited to less than a handful of those selling functions.  *See id.*  As a result, the record supports

Commerce's finding that Zinus Korea's role was limited and that Zinus Indonesia and Zinus U.S. performed the lion's share of those selling functions with regard to United States sales. *Id.*; IDM at 32-33.

Further, Brooklyn Bedding argues that Commerce ignored financial accounting rules adopted by Zinus Korea concerning fees and commissions which include them in selling expenses. Brooklyn Bedding Br. at 17-22. It also argues that Commerce must accept the accounting rules adopted by the respondent. *Id.* at 18-19. Both of these arguments are meritless. As Commerce explained in the final determination, it followed its practice of using actual affiliate selling expenses, which do not include affiliated party commissions, and there is no record evidence that any Zinus Korea actual selling expense and/or fee were excluded. IDM at 32.

In terms of accounting rules, while Commerce generally accepts the GAAP of the country under consideration as appropriate, when it comes to dumping margin calculations, Commerce is not required to use figures which do not accurately reflect the figures required to perform the dumping calculations. *See id.* In other words, although Brooklyn Bedding argues that Korean GAAP may lump together commissions, fees, and selling expenses, Commerce only looks at *actual* expenses incurred. *Id.*

Therefore, Commerce's determination to include only Zinus Korea's actual expenses is supported by substantial record evidence and is otherwise in accordance with law.

## VI.    Commerce's Decision To Use Indonesian GTA Import Data To Value Certain Zinus Indonesia Input Purchase Transactions Is Supported By Substantial Evidence And In Accordance With Law

In the final determination, Commerce disregarded the transaction values for 10 types of mattress material inputs that Zinus Indonesia had purchased from a Zinus Korea affiliate in

China, a non-market economy country. *See* IDM at 16-19; 19 U.S.C. § 1677b(f)(2)–(3); 19 C.F.R. § 351.401(b). Commerce instead valued these inputs using GTA import data from Indonesia, excluding any imports from non-market economy countries. IDM at 18-19. Brooklyn Bedding argues, however, that Commerce should instead use an average of six market economy countries economically comparable to China. *See* Brooklyn Bedding Br. at 22-33. As we demonstrate below, Commerce's decision to rely on the Indonesian GTA import data, excluding the imports from China, is supported by substantial record evidence and is otherwise in accordance with law.

### A. <u>Legal Framework</u>

In the calculation of normal value, Commerce may revise prices between affiliates using the transactions disregarded and major input rules, if it determines that the reported prices are below market value. *See* 19 U.S.C. § 1677b(f)(2)–(3); 19 C.F.R. § 351.401(b). Pursuant to the transactions disregarded rule, Commerce may disregard transactions between persons found to be affiliated for purposes of calculating costs of production "if, in the case of any element of value required to be considered, the amount representing that element does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration." 19 U.S.C. § 1677b(f)(2).

In applying the transactions disregarded rule, Commerce's practice is to adjust the transfer price for the service or input at issue so that it reflects the market price. *See, e.g.*, *Rebar Trade Action Coal. v. United States*, 337 F. Supp. 3d 1251, 1259 (Ct. Int'l Trade 2018) (citing administrative decisions interpreting the transactions disregarded rule). An underlying assumption built into this provision and the antidumping duty calculation, in general, is that

values must be based on market prices and prices from non-market economy countries cannot be used because they are not priced by the forces of supply and demand.  *See id.*

### B.    Substantial Evidence Supports Commerce's Decision That Indonesian GTA Import Data Were The Best Available Source Of Information For Valuing The Inputs Purchased From Non-Market Economy Affiliates

As Commerce explained in the final determination, Zinus Indonesia purchased 10 types of minor inputs from Chinese affiliates, and China is a non-market economy.  IDM at 17. Applying the transactions disregarded rule, 19 U.S.C. § 1677b(f)(2), "because these transactions were between Zinus {Indonesia} and {non-market economy}-based affiliated suppliers, Commerce was unable to use the {non-market economy-based affiliated suppliers' {cost of production} for use as a substitute for market price."  *Id.*   Therefore, Commerce sought surrogate price information that would allow it to find a market-based price as a surrogate.

To that end, Commerce determined "that the most reasonably available information to the parties for this purpose would be GTA import data, as it is readily available and reasonably specific to the voluminous number of affiliated {non-market economy} inputs."  *Id.*   And because the affiliates' data were from China, a non-market economy country, Commerce explained that it sought GTA import data from countries economically similar to China.  *Id.* "Thus, Commerce requested and obtained from the parties GTA import data for the countries that are currently used by Commerce as potential surrogate sources" for China, that is, Brazil, Malaysia, Mexico, Romania, Russia, and Turkey.  *Id.*   Zinus Indonesia also placed Indonesian GTA data on the record.  *Id.*; *see also* Section D Supp. Response at 6-13, & Exhibits SD-8 and SD-9.

In the preliminary determination, for "affiliated inputs where Zinus {Indonesia} did not purchase the same input from an unaffiliated supplier," Commerce used an average of the market

price of the GTA import data for Indonesia and the economically comparable countries, Brazil, Malaysia, Mexico, Romania, Russia, and Turkey.  IDM at 17-18; *see also* Preliminary Cost Memorandum at 2.

For the final determination, after having had additional time to consider the methodology and take the parties' comments into consideration, Commerce determined that it was inappropriate to use the data from all seven countries.  IDM at 18.  The statute does not instruct Commerce what to do in this circumstance, leaving Commerce with the discretion to fill the statutory void with a reasonable methodology.  If the statute does not address an issue, the Court assesses whether Commerce's interpretation is "sufficiently reasonable."  *Zenith Radio Corp. v. United States*, 437 U.S. 443, 540-51 (1978) (citation omitted); *see also Eurodif*, 555 U.S. at 316 (holding Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous.").

Rather than average GTA import prices of the seven countries, because "the statute indicates that the item being tested should reflect a market price in the country under consideration, which is Indonesia in the instant case," Commerce instead determined that "the Indonesian GTA data best reflect market prices for the market under consideration in those instances where market prices directly from an unaffiliated supplier are not available."  IDM at 18.  Using other country values, when data from the market under consideration are on the record, reliable, and available for use, would thwart that goal and be contrary to the statutory preference.

Nonetheless, Commerce credited Brooklyn Bedding's argument that using Indonesian GTA data necessarily includes Zinus Indonesia's affiliated Chinese suppliers with exports to it, and determined that there was "good cause to exclude the China export data included in the

Indonesia GTA data to avoid a clear circularity of using the same affiliated transactions to test the affiliated transfer price." *Id.* at 18-19. Commerce noted, however, that the Indonesian GTA import data should "already exclude imports from China based on Commerce's instructions." *Id.* at 19.

Based on the record and in accordance with 19 U.S.C. § 1677b(f)(2), Commerce found that it was appropriate to "determine{} the market price using Indonesia GTA data" for affiliated party inputs where prices paid to an unaffiliated party are not available. *Id.* The Indonesia GTA data, thus, "reflect a market price in the country under consideration," that is, Indonesia. *Id.*; *see also Changzhou Trina Solar Energy Co. v. United States*, 352 F. Supp. 3d 1316, 1343 (Ct. Int'l Trade 2018) (citing *Inland Steel Indus., Inc. v. United States*, 188 F.3d 1349, 1360–61 (Fed. Cir. 1999)) ("It is not this court's place to substitute its judgment for that of Commerce by selecting a different method of calculation where Commerce has acted within its lawful discretion and made a reasonable decision."). The Court should sustain this determination because it is supported by substantial evidence and in accordance with law.

### C. Commerce's Selection Of Indonesia GTA Data, Pursuant To 19 U.S.C. § 1677b(f)(2), Is In Accordance With Law

Although Commerce's interpretation of 19 U.S.C. § 1677b(f)(2) and use of Indonnesia GTA data for affiliated party inputs where prices paid to an unaffiliated party are not available is in accordance with law, IDM at 18-19, Brooklyn Bedding challenges this interpretation. *See* Brooklyn Bedding Br. at 22-32. Brooklyn Bedding primarily argues that Commerce's approach in the preliminary determination was the correct reading of the statute, and that exclusive reliance on Indonesia GTA data conflicts with Commerce's practice when applying section 1677b(f)(2). *Id.* at 24-31. Brooklyn Bedding also argues that Commerce should not use

Indonesia GTA data because Indonesia is not economically comparable to China. *Id.* at 31-32. We explain below why these arguments are meritless.

First, Brooklyn Bedding argues that because the affiliated transactions were from companies in a non-market economy country, Commerce should continue to be "guided" by its non-market economy methodology because it was determining a surrogate value for costs of production of Chinese suppliers. Brooklyn Bedding Br. at 25-27. While Commerce used the non-market economy methodology as a guide in the preliminary determination, after further consideration of the matter and party comments, Commerce decided that it was inappropriate to use the non-market economy methodology, *i.e.*, valuing the input in a surrogate market country that was at the same level of economic comparability. *See* IDM at 18.

The statutory language for calculating constructed value directs Commerce, when information is available, to use "the amount usually reflected in sales of merchandise under consideration in the *market under consideration*." 19 U.S.C. § 1677b(f)(2) (emphasis added); *see also* IDM at 17-18. As this Court has recognized, the statute "allow{s} Commerce to make a cost adjustment for undervalued purchases from affiliates when constructing normal value" and "the statute is {} *silent with regard to the manner in which the resulting cost adjustment is to be applied* when constructing normal value for subject merchandise." *Thai Plastic Bags Indus. Co. v. United States*, 895 F. Supp. 2d 1337, 1344 n.4 (Ct. Int'l Trade 2013) (emphasis added).

Here, the "market under consideration" is Indonesia, and as Commerce explained in the final determination, "the statute directs {it} to look to the market under consideration when testing the affiliated supplier transfer price against a market price." IDM at 18. Rather than use an average of the GTA import data for seven countries as it had done in the preliminary determination, Commerce properly selected the Indonesian GTA data as "best reflect{ing}"

surrogate market prices to calculate the value of the 10 types of material inputs. *Id.*; *see also Thai Plastic Bags*, 895 F. Supp. 2d at 1346 ("Commerce's explanation for applying 19 U.S.C. § 1677b(f)(2) more precisely on remand, resulting in greater accuracy and consistency with prior agency practice, is reasonable."); *Catfish Farmers of Am. v. United States*, 641 F. Supp. 2d 1362, 1377 (Ct. Int'l Trade 2009) ("Where Commerce is faced with the choice of selecting from among imperfect alternatives, it has the discretion to select the best available information for a surrogate value so long as its decision is reasonable").

Second, Brooklyn Bedding argues that Commerce misread the term "market under consideration" and that it can mean *more* than just the country being investigated. Brooklyn Bedding Br. at 27-31. This is a strained interpretation of the statute, and none of the cases it cites actually stand for that proposition. The purpose of the entire calculation of a normal value based on constructed value is to calculate what it would cost the respondent, in this case in Indonesia, to manufacture and sell the product plus profit. *See* 19 U.S.C. § 1677b(e). Using that standard, the prices of imports into *other* countries, especially non-market economies such as China, would not necessarily be available to Indonesian producers.

Relatedly, Brooklyn Bedding argues that Commerce inappropriately took the "market under consideration" language out of context and applied it to the "information available" language in the next sentence. Brooklyn Bedding Br. at 28-31. This is an even more strained interpretation of the statute, especially where, as here, Commerce turned to facts available because there were no *market* prices of the inputs in Indonesia. *See* IDM at 17-19.

The first sentence of 19 U.S.C. § 1677b(f)(2) provides that an input transaction value may be disregarded, "if, in the case of the element of value required to be considered, the amount representing that element does not fairly reflect the amount usually reflected in sales of

merchandise under consideration in the *market under consideration*." 19 U.S.C. § 1677b(f)(2) (emphasis added). Once an affiliated transaction is disregarded, and "no other transactions are available for consideration, the determination of the amount shall be based on the information available as to what the amount *would have been* if the transaction had occurred between persons who are not affiliated." *Id.* (emphasis added). Clearly, the statute requires Commerce to use, when available, values that fairly reflect the amount paid by an Indonesian manufacturer because it is *that* manufacturer's manufacturing and cost experience that the statute aims to establish if dumping is taking place in the United States from the Indonesian market. *See id.*

Although Commerce had the GTA data from six other countries and initially used an average of that data as facts available, Commerce determined that the best data to use was only Indonesian GTA data as facts available, and not the average. IDM at 18. In other words, interpreting section 1677b(f)(2), Commerce determined that "the statute indicates that the item being tested should reflect a market price in the country under consideration which is Indonesia in the instant case," and used Indonesian GTA data. *Id.* This reasonable interpretation is entitled to deference. *See SKF USA, Inc. v. United States*, 537 F.3d 1373, 1379 (Fed. Cir. 2008) ("[d]eference to an agency's statutory interpretation is at its peak in the case of a court's review of Commerce's interpretation of the antidumping laws").

Third, Brooklyn Bedding simultaneously argues that Commerce's interpretation conflicts with Commerce's practice in applying 19 U.S.C. § 1677b(f)(2), in that Commerce's practice is allegedly to use the affiliated supplier's cost of production even if it is from another country, Brooklyn Bedding Br. at 31-32, while also conceding that this case presents an issue of "first impression" for this Court with interpreting the second sentence of section 1677b(f)(2). *Id.* at 23. Regardless, this was a matter of statutory interpretation for Commerce as it sought to apply

section 1677b(f)(2) more precisely in the final determination.  *See* IDM at 18-19; *Thai Plastic Bags*, 895 F. Supp. 2d at 1346.  Commerce considered the record evidence in this investigation and while it initially averaged the GTA import data for seven countries to value the inputs at issue, Preliminary Cost Memo at 2; IDM at 17-18, in the final determination, Commerce changed the methodology to use only the Indonesian GTA import data because of the statutory preference for data from the "market under consideration."  IDM at 17-18.

Finally, Brooklyn Bedding argues that Commerce should not have used the Indonesian GTA import data because Indonesia is not economically comparable to China and that data *may* be distorted.  Brooklyn Bedding Br. at 26-27, 32-33.

To begin with, section 1677b(f)(2) does not require Commerce to use information from an economically comparable country when selecting prices to replace disregarded transactions.  Rather, the statutory focus is on establishing a surrogate market price for the "market under consideration," 19 U.S.C. § 1677b(f)(2), in this case, Indonesia.  IDM at 18-19.  In the final determination, Commerce also addressed Brooklyn Bedding's argument regarding possible distortion in the Indonesian GTA data, and explained that it did not agree that Zinus Indonesia had misclassified "a certain HTS code related to certain inputs."  IDM at 19.  While Zinus Indonesia had "simply provided and explained in the section D supplemental questionnaire response, that it may be more appropriate to use more specific HTS categories and codes for determining the market value of certain inputs," Commerce determined that this suggestion did "not call into question the accuracy or reliability of the Indonesian GTA data as a whole."  *Id.*; *see also* Section D Supp. Response at SD-13 and SD-22, and Exhibits SD-8 and SD-9b (P.R. 196, C.R. 204).  Rather, Commerce continued to find that the Indonesian GTA import data "best reflect{ed} market prices" for the Indonesian market.  IDM at 18-19; *see also Qingdao Sea-Line*

*Trading*, 766 F.3d at 1386 ("Commerce has broad discretion to determine what constitutes the best available information, as this term is not defined by statute.").

Therefore, Commerce's method of using Indonesian GTA import data to value the inputs in the market under consideration, Indonesia, is supported by substantial evidence and otherwise in accordance with law.

## VII. Brooklyn Bedding Failed To Exhaust Its Administrative Remedies Regarding No Sales Reconciliation Between Zinus Indonesia And Zinus Korea

Brooklyn Bedding argues that Commerce failed to obtain a U.S. sales reconciliation between Zinus Indonesia and Zinus Korea, which undermines the dumping calculations for Zinus Indonesia. Brooklyn Bedding Br. at 33-43.

However, Brooklyn Bedding failed to present this argument in its case briefs in the investigation and thus it failed to exhaust this argument. *See* Brooklyn Bedding Admin. Case Br. (P.R. 274, C.R. 291); Brooklyn Bedding Admin. Rebuttal Case Br. (P.R. 276, C.R. 293). As such, it cannot raise this issue to the Court because it was not presented as required in the administrative briefs commenting on the preliminary determination. *See Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990) (appellant waived argument even though it was characterized as "simply another angle to an issue" raised) (emphasis removed); *Dillinger France S.A. v. United States*, 350 F. Supp. 3d 1349, 1371 (Ct. Int'l Trade 2018); *Stanley Works (Langfang) Fastening Sys., Ltd. v. United States*, 279 F. Supp. 3d 1172, 1189 (Ct. Int'l Trade 2017).

Congress has directed that "the Court of International Trade shall, where appropriate require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d). This statute "indicates a congressional intent that, absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies." *Boomerang Tube LLC v.*

*United States*, 856 F.3d 908, 912 (Fed. Cir. 2017) (citing *Corus Staal BV v. United States*, 502

F.3d 1370, 1379 (Fed. Cir. 2007)).  Also, Commerce's regulations *specifically* require a party to

raise *all* arguments in a timely manner before the agency.  *Corus Staal*, 502 F.3d at 1379 (citing

19 C.F.R. § 351.309(c)(2)).  "The exhaustion requirement in this context is therefore not simply

a creature of court decision, as is sometimes the case, but is a requirement explicitly imposed by

the agency as a prerequisite to judicial review."  *Id.*  Finally, "general policies underlying the

exhaustion requirement — 'protecting administrative agency authority and promoting judicial

efficiency'"— would be vitiated if the Court were to consider arguments raised for the first time

in judicial proceedings.  *See id.* (quoting *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992)).  For

these reasons, this Court should "generally take{} a 'strict view' of the requirement that parties

exhaust their administrative remedies before {Commerce} in trade cases."  *Id.*

     In any event, this argument is meritless.  First, Commerce obtained the relevant U.S.

sales reconciliations from Zinus U.S. and Zinus Korea, the *only* sellers of Zinus Indonesia

mattresses to the first unaffiliated purchasers.  *See* Zinus Section C Questionnaire Response,

Exhibit C-2A (Zinus Korea EP sales reconciliation) (C.R. 95) and Exhibit C-2B (Zinus U.S. CEP

sales reconciliations) (C.R.96); Zinus Supplemental Section C Questionnaire, Exhibit SC-4

(Zinus Korea sales reconciliation to purchases) (C.R. 167); Supplemental Section C

Questionnaire, Part 2, Exhibit SC-6(Revision to C-2A (C.R. 213).  Brooklyn Bedding argues that

Commerce should have sought a U.S. sales reconciliation, which was not for U.S. sales but for

sales *between* Zinus Indonesia and Zinus Korea was required, which it was not.  *See* Brooklyn

Bedding Br. at 35-36.

     Moreover, Commerce collected and analyzed all of Zinus Indonesia's cost of

manufacturing and financial data including production quantities and amounts sold to Zinus

Korea, and did not find any significant discrepancies. Zinus Section D Questionnaire Response, (C.R. 85-86, 173-201); Zinus Supplemental Section D Questionnaire Response, (C.R. 204-207); Preliminary Determination Cost Memorandum, (C.R. 262-263); Final Determination Cost Memorandum, (C.R. 295); Supplemental Section C Questionnaire, Part 2, SC-5a(a)(Sales listing between Zinus Indonesia and Zinus Korea), (C.R. 213). Brooklyn Bedding has not identified any record evidence indicating that the reported figures are inaccurate; instead, it provides a speculative list of items it claims might have been clarified. *See* Brooklyn Bedding Br. at 38-42. Speculation does not rise to a substantial evidence standard.

Therefore, the Court should decline to consider Brooklyn Bedding's arguments about the lack of a U.S. sales reconciliation between Zinus Indonesia and Zinus Korea.

## CONCLUSION

For these reasons, we respectfully request that this Court sustain the final determination and enter judgment in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

s/L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

OF COUNSEL:                                     s/Kara M. Westercamp
DAVID RICHARDSON                 KARA M. WESTERCAMP
Senior Counsel                               Trial Attorney
Department of Commerce          U.S. Department of Justice
Office of the Chief Counsel        Civil Division
  for Trade Enforcement & Compliance   Commercial Litigation Branch
                                     P.O. Box 480
                                     Ben Franklin Station

Washington, D.C.  20044
Tel: (202) 305-7571

March 2, 2022                                      Attorneys for Defendant

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing brief complies with the Rules of this Court and the Court's scheduling order in that it contains 18,628 words, including text, footnotes, and headings.


<u>/s/ Kara M. Westercamp</u>

# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| _____ ) | |
| PT ZINUS GLOBAL INDONESIA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | Consol. Ct. No. 21-00277 |
| ) | |
| and ) | |
| ) | |
| BROOKLYN BEDDING, LLC, *et al.*, ) | |
| ) | |
| Defendant-Intervenors, ) | |
| _____ ) | |

## <u>ORDER</u>

Upon consideration of the motion for judgment upon the administrative record filed by plaintiff and consolidated plaintiffs, responses thereto, plaintiff's and consolidated plaintiffs' replies, the administrative record, and all other pertinent papers, it is hereby

ORDERED that plaintiff's and consolidated plaintiffs' motions are DENIED;

ORDERED that the Department of Commerce's determination at issue in this action is sustained; and

ORDERED that judgment shall enter in favor of the United States.

_____
JUDGE

Dated: _____