**THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

|  |  |  |
|---|---|---|
| PT ZINUS GLOBAL INDONESIA, | ) | |
| | ) | |
| *Plaintiff*, | ) | Consol. Ct. No. 21-00277 |
| | ) | |
| v. | ) | **NON-CONFIDENTIAL** |
| | ) | **VERSION** |
| UNITED STATES, | ) | |
| | ) | Business Proprietary Information |
| *Defendant*, | ) | Removed from Brackets on Pages |
| | ) | 2-3, 7-8, 10-11, 13-15, 20, and 23- |
| and | ) | 24. |
| | ) | |
| BROOKLYN BEDDING, LLC ET AL., | ) | |
| | ) | |
| *Defendant-Intervenors.* | ) | |
| | ) | |

**DEFENDANT-INTERVENORS / CONSOLIDATED PLAINTIFFS' REPLY BRIEF**

Yohai Baisburd
Jeffery B. Denning
Chase J. Dunn
Nicole Brunda

CASSIDY LEVY KENT (USA) LLP
900 19th Street, N.W.
Suite 400
Washington, D.C. 20006
(202) 567-2300

*Counsel to Brooklyn Bedding, LLC, Corsicana
Mattress Company, Elite Comfort Solutions,
FXI, Inc., Innocor, Inc., Kolcraft Enterprises
Inc., Leggett & Platt, Incorporated,
International Brotherhood of Teamsters, United
Steel Paper and Forestry, Rubber,
Manufacturing, Energy, Allied Industrial and
Service Workers International Union, AFL-CIO*

Date:   March 30, 2022

## Table of Contents

Page

I.   ARGUMENT ............................................................................................................. 2

   A.   COMMERCE'S FINDING THAT ZINUS KR HAS A "LIMITED ROLE" IN
        US SALES IS UNSUPPORTED BY SUBSTANTIAL RECORD EVIDENCE .......... 2

        1.   Commerce Ignored Substantial Record Evidence of Selling Activities ................. 2

        2.   Commerce May Not Disregard Zinus KR's Accounting Practices Without
             Finding Them Distortive ........................................................................ 5

        3.   A Proper Adjustment Should be Made for Zinus KR's selling expenses .............. 8

   B.   COMMERCE'S APPLICATION OF THE STATUTORY TRANSACTIONS
        DISREGARDED RULE IS CONTRARY TO LAW ....................................... 9

        1.   Commerce Failed to Show that "Information Available" is Limited to the
             "Market Under Consideration" ............................................................... 9

        2.   When applying Section 1677b(f)(2), the "Market Under Consideration" is
             Determined by the Respondent's "Experience" Purchasing in a
             Geographic Market ............................................................................. 11

   C.   COMMERCE'S UNEXPLAINED REFUSAL TO REQUIRE SUBMISSION
        OF A ZINUS INDONESIA SALES RECONCILIATION IS CONTRARY TO
        LAW ..................................................................................................... 16

        1.   The Futility Exception to the Exhaustion Doctrine Should be Recognized
             in this Case ....................................................................................... 16

        2.   Commerce's Action is Unprecedented and Fails to Address Completeness
             of the US Sales File ............................................................................ 21

II.  CONCLUSION ...................................................................................................... 24

## Table of Authorities

Page(s)

**Statutes**

19 U.S.C. § 1677b .................................................................................................13

19 U.S.C. § 1677b(c) ............................................................................................12

19 U.S.C. § 1677b(c)(4) ........................................................................................13

19 U.S.C. § 1677b(f)(1)(A) .....................................................................................5

19 U.S.C. § 1677b(f)(2) .................................................................................. *passim*

19 U.S.C. § 1677b(f)(3) .........................................................................................14

28 U.S.C. § 2637(d) ..............................................................................................16

**Regulations**

19 C.F.R. § 351.301(c)(1) ...............................................................................24, 25

19 C.F.R. § 351.309(c)(2) .....................................................................................20

**Court Decisions**

*Corley v. United States*, 556 U.S. 303 (2009) ......................................................10

*Corus Staal BV v. United States*, 502 F.3d 1370 (Fed. Cir. 2007) .............16, 19, 20, 23

*Dep't of Hous. & Urban Dev. v. Rucker*, 535 U.S. 125 (2002) .............................9

*Diamond Sawblades Mfrs. Coalition v. United States*, 2013 Ct. Intl. Trade LEXIS 137, Slip Op. 2013-130 (2013) ..............................................................................17

*Goodluck India Ltd. v. United States*, 11 F.4th 1335 (Fed. Cir. 2021) .................19

*GPX Int'l Tire Corp. v. United States*, 37 C.I.T. 1544 (2013) ...............................4

*Habaş Sinai ve Tibbi Gazlar lstihsal Endustrisi A.Ş. v. United States,* 361 F. Supp. 3d 1314 (Ct Int'l Trade 2019) ..............................................................................6

*Hibbs v. Winn*, 542 U.S. 88 (2004) ......................................................................10

*Itochu Bldg. Prods. v. United States*, 733 F.3d 1140 (Fed. Cir. 2013) ...............16

*LTV Steel Co. v. United States*, 985 F. Supp. 95 (Ct. Int'l Trade 1997)........................................15

*Luoyang Bearing Corp. v. United States*, 347 F. Supp. 2d 1326 (Ct. Int'l Trade 2004) ........................................................................................................................................17

*Qingdao Taifa Group Co. v. United States*, 33 C.I.T. 1090 (2009)................................15

*Rhone-Poulenc, Inc. v. United States*, 20 C.I.T. 573 (1996) ...........................................4

*Sao Ta Foods Joint Stock Co. v. United States*, 425 F. Supp. 3d 1314 (Ct. Int'l Trade 2020) ..............................................................................................................................4

*Sigma Corp. v. United States*, 17 C.I.T. 1288 (1993) ....................................................19

*Timken Co. v. United States*, 25 C.I.T. 939 (2001)..........................................................4

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013) ............................................................................................................................16

*Zhejiang Zhaofeng Mech. & Elec. Co., Ltd. v. United States*, 416 F. Supp. 3d 1395 (Ct. Int'l Trade 2019)........................................................................................................23

Administrative Determinations

*Bottom Mount Combination Refrigerator-Freezers From the Republic of Korea: Preliminary Negative Countervailing Duty Determination and Alignment of Final Determination With Final Antidumping Determination,* 76 Fed. Reg. 55,044 (Sep. 6, 2011) ............................................................................................................................11

*Certain Cold-Rolled Steel Flat Products From Brazil: Final Determination of Sales at Less Than Fair Value,* 81 Fed. Reg. 49,946 (Jul. 29, 2016)........................................14

*Certain Corrosion-Resistant Steel Products From Italy: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part,* 81 Fed. Reg. 35,320 (June 2, 2016) .........................................22

*Mattresses from Indonesia: Final Affirmative Determination of Sales at Less Than Fair Value,* 86 Fed. Reg. 15,899 (Mar. 25, 2021) ..........................................1, 15, 24, 25

*Notice of Final Determination of Sales at Less Than Fair Value and Affirmative Critical Circumstances Determination: Bottom Mount Combination Refrigerator-Freezers From Mexico,* 77 Fed. Reg. 17,422 (Mar. 26, 2012) ......................................11

*Notice of Final Determination of Sales at Less Than Fair Value: Certain Cut-To-Length Carbon-Quality Steel Plate Products from Korea,* 64 Fed. Reg. 73,196 (Dec. 29, 1999) ....................................................................................................................14

*Notice of Final Results of Antidumping Duty Administrative Review: Certain Softwood Lumber Products From Canada,* 70 Fed. Reg. 73,437 (Dec. 12, 2005).......................12

*Notice of Final Results of Antidumping Duty Administrative Review: Low Enriched Uranium From France,* 70 Fed. Reg. 54,359 (Sep. 14, 2005)........................................................14

<u>Other Administrative Materials</u>
*Antidumping Duties; Countervailing Duties: Final Rule,* 62 Fed. Reg. 27,296 (May 19, 1997) ................................................................................................................................19

<u>Other Materials</u>
Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts (2012)......................................................................................................................................9

NON-CONFIDENTIAL VERSION

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

|  |  |  |
|---|---|---|
| PT ZINUS GLOBAL INDONESIA, | ) | |
| | ) | |
| *Plaintiff*, | ) | Consol. Ct. No. 21-00277 |
| | ) | |
| v. | ) | **NON-CONFIDENTIAL** |
| | ) | **VERSION** |
| UNITED STATES, | ) | |
| | ) | Business Proprietary Information |
| *Defendant*, | ) | Removed from Brackets on Pages |
| | ) | 2-3, 7-8, 10-11, 13-15, 20, and 23- |
| and | ) | 24. |
| | ) | |
| BROOKLYN BEDDING, LLC ET AL., | ) | |
| | ) | |
| *Defendant-Intervenors.* | ) | |
| | ) | |

## DEFENDANT-INTERVENORS / PLAINTIFFS' REPLY BRIEF

This brief is submitted on behalf of Brooklyn Bedding, LLC, *et al*, defendant-intervenors and plaintiffs in the companion case *Brooklyn Bedding, LLC, et al. v. United States*, Court No. 21-00284 (hereinafter "Plaintiff" or "Petitioners") in reply to briefs filed on March 2, 2022, by the United States ("Defendant") ("*Defendant Response*") and PT. Zinus Global Indonesia ("*Zinus Response*") concerning Plaintiffs' challenge to the final determination of the US Department of Commerce ("Commerce") in the antidumping duty investigation of mattresses from Indonesia.  *Mattresses from Indonesia*, 86 Fed. Reg. 15,899 (Mar. 25, 2021) (LTFV final determination) ("*Final Determination*") (P.R. 292), and accompanying Issues and Decision Memorandum ("*IDM*") (P.R. 284).

## I.  ARGUMENT

### A.  COMMERCE'S FINDING THAT ZINUS KR HAS A "LIMITED ROLE" IN US SALES IS UNSUPPORTED BY SUBSTANTIAL RECORD EVIDENCE

#### 1.  Commerce Ignored Substantial Record Evidence of Selling Activities

Plaintiffs have identified record evidence demonstrating Zinus KR's extensive selling activities on behalf of Zinus Indonesia's sales of subject merchandise.  Petitioners' Case Brief (Feb. 9, 2021) ("*Petitioners Case Br.*") at 23-27 (C.R. 291); *Plaintiffs Opening Br.* (Nov. 9, 2021) (ECF Doc. 24) at 12-16.  During the administrative phase, the applicable "Commerce Position" ignored Plaintiffs' discussion and the record evidence.  *IDM* Comment 8, at 32-33 (P.R. 284).[1]  In this appeal, Defendant responds, "{t}he only point that this recitation of activities proves is that Zinus Korea is a large company with affiliated manufacturing and sales facilities all over the world." *Defendant Response* at 49.  Zinus claims Commerce "thoroughly evaluated this issue," but cites no Commerce analysis.  This is because Commerce did not evaluate the evidence it simply transcribed in the Comment 8 introduction of the final determination issues and decision memorandum.  *Zinus Response* at 13.

The record undermines these responses.  *First*, Plaintiffs' record citations identify a large sales operation handling goods produced in [      ] countries.  There are multiple affiliated US sales offices and warehouses and Zinus KR and the sales affiliates [

].  There are management-intensive consignment sales.  Section C Response (July 14, 2020) ("*CQR*") at C-22 (C.R. 117).  All sales are managed from Zinus KR and [

---

[1] In the introduction to Comment 8 Commerce recited evidence raised in Petitioners' (and Zinus') brief, as is typical.  *IDM* at 30-31.  However, Commerce did not ***evaluate*** this evidence in its determination.

].  *Plaintiffs Opening Br.*
at 14-15.

*Second*, Zinus KR does not manufacture anything.  Because it only sells, all incurred
expenses relate to sales activities.  *Id.* at 10.  This is why selling expenses constitute [        ] of
Zinus KR's total SG&A expenses.  *See* Part A.2., below.

*Third*, by Defendant's math [        ] of selling expenses stated in Zinus KR's
audited financial statements are reported in the dumping response.  *Defendants Response* at 50
(noting that Zinus KR booked [        ] of selling expenses while [        ]
were captured in the sales database).  Meanwhile, Zinus sells [        ] to US customers.

*Fourth,* through adoption of Korean International Financial Reporting Standards ("K-
IFRS"), Part 1115, the Zinus KR's Directors determined Zinus KR to be exclusively a "selling
agent" and that Zinus KR will report all inter-company sales on a net basis (in which cost of
sales is removed), leaving only selling expenses as a cost of the commission revenue booked
from sales of subject mattresses to US customers.  *Plaintiffs Opening Br.* at 19.

*Finally*, Zinus KR alone handled [        ] of all reported sales, the export
price sales.  *Id.* at 10 and 14.

Despite substantial record evidence showing Zinus KR handles virtually all selling
activities, Commerce found Zinus KR's "reportedly limited role as an invoicing party."  This is
the entirety of Commerce's "analysis."  *IDM* at 32.  Significantly, Commerce has simply
accepted Zinus' reporting instead of reaching a determination after independent investigation.
Furthermore, Defendant and Zinus aver that the questionnaire prohibits reliance on affiliated
commission payments and instead considers only "actual" expenses when adjusting sales prices
for affiliated party commission expenses.  *Defendant Response* at 49; *Zinus Response* at 23; *IDM*

at 32.  However, the questionnaire probes more deeply by also instructing respondents: "if you report payments to any affiliated selling agent{s}" explain "why you are unable to report those actual expenses" and "{i}ndicate whether the commissions were paid at arm's length."  *See* Initial Antidumping Questionnaire (May 14, 2020) ("*Questionnaire*") at Section C, "Field Number 39.0: Commissions" (P.R. 67).  Despite this record, and Plaintiff's comprehensive discussions of Zinus KR's extensive selling activities when selling nearly exclusively to the US, Commerce declined to investigate the matter.

While Bartleby the Scrivener may respond "I would prefer not to"[2] when asked to do something, Commerce's failure to address substantial record evidence conflicts with repeated determinations of this court finding Commerce must investigate pertinent issues impacting antidumping margins.  *See GPX Int'l Tire Corp. v. United States*, 37 C.I.T. 1544, 1553 (2013) (Commerce "cannot ignore relevant evidence by adopting a methodology that refuses to consider it"); *Timken Co. v. United States*, 25 C.I.T. 939, 959 (2001) ("Commerce's administrative duties include Commerce's responsibility to undertake reasonable investigatory functions"); *Rhone-Poulenc, Inc. v. United States*, 20 C.I.T. 573, 578 (1996) ("Commerce's failure to perform an independent investigation of the facts related to this issue falls short of its statutory duty to investigate antidumping cases and assign fair antidumping margins.").  This court recently remanded when Commerce failed to consider all pertinent record evidence.  *See, e.g., Sao Ta Foods Joint Stock Co. v. United States*, 425 F. Supp. 3d 1314, 1329 (Ct. Int'l Trade 2020), (denial of separate rate status was unsupported by substantial evidence because "Commerce failed to consider the documentary evidence").

---

[2] Herman Melville, "Bartleby, the Scrivener" 1853.

### 2. Commerce May Not Disregard Zinus KR's Accounting Practices Without Finding Them Distortive

Zinus argues that the K-IFRS accounting rules adopted by Zinus KR are irrelevant in the context of unreported commission expenses between Zinus KR and Zinus Indonesia, *Zinus Response* at 19-21, and Defendant argues that Commerce practice is to capture only actual expenses, not imputed amounts, and that related party commissions are not used because "manipulation" of these amounts "would distort the dumping calculation." *Defendant Response* at 49. These arguments improperly ignore both the accounting rules adopted by Zinus and the statutory requirement instructing Commerce to rely on the respondent's accounting practices unless proven distortive. They also leave no room for analysis of affiliated commission payments to determine whether they reflect arm's length commission rates despite unambiguous instructions in the *Questionnaire* concerning commissions paid to affiliated agents that contemplate testing whether such payments reflect an arm's-length transaction. Accordingly, to properly implement its questionnaire, Commerce should adjust for commission payments where they are at arm's length and the respondent otherwise fails to accurately report actual expenses. Commerce's erroneous determination that Zinus KR had a limited role in US sales apparently caused it to ignore this analysis.

K-IFRS Part 1115 requires Zinus KR to be treated as an agent on sales of merchandise produced by Zinus Indonesia and recognizes that Zinus KR earns fees or commissions on these sales. As discussed in *Plaintiffs Opening Br*. at 17-19, Section 1677b(f)(1)(A) and judicial precedent **require** Commerce to follow K-IFRS Part 1115 unless doing so causes distortion. Commerce never considered whether the revenue Zinus KR realized through price mark-ups reflected arm's length commission for its extensive activities as a K-IFRS 1115 agent. Furthermore, this court recently affirmed Commerce's resort to IFRS rules in methodologies

adopted in respondent questionnaire responses.  *Habaş Sinai ve Tibbi Gazlar lstihsal Endustrisi A.Ş. v. United States,* 361 F. Supp. 3d 1314, 1327 (Ct Int'l Trade 2019) (affirming Commerce's revised cost of production calculation, and noting the methodology is "rooted in International Financial Reporting Standards").

When adopting accounting rules stipulating that it is to be deemed an agent in its financial accounting practices when making intercompany sales, Zinus KR relied upon its independent auditors' judgement and analysis of the specific facts and circumstances of the transactions concerned.  Zinus KR disclosed in notes to its 2018 financial statements "{t}he Company applied Korean IFRS 1115, 'Revenues from Contracts with Customers.'"  Section A Response (June 19, 2020) ("*AQR*") at Exhibit A-11d(3) (C.R. 38-39).  And Zinus reports that K-IFRS Part 1115 "applies to all intercompany sales transactions."  Section C Supplemental Response (part 2) (Sept. 28, 2020) ("*SCQR Pt.2*") at SC2-3 (C.R. 213).  Accordingly, because all sales of subject merchandise began with intercompany transactions between Zinus Indonesia and Zinus KR, K-IFRS 1115 applies to all US sales of subject merchandise.

Zinus downplays the rationale underlying the K-IFRS provision requiring principal versus agent considerations of gross versus net presentation of revenues and expenses for financial statement reporting purposes, arguing "nor does the accounting rule transform Zinus KR into a commissioned sales agent."  *Zinus Response* at 20.  This position conflicts with accounting rules governing Zinus KR operations.  *First*, as noted, Zinus KR adopted the K-IFRS and these standards govern its financial accounting.  Adoption was a significant and transformational event, requiring changes to data inputs, processes, and financial analyses embedded in its books and records.  Transition to the K-IFRS was effective on January 1, 2017, well before the period of investigation ("POI") and Zinus KR's 2017 audited financial statements

acknowledged and explained implementation of numerous accounting changes required by K-IFRS. *See* Zinus Xiamen's Information From China Investigation (Oct. 14, 2020) ("*Xiamen China Submissions*") (C.R. 226), Attachment 1 (Section A response) at Exhibit A-10h-2 (Zinus KR 2017 financial statement), which discusses the company's transition to "K-IFRS" at Note 40 ("Transition to Korean IFRS"). These changes both transformed the company's accounting practices and classified Zinus KR an agent on all sales of subject merchandise. *Second,* under K-IFRS Part 1115, principals must recognize revenue and expenses in gross amounts whereas agents like Zinus KR must recognize only fees in the form of commissions.[3] This is the agent's net revenue. Accordingly, during the POI Zinus Indonesia incurred affiliated party commission fees on all sales of subject merchandise but Zinus failed to report the amounts or detail associated expenses and Commerce declined to pursue the matter, which caused an understatement of selling expenses.[4]

Using the example from the *Zinus Response*, at 20, as an agent under the adopted accounting rules, Zinus KR does not report a cost of goods sold of $100 or a sales revenue of $110; it reports only net revenue of $10. This is the unreported "revenue in the amount of any fee or commission to which {the agent} expects to be entitled." K-IFRS Part 1115, B36. Using available data, Plaintiffs calculated the Zinus KR fee to be [          ]. *Plaintiffs Opening Br* at 21. Indeed, Commerce should have expected [              ] commission-based actual selling expenses given the amount of the Zinus KR markup and that the only non-G&A expenses associated with its net revenue are selling expenses. Defendant highlighted this point when

---

[3] K-IFRS Part 1115 is reproduced in *Plaintiffs Opening Br.* at 18-19.

[4] *See Petitioners Case Br.* at 28-31 (C.R. 291), discussing Zinus's failure to report Zinus KR as an agent and the manner in which it earned commissions. Furthermore, Zinus delayed disclosing application and terms of K-IFRS 15. *Id.* at 31.

saying, "Zinus Korea had 24,972,916 won in selling and general administrative expenses in 2019, with selling expenses comprising [                    ] of this amount." *Defendant Response* at 50. Thus [       ] of Zinus KR's booked SG&A is selling expenses.

### 3. A Proper Adjustment Should be Made for Zinus KR's selling expenses

Commerce failed to require Zinus to report either the commission realized or the full actual extent of expenses underlying the commission. Although Zinus did report some Zinus KR selling expenses, these do not relate to commissions. Zinus captured only traceable bank charges and advertising expenses, which, as direct selling expenses incurred in making the US mattress sale, must be reported separately.[5] Having reported [           ] of Zinus KR's booked selling expenses demonstrates on its face that Zinus' "actual" expense reporting is incomplete. Of greater significance, Commerce found that the US sales database includes [                ] of traceable direct selling expenses. This is a [               ] of the Zinus KR selling expenses (*i.e.*, [                ]) but is commensurate with the unsupported determination that Zinus KR has "limited" involvement with US sales. *IDM* at 32. It is the remaining actual expenses set forth in Zinus KR 2019 Audit Report at Note 31 ("Selling general and administrative expenses") that should have been reported as "actual" expenses associated with commission fees, as contemplated in K-IFRS 1115.[6] Zinus ignored the expenses in its responses, and thus made no attempt to demonstrate that the unreported expenses do not underly the commission fee that, according to Zinus and Defendant, constitute the only selling expense adjustment allowed in this case. Again, Commerce entirely failed to investigate this matter.

In sum, this Court should remand for reconsideration of Zinus KR's role in all US sales.

---

[5] *See Questionnaire* at Appendix I ("Direct Section vs. Indirect Expenses") (P.R. 67).

[6] *See AQR* Exhibit A-11d(1), at page 76 (P.R. 98).

**B.    COMMERCE'S APPLICATION OF THE STATUTORY TRANSACTIONS DISREGARDED RULE IS CONTRARY TO LAW**

**1.    Commerce Failed to Show that "Information Available" is Limited to the "Market Under Consideration"**

As explained in *Plaintiffs Opening Br.*, at 25, when no unaffiliated market economy transactions are available on the record, and thus under the first sentence of 19 U.S.C. §1677b(f)(2) there is no information on "sales of merchandise under consideration in the market under consideration," the second sentence of Section 1677b(f)(2) directs Commerce to use "information available as to what the amount would have been if the transaction had occurred between persons who are not affiliated." This broad authorization in the second sentence is distinct from, and not qualified by, the preceding sentence. *Id.* at 28-29.

While Defendant baldly labels this interpretation of the statute "strained," *Defendant Response* at 58, it is a logical reading of 19 U.S.C. § 1677b(f)(2) under traditional tools of statutory construction. A well-settled principal of statutory construction provides, "general terms are to be given their general meaning." *See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts, 101 (2012) ("*Reading the Law*") (discussing the "General-Terms Canon"); *see also e.g.*, *Dep't of Hous. & Urban Dev. v. Rucker*, 535 U.S. 125, 131 (2002) (giving unqualified statutory term broad meaning). The second sentence unambiguously authorizes use of "information available" without any limitation. Had Congress intended to limit Commerce's considerable discretion when granting this authorization, it would have done so. To paraphrase *Reading the Law*, at 101: "information available" means information available and it "must be given general effect."

Indeed, Defendant's contention that the second sentence is controlled by a qualification contained in the first would render the second sentence meaningless in certain cases, violating another principle of statutory construction, "A statute should be construed so that the effect is

given to all of its provisions, so that no part will be inoperative or superfluous, void or insignificant….". *Corley v. United States*, 556 U.S. 303, 314 (2009) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)).  The first sentence both references comparison to the "market under consideration," and to "sales of merchandise under consideration."  Plaintiffs agree that where unaffiliated sales transactions are available they are the appropriate market benchmark.  *See Plaintiffs Opening Br*. at 24-25.  As Defendant concedes that the second sentence authorizes Commerce to act when there are no such transactions for comparison.  *Defendant Response* at 58.  However, if the "information available" (second sentence) is limited to "sales of merchandise under consideration in the market under consideration" (first sentence), the second sentence is rendered superfluous, as it applicable only when there are no sales transaction data on the record.  Accordingly, Commerce's decision to rely on only Indonesian data is based on this erroneous interpretation of the statute and should be rejected by this Court.

Even if this Court finds the second sentence of Section 1677b(f)(2) is qualified by use of "market under consideration" in the first sentence, there is no basis to limit this "market" to only the *country* under investigation, here Indonesia.  This is because Zinus Indonesia did not purchase the relevant [      ] inputs from Indonesian suppliers.  Nonetheless, Defendant claims that the "market under consideration" must be Indonesia because "{t}he purpose of the entire calculation of normal value based on constructed value is to calculate what it would cost the respondent, in this case in Indonesia, to manufacture and sell the product plus profit."  *Defendant Response* at 58.  Zinus similarly claims that the statute is explicit that "the affiliated input price is to be compared to a price 'in the market under consideration,' in this case, Indonesia."  *Zinus Response* at 10.  These arguments are flawed because they ignore the fact that Zinus Indonesia

purchased none of the [     ] inputs at issue from affiliated suppliers located in Indonesia.  It purchased from affiliated suppliers in China.

Consistent with Commerce's established practice when applying 19 U.S.C. §1677b(f)(2), the benchmark price must account for Zinus Indonesia's *experience* when purchasing inputs from sellers located in China.  This approach is consistent with terms of the statute and recognizes that prices for goods vary among markets because of unique characteristics of individual markets.

### 2. When applying Section 1677b(f)(2), the "Market Under Consideration" is Determined by the Respondent's "Experience" Purchasing in a Geographic Market

It is undisputed that if Zinus Indonesia sourced the inputs from affiliated suppliers located in a market economy country Commerce would have based its calculation of market value on the market economy producer's costs, regardless of where the affiliate is located. *Plaintiffs Opening Br*. at 30.  For example, *Bottom Mount Refrigerators from Mexico* involved a Korean conglomerate with affiliates located throughout the globe.  Mexican respondent Samsung Electronics Mexico ("SAM") purchased compressors from its Korean affiliate, Samsung Gwangju Electronics Co., Ltd ("SGEC").  *Bottom Mount Refrigerators from Mexico*, 77 Fed. Reg. 17,422 (Mar. 26, 2012) (LTFV Final), IDM at Comment 29; *see also Bottom Mount Refrigerators from Korea*, 76 Fed. Reg. 55,044, 55,047 (Sep. 6, 2011) (CVD Prelim) (noting that SGEC is a Korean producer of bottom mount refrigerators subject to the CVD investigation). Because SGEC was SAM's only source for compressors (a minor input), when applying Section 1677b(f)(2) Commerce compared the transfer price SAM paid SGEC to SGEC's cost of production ("COP").  *Id*.  Thus, Commerce used ***Korean*** costs to determine the surrogate market price for a ***Mexican*** respondent because this reflected the respondent's experience when purchasing compressors.  As Zinus argued below, this is an example of Commerce's consistent

practice of using the affiliated supplier's COP when no transaction market prices are available. *See* "Zinus' Administrative Case Brief" (Feb. 9, 2021) at 27 (C.R. 292) (noting Commerce has "traditionally examined whether the inputs were provided at greater than the supplier's cost of production" and urging Commerce to rely on its Chinese suppliers' costs).

The novel issue raised in *Plaintiffs Opening Br*., at 6 and 23, is not whether to examine third country costs in determining "the amount usually reflected in sales of merchandise under consideration in the market under consideration." Commerce can and routinely does look to such sources.[7] The question is: How will Commerce develop a value that reflects Zinus Indonesia's experience when purchasing inputs from affiliated suppliers located China?

As Commerce properly determined, in such circumstances it is "unable to use the NME-based affiliated suppliers' COP for use as a substitute for market price" because prices and costs in NME countries are unreliable. *IDM* at 17 (P.R. 284). However, Commerce may not ignore the respondent's experience of purchasing inputs from an NME-based supplier, because doing so ignores the relevant market under consideration. Indeed, as recognized in the preliminary determination transactions disregarded methodology, Commerce has a statutorily prescribed method of calculating NME producer costs: it values production inputs using values obtained from a surrogate market economy country that is at a comparable level of economic development. *See* 19 U.S.C. § 1677b(c) and *Plaintiffs Opening Br*. at 23, 25-27.

During the 2019 POI, Commerce considered Brazil, Malaysia, Mexico, Romania, Russia, and Turkey to be economically comparable to China and thus potential sources for surrogate

---

[7] Indeed, Commerce has previously made clear that its "general practice" in applying 19 U.S.C. § 1677b(f)(2) "is to define the market under consideration as the entire home market *or third country*," further underscoring the absurdity of the Defendant's narrow view of the "market under consideration." *See Certain Softwood Lumber from Canada*, 70 Fed. Reg. 73,437 (Dec. 12, 2005) (AD AR Final), IDM at Comment 12 (emphasis added).

values when applying the NME methodology. *IDM* at 17 (P.R. 284). A six country average of these values was a reasonable proxy for Zinus' Chinese affiliates' costs, and thus for a market value of the [    ] inputs when applying Section 1677b(f)(2). *Plaintiffs Opening Br.* at 26-27. Consistent with past practice, using these values was a reasonable methodology for determining Zinus Indonesia's experience when purchasing inputs from affiliated Chinese suppliers.

Commerce's decision to abandon its preliminary NME-cost focused methodology and instead resort to solely Indonesian GTA data based on an erroneous interpretation of the statute, *see IDM* at 17-18 (P.R. 284), is unreasonable for several reasons. *First*, focusing on only input prices in Indonesia is unsupported by substantial record evidence because Zinus did not purchase the [    ] inputs from Indonesian suppliers. *Zinus Response* at 2. Indonesian prices—however established—cannot reflect Zinus Indonesia's experience when buying from Chinese suppliers. This is particularly true because Indonesia is not economically comparable to China.[8] *Defendant Response* at 54-55; *see also IDM* at 17-18 (same). *Second*, resorting exclusively to Indonesian prices is inconsistent with Commerce practice of relying on affiliated supplier's COP, regardless of geography. Consequently, abandoning supplier COP (or a surrogate for such costs) in this case is an unwarranted departure from consistent practice when applying Section 1677b(f)(2). *Third*, when calculating normal value, the statute instructs Commerce to focus on the actual experience of the individual respondent. *See generally* 19 U.S.C. § 1677b. Accordingly, Commerce's calculation should reflect Zinus Indonesia's actual experience when purchasing inputs—not the experience of a mythical Indonesian producer purchasing from local unaffiliated

---

[8] The statute implicitly recognizes that prices and costs can vary across countries based on their respective levels of economic development. This is why Commerce is instructed to rely on surrogate prices or costs "in one or more market economy countries that are at a level of economic development comparable to that of the nonmarket economy country" being examined, whenever possible. 19 U.S.C. § 1677b(c)(4).

suppliers.  *Finally*, Commerce's unwarranted interpretation that "market under consideration" is

only Indonesia is particularly unreasonable because Commerce [

                    ] market price values.  Specifically, Commerce [

                                                    ].  *Plaintiffs*

*Opening Br.* at 24-25, 28.  Under the Defendant's strained interpretation of the statute, such

[                         ] could not be used because they do not reflect the Indonesian market,

because they would "not necessarily be available to Indonesian producers."  *Defendants*

*Response* at 58.  Neither Defendant nor Zinus acknowledge much less explain this inconsistency.

    None of the agency determinations cited by Zinus support a geographically limited

application of "market under consideration," because none involved affiliated third-country

suppliers.  *See Zinus Response* at 33-34.  In each case the record contained multiple sources for a

market price benchmark, including prices paid by respondents to a home market unaffiliated

supplier, and Commerce determined that the respondent's own unaffiliated purchases were the

superior market price benchmark because these prices reflected the respondent's own

"experience" and thus best represented the "market under consideration."  *See Cold Rolled Steel*

*from Brazil*, 81 Fed. Reg. 49,946 (Jul. 29, 2016) (LTFV final), IDM at Comment 10 (applying

1677b(f)(2), Commerce relied on prices paid to unaffiliated suppliers rather than alternative

potential market values available on the record); *Uranium from France*, 70 Fed. Reg. 54,359

(Sep. 14, 2005) (LTFV Final), IDM at Comment 3 (applying 1677b(f)(3), Commerce relied on

prices paid to unaffiliated suppliers rather than prices paid by a large industrial consumer); *CTL*

*Steel Plate from Korea*, 64 Fed. Reg. 73,196 (Dec. 29, 1999) (LTFV Final), IDM at Comment 12

(applying 1677b(f)(2), Commerce relied on prices paid to unaffiliated suppliers, rather than the

prices the affiliated suppliers paid to their unaffiliated suppliers).

In this case, Commerce followed the practice reflected in these cases when using Zinus'

unaffiliated purchase prices as market price benchmarks whenever such prices were available,

[                                                                                    ].  *Plaintiffs Opening Br.* at

24-25, 28.  Thus, even when applying the first sentence of Section 1677b(f)(2), Commerce based

its market price benchmark on Zinus Indonesia's experience and [


].  [            ] when relying on "information available" as authorized by Section

1677b(f)(2), Commerce must also use a third country affiliate's costs—or a surrogate for those

costs when the affiliate is located in an NME—when such unaffiliated purchases are not

available, because this reflects the respondent's actual experience.

Finally, Zinus' contention that Plaintiffs failed to exhaust administrative remedies when

challenging use of only Indonesia as a surrogate source for affiliated Chinese supplier costs is

misplaced.  *Zinus Response* at 35.  Because Commerce announced the revised methodology in

the *Final Determination*, Plaintiffs could not raise objections until this appeal.  *See Qingdao*

*Taifa Group Co. v. United States*, 33 C.I.T. 1090, 1093 (2009) (citing *LTV Steel Co. v. United*

*States*, 985 F. Supp. 95, 120 (Ct. Int'l Trade 1997)) ("A party…may seek judicial review of an

issue that it did not raise in a case brief if Commerce did not address the issue until its final

decision…").  This is not a failure to exhaust.

In sum, this Court should remand for reconsideration of Commerce's erroneous

construction of 19 U.S.C. § 1677b(f)(2).

### C.  COMMERCE'S UNEXPLAINED REFUSAL TO REQUIRE SUBMISSION OF A ZINUS INDONESIA SALES RECONCILIATION IS CONTRARY TO LAW

#### 1.  The Futility Exception to the Exhaustion Doctrine Should be Recognized in this Case

Defendant and Zinus argue that this Court should not consider Commerce's unprecedented failure to require submission of Zinus Indonesia's US sales reconciliation, based on their view that the issue was not raised in the administrative case brief and thus Plaintiffs failed to exhaust administrative remedies.  *Defendant Response* at 61, *Zinus Response* at 38. However, Plaintiffs raised this issue in multiple submissions before and after the preliminary determination and in a teleconference meeting with Commerce officials early in the investigation.  Commerce was thus frequently alerted to the issue in submissions providing clarity and therefore had multiple opportunities to reconsider or explain why it departed from standard practice.  In addition, submission of the missing reconciliation after briefing would have meant placing new factual information on the record after "verification," when the administrative record had closed.  Finally, briefing was completed only 30 days before the statutory deadline for the final determination, leaving insufficient time for taking such new information.  On this record it would have been futile for Plaintiffs to raise this issue once again in the case brief.

The exhaustion doctrine is discretionary and only required "where appropriate," *see* 28 U.S.C. § 2637(d), meaning it must "serve some practical purpose where applied."  *Itochu Bldg. Prods. v. United States*, 733 F.3d 1140, 1145 (Fed. Cir. 2013).  Thus, "a party often is permitted to bypass an available avenue of administrative challenge if pursuing that route would clearly be futile, *i.e.,* where it is clear that additional filings with the agency would be ineffectual."  *Id.* (citing *Corus Staal BV v. United States*, 502 F.3d 1370, 1378-79 (Fed. Cir. 2007); *see also Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1381 (Fed. Cir. 2013) (recognizing an exception "where exhaustion would be 'a useless formality'").

16

There would be no practical purpose to applying the exhaustion bar here, as raising the issue of the missing Zinus Indonesia reconciliation in the case brief would have been ineffectual. Commerce already had repeatedly declined to act and there was insufficient time to re-open the record and to obtain, comment on, and verify the missing reconciliation.  Furthermore, if unreported sales were uncovered or other information was needed it would have been impossible to address such needs before the statutory deadline.

As this court has recognized, "exhaustion does not require Sisyphean repetition or exactitude in wording in order that an objection be noted and preserved." *Diamond Sawblades Mfrs. Coalition v. United States*, 2013 Ct. Intl. Trade LEXIS 137, Slip Op. 2013-130 (2013) at *47.  Instead, "{a}n argument satisfies the exhaustion requirement 'if it alerts the agency to the argument with reasonable clarity and avails the agency with an opportunity to address it.'"  *Id.* at *48 (quoting *Luoyang Bearing Corp. v. United States*, 347 F. Supp. 2d 1326, 1352 (Ct. Int'l Trade 2004)).

As in *Diamond Sawblades*, "this is not an instance where a party did not even attempt to raise its argument before the agency."  *Id.*  During the investigation Plaintiffs filed six or more submissions requesting Commerce to require submission of a US sales reconciliation from Zinus Indonesia, the named respondent and sole producer of the subject merchandise.  Plaintiffs first raised the issue immediately after Zinus submitted its initial Section C response, because this submission should have included sales reconciliations for Zinus Indonesia, Zinus KR, and Zinus US.[9]  *See* Petitioners' CQR Deficiency Comments—Part 1 (Aug. 10, 2020) at 4 (C.R. 130) ("A proper reconciliation of Zinus' US POI sales obviously must include a reconciliation of Zinus

---

[9] Section C responses are the second of numerous factual submissions required of respondents and the first information request therein ***requires*** submission of comprehensive sales reconciliations tied to audited financials.  *See Questionnaire* at Section C, Part IV (P.R. 67).

Indonesia's total quantity and value of its sales to Zinus KR.").  Plaintiffs then argued that

exporting producers are always required to submit sales (and cost) reconciliations and in this

case the need is especially high because of ambiguities concerning the proper universe of

reviewable CEP inventory sales (*i.e.*, the contested FIFO methodology issue).  This is the

threshold question of "completeness," which is discussed below.  *See generally* Petitioners' CQR

Deficiency Comments—Part 2 (Aug. 11, 2020) at 2-7 (C.R. 132).  Plaintiffs next met with

Commerce officials on August 21, 2020, to discuss this and other issues.  *See* Teleconference

Memorandum (Aug. 26, 2020) (P.R. 171).  After Zinus erroneously, and without citing any

authority, claimed the exporter/producer respondent is not required to provide a sales

reconciliation when sales are invoiced through an affiliate, *see* Zinus' Rebuttal (Aug. 20, 2020)

at 4-5 (C.R. 158), Plaintiffs again submitted comments emphasizing the importance of a sales

reconciliation in order to ensure completeness of the record.  *See* Petitioners' Response to Zinus

(Aug. 25, 2020) at 4-5 (C.R. 161).

Despite Plaintiffs' entreaties, Commerce declined to instruct Zinus to submit the missing

reconciliation in the first supplemental Section C questionnaire.  *See* First Supplemental Section

C Questionnaire (Sep. 2, 2020) (C.R. 165).  Because reconciliations always are submitted early

in an investigation (typically in C or supplemental C questionnaire responses) Commerce's

unprecedented refusal was startling and appeared entrenched.  Nonetheless, Plaintiffs continued

to raise concerns over the missing reconciliation in additional submissions made before the

preliminary determination, including Petitioners' Request for Addendum (Sep. 9, 2020) (C.R.

166) and Petitioners' Pre-Prelim Comments (Oct. 9, 2020) (C.R. 219).  Furthermore, in

comments submitted ***after*** the preliminary determination Plaintiffs again requested that

Commerce require Zinus Indonesia to provide a sales reconciliation to ensure completeness of

the record.  S*ee* Petitioners' Post-Prelim Comments (Nov. 19, 2020) at 11-13 (C.R. 265).

Commerce was thus repeatedly alerted to the issue and given an opportunity to address it.  Yet,

Commerce repeatedly declined to act.

The foregoing history makes this case similar to *Sigma Corp. v. United States*, 17 C.I.T.

1288, 1309 (1993), where the court found, "{t}his instance falls within the futility exception to

the {exhaustion} rule because plaintiffs repeatedly raised this issue during the administrative

proceedings."  Furthermore, by the time Plaintiffs submitted their case brief "verification" had

been completed and the record of the investigation was closed.[10]  *See, e.g., Goodluck India Ltd.*

*v. United States*, 11 F.4th 1335, 1343-44 (Fed. Cir. 2021) (noting that "{v}erification represents

a point of no return," after which Commerce does not collect new factual information);

*Antidumping Duties; Countervailing Duties; Final Rule*, 62 Fed. Reg. 27,296, 27,332 (May 19,

1997) (explaining that submission of new factual information after verification is inappropriate

"because the Department is unable to verify post-verification submissions of new factual

information").  Moreover, only 30 calendar days remained between submission of rebuttal briefs

on February 16, 2021 and the March 18, 2021 statutory deadline for the final determination.

This was insufficient time to request, submit, comment on, and verify significant new factual

information.  Clearly, it would have been futile, "useless motion" to once again push Commerce

to require Zinus to submit the missing Zinus Indonesia sales reconciliation.  *See Corus Staal BV*

*v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007) (noting that the futility exception to the

exhaustion requirement applies when parties "would be required to go through obviously useless

motions in order to preserve their rights") (internal quotation marks and citation omitted).

---

[10] There was no on-site verification.  Instead, this crucial procedure was ostensibly conducted
through the Supplemental Questionnaire in Lieu of On-Site Verification" (Jan. 19, 2021)
("*ILOV" Questionnaire*") (P.R. 262).

The missing reconciliation remained significant, however, as it underlaid arguments in Plaintiffs' administrative rebuttal brief. *First,* no "completeness test" was conducted and until that is done, under Commerce practice, the US sales file used in the dumping calculations is under a dark cloud. *Second*, completeness of the record was central to Plaintiffs' rebuttal arguments defending Commerce's preliminary decisions to reject Zinus' FIFO methodology for identifying the universe of CEP inventory sales and to set the quantity of such sales at [                ] units. *See* Petitioners' Rebuttal Brief (Feb. 16, 2021) at 5-33 (C.R. 293). As noted, the proper universe of CEP inventory sales would have been clarified or resolved by Zinus Indonesia's sales reconciliation, but it would have been odd for Plaintiffs to raise this point in a rebuttal defending Commerce.

Finally, Defendant argues that Plaintiffs violated 19 C.F.R. § 351.309(c)(2) by not once again seeking submission of the missing reconciliation in the case brief, and that the Federal Circuit made compliance with this regulation a prerequisite to judicial review. *Defendants Response* at 62 (citing *Corus Staal*, 502 F.3d at 1379). Defendant overreads *Corus Staal*. Commerce has no power to limit this Court's jurisdiction or the scope of review by regulation, only Congress could do so. Moreover, the facts differ significantly from *Corus Staal*, where the plaintiff only partially raised an issue nine months *before* the preliminary determination and where, even under those circumstances, the Federal Circuit noted that its conclusion "d{id} not imply that the court would have abused its discretion if it had excused Corus from having to exhaust its administrative remedies." *Corus Staal*, 502 F.3d at 1381, n.5.

## 2. Commerce's Action is Unprecedented and Fails to Address Completeness of the US Sales File

Plaintiffs noted that Commerce's decision to allow Zinus Indonesia to file no sales reconciliation "appears to be an unprecedented departure from longstanding practice." *Plaintiffs Opening Br.* at 33, 37.  Zinus disagrees.  Citing the China mattresses investigation, Zinus asserts, "{review of the} exhibit list from Zinus Xiamen's Section C questionnaire response … confirms that Zinus Xiamen … provided sales reconciliation packages for Zinus KR and Zinus US, but not a separate reconciliation for Zinus Xiamen, the Chinese producing entity under investigation." *Zinus Response* at 39.  This is a misleading statement.

Zinus failed to inform this Court that the Xiamen sales reconciliation apparently **was** on the record and verified by Commerce.  *See Xiamen China Submissions* (C.R. 247), Attachment 5 at page 11 ("Completeness Tests").[11]

Referencing Exhibit CVE-5 ("Sales Reconciliations…") Commerce states, "We traced the sales of finished goods to the unconsolidated financial statements of Zinus Xiamen and Zinus Zhangzhou."  Commerce explained that when conducting the "Completeness Tests" it "performed" on-site sales "reconciliations" at the Zinus Xiamen and Zinus Zhangzhou factories "to ensure" that "all sales of merchandise under consideration to the United States were made through Zinus KR or one of the Zinus U.S. affiliates."  Commerce "tied the amounts …to the **consolidated financial statements of Zinus**."  *Id.* at 11 (emphasis added).  This tying of reported values to the producer/exporter's financials constitutes completeness.  Put simply, it appears a Xiamen reconciliation was the basis for the verification "Completeness Tests."

---

[11] "Completeness" addresses whether the reported US sales file is "complete" in the sense that it captures "the total quantity and value of all sales in the fiscal years overlapped by the POI." *Antidumping Questionnaire* at Section C, Part IV (P.R. 67).

NON-CONFIDENTIAL VERSION

Commerce has explained that "{e}stablishing the completeness and accuracy of a respondent's reported total sales" "serves as the foundation of not only the verification but also of the respondent's sales information submitted to the Department." *Certain Corrosion-Resistant Steel Products From Italy*, 81 Fed. Reg. 35,320 (June 2, 2016) (LTFV final, affirmative critical circumstances, in part), IDM Comment 1. In this case, Commerce did not perform an on-site verification in Indonesia because of the COVID pandemic and the *ILOV Questionnaire* (P.R. 262) did not request the missing Zinus Indonesia reconciliation or otherwise mention "completeness." Accordingly, Commerce has not established completeness of Zinus' sales file and this case remains the ***only*** known instance where Commerce did not require record evidence tracing POI quantity and value of production into the audited financial statements of the named exporter/producer respondent.

Defendant and Zinus argue that because only Zinus KR and Zinus US sell to US customers the record needs only sales reconciliations from these entities. *Defendant Response* at 62; *Zinus Response* at 39. Zinus goes on to assert that "it is frankly unclear…what sort of 'reconciliation' Petitioners seek…" *Id.* at 40. Defendant and Zinus are wrong. These reconciliations cannot show that the US sales file is a complete listing of all US sales of subject merchandise produced and sold by Zinus Indonesia because they reconcile only ***reported*** US sales to the Zinus KR and Zinus US financials. Because these reconciliations do not tie to the Zinus Indonesia financials they cannot resolve "completeness." This is why Commerce traced Zinus Xiamen production from the sales file to its financial statements.

This record requires a comprehensive trace from reported sales to respondent Zinus Indonesia's audited financial statements in order to ensure Zinus's US sales file captures all POI sales of subject merchandise; *i.e.,* to ensure completeness. Zinus no doubt knows that this is the

missing information that Plaintiffs seek.  As shown in *Plaintiffs Opening Br.* at 33-36, reconciliations are an "important link" between reported sales and audited financials.  *See, e.g., Zhejiang Zhaofeng Mech. & Elec. Co., Ltd. v. United States*, 416 F. Supp. 3d 1395, 1401 (Ct. Int'l Trade 2019).  Indeed, the vigorously litigated matter of using a FIFO methodology (versus the quarterly ratios methodology) to identify US sales and the intertwined issue of establishing the base quantity of CEP inventory sales (Zinus argues for [        ] units while Commerce found [        ] units) highlights the need for a credible completeness foundation under all of Zinus's submitted sales data.

Finally, the table Zinus offers up as a "reconciliation," *Zinus Response* at 41, would never suffice if submitted to Commerce.  It should not satisfy this Court.  This assessment is self-evident by comparison to the multistep, extensively documented reconciliations submitted at *CQR* Exhibits C-2A (Zinus KR) and C-2B (Zinus US) (C.R. 96 and 97, respectively).

In sum, this case warrants exercise of this Court's discretion to invoke the futility exception to the exhaustion doctrine.  Because Plaintiffs repeatedly and with clarity requested that Commerce require submission of the Zinus Indonesia sales reconciliation, before and after the preliminary determination, Commerce was repeatedly alerted to the issue and thus had multiple opportunities to explain its unprecedented inaction.  Furthermore, because a sales reconciliation would necessarily include new factual information, the closed record presented an additional bar to persuading Commerce to act so late in the investigation.  It would have been "useless motion{}" for the Plaintiff to have raised the issue once again in the administrative case brief.  *Corus*, 502 F.3d at 1379.  On remand Commerce should be instructed to open the record and require submission of Zinus Indonesia sales reconciliation, allow standard opportunities for rebuttal information and comments by parties, then verify the new data.  Otherwise, Commerce

must explain why it is declining in this case to follow long-standing practice set forth in the Section C, Part IV of the *Questionnaire* with respect to US sales reconciliations.

## II.   CONCLUSION

Plaintiffs respectfully request that this Court remand the *Final Determination* for the foregoing reasons.  Concerning Zinus KR selling activities, on remand Commerce should be instructed to 1) reconsider its determination that Zinus KR has a limited role in US sales, including specifically evaluating pertinent record evidence of such activities; 2) investigate whether Zinus failed to report associated actual expenses and, if necessary, consider whether imputed commission rates reflect arm's length charges; and 3) follow applicable K-IFRS rules treating Zinus KR as an agent on all US sales of subject merchandise or explain why doing so distorts the margin calculations.

Concerning application of 19 U.S.C. § 1677b(f)(2) (Transactions disregarded), on remand Commerce should be instructed to 1) use the average of GTA values from Brazil, Malaysia, Mexico, Romania, Russia, and Turkey to establish proxy price benchmark prices reflecting Zinus Indonesia's experience when purchasing [      ] inputs from affiliated suppliers located in China and 2) ignore Indonesian import values when establishing these benchmarks because such values cannot reflect Zinus "experience," because it did not purchase in Indonesia, and because Indonesia is not economically comparable to China.

Concerning the missing Zinus Indonesia sales reconciliation, on remand Commerce should be instructed to 1) require submission of a comprehensive reconciliation in accordance with Section C, Part IV of the Antidumping Questionnaire or explain its extraordinary one-time change in practice; 2) allow parties to submit rebuttal information, in accordance with 19 C.F.R.

24

NON-CONFIDENTIAL VERSION

§ 351.301(c)(1), and comments, if Zinus finally submits the missing reconciliation; and 3) verify if warranted.

Concerning challenges to the *Final Determination* raised by Zinus in this consolidated appeal, the Court should reject the remedies Zinus seeks for the reasons set for in the response briefs of Defendant and Plaintiff, Brooklyn Bedding, LLC, *et al.*

Respectfully submitted,

/s/ Yohai Baisburd

Yohai Baisburd
Jeffery B. Denning
Chase J. Dunn
Nicole Brunda

CASSIDY LEVY KENT (USA) LLP
900 19th Street, N.W.
Suite 400
Washington, D.C. 20006
(202) 567-2300
*Counsel to Brooklyn Bedding, LLC, et al.*

Date:   March 30, 2022

**<u>Certificate of Compliance with Chambers Procedures 2(B)(1)</u>**

The undersigned hereby certifies that the foregoing brief contains 6,998 words, exclusive of the caption block, table of contents, table of authorities, signature block, opening and closing brackets ("["  "]" ) used exclusively to set off business proprietary information, and certificates of counsel, and therefore complies with the maximum 7,000 word count limitation set forth in the Standard Chambers Procedures of the U.S. Court of International Trade.

By:      <u>/s/ Yohai Baisburd</u>
                Yohai Baisburd