## UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| PT. ZINUS GLOBAL INDONESIA, )<br><br>Plaintiff, )<br>and )<br><br>BROOKLYN BEDDING, LLC ET AL., )<br><br>Consolidated Plaintiff, )<br><br>v. )<br><br>UNITED STATES, )<br><br>Defendant, )<br><br>and )<br><br>PT. ZINUS GLOBAL INDONESIA and )<br>BROOKLYN BEDDING, LLC ET AL., )<br><br>Defendant-Intervenors. ) | NON-CONFIDENTIAL<br>VERSION<br><br>Court No. 21-00277<br>(Consol.)<br><br><br>Business Proprietary<br>Information removed from<br>pages: 4, 8-9, 13, 15, and 22. |

### PLAINTIFF PT. ZINUS GLOBAL INDONESIA'S REPLY BRIEF IN SUPPORT OF ITS RULE 56.2 MOTION FOR JUDGEMENT UPON THE AGENCY RECORD

ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 942-5000
Fax: (202) 942-5999

J. David Park
Henry D. Almond
Daniel R. Wilson
Leslie C. Bailey
Kang Woo Lee
Gina M. Colarusso

*Counsel to PT. Zinus Global Indonesia*

Phyllis L. Derrick
Eric Johnson

Dated: March 30, 2022

*Consultants to PT. Zinus Global Indonesia Plaintiff*

<h1 style="text-align:center"><u>TABLE OF CONTENTS</u></h1>

I.     INTRODUCTION ..........................................................................................1

II.    ARGUMENT ................................................................................................1

A.    Defendant and Defendant-Intervenor Fail to Justify Commerce's Decision Regarding Zinus' CEP Inventory Sales................................................................2

    1.    Commerce's Use of a Quarterly Ratio Sales Methodology to Determine the Quantity of Subject CEP Inventory Sales is Unsupported by Substantial Evidence ................................................................................... 3

    2.    Defendant and Defendant-Intervenor Fail to Justify Commerce's Inclusion of Merchandise In Transit In the Quarterly Ratios ..................................... 7

B.    Defendant and Defendant-Intervenor Fail to Justify Commerce's Calculation of CV Profit ............................................................................15

    1.    Commerce's Determination to Use a Third Country Profit Source is Unsupported by Substantial Evidence ....................................................... 15

    2.    Commerce's Decision to Not Apply the Statutory Profit Cap is Unreasonable and Unsupported by Substantial Evidence ........................ 17

C.    BPM Was Not Involved In Sales of Subject Merchandise and Commerce's Justification to Include the Company's Expenses in the Calculations is Not Supported by Record Evidence.............................................................................21

III.    CONCLUSION............................................................................................23

i

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Statutes**

19 U.S.C. § 1677b(e)(2)(B) ..........................................................................................15

19 U.S.C. § 1677b(e)(2)(B)(iii) ............................................................................ *passim*


**Cases**

*Amanda Foods (Vietnam) Ltd. v. United States*,
    647 F. Supp. 2d 1368 (Ct. Int'l Trade 2009) ...........................................................5

*Geum Poong Corp. v. United States*,
    193 F. Supp. 2d 1363 (Ct. Int'l Trade 2002) .........................................................15

*Husteel v. United States*,
    180 F. Supp. 3d 1330 (Ct. Int'l Trade 2016) ...................................................18, 21

*Mid Continent Steel & Wire, Inc. v. United States*,
    203 F. Supp. 3d 1295 (Ct. Int'l Trade 2017) ...................................................15, 16

*Rebar Trade Action Coal. v. United States*,
    398 F. Supp. 3d 1374 (Ct. Int'l Trade 2019) ...........................................................5

*SKF USA Inc. v. United States*,
    254 F.3d 1022 (Fed. Cir. 2001)...........................................................................3, 7

## I.   <u>INTRODUCTION</u>

PT. Zinus Global Indonesia ("Plaintiff" or "Zinus"), an Indonesian producer and exporter of mattresses, submits this reply brief in response to arguments made by Defendant United States ("Defendant") and Defendant-Intervenors[1] respective response briefs in opposition to Zinus' Rule 56.2 Motion for Judgment on the Agency Record and accompanying memorandum in support.  *See* Defendant's Response to Plaintiffs' Motions for Judgment on the Agency Record, Mar. 2, 2021, ECF No. 34 ("Def. Response Br."); Brooklyn Bedding, LLC et al. Response Brief in Opposition to Plaintiff's Motion for Judgement on the Agency Record, Mar. 2, 2022, ECF. No. 29 ("Pet'r. Response Br.").  Zinus challenges certain aspects of the U.S. Department of Commerce's ("Commerce") final determination and resulting antidumping duty order in the antidumping duty ("AD") investigation of mattresses from Indonesia.  *Mattresses from Indonesia: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 15,899 (Mar. 25, 2021) ("*Final Determination*") (P.R. 292), and accompanying Issues and Decision Memorandum ("Final IDM") (P.R. 284).  Zinus demonstrates below that Defendant and Defendant-Intervenor fail to justify the challenged aspects of Commerce's final determination.

## II.   <u>ARGUMENT</u>

In Zinus' affirmative brief in support of its Rule 56.2 Motion, Zinus raised three primary arguments as to why Commerce's final determination was unsupported by substantial record evidence or otherwise not in accordance with law.  *See* Memorandum in Support of PT. Zinus

---

[1] Defendant-Intervenors, consist of Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises Inc., Leggett & Platt, Incorporated, International Brotherhood of Teamsters, United Steel Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, and AFL-CIO.  They are also listed as defendant-intervenors in the above caption.  These entities are hereinafter referred to as either "Defendant-Intervenors" or "Petitioners."

Global Indonesia's Motion for Judgment Upon the Agency Record, Nov. 9, 2021 (ECF Nos. 22 and 23 ("Zinus' 56.2 Br.").  First, Zinus demonstrated that Commerce's determination to use a quarterly ratio methodology to allocate U.S. sales from inventory was unreasonable and unsupported by substantial record evidence. *Id.* at 12-20.  Moreover, to the extent Commerce could use such a quarterly methodology, the agency's ratio calculations were skewed. *Id.* at 21-26.  Second, Commerce impermissibly ignored record constructed value ("CV") profit sources pertaining to production and sales of mattresses, or products in the same general category of products as mattresses. *Id.* at 26-34.  Further, to the extent Commerce could disregard these sources as a primary CV profit source, the agency did not discharge its obligation to identify a suitable, and statutorily-mandated CV profit cap. *Id.* at 34-36.  Finally, Zinus demonstrated that Commerce's determination to implement certain adjustments to U.S. price were also unsupported by substantial record evidence and contrary to law. *Id*. at 36-46.

Defendant and Defendant-Intervenor, in their respective response briefs, responded to Zinus' arguments with *post hoc* explanation and largely rest on unsupported speculation.  Zinus responds to each of Defendant's and Defendant-Intervenor's claims herein.

### A. Defendant and Defendant-Intervenor Fail to Justify Commerce's Decision Regarding Zinus' CEP Inventory Sales

The question in this litigation on the issue of how to assign a country of origin (i.e., Indonesia versus other), and therefore determine whether particular sales should be included in the antidumping margin calculations is twofold.  First, was Commerce right to disregard Zinus' country of origin reporting based on a first in first out ("FIFO") methodology appropriate, and, second, if disregarding the FIFO methodology was justified, whether Commerce's calculation of quarterly ratios was reasonable and supported by evidence.

As discussed in Zinus' affirmative brief, the record in this case establishes that Zinus' FIFO methodology was vastly superior to the quarterly ratios Commerce ultimately used. *See* Zinus' 56.2 Br. at 12-20. Defendant and Defendant-Intervenors various claims do not call into question Zinus' reporting, but rather they raise superfluous arguments that say nothing as to the reasonableness of the FIFO methodology. In the first subsection below we address this threshold issue briefly and otherwise refer the Court's attention to Zinus' affirmative Rule 56.2 Brief on this issue.

With respect to the second question – whether Commerce's decision to include merchandise in transit in the numerator of the quarterly ratio calculations – Defendant and Defendant-Intervenor advance no logical justification to support Commerce's adjustment in this regard. Moreover, to the extent Defendant's brief can be construed to advance any argument or justification, any such justification would be *post hoc*. *SKF USA Inc. v. United States*, 254 F.3d 1022, 1028 (Fed. Cir. 2001) ("Although Commerce's argument may be compelling, the agency must adopt this position on the agency record if the court is to affirm it here"). Regardless of whether a quarterly ratio methodology is reasonable in theory, Commerce offered no explanation in its Issues and Decision Memorandum as to why Petitioner's proposed quarterly ratio calculations were reasonable or supported by the record. *See* Final IDM at 9 (P.R. 284). In the second subsection that follows we address this issue and demonstrate that if Commerce is to use a quarterly ratio methodology the agency's final determination ratio calculations must be revisited.

1. **Commerce's Use of a Quarterly Ratio Sales Methodology to Determine the Quantity of Subject CEP Inventory Sales is Unsupported by Substantial Evidence**

Defendant and Defendant-Intervenor take issue with Zinus' FIFO methodology, claiming that the methodology is imprecise and unsupported, and arguing that Commerce was reasonable

in that "both methodologies are imperfect and result in estimates" of the quantity of Indonesian-origin mattresses sold from inventory. Def. Response Br. at 25. The question before the agency was essentially a simple binary choice between two methodologies to allocate the total universe of U.S. inventory sales. While both may be based on mathematical principles used to assign a country of origin to each sale, the FIFO methodology is vastly superior, and nothing in Commerce's Final Determination or the response briefs suggest that the quarterly ratios are a better alternative.

In particular, throughout the investigation Zinus detailed and explained that the FIFO methodology accounted for import timing on a country and model-specific basis. Contrary to Defendant-Intervenor's argument, Zinus also detailed in its administrative case brief how the FIFO methodology resulted in patently more accurate results than the quarterly ratios. *Contra* Pet'r. Response Br. at 12-14 (arguing that Zinus failed to meet its burden of proof). For example, with respect to model [                    ] Zinus detailed its monthly imports by country and demonstrated that based on the FIFO methodology, Zinus identified [        ] sales out of [        ] Indonesian imports, all aligning with the timing of the Indonesian imports (i.e., sales following importation). Zinus' Admin. Case Brief (Feb. 9, 2021) ("Zinus Case Br.") at 15 (P.R. 275, C.R. 292). In contrast, for this example model, the quarterly sales ratio methodology did not take into account model-specific import quantities or timing, and resulted in Commerce identifying sales of only [    ] mattresses out of the [        ] imported from Indonesia. *Id.* at 16. Attachments 1 and 2 to Zinus' case brief demonstrate that on a mattress model basis, the quarterly ratios result in significant quantities of sales being assigned an origin of Indonesia prior to Zinus ever importing the model from Indonesia. *Id.* at Attachment 1. In contrast, the FIFO methodology tracks import timing on a model basis remarkably well. *Id*. at Attachment 2.

Despite Zinus raising these arguments in its case brief, Commerce did not meaningfully address these arguments in its Final Determination. Zinus again pointed to these arguments in its Rule 56.2 Br., at pages 18-19, and Defendant again does not advance any legitimate argument to indicate that the FIFO methodology was flawed. Rather, Defendant claims that the methodology "forc{es} attribution of sales to large shipments of mattresses from other countries before attributing any sales to shipments from the new company." Def. Response Br. at 25. This claimed flaw is actually a sign of accuracy, as the FIFO methodology correctly takes into account the timing of imports. *See* Zinus Case Br. at 11-20 and Attachments 1 and 2 (C.R. 292) (detailing how the FIFO methodology correctly attributed sales to particular countries of origin based on the timing of imports by model, while the quarterly ratio methodology results in the absurd scenario where imports are attributed to Indonesia even before particular models were ever imported from Indonesia).

At bottom, Commerce's determination was unreasonable and unsupported by substantial evidence as the agency ignored these arguments and chose a less accurate methodology, and its *post hoc* claims of inaccuracy are unsupported by any record evidence. *Cf. Rebar Trade Action Coal. v. United States*, 398 F. Supp. 3d 1374, 1383 (Ct. Int'l Trade 2019) (reasoning that Commerce's choice among multiple reasonable options is upheld only "so long as Commerce has pursued a reasonable and lawful course of action") (citation omitted); *see Amanda Foods (Vietnam) Ltd. v. United States*, 647 F. Supp. 2d 1368, 1378 (Ct. Int'l Trade 2009) (explaining that "for Commerce's conclusion to be supported by substantial evidence, the court must be satisfied that, viewing the record as a whole, a reasonable mind could conclude that Commerce chose the best available information.") (citation omitted).

While Defendant glosses over this fundamental shortcoming, Defendant again points to irrelevant considerations with respect to the warranty and commission expenses. *See* Def. Response Br. at 23-24; *see also* Pet'r. Response Br. at 17-19. Although Zinus raised these issues in its affirmative brief – as these were the concerns Commerce raised in its Final Determination – these points are essentially irrelevant. That is, whether Zinus incurs warranty expenses or pays commissions to sales agents says nothing as to which allocation methodology (FIFO versus quarterly ratios) is appropriate. That said, with respect to warranties, again, the record could not be more clear that Zinus did not provide any warranty programs to its customers. *See* Zinus' July 13, 2020, Section C Response ("Zinus Section C Response"), at C-58 (P.R. 119, C.R. 117). Defendant's focus on the phrase "defective allowances" at page 23 of its brief misses the point entirely. In particular, "defective allowances" are price reductions that Zinus U.S. affords to its customers in the form of a reduction to price and is in no way attributable back to the manufacturer (Zinus U.S. grants the allowances regardless of the manufacturer). *See* Zinus Section C Response at C-41 and Exhibit C-15 (C.R. 117).

With respect to commissions, there is no inconsistency as Zinus explained in its initial section C questionnaire response that Zinus Indonesia (*i.e.*, the mattress producing entity in Indonesia) did not use selling agents for the sales of subject merchandise. Zinus Section C Response at C-54-55 (P.R. 119, C.R. 117). In its post-preliminary supplemental questionnaire response, Zinus thoroughly explained how record evidence confirms the accuracy of its reporting that Zinus Indonesia did not pay or incur any commission expenses for sales of subject merchandise. *See* Zinus Dec. 14, 2020, Post-Preliminary Supplemental Questionnaire Response ("Zinus Post-Prelim Supp. QR") (Questions 1-4) at 1-5 (P.R. 256, C.R. 271). Zinus also explained that Zinus US' customers to whom it reported paying commissions in Commerce's

prior investigation of mattresses from China simply did not purchase Indonesian mattresses during the POI, and thus did not earn commissions under the terms of the agreements based on sales of subject merchandise. *Id*. at 4; *see also* Zinus' Response to Petitioners' Post-Preliminary Comments (Nov. 27, 2020) at 4-6 (P.R. 243, C.R. 266).

Thus, to the extent Commerce's determination to use the quarterly ratio methodology was the result of Commerce's analysis with respect to warranties and commissions, Commerce's determination is unreasonable and unsupported by substantial record evidence, because these issues in no way implicate the accuracy of the FIFO methodology or Zinus' inability to track country of origin for its U.S. CEP inventory sales. The question is whether Commerce acted reasonably and reached a conclusion that was supported by record evidence in selecting a back-of-the-envelope quarterly ratio over the much more precise FIFO methodology Zinus presented. As discussed above, the record and Commerce's selective analysis establishes that Commerce's chosen methodology was neither reasonable nor supported by substantial record evidence.

## 2. Defendant and Defendant-Intervenor Fail to Justify Commerce's Inclusion of Merchandise In Transit In the Quarterly Ratios

In their respective response briefs, Defendant and Defendant-Intervenors attempt to shore up Commerce's limited reasoning set forth in the Final IDM regarding the inclusion of mattresses in transit from Indonesia to the United States (*i.e.*, mattresses still on ocean freight vessels prior to importation or entry into U.S. inventory) in the quarterly ratio calculations. Def. Response Br. at 26; Pet'r. Response Br. at 22-24. As an initial matter, the reasoning set forth in the response briefs go well beyond the cursory analysis included in Commerce's Final IDM and therefore constitute impermissible *post hoc* justification. *SKF USA Inc.*, 254 F.3d at 1028. Regardless, as discussed below, nothing in the response briefs warrants Commerce including merchandise in transit in the ratio calculations.

To reiterate from Zinus' affirmative brief, Commerce's quarterly ratio calculations are as follows:



In these calculations the **[          ]** mattress figure is the number of mattresses from Indonesia received in Zinus' U.S. inventory. *See* Zinus' Sept. 28, 2020 Supplemental Section C Response (Part 2) ("Zinus Supp. Section C Response (Pt. 2)") at Exhibit SC-5c (C.R. 213); *see also* Zinus' Case Br. at 20-23 (C.R. 292). The **[          ]** mattress figure is the total number of mattresses Zinus purchased for U.S. inventory during the period. *See* Zinus' Case Br. at 20-23 (C.R. 292); Zinus' Sept. 28, 2020 Second Supp. Section C Response ("Zinus Second Supp. CQR") at 1-2 (P.R. 200, C.R. 214); Zinus Supp. Section C Response (Pt. 2) at Exhibit SC-5c (C.R. 213). The difference between these two figures -- **[          ]** mattresses are those that Zinus KR had transferred title to Zinus US, but were physically still in transit from Indonesia to Zinus US as of December 31, 2019. *See* Zinus Supp. Section C Response (Pt. 2) at Exhibit SC-5c (C.R. 213).

There is no question that these **[          ]** mattresses were, in fact, in transit. Zinus provided complete support for this number of mattresses that had been purchased by Zinus U.S.

from Zinus Indonesia, but were still en route to the United States at the close of the period of investigation (*i.e.*, mattresses which shipped from Indonesia in 2019, but had not yet arrived in the U.S. inventory by December 31, 2019). *See* Zinus Supp. Section C Response (Pt. 2) at Exhibit SC-5c (C.R. 213). In its response brief, Defendant does not question this fact -- at no point does Defendant argue that these mattresses are anything but in-transit merchandise that has not arrived in the United States. Def. Response Br. at 26. For their part, Defendant-Intervenors suggest that the evidence supporting the in-transit nature of the merchandise is insufficient as, in their words, the evidence is a "simple Excel list." Pet'r. Response Br. at 24. This claim ignores the nine pages of sample invoices, shipping documents, and U.S. Customs and Border Protection Form 7501 entry paperwork included in the exhibit (and cited in Zinus' Rule 56.2 Br.) to support the data for certain shipments. Zinus Supp. Section C Response (Pt. 2) at Exhibit SC-5c, Part 4 (C.R. 213). These are the exact sort of materials Commerce routinely relies on to substantiate shipping dates, entry dates and similar data.

Accordingly, the question before the Court remains whether Commerce's decision to include the [        ] mattresses in-transit in the quarterly ratio calculations was reasonable and supported by record evidence. In their response briefs, Defendant and Defendant-Intervenors advance speculative theories as to why this could be appropriate, but, at bottom, their fundamental claim is that merchandise that had not yet entered the United States should still be included, because it is possible that the mattresses could have been sold prior to importation and entry into inventory. This line of argument is premised on hypotheticals and speculation and is misguided in multiple respects.

Most fundamentally, this theory ignores the sales channel at issue. Specifically, the sales subject to the quarterly ratio methodology are those sales made out of U.S. inventory -- this is the

whole issue here, as Zinus could not link the country of origin to prior sales due to co-mingling of merchandise within U.S. inventory.  By definition, the reportable sales *were physically held in U.S. inventory* and merchandise in-transit necessarily should not be included in the analysis or any quarterly ratios to assign a country of origin to the sales out of inventory, because this in-transit merchandise *was not held in U.S. inventory* during the period of investigation.

This theory also ignores the basis on which Commerce requests that respondents identify the universe of transactions to report their U.S. sales, which is based on the date of sale.  Zinus reported U.S. sales in two separate channels, (1) sales out of U.S. inventory (referred to as CEP inventory sales or "Channel 1" sales) and (2) direct shipment sales.  Zinus' June 18, 2020, Section A Response ("Zinus Section A Response") at A-18-A-19 (P.R. 97, C.R. 36).  This second type – direct shipment EP or CEP sales where Zinus Indonesia shipped the merchandise directly to the customer is not relevant to the issue at hand.

Within the other sales channel – the CEP inventory sales channel at issue here – following standard Commerce reporting methodologies, Zinus identified the date of sale as the earlier of shipment date out of U.S. inventory or the Zinus U.S. invoice date to the unaffiliated customer.  Zinus Section C Response at C-27 (P.R. 119, C.R. 117) (describing the CEP inventory sales and confirming that "Zinus has used the earlier of shipment or invoice date for reporting date of sale").  In turn, again following standard reporting methodologies, Zinus identified its reportable transactions on the basis of the date of sale.  Zinus Section A Response at A-17 (P.R. 97, C.R. 36) (where Commerce's questionnaire instructions indicate that the date of sale is "important to Commerce's analysis" as "{i}t will determine which sales records are reported" in the U.S. sales database.)  Accordingly, because Zinus used the earlier of shipment from U.S. warehouse or invoice to the customer as the date of sale in this sales channel, Zinus reported all

sales out of U.S. inventory where either (1) the merchandise left the U.S. warehouse during the period of investigation (*i.e.*, January 1, 2019 through December 31, 2019) or (2) the merchandise had not yet left the warehouse, but had been invoiced within the period. As a practical matter, there were no such sales in this second category, as Zinus U.S. typically issued its invoice at the time of shipment, thus, there were no sales invoiced during the period that had not yet shipped out of inventory.

Specifically, based on the FIFO methodology, Zinus segregated its U.S. inventory sales and reported them in two separate databases (one corresponding to sales identified as Indonesia origin, and the other related to all other sales). *See* Zinus Section C Response at C-2-C-3 (P.R. 119, C.R. 117) (discussing the two databases). Again, based on the date of sale, Zinus' reportable U.S. inventory sales out of inventory could only be sales that (1) shipped out of the U.S. warehouse during the period or (2) had an invoice date during the period, but shipped out of inventory after the period. Among these reported sales in the two databases, all of the U.S. inventory sales shipped out of U.S. inventory by December 31, 2019.[2] This is a key point. Because all of the reportable U.S. inventory sales were shipped out of U.S. inventory within the period of investigation, the merchandise in-transit necessarily had not been invoiced, could not have dates of sale in the period of investigation, and are simply non-reportable products that had not been sold.

Taking a step back, to accept Defendant and Defendant-Intervenors' theories about sales taking place while the merchandise was still in transit to the United States, the sales would need

---

[2] The databases themselves contain thousands of rows and are only submitted to the agency in electronic SAS file format. Though these database files do not lend themselves well to presentation through the court's record appendix submission process, a simple review of the files confirms that all reported U.S. inventory sales had shipment dates between January 1, 2019, and December 31, 2019.

to be invoiced in 2019 (that is, the sales would have a date of sale in 2019) and would then ship out of U.S. inventory at some later stage. While such a scenario is farfetched at best, the record confirms there were no such sales and Defendant's *post hoc* justifications cannot overcome this obvious flaw in Commerce's reasoning. The only other possible theory Defendant could advance is that there were some sales that fit this pattern, but Zinus did not report them. But, that is not a theory Defendant has advanced, and there would be no record support for it in any event.

In particular, Defendant claims that Commerce's chosen ratio methodology "better reflect the quantity of mattresses in Zinus U.S.'s inventory available for sale during the period of investigation." Def. Response Br. at 24. But, including mattresses that expressly *were not* in U.S. inventory during the period of investigation, Commerce's calculations are flawed and unsupported. Likewise, Defendant's claim that "there is no requirement that a product be imported before it is sold" is misguided because it ignores the reporting parameters which establish that (1) only sales with dates of sale in the period of investigation are reportable and (2) the appropriate date of sales is the date of shipment from the U.S. warehouse. Defendant overlooks this point and offers no explanation or hypothetical to indicate that a mattress still in Zinus' control and on a boat to the United States could be considered to have a date of sale in the period of investigation.

This claim also ignores the accounting treatment of these sales and shipments. As Zinus explained, at the time the merchandise ships from Indonesia, Zinus U.S. takes title and records the purchases in a temporary merchandise in-transit account. Zinus Second Supp. CQR at 1-2 (P.R. 200, C.R. 214). Only upon arrival and verification at the U.S. warehouse locations does Zinus U.S. reclassify the merchandise as finished goods inventory. Defendant's speculative theory would have merchandise invoiced and sold prior to being classified as finished goods

inventory, and this theory ignores the simple fact that if the product was sold by Zinus U.S. it would no longer be either merchandise in-transit or finished goods inventory – it would be sold merchandise and classified as such. The fact that the goods are treated as merchandise in-transit confirms that the merchandise has not been sold, which directly undercuts Defendant's hypothetical scenario.

Defendant also claims that "record evidence shows that the quantity of Zinus U.S. inventory of Indonesia mattresses sold *exceeded* the quantity of such mattresses in the Zinus U.S. warehouse," indicating that there must be some sales of mattresses that were "in-transit." Def. Response Br. at 26. Defendant does not detail its analysis on this point, and instead only points in general to two exhibits – Zinus' U.S. sales reconciliation, and a table detailing Zinus U.S.'s purchases for inventory. This argument appears to be similar to an argument at page 21 of Defendant's brief and referenced in footnote 10.

Regardless, this comparison does not support Defendant's claim. Specifically, neither of these exhibits includes a total number of mattresses held in warehouse. The first exhibit, Section C Response at Exhibit C-2B, includes a total <u>sales</u> figure during the period of investigation. The second exhibit Section A Supp. Response at Exhibit SA-5 includes a summary of all mattresses Zinus U.S. <u>purchased</u> during the period. Defendant presents this argument as absolute proof that in-transit quantities were sold in the period because the sales volume is greater than the volume in inventory. The problem here is that neither of these exhibits say anything as to <u>inventory already held at the beginning of the period of investigation</u>. Thus, the figure for purchases in the period (the **[          ]** figure in footnote 10 of Def. Response Br.) is the number of mattresses purchased during the period, and not mattresses in inventory during the period, because this

figure does not include mattresses that were already in the warehouse at the beginning of the period of investigation.

For example, assume Zinus U.S. held 100 mattresses in inventory as of January 1, 2019 and imported zero mattresses during 2019 (or after). If the company sold 100 mattresses during the period this would not mean that the sales quantity of 100 was "in-transit." It would just mean that the sales pertained to prior imports. Defendant's purported proof of sales of "in-transit" merchandise is therefore misguided. Moreover, again, even if there were any such sales of in-transit merchandise, they would not be reportable transactions because they could not have shipped out of U.S. inventory prior to importation.

Similarly, Defendant-Intervenors lead with the argument that it is possible that there were sales that were invoiced prior to importation, Pet'r. Response Br. at 22, but they point to no record evidence to support this claim. Indeed, the record evidence confirms that there were no such sales, as we demonstrated above that all of the sales invoiced during the period of investigation had shipment dates out of U.S. inventory within 2019. At footnote 12 of their Response Brief, Defendant-Intervenors point to a few isolated examples where the invoice date came before shipment, but these sales reflect circumstances that are entirely different than the suggested situation where a sale could have been invoiced while the merchandise remained in-transit and had not yet entered U.S. inventory, and in all instances reflect sales actually shipped out of inventory during the period of investigation. Their remaining arguments are all premised on the same claim – that sales could be invoiced prior to importation – which runs counter to the record facts showing there were no such sales during the period.

Moreover, as a final point, it is worth revisiting Commerce's quarterly ratio calculations, which we provide again below in pertinent part.

[

]

Here, we highlight that Commerce has used the merchandise in-transit as of December 31, 2019, to inflate the Indonesian inventory quantities in the second, third, and fourth quarters of 2019. For example, based on this in-transit merchandise inflator, Commerce increased the volume of Indonesian merchandise in inventory in the second quarter from [          ] mattresses to [          ] mattresses.  There is no theory that Defendant or Defendant-Intervenor could advance to suggest that the second quarter of 2019 inventory volumes or sales were understated by virtue of shipments from Indonesia that did not enter the United States until 2020.  Thus, Commerce's calculations are based on an absurd and unsupported assumption – that Zinus could sell mattresses out of inventory that would not arrive in inventory for several months – and yields absurd results by inflating the Indonesian-origin quantities in inventory based on shipments from several months in the future.

### B. Defendant and Defendant-Intervenor Fail to Justify Commerce's Calculation of CV Profit

#### 1. Commerce's Determination to Use a Third Country Profit Source is Unsupported by Substantial Evidence

As discussed in Zinus' affirmative Rule 56.2 Brief, Commerce's determination to rely solely on the financial statement of Indian mattress producer Emirate Sleep's 2019 financial statement ran contrary to the statute's preference under 19 U.S.C. § 1677b(e)(2)(B) for data pertaining to sales and production in the home market -- Indonesia.  In particular, this Court has confirmed that the ultimate goal in calculating CV profit "is to approximate the home market

profit experience." *Geum Poong Corp. v. United States*, 193 F. Supp. 2d 1363, 1370 (Ct. Int'l Trade 2002); s*ee also Mid Continent Steel & Wire, Inc. v. United States*, 203 F. Supp. 3d 1295, 1310 (Ct. Int'l Trade 2017) ("The goal in calculating CV profit is to approximate the home market profit experience of the respondents.") (citation omitted).

Although Commerce has in some cases resorted to third country profit sources, and this Court has upheld such determinations, this case is distinguishable from those cases because there are multiple viable in-country alternatives, and Commerce unreasonably disregarded each of them. These alternatives include financial statements from two Indonesian mattress producers: PT Graha Seribusatu Jaya ("PT Graha") and PT Ecos Jaya Indonesia ("Ecos"). Commerce's disqualification of each of these financial statements was unsupported by substantial record evidence and contrary to the statute's preference for home market sales, production, and profit levels.

Defendant continues to argue that PT Graha's financial statements are flawed because the 2018 statements are less contemporaneous with the period of investigation than the Emirates Sleep financial statements, and the 2019 statements are unaudited. Def. Response Br. at 44. Yet, the PT Graha information still "approximate{s} the home market profit experience" in a way that the Emirates Sleep financial statements cannot. *Mid Continent Steel & Wire, Inc. v. United States*, 203 F. Supp. 3d 1295, 1310 (Ct. Int'l Trade 2017).

Regarding Ecos, Defendant again seeks to overstate any relevance or impact on the profit calculation derived from the company's financial statement based on an inconsequential comment from the auditor in the company's audited financial statements. Def. Response Br. at 45-46. As discussed in Zinus' affirmative Rule 56.2 Brief, the only "qualification" on the auditor's opinion related to the fact that the company did not include a liability amount in its

financial statements to account for estimated liabilities related to post employment employee benefits. Defendant cites to Commerce's conclusory analysis of this point in the Final Decision Memorandum at page 23, asserting that the qualification could impact costs, either increasing or decreasing them. Def. Response Br. at 45.

This explanation is nonsensical, as a company's accounting decision not to include a provision for a potential liability could only move the company's costs in one direction. That is, had the company included such a liability, that liability, if anything, would have been a positive cost – including the liability could not have "decreased" the company's costs as Defendant hypothesizes. Thus, from a profit calculation perspective, if anything, the company's profits are overstated in so far as the company did not attribute an amount for a liability that it should have. Indeed, it is not as though the financial statements are in some way "unreliable" by virtue of this limited statement from the auditor. It is worth noting here that this is the only disqualifying factor Commerce relied on with respect to the Ecos financial statement. The fact of the matter is it is perfectly suitable for use as a CV profit source (or CV cap source, as discussed below) and Defendant's thin reasoning to disqualify the statement renders Commerce's reliance on the Emirates Sleep financial statement unsupported by substantial record evidence.

### 2. Commerce's Decision to Not Apply the Statutory Profit Cap is Unreasonable and Unsupported by Substantial Evidence

As discussed above, the record of this investigation contains a variety of profit sources related to production and sales in Indonesia that Commerce should have used as the primary CV profit source. However, in resorting to a third country profit source, under 19 U.S.C. § 1677b(e)(2)(B)(iii), Commerce was obligated to again re-visit the various potential Indonesian profit sources to identify a profit cap pursuant to the statute given that the "the amount allowed for profit may not exceed the amount normally realized by exporters or producers… in

connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise." 19 U.S.C. § 1677b(e)(2)(B)(iii). At bottom, this provision requires Commerce to tie the profit amount back to some measure in the home country.

In its response brief, Defendant again seeks to essentially strike the profit cap requirement from the statute indicating that because, in its view, Emirates Sleep was the appropriate profit source, it too was the best available source to serve as a facts available profit cap. Def. Response Br. at 48. This logic ignores the fact that the profit cap requirement in 19 U.S.C. § 1677b(e)(2)(B)(iii) is tied to the home market (*i.e.*, Indonesia). Defendant-Intervenors argue that Commerce did in fact apply a profit cap, and argues that even if it did not it may be possible for Commerce to "dispense with the profit cap entirely" if any profit cap is "unreasonable or representative." Pet'r. Response Br. at 44-45 (citing *Husteel v. United States*, 98 F. Supp. 1315, 1348 (Ct. Int'l Trade 2015)).

Whether Commerce did or did not apply a profit cap in using the same third country source as both the profit and the cap is a question of semantics. In particular, in addressing a subsequent remand in the *Husteel* case, this Court held that applying the same source as the "cap" is not a reasonable interpretation of the statute. *See Husteel v. United States*, 180 F. Supp. 3d 1330, 1348 (Ct. Int'l Trade 2016) ("The court does not accept Commerce's tautology that selecting as a 'cap' the same rate without the 'cap' is a reasonable interpretation of the statute and SAA's profit cap requirement; rather a non-cap is not a cap."). The Court nonetheless upheld Commerce's overall CV profit determination in that case, reasoning that the available alternatives in that case were so bad as to not be any "better than no cap." *Id.*

With this framework in mind, the question before the Court is whether any of the Indonesian profit sources fulfill the profit cap requirement better than the "non-cap" Commerce has applied. Commerce fundamentally did not answer this question in its Final Determination because it decided to apply a "non-cap" using the same reasoning it used to identify the primary profit source. When using a third country profit source, the statute mandates a separate analysis under the profit cap provision, yet Commerce simply restated its primary CV profit analysis. Indeed, it is clear that at some level Commerce viewed the various Indonesian sources as potential candidates. In identifying the primary profit source, Commerce indicated that it was "choosing among two alternatives," and Commerce found that Emirates Sleep was the "best option" as a CV profit cap source. Final IDM at 25 (P.R. 284). For purposes of the profit cap Commerce needs to (1) eliminate Emirates Sleep from consideration and (2) reconsider whether any of the remaining options are viable.

In this regard, we highlight in particular the PT Graha 2018 audited financial statement. Commerce addressed this financial statement in footnote 153 of the Final IDM; it is addressed again at page 48 of Defendant's Response Brief and page 46 of Defendant-Intervenor's Response Brief. Commerce claims that the 2018 financial statement is not a viable CV profit cap source because the statement is not contemporaneous with the period of investigation. *Id*. at 25, fn. 153 (P.R. 284). But contemporaneity is not a concern when searching for a "facts available" profit cap. Specifically, the language of the statute suggests that the selected profit source cannot be higher than the profits "normally realized" in connection with the production and sale of the subject merchandise in the country under investigation. The phrase "normally realized" cannot be read to have a strict contemporaneity requirement, as the level "normally realized" can be properly assessed with reference to historical profit levels, especially where those profit levels

relate to the year immediately prior to the period of investigation.  In short, the 2018 profit levels for Indonesian producer PT Graha reflect the profit levels "normally realized" by Indonesian mattress producers.

Commerce's other claim enumerated as item 3 in footnote 153 and repeated at page 48 of Defendant's Response Brief – that the profit level for PT Graha "may" be based on sales "predominantly to the United States" because the company sought to be a voluntary respondent – is also unavailing.  Not only does the use of the word "may" indicate that Commerce's reasoning is speculative, but it also ignores the fact that the Department has a significant amount of information regarding the company via the company's own voluntary questionnaire responses. Indeed, following Commerce's standard reporting requirements, the company submitted a complete questionnaire response, including U.S. and home market data.  *See generally* PT Graha's Section A Response (June 19, 2020) (P.R. 103-04, C.R. 44-49); PT Graha's Section B Response (June 23, 2020) (P.R. 107, C.R. 50-60); Graha's Section D Response (July 7, 2020) (P.R. 113, C.R. 67-76, 84); PT Graha's Section C Response (July 14, 2020) (P.R. 121, C.R. 121). Based on these data, both Zinus and Petitioners submitted CV profit calculations using Commerce's standard calculation program to calculate the profit associated with the company's period of investigation home market sales.  *See* Zinus' CV Profit Submission (Aug. 18, 2020) at Exhibit 1 (P.R. 157, C.R. 138); and Petitioners' CV Profit Submission (Aug. 18, 2020) at Attachment 1 (P.R. 154, C.R. 136).  Although the calculated profit figures are proprietary, Commerce cannot disregard the company's financial statements based on speculation about the company's sales in light of the wealth of record information about the company and its sales.

Similarly, another alternative Commerce considered, the financial statement of Innocycle, likewise would be a suitable as a CV profit source.  Commerce disqualified that financial

NON-CONFIDENTIAL VERSION

statement reasoning that, although the company was a mattress producer and was one of two apparent final contenders in the agency's view, it produced other products which "are not comparable merchandise." Final IDM at 25 (P.R. 284). It is unclear whether Commerce considered Innocycle as a profit cap option alternative or even whether Commerce determined that the claimed "not comparable merchandise" was within the "same general category" of merchandise as mattresses, as required by 19 U.S.C. § 1677b(e)(2)(B)(iii).

In short, consistent with *Husteel*, Commerce did not, in fact, apply a CV profit cap, as required by the statute. Moreover, when selecting a CV profit cap, unlike when selecting a primary CV profit source, the question is not which profit source is "best." Rather, the question is whether there is a CV profit source that satisfies the statutory requirements, even on a "facts available" basis. In reaching its determination to use Emirates Sleep's financial statement as the profit cap, Commerce's analysis therefore ran contrary to law and is unsupported by substantial record evidence which indicates there are available alternatives to identify the profit normally realized on the production and sale of mattresses, or other products in the same general category of products, in Indonesia.

### C. BPM Was Not Involved In Sales of Subject Merchandise and Commerce's Justification to Include the Company's Expenses in the Calculations is Not Supported by Record Evidence

As a threshold matter, Zinus' affiliate BPM was not involved in the manufacture or sale of subject merchandise. *See, e.g.*, Zinus Section A response at A-9 (P.R. 97, C.R. 36); Zinus Supp. Section C Response (Pt. 2) at SC2-6, Exhibit SC-12 (P.R. 199, C.R. 213); and Zinus Post-Prelim Supp. Response at 10-12 (P.R. 256, C.R. 271). Defendant and Defendant-Intervenors point to no evidence to contradict this fact. The premise of Commerce's determination to include BPM's expenses in the calculations is that "commissions and certain other sales allowances were being shifted from Zinus U.S. to BPM." Def. Response Br. at 28. The record evidence hook the

agency points to in support of this conclusion is its assertion that Zinus U.S. "grants commissions for *non-subject* merchandise, but record evidence shows Zinus U.S. does not know the country of origin of the mattresses sold to the first unaffiliated purchaser." Def. Response Br. at 31. In essence, Commerce's theory is that it does not believe Zinus' explanation that Zinus U.S. grants commissions for non-subject mattresses only, due to the co-mingling of mattresses in inventory (which would, in theory, indicate that commissions were in fact paid on Indonesian mattresses, and, by extension, would justify pulling in expenses paid by BPM on its sales).

However, the record undermines this theory entirely. As detailed in Zinus' Post-Preliminary Supplemental Questionnaire Response, the commissions that Zinus U.S. paid during the period of investigation [

]. *See* Zinus Post-Prelim Supp. Response at 2-5 (C.R. 271). The co-mingling of merchandise in the United States therefore does not undermine Zinus' clear and supported statements that it did not pay commissions for subject mattresses.

Likewise, there is no evidence that there was any "scheme to shift Zinus Indonesia mattress commissions and sales allowances to BPM's sales" as Defendant suggests. Def. Response Br. at 31. All Commerce and Defendant point to are relative changes in the overall levels of sales and sales deductions for BPM. This is not evidence of a "scheme;" it is simply evidence of the company's sales and related costs. Zinus does not challenge that Commerce retains some discretion to modify allocations to increase accuracy as Defendant suggests. *See* Def. Response Br. at 32. But here, Commerce has not undertaken a reallocation to increase accuracy. Rather, Commerce has pulled in costs from a company not involved in the production or sale of Indonesian mattresses, without any evidence that any of the company's expenses actually related to the subject Indonesian mattresses, and in a manner directly contradictory to

Zinus' questionnaire responses. This is classic "facts available" analysis, but as described in Zinus' affirmative Rule 56.2 brief, there is no basis for the agency to have done so, and by taking a "facts available" approach the agency entirely avoided the statutory requirements and procedural safeguards for doing so. Zinus' 56.2 Br. at 36-41. Had Commerce found Zinus' questionnaire responses lacking, the agency was obligated to notify Zinus and request modified data, rather than cobble together its own calculations to replace Zinus' reported data.

## III.    <u>CONCLUSION</u>

For the foregoing reasons, Zinus respectfully requests that this Court hold the foregoing aspects of the *Final Determination* to be unsupported by substantial evidence and otherwise not in accordance with law. Zinus further requests that this Court remand the agency's determination with instructions to Commerce to correct its errors and to provide such other relief as this Court deems just and appropriate.

Respectfully submitted,

/s/ J. David Park
J. David Park
Henry D. Almond
Daniel R. Wilson
Leslie C. Bailey
Kang Woo Lee
Gina M. Colarusso
*Counsel to PT. Zinus Global Indonesia*
*Plaintiff*

Phyllis L. Derrick
Eric Johnson
*Consultants to PT. Zinus Global Indonesia*
*Plaintiff*

ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20001
Phone:  (202) 942-5000

**Dated:  March 30, 2022**

| | |
|---|---|
| PT. ZINUS GLOBAL INDONESIA, | ) |
| | ) |
| Plaintiff, | ) |
| and | ) |
| | ) |
| BROOKLYN BEDDING, LLC ET AL., | ) |
| | ) |
| Consolidated Plaintiffs, | ) |
| | ) |
| v. | ) Court No. 21-00277 |
| | ) (Consol.) |
| UNITED STATES, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| PT. ZINUS GLOBAL INDONESIA and | ) |
| BROOKLYN BEDDING, LLC ET AL., | ) |
| | ) |
| Defendant-Intervenors. | ) |
| | ) |

## CERTIFICATION OF COMPLIANCE WITH CHAMBERS PROCEDURE 2(B)(1)

The undersigned hereby certifies that the attached Reply Brief in Support of Plaintiff's

Rule 56.2 Motion for Judgment Upon the Agency Record, filed on March 30, 2022, contains

6,981 words, exclusive of the table of contents, table of authorities, and counsel's signature

block, according to the word count function of the word-processing system used to prepare this

brief, and inclusive of the words in the embedded images, counted manually. The brief therefore

complies with the maximum 7,000 word count limitation set forth in the Court's Chambers

Procedures.

By:  /s/ Henry D. Almond
     HENRY D. ALMOND

**Dated:  March 30, 2022**