Slip Op. 23-39

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| PT. ZINUS GLOBAL INDONESIA,<br><br>　　　Plaintiff,<br><br>and<br><br>BROOKLYN BEDDING, LLC,<br>CORSICANA MATTRESS COMPANY,<br>ELITE COMFORT SOLUTIONS, FXI, INC.,<br>INNOCOR, INC., KOLCRAFT<br>ENTERPRISES INC., LEGGETT & PLATT,<br>INCORPORATED, INTERNATIONAL<br>BROTHERHOOD OF TEAMSTERS, AND<br>UNITED STEEL, PAPER AND FORESTRY,<br>RUBBER, MANUFACTURING, ENERGY,<br>ALLIED INDUSTRIAL AND SERVICE<br>WORKERS INTERNATIONAL UNION,<br>AFL-CIO,<br><br>　　　Consolidated Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>　　　Defendant,<br><br>and<br><br>BROOKLYN BEDDING, LLC,<br>CORSICANA MATTRESS COMPANY,<br>ELITE COMFORT SOLUTIONS, FXI, INC.,<br>INNOCOR, INC., KOLCRAFT<br>ENTERPRISES INC., LEGGETT & PLATT,<br>INCORPORATED, INTERNATIONAL<br>BROTHERHOOD OF TEAMSTERS, AND<br>UNITED STEEL, PAPER AND FORESTRY,<br>RUBBER, MANUFACTURING, ENERGY,<br>ALLIED INDUSTRIAL AND SERVICE<br>WORKERS INTERNATIONAL UNION,<br>AFL-CIO,<br><br>　　　Defendant-Intervenors. | Before: Jennifer Choe-Groves, Judge<br><br>Consol. Court No. 21-00277 |

# OPINION AND ORDER

[Sustaining in part and remanding in part the U.S. Department of Commerce's final affirmative determination of sales at less than fair value on mattresses from Indonesia.]

Dated:  March 20, 2023

J. David Park, Henry D. Almond, Daniel R. Wilson, Leslie C. Bailey, Kang Woo Lee, and Gina Marie Colarusso, of Arnold & Porter Kaye Scholer, LLP, Washington, D.C., for Plaintiff PT. Zinus Global Indonesia.  With them on the brief were Phyllis L. Derrick and Eric Johnson.

Yohai Baisburd, Jeffery B. Denning, Chase J. Dunn, and Nicole Brunda, of Cassidy Levy Kent (USA) LLP, Washington, D.C., for Consolidated Plaintiffs and Defendant-Intervenors Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises Inc., Leggett & Platt, Incorporated, International Brotherhood of Teamsters, and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO.

L. Misha Preheim, Assistant Director, and Kara M. Westercamp, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant United States.  With them on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, and Patricia M. McCarthy, Director.  Of counsel on the brief was David W. Richardson, Senior Counsel, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

Choe-Groves, Judge:  Plaintiff PT. Zinus Global Indonesia ("Plaintiff" or "Zinus Indonesia") challenges the final affirmative determination of the U.S. Department of Commerce ("Commerce") in the antidumping duty investigation on mattresses from Indonesia.  Mattresses from Indonesia ("Final Determination"), 86

Fed. Reg. 15,899 (Dep't of Commerce Mar. 25, 2021) (final affirmative

determination of sales at less than fair value).  Before the Court is Plaintiff's Rule

56.2 Motion for Judgment Upon the Agency Record of Plaintiff PT. Zinus Global

Indonesia ("Plaintiff's Motion").  Pl.'s R. 56.2 Mot. J. Agency R., ECF Nos. 22,

23.  Defendant United States and Consolidated Plaintiffs and Defendant-

Intervenors Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort

Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises, Inc., Leggett & Platt, Inc.,

the International Brotherhood of Teamsters, and the United Steel, Paper and

Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers

International Union, AFL-CIO (collectively, "Brooklyn Bedding") oppose

Plaintiff's Motion.  Brooklyn Bedding's Resp. Br. Opp'n Pl.'s Mot. J. Agency R.

("Brooklyn Bedding's Resp."), ECF Nos. 29, 30; Def.'s Resp. Pl.'s Mots. J.

Agency R. ("Def.'s Resp."), ECF Nos. 33, 34.  Also before the Court is Brooklyn

Bedding's Motion for Judgment on the Agency Record ("Brooklyn Bedding's

Motion").  Brooklyn Bedding's Mot. J. Agency R., ECF Nos. 24, 25.  Plaintiff and

Defendant oppose Brooklyn Bedding's Motion.  Pl.'s Resp. Br. Opp'n Consol.

Pl.'s Mot J. Agency R. ("Pl.'s Resp."), ECF Nos. 31, 32; Def.'s Resp.

       For the reasons discussed below, the Court grants in part and remands in part

Plaintiff's Motion and grants in part and remands in part Brooklyn Bedding's

Motion.

## ISSUES PRESENTED

This case presents the following issues:

1.  Whether Commerce's use of a quarterly ratios sales methodology and rejection of Zinus Indonesia's proposed first-in-first-out methodology for determining the quantity of Indonesian mattresses sold during the period of investigation was supported by substantial evidence;

2.  Whether Commerce's use of Emirates Sleep Systems Private's financial statements rather than the financial statements of Indonesian producers in the calculation of constructed value was supported by substantial evidence;

3.  Whether Commerce's calculation of a profit cap was in accordance with the law;

4.  Whether Commerce's adjustments to the reported sales deductions of Zinus, Inc. ("Zinus U.S.") were supported by substantial evidence;

5.  Whether Commerce's decision to adjust selling expenses attributable to Zinus, Inc. ("Zinus Korea") to account for actual selling expenses only was supported by substantial evidence;

6.  Whether Commerce's use of Indonesian Global Trade Atlas ("GTA") import data to value input purchase transactions involving an

affiliated supplier in a non-market economy was supported by

substantial evidence and in accordance with the law; and

7.    Whether Commerce's decision to not require Zinus Indonesia to

submit a U.S. sales reconciliation was supported by substantial

evidence.

## BACKGROUND

On March 30, 2020, an antidumping duty petition concerning imports of

mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of

Turkey, and the Socialist Republic of Vietnam was filed with Commerce by

Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions,

FXI, Inc., Innocor, Inc., Kolcraft Enterprises, Inc., Leggett & Platt, Inc., the

International Brotherhood of Teamsters, and the United Steel, Paper and Forestry,

Rubber, Manufacturing, Energy, Allied Industrial and Service Workers

International Union, AFL-CIO.  Antidumping Countervailing Duty Pet.

("Petition") (Mar. 31, 2020), PR 1–4, CR 1–10.[1]  In response to the Petition,

Commerce initiated on April 24, 2020 an antidumping investigation on mattresses

imported from Indonesia.  Mattresses from Cambodia, Indonesia, Malaysia, Serbia,

Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam, 85 Fed.

---

[1]  Citations to the administrative record reflect the public record ("PR") and
confidential record ("CR") document numbers filed in this case, ECF Nos. 39, 40.

Reg. 23,002 (Dep't of Commerce Apr. 24, 2020) (initiation of less-than-fair-value

investigations).  The period of investigation was January 1, 2019 through

December 31, 2019, the four most recent financial quarters prior to the filing of the

March 2020 Petition.  Id. at 23,003; Commerce's Decision Mem. Prelim.

Affirmative Determination and Postponement Final Determination Less-Than-

Fair-Value Investigation Mattresses from Indonesia ("Preliminary Determination

Memo" or "PDM") at 5, PR 226; see also 19 C.F.R. § 351.204(b)(1).  Zinus

Indonesia was selected as the sole mandatory respondent in the investigation.  See

Less-Than-Fair-Value Investigation Mattresses Indonesia Respondent Selection

Mem. ("Selection Memo"), PR 66, CR 32.

Prior to the investigation, Zinus Korea and Zinus U.S. participated in an

antidumping duty investigation covering mattresses produced in the People's

Republic of China ("China").  See Mattresses from the People's Republic of China

("Mattresses from China"), 84 Fed. Reg. 56,761 (Dep't of Commerce Oct. 23,

2019) (final affirmative determination of sales at less than fair value, and final

affirmative determination of critical circumstances, in part).  Commerce requested

that Zinus Indonesia place on the record certain business proprietary information

submitted by Zinus Xiamen in the Mattresses from China investigation.  See

Commerce's Request Additional Information at 3, PR 207.

On November 3, 2020, Commerce published its preliminary determination.

Mattresses from Indonesia ("Preliminary Determination"), 85 Fed. Reg. 69,597

(Dep't of Commerce Nov. 3, 2020) (preliminary affirmative determination of sales

at less than fair value, postponement of final determination, and extension of

provisional measures); see also PDM.  In the Preliminary Determination,

Commerce applied a quarterly ratios sales methodology proposed by Brooklyn

Bedding to determine the quantity of Zinus Indonesia's U.S. sales.  See PDM at 9–

10; see also Commerce's Prelim. Determination Margin Calculation Zinus

Indonesia at 1–3 (Oct. 27, 2020), PR 229, CR 258.

In calculating constructed value profit and selling expenses in the

Preliminary Determination, Commerce used the financial statements of Emirates

Sleep Systems Private ("Emirates"), a producer that manufactured mattresses in

India.  PDM at 13.  Commerce's calculation did not include the costs of certain

inputs purchased by Zinus Indonesia from two affiliated Chinese suppliers.  PDM

at 12; Commerce's Cost Calculation Mem. (Oct. 27, 2020) at 1–2, PR 231, CR

262.  Commerce calculated the cost of inputs using the average of GTA data for

Brazil, Indonesia, Malaysia, Mexico, Romania, Russia, and Turkey.  Commerce's

Cost Calculation Mem. at 1–2, Att. 2a.  Commerce also calculated constructed

export price based on Zinus U.S.' expenses, increasing the starting price by the

amount of billing adjustments and making deductions for rebates, movement

expenses, and selling expenses.  PDM at 10.  Commerce calculated a dumping

margin of 2.61 percent for Zinus Indonesia.  Preliminary Determination, 85 Fed.

Reg. at 69,598.

Following the Preliminary Determination, Commerce issued supplemental

questionnaires to Zinus Indonesia.  Commerce's Post-Prelim. Supp. Questionnaire

(Dec. 2, 2020), PR 249, CR 267.  The parties to the investigation submitted

additional briefing.  Zinus Indonesia's Admin. Case Br. (Feb. 10, 2021), PR 275,

CR 292; Brooklyn Bedding's Admin. Case Br. (Feb. 9, 2021), PR 274, CR 291;

Brooklyn Bedding's Rebuttal Admin. Case Br. (Feb. 16, 2021), PR 276, CR 293;

Zinus Indonesia's Rebuttal Admin. Case Br. (Feb. 17, 2021), PR 277, CR 294.

Commerce published its Final Determination on March 25, 2021.  See Final

Determination, 86 Fed. Reg. at 15,899; Issues and Decision Memo Final

Affirmative Determination Less-Than-Fair-Market Value Investigation Mattresses

from Indonesia ("IDM"), ECF No. 15-4.

In the Final Determination, Commerce continued to apply the quarterly

ratios methodology for assigning country of origin to mattresses sold from Zinus

U.S.' constructed export price inventory and continued to calculate constructed

value profit and selling expenses based on the financial statements of Emirates.

IDM at 8–9, 20–25.  Commerce also made adjustments to constructed export price

sales based on sales deductions of Zinus U.S. and Best Price Mattress, Inc. ("Best

Price Mattress"), an affiliated company, during the period of investigation.  Id. at

15.  Zinus Indonesia's antidumping margin was calculated at 2.22 percent.  Final

Determination, 86 Fed. Reg. at 15,900.

The antidumping duty order was published on May 14, 2021.  Mattresses

from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey,

and the Socialist Republic of Vietnam ("Antidumping Duty Order"), 86 Fed. Reg.

26,460 (Dep't of Commerce May 14, 2021) (antidumping duty orders and

amended final affirmative antidumping determination for Cambodia).  Zinus

Indonesia timely filed this action.  See Summons, ECF No.1; Compl., ECF No. 5.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction pursuant to Section 516A(a)(2)(B)(i) of the Tariff

Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i), and 28 U.S.C. § 1581(c).

The Court will hold unlawful any determination found to be unsupported by

substantial evidence on the record or otherwise not in accordance with the law. 19

U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I.    Legal Framework

Commerce imposes antidumping duties on foreign goods if "(1) it

determines that the merchandise 'is being, or is likely to be, sold in the United

States at less than its fair value,' and (2) the International Trade Commission

determines that the sale of the merchandise at less than fair value materially

injures, threatens, or impedes the establishment of an industry in the United

States." Diamond Sawblades Mfrs. Coal. v. United States, 866 F.3d 1304, 1306

(Fed. Cir. 2017).  Antidumping duties are calculated as the difference between the

normal value of subject merchandise and the export price or the constructed export

price of the subject merchandise.  19 U.S.C. § 1673.

Normal value is ordinarily determined using the sales price of the subject

merchandise in the seller's home market.  19 U.S.C. § 1677b(a)(1)(B)(i).  If

Commerce determines that normal value cannot be reliably calculated using home

market or third-country sales, Commerce may use the subject merchandise's

constructed value as an alternative to normal value.  Id. § 1677b(a)(4).  The

method for calculating constructed value is defined by statute.  Id. § 1677b(e).

When calculating constructed value, Commerce must utilize the respondent's

actual selling, general, and administrative expenses, and profits in the respondent's

home market or a third-country market.  Id. § 1677b(e)(2)(A).  If Commerce

cannot rely on those data, it may look to:

> (i) the actual amounts incurred and realized by the specific exporter or
> producer being examined in the investigation or review for selling,
> general, and administrative expenses, and for profits, in connection
> with the production and sale, for consumption in the foreign country,
> of merchandise that is in the same general category of products as the
> subject merchandise,

(ii) the weighted average of the actual amounts incurred and realized by exporters or producers that are subject to the investigation or review (other than the exporter or producer described in clause (i)) for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country, or

(iii) the amounts incurred and realized for selling, general, and administrative expenses, and for profits, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise.

Id. § 1677b(e)(2)(B).

Commerce must also calculate export price or constructed export price

(collectively, "U.S. price").  Export price is:

the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States,

subject to certain adjustments.  Id. § 1677a(a).  Constructed export price is:

the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter,

subject to certain adjustments.  Id. § 1677a(b).  The price used to calculate export

price and constructed export price is reduced by commissions, selling expenses,

further manufacturing expenses, and the profit allocated to these expenses.  Id.
§ 1677a(d).

## II.     Quantity of Mattresses Methodology

During the period of investigation, Zinus U.S. purchased mattresses

produced in Indonesia and three other countries, which were comingled in

warehouses maintained by Zinus U.S. or third parties.  IDM at 8; Zinus Indonesia's

Section A Questionnaire Resp. (Jun. 19, 2020) at A-5–A-6, PR 97–102, CR 36–39.

Zinus Indonesia reported to Commerce that Zinus Korea was able to track the

country of origin for mattresses sold and shipped directly to unaffiliated United

States customers, but Zinus U.S. did not track the country of origin for sales of

mattresses held in its United States warehouses.  IDM at 8; Zinus Indonesia's

Section A Questionnaire Resp. at A-4–A-7.

In order to calculate a quantity of subject mattresses sold from its United

States inventory, Zinus Indonesia advocated for Commerce to adopt a first-in-first-

out methodology, which Zinus Indonesia used in its responses.  IDM at 8; see also

Zinus Indonesia's Section A Questionnaire Resp. at A-6–A-7; Zinus Indonesia's

Supp. Section C Questionnaire Resp (Sept. 21, 2020). at SC1-10–SC1-11, PR 193,

CR 167.  In support of this methodology, Zinus Indonesia provided Commerce

with a monthly breakdown of mattresses imported into the United States, which

identified imports by country of origin, month, and model.  See Zinus Indonesia's

Second Supp. Section C Questionnaire Resp. (Sept. 28, 2020), Ex. SC2-1, PR 200,

CR 214.  Brooklyn Bedding argued during the administrative investigation that the

first-in-first-out methodology was distortive of total constructed export price

inventory sales and proposed that Commerce apply a quarterly ratios methodology

in which the quantity of mattresses purchased by Zinus U.S. for each quarter under

review was apportioned based on country.  IDM at 8; Brooklyn Bedding's Pre-

Prelim. Cmts. (Oct. 9, 2020) at 6–10, 15–17, PR 210, CR 219.  The percentage

assigned to Indonesia-origin mattresses was applied to Zinus U.S.' total sales for

the corresponding quarter.  IDM at 9; PDM at 10; <u>see also</u> Brooklyn Bedding's

Pre-Prelim. Cmts. at 15.

In the <u>Preliminary Determination</u>, Commerce adopted the quarterly ratios

methodology.  PDM at 10.  In discussing the first-in-first-out methodology,

Commerce stated that "[q]uestions remain about the accuracy of this methodology

with respect to [constructed export price] sales reporting" and that Commerce

would "continue to examine this issue for purposes of the final determination."  <u>Id.</u>

In the <u>Final Determination</u>, Commerce continued to apply the quarterly ratios

methodology, finding it to be the preferrable methodology because "it applies

quarterly ratios grounded in purchase data to the full universe of Zinus U.S.' sales

from inventory during the [period of investigation], it is neutral in terms of

determining which sales to report as subject merchandise sales," and "is less susceptible to manipulation." IDM at 8–9.

Plaintiff argues that Commerce erred in adopting a quarterly ratios methodology for determining the quantity of subject constructed export price inventory sales over Plaintiff's proposed first-in-first-out methodology. Pl.'s Mem. Supp. Pl.'s Mot. J. Agency R. ("Pl.'s Br.") at 12–26, ECF Nos. 22-1, 23-1. Plaintiff presents two arguments. Id.

First, Plaintiff contends that Commerce's decision to adopt the quarterly ratios methodology proposed by Brooklyn Bedding over the first-in-first-out methodology proposed by Plaintiff was not supported by substantial evidence. Id. at 15–20. Plaintiff argues that Commerce failed to address the merits of the first-in-first-out methodology and misconstrued the record evidence in weighing the reimbursement of warranty claims and the payment of commissions. Id. at 16–19. Plaintiff contends that it provided evidence on the record demonstrating that the first-in-first-out methodology was accurate, reasonable, and "vastly superior to [the] quarterly import ratios, which do not correlate to the model- and time-specific import patters [sic] and result in widespread distortions and inaccuracies." Id. at 18–19. Plaintiff further argues that Commerce acted unreasonably in rejecting the first-in-first-out methodology without soliciting additional information and documentation related to Commerce's concerns. Id. at 19–20. Plaintiff contends

that record evidence demonstrated that commissions and warranties were not paid

on subject mattresses during the period of investigation because Zinus Indonesia

did not use selling agents for the subject mattresses and warranties were not

offered, only "defective allowances." Id. at 16–17.

Defendant and Brooklyn Bedding raise multiple arguments in opposition to

Plaintiff's position. First, Defendant and Brooklyn Bedding contend that Plaintiff

was given an opportunity to defend the first-in-first-out methodology and failed to

carry its burden of convincing Commerce. Brooklyn Bedding's Resp. at 12–17;

Def.'s Resp. at 24–25. Specifically, issues regarding the first-in-first-out

methodology were raised by Brooklyn Bedding during the investigation and

Commerce solicited responses to two questionnaires following the Preliminary

Determination. Brooklyn Bedding's Resp. at 12–17; Def.'s Resp. at 24. Second,

Defendant and Brooklyn Bedding argue that Plaintiff did not adequately explain

how the first-in-first-out methodology functions or address record evidence that the

methodology was distortive. Def.'s Resp. at 22–23; Brooklyn Bedding's Resp. at

14–17. Third, Defendant and Brooklyn Bedding argue that Plaintiff's opposition

to Commerce's focus on the payment of warranties and commissions ignores the

relevant point of whether Plaintiff was capable of tracking the country of origin for

constructed export price inventory sales. Def.'s Resp. at 23–24; Brooklyn

Bedding's Resp. at 17–19. Regardless of whether commissions were paid and if

certain payments were classified as "warranties" or "defective allowances," Defendant and Brooklyn Bedding contend that the record did not explain how Zinus U.S. could seek reimbursement from its suppliers or grant commissions on non-subject merchandise without tracking the country of origin.  Def.'s Resp. at 23–24; Brooklyn Bedding's Resp. at 17–19.

Second, Plaintiff argues that even if Commerce's use of the quarterly ratios methodology was supported by substantial evidence, the inclusion of mattresses still in-transit from Indonesia to the United States at the end of the period of investigation was unreasonable.  Pl.'s Br. at 21–26.  Plaintiff contends that Brooklyn Bedding's calculations, which were adopted by Commerce, were based on the quantity of mattresses shipped from Indonesia and not the quantity of mattresses that entered the United States during the period of investigation.  Id. at 21–23.  Plaintiff submitted evidence showing that mattresses were sold by Zinus Korea to Zinus U.S. using free on board shipping terms, under which title passed from Zinus Korea to Zinus U.S. at the time of shipment.  Zinus Indonesia's Second Supp. Section C Questionnaire Resp. at 1–2.  Plaintiff contends that any identification of constructed export price inventory sales must be limited to the inventory actually received by Zinus U.S. and that substantial record evidence does not support the inclusion of in-transit mattresses.  Pl.'s Br. at 23–25.  Plaintiff also argues that Commerce failed to consider and address Plaintiff's arguments

regarding the inclusion of in-transit mattresses or to explain its reasoning for

adopting the figures offered by Brooklyn Bedding.  Id. at 25–26.

Brooklyn Bedding argues that Plaintiff has provided no factual or legal

support for its position that mattresses in-transit could not have been sold from

Zinus U.S.' inventory.  Brooklyn Bedding's Resp. at 22.  Defendant and Brooklyn

Bedding contend that record evidence demonstrates that sales were made of

mattresses before the mattresses entered the United States.  Id. at 22–23; Def.'s

Resp. at 26.  Brooklyn Bedding notes that Zinus Korea never took physical

possession of mattresses before shipment to Zinus U.S. and that "back-to-back"

sales were reported using a date based on shipment from Indonesia to the United

States.  Brooklyn Bedding's Resp. at 23.  Brooklyn Bedding also notes that

Plaintiff has offered no internal policy precluding the sale of mattresses before

importation, which is seemingly permitted under Plaintiff's accounting practices.

Id. at 24.  Defendant and Brooklyn Bedding cite the language of 19 U.S.C.

§ 1677a(b), which defines "constructed export price," and contemplates sales to

purchasers within the United States before the physical importation of goods.  Id.

at 23; Def.'s Resp. at 26; see also 19 U.S.C. § 1677a(b).

In determining whether subject merchandise was sold at less than fair value,

Commerce compares "the export price or constructed export price and normal

value."  19 U.S.C. § 1677b(a).  Because Zinus Indonesia did not have home market

or third country sales, normal value was based on constructed value.  Id.

§ 1677b(a)(1); see also Zinus Indonesia's Notification Non-Viable Home Market

(May 28, 2020), PR 82; PDM at 8–9, 12–13.  Constructed export price is the price

at which subject merchandise is first sold in the United States by a seller affiliated

with the producer or exporter to a non-affiliated purchaser.  19 U.S.C. § 1677a(b).

Calculation of constructed export price requires Commerce to identify sales

of subject merchandise in the United States during the period of investigation.  See

id.  The relevant statutes and regulations provide little guidance on how to allocate

merchandise within an inventory that comingles subject and non-subject

merchandise.  Commerce has discretion in determinations "involv[ing] complex

economic and accounting decisions of a technical nature."  See Fujitsu Gen. Ltd. v.

United States, 88 F.3d 1034, 1039 (Fed. Cir. 1996) (citation omitted).  Commerce

still "must [ ] explain [cogently] why it has exercised its discretion in a given

manner."  See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463

U.S. 29, 48 (1983) (citation omitted).  The methodology adopted by Commerce

must be a reasonable means of effectuating the statutory purpose.  Tri Union

Frozen Prods., Inc. v. United States, 40 CIT __, __, 163 F. Supp. 3d 1255, 1301

(2016), aff'd, 741 F. App'x 801 (Fed. Cir. 2018) (citing Ceramica Regiomontana,

S.A. v. United States, 10 CIT 399, 404–05, 636 F. Supp. 961, 966 (1986), aff'd,

810 F.2d 1137, 1139 (Fed. Cir. 1987)).  A party proposing a methodology bears the

burden of establishing that the allocation is "as specific a basis as is feasible,

and . . . does not cause inaccuracies or distortions."  19 C.F.R. § 351.401(g)(2); see

also Koyo Seiko Co. v. United States, 551 F.3d 1286, 1293 (Fed. Cir. 2008)

(importer has the burden to prove its proposed methodology is "calculated on as

specific a basis as is feasible" and is free of distortions).  The Court will affirm

Commerce's choice of a methodology even if substantial evidence supports

multiple options.  See Fujitsu Gen. Ltd., 88 F.3d at 1044.

Commerce has discretion in selecting the methodology for allocating goods

in an investigation but must base its methodology on the best available information

in order to establish antidumping margins as accurately as possible.  Tri Union

Frozen Prods., 40 CIT at __, 163 F. Supp. 3d at 1267; see also Shakeproof

Assembly Components, Div. of Ill. Tool Works, Inc. v. United States, 268 F.3d

1376, 1382 (Fed. Cir. 2001).  Commerce justified its adoption of the quarterly

ratios methodology by explaining that the methodology "applies quarterly ratios

grounded in purchase data to the full universe of Zinus U.S.' sales from inventory

during the [period of investigation]," "is neutral in terms of determining which

sales to report as subject merchandise sales," and "is less susceptible to

manipulation."  IDM at 9.  In support of its determination, Commerce stated that it

agreed with Brooklyn Bedding's Pre-Preliminary Comments regarding the

accuracy of the quarterly ratios methodology.  Id. (citing Brooklyn Bedding's Pre-

Prelim. Cmts. at 15–17).  In the cited submission, Brooklyn Bedding explained the process of calculating the quarterly ratios methodology as beginning with quantities reported in Zinus Indonesia's Section C Questionnaire Response and adjusting the quantities to reflect the total number of mattresses shipped by Zinus Indonesia to Zinus Korea during the period of investigation based on Zinus Korea's sales reconciliation.  Brooklyn Bedding's Pre-Prelim. Cmts. at 15.  Using these figures, Brooklyn Bedding calculated the ratios of Indonesian-origin mattresses to the total product shipped for each quarter and applied the ratios to the constructed export price inventory reported by Zinus Indonesia.  Id.  Brooklyn Bedding explained that the quarterly ratios methodology was more accurate and less susceptible to variation than a first-in-first-out approach or last-in-last-out approach.  Id. at 16–17.

    With respect to the alternative first-in-first-out methodology proposed by Plaintiff, Commerce explained that the first-in-first-out methodology did "not accurately or appropriately capture a sufficient number of sales of subject merchandise" and there were inconsistencies between Plaintiff's ability to offer warranties and commissions and Plaintiff's claimed inability to track the country of origin for mattresses sold.  IDM at 9.  In questioning the reliability of Zinus Indonesia's reporting, Commerce determined that the first-in-first-out methodology:

[did] not accurately or appropriately capture a sufficient number of sales of subject merchandise. To come to any other conclusion would be inconsistent with the commercially realistic business practices of a multinational company engaged in the production and sale of a consumer product such as mattresses that provides commissions on certain sales from its inventory.

Id.

The Court concludes that Commerce expressed reasonable concerns regarding the accuracy of the first-in-first-out methodology. The Court notes that Commerce was not required to adopt the first-in-first-out methodology proposed by Plaintiff over the valid alternative quarterly ratios methodology. See Fujitsu Gen. Ltd., 88 F.3d at 1044. Commerce explained that the quarterly ratios methodology was preferable because it was grounded in Zinus U.S.' purchase data, was applied to the totality of the subject mattresses available for sale during the period of investigation, and was neutral in determining which sales to designate as subject merchandise. IDM at 9 (citing Brooklyn Bedding's Pre-Prelim. Cmts. at 15–17). In the absence of accurate records maintained by Zinus Indonesia and Zinus U.S., the Court concludes that Commerce's use of the quarterly ratios methodology was reasonable because Commerce determined that it more accurately identified the quantity of subject mattresses sold than the alternate proposed method that Commerce deemed questionable. The Court sustains Commerce's use of the quarterly ratios methodology.

Plaintiff argues that if the Court were to sustain the use of the quarterly

ratios methodology, it should remand this case to Commerce with instructions to

exclude from the constructed export price calculation mattresses that had not yet

arrived in the United States at the end of the period of investigation.  Pl.'s Br. at

21–26.  Plaintiff contends that Commerce's inclusion of mattresses in-transit from

Indonesia at the end of the period of investigation was unsupported by record

evidence that demonstrated that mattresses classified as in-transit could not have

been shipped to customers during the period of investigation.  Id.  Brooklyn

Bedding and Defendant argue that Commerce was correct to include mattresses in-

transit because the relevant statute contemplates sales before importation into the

United States and the record supports that mattresses were sold to United States

customers despite being classified as in-transit.  Brooklyn Bedding's Resp. at

22–24; Def.'s Resp. at 26–27.

Section 1677a(b) of title 19 defines "constructed export price" as:

the price at which the subject merchandise is first sold (or agreed to be
sold) in the United States *before or after the date of importation* by or
for the account of the producer or exporter of such merchandise or by a
seller affiliated with the producer or exporter, to a purchaser not
affiliated with the producer or exporter, as adjusted under subsections
(c) and (d).

19 U.S.C. § 1677a(b) (emphasis added).  This statutory definition expressly

contemplates the potential for goods to be sold in the United States before physical

importation.  Id.

Commerce acknowledged Zinus Indonesia's objection to the inclusion of

mattresses still in-transit from Indonesia at the end of the period of investigation

but did not provide express reasons for or specific record evidence in support of

rejecting the argument, stating only that "[w]e therefore agree with the petitioners

that the quarterly ratio sales reporting methodology used in the Preliminary

Determination, along with the quantity of mattresses that Zinus U.S. purchased

from [Zinus Korea], is preferable in this case."  IDM at 8–9.  Though inclusion of

goods sold or agreed to be sold in-transit prior to importation might be permissible

under 19 U.S.C. § 1677a(b), Commerce failed to provide sufficient explanation or

citations to record evidence to support its inclusion of in-transit pre-importation

goods sold in this case.  The Court remands to Commerce for further consideration

and explanation of its determination to include mattresses in-transit in the

calculation of constructed export price.

### III.    Constructed Value Profit Calculations

Commerce based the calculation of normal value on constructed value.  IDM

at 21.  Because Zinus Indonesia lacked a viable home or third-country market,

Commerce calculated constructed value profit and selling expenses under 19

U.S.C. § 1677b(e)(2)(B), which provides three methods:

> (i) the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for selling, general, and administrative expenses, and for profits, in connection with the production and sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise,

> (ii) the weighted average of the actual amounts incurred and realized by exporters or producers that are subject to the investigation or review (other than the exporter or producer described in clause (i)) for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country, or

> (iii) the amounts incurred and realized for selling, general, and administrative expenses, and for profits, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise.

19 U.S.C. § 1677b(e)(2)(B). Commerce eliminated options (i) and (ii) because "[Zinus Indonesia did] not have sales of the general category of merchandise in the home market and there [were] no other respondents being investigated in this proceeding" and applied option (iii). IDM at 21; see also Zinus Indonesia's Notification Non-Viable Home Market.

Commerce considered financial statements for eight companies provided by the parties to the investigation: PT Graha Seribusatu Jaya ("Graha"), an Indonesian producer of mattresses; PT Ecos Jaya Indonesia ("Ecos"), an Indonesian producer

of mattress and sleep products; PT Inocycle ("Inocycle"), an Indonesian producer

of non-woven and staple fiber and materials recycling; PT Chitose International

("Chitose International"), an Indonesian producer of furniture for homes, schools,

restaurants, and hospitals; PT Boston Furniture Industries ("Boston Furniture"), an

Indonesian producer of wood furniture and special construction or repairs; Luxury

Sleep Products, a Malaysian producer of bedroom furniture; Slarafija Trade, a

Serbian producer of mattresses; and Emirates, an Indian producer of mattresses.

IDM at 21–24.  Upon consideration of the submitted financial statements,

Commerce selected Emirates to be the best available surrogate for calculating

constructed value profit.  Id. at 25.

Commerce also determined that it was unable to calculate a profit cap in

accordance with section 1677b(e)(2)(B)(iii) "because the record [did] not contain

any information for making such a calculation."  Id. at 25.  Noting that Commerce

may apply section 1677b(e)(2)(B)(iii) on the basis of facts available, Commerce

determined Emirates to be "the best option for determining the profit cap as facts

available" and adopted Emirates' profit information as a "reasonable profit cap."

Id.  Plaintiff challenges Commerce's (A) use of Emirates financial statements as

surrogate date; (B) rejection of Indonesian manufactures in selecting surrogate

financial data; and (C) calculation, or lack of calculation, of the statutorily required

profit cap.  Pl.'s Br. at 26–36.

### A.    Emirates Sleep Systems Private Limited

Plaintiff argues that Commerce's selection of Emirates as a surrogate data source was unsupported because Emirates' financial statement was not specific to the subject merchandise, the respondent, foreign market, or period of investigation. Pl.'s Br. at 30; see Brooklyn Bedding's Submission Concerning Constructed Value Profit Selling Expenses (Aug. 17, 2020) at Att. 2-B ("Emirates' Financial Statement"), PR 154, CR 136.  Specifically, Plaintiff points to Emirates' lack of sales in Indonesia and Emirates' lack of business operations, products, and a customer base similar to that of Zinus Indonesia.  Pl.'s Br. at 29.  Plaintiff also notes that Emirates generated roughly 25 percent of its revenue through the sale of services and had missing annexures from its financial statements.  Id. at 29–30.

Brooklyn Bedding argues that Commerce's use of Emirates was permissible under 19 U.S.C. § 1677b(e)(2)(B) and consistent with existing precedent. Brooklyn Bedding's Resp. at 38.  Brooklyn Bedding argues that Commerce has greater freedom in selecting a surrogate under 1677b(e)(b)(iii) than under subsections (i) and (ii).  Id. at 38–39.  Brooklyn Bedding also disputes Plaintiff's contentions regarding the portion of Emirates' business related to services, noting that Commerce determined the services in question to be of a nature appropriate for a company engaged in the manufacture and sale of mattresses.  Id. at 39–40. Brooklyn Bedding highlights that Commerce addressed the issue of Emirates'

missing annexures at the time of the <u>Final Determination</u> and determined Emirates'

Financial Statement to be complete.  <u>Id.</u> at 40.

Defendant contends that Commerce's use of Emirates' Financial Statement

was supported by the record.  Def.'s Resp. at 39–40.  Defendant argues that

Commerce was not required to select a company from Indonesia and acted within

its authority in selecting financial statements deemed more accurate and reliable,

even when the financial statements were not fully contemporaneous.  <u>Id.</u> at 40–44.

In selecting a surrogate data source, Commerce considered four criteria:

> (1) similarity of the potential surrogate companies' business operations
> and products to the respondent's business operations and products;
> (2) the extent to which the financial data of the surrogate company
> reflect sales in the home market and do not reflect sales to the United
> States; (3) the contemporaneity of the data to the [period of
> investigation]; . . . [and (4)] the extent to which the customer base of
> the surrogate company and that of the respondent are similar.

IDM at 22; <u>see also</u> <u>Mid Continent Steel & Wire, Inc. v. United States</u> ("<u>Mid</u>

<u>Continent II</u>"), 941 F.3d 530, 542–43 (Fed. Cir. 2019) (concluding that

Commerce's analysis applying the four part framework was a reasonable

interpretation of the statute).  Commerce also reviewed the provided financial

statements to ensure that they "(1) reflect[ed] a net profit; (2) [were] complete (i.e.,

all of the financial statements [were] included with the auditor's report showing an

unqualified opinion and all accompanying footnotes were provided); and (3)

[were] fully translated."  IDM at 22.  Based on these criteria, Commerce

eliminated all financial statements other than those of Emirates and Inocycle.  Id. at

23.

In comparing the financial statements of Emirates and Inocycle, Commerce

noted that "[t]he specific language of both the preferred and alternative methods

[(19 U.S.C. § 1677b(e)(2)(A) & (B))] appear to show a preference that the profit

and selling expenses reflect: (1) production and sales in the foreign country; and

(2) the foreign like product, i.e., the merchandise under consideration."  Id. at 23.

Emirates is an Indian-based manufacturing company that primarily manufactures

mattresses, bases, and other sleep-related products and derives the majority its

revenue from manufacturing mattresses.  Id. at 23–24; Emirates' Financial

Statement.  Inocycle is an Indonesian-manufacturer that derives six percent of its

revenue from the production of mattresses.  IDM at 23; Zinus Indonesia's

Constructed Value Profit Submission at Ex. 3 ("Inocycle's Financial Statement"),

PR 156–63, CR 137–44.

In its administrative case brief before Commerce, Zinus Indonesia argued

that Emirates' Financial Statement was not sufficiently contemporaneous to the

period of investigation.  Zinus Indonesia's Admin. Case Br. at 33–38.  That a

financial statement does not fully overlap the period of investigation does not

defeat its contemporaneity for purposes of section 1677b(e)(b)(iii).  See DuPont

Teijin Films China Ltd. v. United States, 38 CIT 1282, 1291–92, 7 F. Supp. 3d

1338, 1349 (2014) (Commerce's decision to rely on data that overlapped with two

months only of the period of investigation was reasonable). Commerce may opt to

prioritize factors such as accuracy or reliability over contemporality as long as the

adopted financial statement overlaps with the period of investigation. See Qingdao

Sea-Line Trading Co., Ltd. v. United States, 766 F.3d 1378, 1386 (Fed. Cir. 2014)

(Commerce's decision to use more accurate but less contemporaneous data was

reasonable). In this case, the period of investigation was January 1, 2019 through

December 31, 2019. IDM at 2. Emirates' Financial Statement covered fiscal year

April 2018 through March 2019. See Emirates' Financial Statement at 1. Because

Emirates' Financial Statement overlapped the first three months of the period of

investigation, the Court concludes that Commerce was reasonable in its

determination that the financial statement was sufficiently contemporaneous.

Commerce considered Zinus Indonesia's argument that Emirates was not a

comparable business because 23.29 percent of its revenue was derived from

advertising, marketing, and promotional services. IDM at 24; see Emirates'

Financial Statement at Annexure A. Emirates was "a manufacturing company

basically into the manufacturing of all types and kinds of mattresses, bases, and

other sleep related products and systems. The company [was] also into trading

both wholesale and retail, of such manufactured products. The company

provide[d] advertising, marketing, and promotional services to its holding

company." Emirates' Financial Statement at Independent Auditor's Report, note 1.

Commerce observed that the majority of Emirates' activities related to the

manufacturing of mattresses and concluded that "marketing, promotion, and

trading activities related to mattresses and sleep systems [was] a completely

appropriate activity for a company engaged in the manufacturing and sale of

mattresses." IDM at 24. Commerce also determined that the record did not

include any evidence suggesting that the expenses related to these activities was

not properly included in Emirates' profit calculation. Id. Commerce limited its

calculation of constructed value selling expenses to transportation expenses and

excluded costs associated with retail, marketing, advertising services, and

commissions. Id.

Emirates' business activities related to the wholesale and retail sale of

mattresses and the majority of Emirates' business activities were the same as those

of Zinus Indonesia. IDM at 23–25; see also PDM at 13. The only other candidate

determined acceptable by Commerce, Inocycle, was predominantly engaged in the

processing of non-woven fibers and the manufacture of artificial stable fibers.

IDM at 23–25; see Inocycle's Financial Statement. Inocycle's manufacture of

homeware products, including pillows, bolsters, mattresses, blankets, carpets,

mattress protectors, and bed cover sets for sale in the Indonesian market was a

minority of its business operations. IDM at 23–24; see Inocycle's Financial

Statement.  The Court concludes that Commerce's determination that the products

and business operations of Emirates were sufficiently similar to those of Zinus

Indonesia, and were preferable over Inocycle, was reasonable and supported by the

record.

Missing from Emirates' Financial Statement were annexures referenced in

the auditor's notes.  IDM at 25; see Emirates' Financial Statement at Independent

Auditor's Report, notes 6, 8, 12, 13.  In a footnote in its administrative case brief,

Zinus Indonesia argued before Commerce that the missing annexures rendered the

financial statement incomplete.  IDM at 25; Zinus Indonesia's Admin. Case Br. at

36, n.51.  Commerce reviewed Emirates' Financial Statements, including the

Independent Auditor's Report.  IDM at 24–25; Emirates' Financial Statement at

Independent Auditor's Report.  Upon its review, Commerce determined that the

information provided for Emirates included a full audit report, each of the financial

statements, and all of the accompanying footnotes.  Id. at 25.  Commerce also

determined that none of the referenced annexures referred to information that

would call into question the amounts on the income statement or the related profit

and selling expenses and that the annexures were referenced in the auditor's notes

that already detailed the corresponding balance sheet items.  Id.; see Emirates'

Financial Statement at Independent Auditor's Report, notes 6, 8, 12, 13.

Commerce reasonably rejected Plaintiff's annexure argument because Emirates provided a full audit report, financial statements, and accompanying footnotes and none of the missing annexures called into question the reflected profit and selling expenses.  IDM at 25.  Because the annexures did not undermine the reliability or accuracy of Emirates' Financial Statement, the Court concludes that Commerce's acceptance of the financial statements was reasonable.

As Commerce determined, Emirates was a mattress producer with similar business operations, products, and customer base to Zinus Indonesia.  Id. at 25. Commerce reasonably determined that Emirates' financial documents were sufficiently contemporaneous to the period of investigation and the record did not include any reason to question the financial documents' reliability or accuracy.  Id. at 24.  Commerce's determination that Emirates provided the best option for calculating constructed value was consistent with its established criteria.  The Court concludes that Commerce's choice of Emirates as an acceptable surrogate data source was supported by substantial evidence.

### B.    PT Graha Seribusatu Jaya and PT Ecos Jaya Indonesia

Plaintiff argues that Commerce erroneously rejected the financial statements of two Indonesian mattress producers, Graha and Ecos. Pl.'s Br. at 31–34. Commerce considered Graha's 2018 and 2019 financial statements.  IDM at 23; see Zinus Indonesia's Constructed Value Profit Submission at Ex. 1; Brooklyn

Bedding's Submission Concerning Constructed Value Profit Selling Expenses at

Att. 1; Graha's Section A Questionnaire Resp. (Jun. 19, 2020) at Ex. A-27–A32,

PR 103, CR 44.  Commerce rejected Graha's 2018 financial statement as not

contemporaneous to the period of investigation and Graha's 2019 financial

statement as not audited.  IDM at 23.  Plaintiff contends that even if Commerce's

rejection of Graha's 2019 financial statement as incomplete was reasonable,

Commerce should have adopted Graha's 2018 financial statement over Emirates'

2018–2019 financial statement because the specificity of Graha's information for

the Indonesian market should have outweighed the limited contemporaneity of the

three months of overlap of Emirates' Financial Statement with the period of

investigation.  Pl.'s Br. at 32–33.  Commerce considered and rejected Ecos' 2019

financial statement because it contained a qualified opinion by the auditor relating

to estimated future liabilities pertaining to post-employment benefit obligations.

Id. at 22; see Zinus Indonesia's Constructed Value Profit Submission at Ex. 2.

Plaintiff argues that Commerce failed to consider the significance of the auditor's

comment on the calculation of Ecos' profit and the auditor's indication that Ecos

would meet its obligations.  Id. at 33–34.

     Brooklyn Bedding and Defendant contend that Commerce's rejection of the

financial statements of Graha as not contemporaneous and unaudited was

consistent with Commerce's established practice and that the applicable statute

does not impose an obligation on Commerce to prioritize geographic proximity.

Brooklyn Bedding's Resp. at 41; Def.'s Resp. at 44–45.  Brooklyn Bedding and

Defendant also argue that Commerce's rejection of Ecos' financial statements

because of a qualified auditor's report was consistent with Commerce's existing

practice of not looking beyond surrogate financial statements and was reasonable

in light of Commerce's inability to seek clarification from the company or auditor.

Brooklyn Bedding's Resp. at 42–43; Def.'s Resp. at 45–46.  Brooklyn Bedding

and Defendant do not agree with Plaintiff's suggestion that the qualification was

trivial and unable to adversely affect the dumping margin calculation, and they

note that Commerce addressed the point in the Final Determination.  Brooklyn

Bedding's Resp. at 42–43; Def.'s Resp. at 45–46.  Finally, Brooklyn Bedding notes

that Plaintiff advanced no arguments before the Court rebutting Commerce's

analysis rejecting the other considered Indonesia companies: Inocycle, Chitose

International, and Boston Furniture.  Brooklyn Bedding's Resp. at 43.

Commerce is tasked with approximating a respondent's home market

experience and selecting data that permits it "to estimate, reasonably and fairly, a

profit rate that [the respondent] would have realized from sales in its home

market."  Mid Continent Steel & Wire, Inc. v. United States ("Mid Continent I"),

41 CIT __, __, 203 F. Supp. 3d 1295, 1310 (2017).  As discussed above,

Commerce identified multiple factors that it considered in determining what

surrogate financial information to use in its calculation, including the

contemporaneity of the available financial information with the period of

investigation.  IDM at 22; see Mid Continent II, 941 F.3d at 542–43.  The

administrative record included two financial statements for Graha covering the

year ending on December 31, 2018 and the year ending on December 31, 2019.

See Graha's Section A Questionnaire Resp. at Exs. A-27–A-28; Zinus Indonesia's

Constructed Value Profit Submission at Ex. 1A.  Commerce disregarded Graha's

2018 financial statement as not contemporaneous with the period of investigation.

IDM at 23.

      Commerce rejected Graha's 2019 financial statement because it was not

audited and Ecos' financial statement because its audit included a qualified

opinion.  Id.  Commerce noted that the qualification in Ecos' financial statement,

which concerned a deviation from the requirements of the generally accepted

accounting principles ("GAAP") of Indonesia, had the potential to impact the

constructed value calculation.  Id.  Because an audit supports the reliability of the

financial data, Commerce was within its discretion to favor an audited opinion over

an unaudited opinion.  See SeAH Steel VINA Corp. v. United States, 41 CIT __,

__, 269 F. Supp. 3d 1335, 1351–52 (2017).  Similarly, Commerce was within its

discretion to favor an unqualified auditor's opinion over a qualified auditor's

opinion.  See Golden Dragon Precise Copper Tube Grp., Inc. v. United States, 40

CIT __, __, 2016 WL 4442163, at *5 (2016).

    In selecting a constructed value surrogate, Commerce was tasked with

comparing the options presented and their "comparative deficiencies."  See Mid

Continent II, 941 F.3d at 544 (in determining a surrogate for constructed value,

"[t]he size of any subsidies would obviously be relevant, as would the comparative

deficiencies of the alternative sources.").  Plaintiff argues that Commerce, despite

the deficiencies in the reported data of Graha and Ecos, should have prioritized the

manufacturers from Indonesia over an out-of-country manufacturer in order to

reach a more accurate constructed value calculation.  Though option (ii) of

§ 1677b(e)(2)(B) contains a geographic restriction for data from the home country

market, no similar restriction is included in option (iii).  Compare 19 U.S.C.

§ 1677b(e)(2)(B)(ii) with id. § 1677b(e)(2)(B)(iii); see also Thai I-Mei Frozen

Foods Co. v. United States, 31 CIT 334, 345–46, 477 F. Supp. 2d 1332, 1343

(2007).  In fact, to impose such a requirement on section (iii) would effectively

nullify the language "any other reasonable method."  The language of the statute

provides Commerce with discretion to weigh the individual factors and to identify

the best available information.  Because Commerce is not required to select a

manufacturer from the respondent's home market and the record supports the

rejection of the financial statements provided for Graha and Ecos, the Court

concludes that Commerce's determination was reasonable and supported by substantial evidence.

### C.   Profit Cap

Commerce determined that the record did not contain information necessary to calculate a profit cap as required by 19 U.S.C. § 1677b(e)(2)(B)(iii).  IDM at 25. In the alternative, Commerce applied facts available and adopted Emirates' profit information as a profit cap for the <u>Final Determination</u>.  <u>Id.</u>  Using Emirates' information, a constructed value profit rate of 18.36 percent was calculated.  <u>See</u> PDM at 13; Prelim. Cost Calculation Mem. at 2, PR 231, CR 262; Final Cost Calculation Mem. at 1–2, PR 286, CR 295.

Plaintiff contends that Commerce's failure to apply a profit cap in accordance with section 1677b(e)(2)(B)(iii) caused the calculation of constructed value to be unlawful.  Pl.'s Br. at 34–36.  Plaintiff argues that Commerce could have utilized the financial records of the considered Indonesian companies to establish a profit cap and that the information provided by Ecos suggests that the ceiling for profit in the Indonesian market for mattresses was only 10.78 percent. <u>Id.</u> at 34.  In recognizing a profit rate of 18.36 percent, Plaintiff argues, Commerce ignored its obligation to apply an accurate and representative profit cap.  <u>Id.</u> at 34– 35.

Brooklyn Bedding and Defendant dispute Plaintiff's argument that

Commerce failed to apply a profit cap in accordance with section

1677b(e)(2)(B)(iii) and note that Commerce did apply a profit cap based on the

financial statements of Emirates.  Brooklyn Bedding's Resp. at 44; Def.'s Resp. at

47.  Defendant contends that it would have been inappropriate for Commerce to

use the rejected financial statements of the Indonesian companies because usable

information existed on the record in the form of Emirates' Financial Statement.

Def.'s Resp. at 47–48.  Brooklyn Bedding and Defendant contend that Commerce

complied with its statutory obligations in establishing a profit cap and that the use

of Emirates' profit data was supported by substantial evidence on the record.

Brooklyn Bedding's Resp. at 44–47; Def.'s Resp. at 48.

Section 1677b(e)(2)(B)(iii) of title 19 instructs that if Commerce relies on

"any other reasonable method" for determining a respondent's expenses and profits

in calculating constructed value, the amount allowed for profit is limited to "the

amount normally realized by exporters or producers . . . in connection with the

sale, for consumption in the foreign country, of merchandise that is in the same

general category of products as the subject merchandise."  19 U.S.C.

§ 1677b(e)(2)(B)(iii).  This section requires that Commerce apply an "upward limit

for profit commonly termed the 'profit cap.'"  SeAH Steel Corp. v. United States,

45 CIT __, __, 513 F. Supp. 3d 1367, 1398 (2021) (quoting Atar S.r.l. v. United

States, 730 F.3d 1320, 1322 (Fed. Cir. 2013)).  The statute provides that the profit

cap should be based on the profit on sales in the foreign country of merchandise in

the same general category of products as the subject merchandise.  19 U.S.C.

§ 1677b(e)(2)(B)(iii).  Commerce cannot sidestep its obligation without providing

an adequate explanation.  Husteel Co. v. United States, 39 CIT __, __, 98 F. Supp.

3d 1315, 1348 (2015).  When Commerce determines that it cannot calculate a

profit cap because the record lacks relevant information of sales in respondent's

home country of merchandise in the same general category of the subject

merchandise by home country producers, it must attempt to calculate a profit cap

based on facts available.  Id.

As an initial matter, Plaintiff's argument is incorrect that Commerce did not

calculate a profit cap.  In the Final Determination, Commerce determined that it

was:

> unable to calculate the amount realized by exporters or producers in
> connection with the sale, for consumption in the foreign country, of the
> merchandise in the same general category of products as the subject
> merchandise (i.e., the "profit cap"), in accordance with section
> 773(e)(2)(B)(iii) of the Act, because the record does not contain any
> information for making such a calculation.

IDM at 25.  In order to establish a profit cap, Commerce resorted to facts available.

Id.  Commerce determined that the financial statements of Indonesian

manufacturers on the record could not be used because "[n]one of the suggested

financial statements reflect profit only on sales of the general category of products in the foreign country under investigation." Id. After eliminating the Indonesian companies, Commerce concluded that Emirates provided the best available information and that Emirates' profits served as a reasonable profit cap. Id.

The record included financial statements from five Indonesian producers: Graha, Ecos, Inocycle, Chitose, and Boston Furniture. Graha's Section A Questionnaire Resp. at Ex. A-27–A-28; Zinus Indonesia's Constructed Value Profit Submission at Exs. 2–5. Chitose was an Indonesian producer of multiple types of furniture for use in homes, schools, and hospitals. IDM at 22; see Zinus Indonesia's Constructed Value Profit Submission at Ex. 4. Boston Furniture was an Indonesian producer of wood furniture and special construction or repairs. IDM at 22; see Zinus Indonesia's Constructed Value Profit Submission at Ex. 5. Commerce determined that both Chitose and Boston Furniture produced goods not comparable to Zinus Indonesia. IDM at 23. Similarly, mattress manufacture and sales represented only a minority of Inocycle's business, which was predominantly dedicated to the production of fiber. Id.; see Zinus Indonesia's Constructed Value Profit Submission at Ex. 3. Commerce acknowledged that Graha's financial statements might have reflected the necessary production and sales in Indonesia, but the statements suffered from a lack of contemporaneity and a lack of an

accompanying audit, and it was unclear if Graha made sales predominantly to the United States.  IDM at 25, n.153.

Plaintiff argues that Commerce should have adopted the profit information of Ecos in determining a profit cap, despite the qualified opinion of the auditor. Pl.'s Br. at 34–35.  Commerce disregarded the financial statement of Ecos because it contained a qualified audit.  IDM at 22–23.  The qualification was due to Ecos not calculating its estimated liabilities for post-employment employee benefits in accordance with Indonesian accounting standards.  Id.; see also Zinus Indonesia's Constructed Value Profit Submission at Ex. 2.  Plaintiff contends that Ecos' employment benefit liability was understated and translated into an overstatement of profits.  Pl.'s Br. at 33–34; see also Zinus Indonesia's Admin. Case Br. at 39–40.  Plaintiff argues that if Commerce had used the financial statements of Ecos, it would have calculated a profit cap of 10.78 percent, which should represent the ceiling for Indonesian profit rates.  Pl.'s Br. at 34; see also Zinus Indonesia's Admin. Case Br. at 42–43.  Plaintiff contends that Commerce's calculation of an 18.36 percent profit rate using Emirates' data was unreasonable.  Pl.'s Br. at 34–35.

The Court notes that Plaintiff has not provided record support for its assertion that the 10.78 percent profit rate derived from Ecos' data is more representative of the Indonesian market than the 18.36 percent profit rate derived

from Emirates' data, beyond Plaintiff's preference for Ecos' financial report that

Commerce determined to be flawed.  Commerce expressly disagreed with Zinus

Indonesia's contention that the qualified opinion would not impact the calculation

of period costs, revenues, expenses, cash flow, profits, or selling expenses, and

concluded that because the opinion relates to future obligations, Ecos' qualified

financial report could either increase or decrease the current costs of Ecos.  IDM at

23.  Even if Emirates' profit rate was higher than those of the other companies

considered, Commerce identified reasonable grounds for determining that the

profit rates of the Indonesian companies did not represent merchandise in the same

general category of the subject merchandise.

Based on its review of the financial statements on the record, Commerce

determined that Emirates provided the best available option for the profit cap using

facts available.  Id. at 25.  The Court observes that Commerce chose between

several imperfect options.  The Court does not review whether Commerce used the

best available information, but rather whether Commerce's determination of the

best available information was reasonable.  See Zhejiang DunAn Hetian Metal Co.

v. United States, 652 F.3d 1333, 1341 (Fed. Cir. 2011).  Because Commerce

examined numerous financial statements on the record and explained its

determination sufficiently, Commerce has satisfied its statutory requirement to

apply a profit cap and has articulated a reasonable justification for using Emirates'

profit data.  The Court sustains Commerce's use of Emirates' Financial Statement

for the calculation of constructed value and the profit cap.

### IV.    Adjustment to Zinus U.S.' Report of Sales Deductions

During the investigation, Brooklyn Bedding alleged that Zinus Indonesia

attempted to mask dumping of subject mattresses by shifting sales deductions to

non-subject merchandise sold through Best Price Mattress.  See Brooklyn

Bedding's Pre-Prelim. Cmts. at 2–3.  Commerce determined that "questions remain

as to the commercial practicality of [Zinus Indonesia's] reporting of its sales

practices with regard to commissions and certain other sales allowances" and that a

price adjustment to U.S. sales was appropriate.  IDM at 13–14.  Commerce

calculated the adjustment by combining the sales deductions, net of discounts, and

returns of Zinus U.S. and Best Price Mattress, and dividing the sum by the

combined gross sales of Zinus U.S. and Best Price Mattress.  Id. at 15.  Commerce

applied the resulting ratios to the gross unit price of all constructed export price

sales.  Id.  Plaintiff contends that Commerce's application of the price adjustment

was unlawful and unsupported by the record.  Pl.'s Br. at 36–46.

### A.    Facts Available

Plaintiff argues that Commerce unlawfully relied upon facts available in

reaching its determination to apply the adjustment to Zinus U.S.' constructed

export price sales prices without satisfying the statutory prerequisites.  Pl.'s Br. at

36, 39–41.  Plaintiff alleges that Commerce could not have relied on facts available because Zinus Indonesia provided all requested information relating to sales allowances, commissions, and deductions, and Commerce did not advise Zinus Indonesia of any reporting deficiencies prior to the Final Determination.  Id. at 38, 39–41.

Brooklyn Bedding and Defendant contend that Plaintiff claims incorrectly that Commerce relied on facts available in its determination to apply the price adjustment.  Brooklyn Bedding's Resp. at 25, 29–30; Def.'s Resp. at 31–32. Brooklyn Bedding and Defendant assert that Commerce instead adjusted its methodology.  Brooklyn Bedding's Resp. at 27, 30–34; Def.'s Resp. at 31–32. Brooklyn Bedding argues that Commerce was not required to solicit additional information because Commerce's use of the phrase "questions remain" did not relate to necessary information missing from the record.  Brooklyn Bedding's Resp. at 25–26, 29–30.

Commerce may apply "facts available" if:

(1) necessary information is not available on the record, or

(2) an interested party or any other person—

> (A)   withholds information that has been requested by the administering authority or the Commission under this subtitle,

> (B)   fails to provide such information by the deadlines for submission of the information or in the form and manner

     requested, subject to subsections (c)(1) and (e) of section 1677m
     of this title,

     (C)    significantly impedes a proceeding under this subtitle, or

     (D)    provides such information but the information cannot be
     verified as provided in section 1677m(i) of this title.

19 U.S.C. § 1677e(a).  The statute provides two paths through which Commerce

can rely on facts otherwise available.  The first is when information is absent from

the administrative record, regardless of the reason for the absence.  Id.

§ 1677e(a)(1).  The second requires a party's act or omission to negatively impact

the administrative record or impede the proceeding.  Id. § 1677e(a)(2).  Before

Commerce can rely on facts otherwise available, it must notify the party

responsible for submitting the relevant information of the deficiency and afford, to

the extent practicable, the party an opportunity to cure the deficiency.  Id.

§ 1677m(d).

     Plaintiff alleges that Commerce's use of Best Price Mattress' cost data

constituted a facts available approach to the assessment of the price adjustment.

Pl.'s Br. at 39–41; Pl.'s Reply Br. Supp. R. 56.2 Mot. J. Agency R. ("Pl.'s Reply")

at 22–23, ECF Nos. 37, 38.  Plaintiff has not identified what facts Commerce

relied upon that were not in the administrative record.  Commerce issued

supplemental questionnaires following the Preliminary Determination that included

requests for information on commission costs for Zinus Indonesia, Zinus U.S., and

Zinus Korea; sales and business records of Zinus U.S. and Best Price Mattress;

changes in commissions practices following the Mattresses from China

investigation; and tracking inventory and country of origin.  See Zinus Indonesia's

Post-Prelim. Supp. Questionnaire Resp. (Dec. 15, 2020), PR 256, CR 271;

Commerce's Post-Prelim. Supp. Questionnaire in-lieu of Verification (Jan. 19,

2021), PR 262; CR 277.  Commerce acknowledged that Zinus Indonesia fully

responded to the questionnaires but determined that "questions remain as to the

commercial practicality of Zinus' reporting of its sales practices with regard to

commissions and certain other sales allowances."  IDM at 14; see also Zinus

Indonesia's Post-Prelim. Supp. Questionnaire Resp. (Dec. 15, 2020), PR 256, CR

271; Zinus Indonesia's Supp. Verification Questionnaire Resp. (Jan 28, 2021), PR

269; CR 278–79, 281.

Commerce identified multiple elements of Zinus Indonesia's responses that

it found inconsistent or suspicious:

> First, with respect to [constructed export price] inventory sales, as noted
> above in Comment 1, it is not clear how Zinus is able to identify which
> of the non-subject mattresses it sold from inventory earned
> commissions if it does not know the country of origin of the
> merchandise sold out of inventory.  In our Post-Preliminary
> Supplemental Questionnaire, we asked Zinus to explain why the
> company apparently changed its selling practices with respect to
> commissions on U.S. sales of the subject merchandise though Zinus
> U.S. since the time of the Mattresses from China investigation.  In
> response, Zinus stated that "Zinus U.S.'s customers to whom it paid a
> commission in the China investigation simply did not purchase

Indonesian mattresses during the [period of investigation], and thus did not earn commissions under the terms of the agreements based on sales of subject mattresses."  However, Zinus did not explain why some of Zinus U.S.'s customers would agree to purchase mattresses of Indonesian origin on which they would earn no commissions when they could receive commissions from Zinus U.S. on mattresses manufactured in other countries.

Moreover, in its response to our Post-Preliminary Supplemental Questionnaire, Zinus also stated that Zinus U.S. sold subject merchandise to corporate customers whose affiliates purchased nonsubject merchandise from both Zinus U.S. and [Best Price Mattress] and earned commissions on these sales.  Furthermore, for a particular customer, Zinus stated that, as of March 2019 (i.e., a month before Zinus U.S. began purchasing mattresses from Zinus), it no longer paid commissions to this customer and that Zinus began selling Indonesian mattresses to this customer in November 2019.  Zinus again did not explain why it ceased paying commissions to this customer or whether the sourcing of the mattresses had any influence on this decision.

The fact that [Best Price Mattress'] financial statements on the record show disproportionate changes between [Best Price Mattress'] overall sales deductions and its revenues between 2018 and 2019 raises further questions about the reliability of Zinus' reporting with respect to its sales practices regarding the payment of commissions.  For these reasons, we find it appropriate to make an adjustment to the prices of Zinus' [constructed export price] sales to ensure that all sales allowances and deductions are accounted for in the margin calculation.

IDM at 14.  Commerce did not indicate that it was looking beyond the information on the administrative record to make its determination.  In fact, during the investigation, Brooklyn Bedding argued for the application of facts otherwise available before Commerce, Brooklyn Bedding's Admin. Case Br. at 13–17; IDM

10–11, but Commerce declined to adopt this proposal in the <u>Final Determination</u>.
IDM at 14–15.

The Court observes that Commerce's reference to the phrase "questions
remain" did not relate to factual information missing from the record but to "the
commercial practicality" of Zinus Indonesia's reporting.  IDM at 14.  Because no
factual information was absent from the record necessary for Commerce to reach
its determination to apply an adjustment, Commerce did not unlawfully apply facts
otherwise available and was not required to solicit additional information.

### B.       Reasonableness of Commerce's Adjustment

Plaintiff contends that Commerce's application of the price adjustment was
unsupported by the record.  Plaintiff argues that Commerce was provided with all
of Zinus Indonesia's requested sales and rebate information, but that Commerce
disregarded this evidence and concluded without support that Zinus U.S. shifted
expenses to Best Price Mattress.  Pl.'s Br. at 41–44.  Plaintiff challenges
Commerce's characterization that Best Price Mattress' financial statements showed
disproportionate changes in sales deductions and revenue between 2018 and 2019
and that these changes suggested impropriety.  <u>Id.</u> at 42.  Plaintiff argues that the
sales deductions and revenue of Best Price Mattress were irrelevant to the matter
before Commerce and should not have been considered in applying the adjustment.
<u>Id</u>.  Even if the information was relevant, Plaintiff contends that it does not call

into question the reliability of Zinus Indonesia's reporting.  Id. at 43–44.  Plaintiff

further contends that Commerce should alter its calculation to consider only

mattress-specific sales information and not company-wide sales information.  Id. at

45–46.

Brooklyn Bedding and Defendant contend that Commerce's determination

to apply a price adjustment was reasonable and supported by evidence, suggesting

that Zinus Indonesia shifted costs between Zinus U.S. and Best Price Mattress in

order to lower Zinus Indonesia's dumping margin.  Brooklyn Bedding's Resp. at

27–36; Def.'s Resp. at 27–30.  Brooklyn Bedding argues that Commerce has broad

discretion in imposing adjustments and that Commerce acted reasonably based on

the record evidence.  Brooklyn Bedding's Resp. at 27, 30–34.  Defendant argues

that the record reflected suspicious changes in Zinus U.S. and Best Price Mattress'

commissions policy and payments between the Mattresses from China

investigation and the period of investigation.  Def.'s Resp. at 28–29.  Defendant

asserts that Zinus Indonesia's claimed inability to track country of origin is

inconsistent with Zinus Indonesia's claim that commissions were only paid on non-

subject merchandise.  Def.'s Resp. at 31.  Brooklyn Bedding and Defendant also

contend that Plaintiff's implication that its customers agreed to purchase subject

mattresses on which no commissions were offered when those customers could

have earned commissions on non-subject mattresses is commercially impractical.

Id. at 29–30; see Brooklyn Bedding's Resp. at 27.  Defendant further argues that

Commerce did not disregard certain sales data but determined that the data did not

reflect a proper allocation based on other record evidence.  Def.'s Resp. at 32–33.

Brooklyn Bedding and Defendant assert that Commerce acted within its

available discretion in using company-wide data, rather than mattress-specific data,

and that the use of company-wide data was reasonable.  Brooklyn Bedding's Resp.

at 34–36; Def.'s Resp. at 33–34.  Defendant asserts that Plaintiff's suggestion to

use only mattress-specific sales is not practical because Commerce used the total

sales deductions and sales of both Zinus U.S. and Best Price Mattress in order to

put the companies in an equivalent position.  Def.'s Resp. at 33.  Defendant

contends that artificially reducing the denominator of the ratio to only Zinus U.S.'

sales of subject mattresses would distort the allocation.  Id.

In calculating constructed export price, Commerce makes a deduction of

costs and expenses related to selling subject merchandise in the United States.  19

U.S.C. § 1677a(d)(1).  The statute is silent as to how Commerce is to calculate

those expenses and Commerce has discretion in developing methodologies for

administering antidumping laws.  See Vicentin S.A.I.C. v. United States, 44 CIT

__, __, 466 F. Supp. 3d 1227, 1238 (2020).  The methodology adopted by

Commerce must be reasonable and not distortive, but Commerce need not exclude

all non-subject merchandise.  United States Steel Corp. v. United States, 34 CIT

252, 257, 712 F. Supp. 2d 1330, 1337 (2010); Acciai Speciali Terni S.p.A. v.

United States, 25 CIT 245, 277–78, 142 F. Supp. 2d 969, 1000–01 (2001); see also

19 C.F.R. § 351.401(g)(4).

The adjustment methodology adopted by Commerce combined Zinus U.S.'

and Best Price Mattress' 2019 sales deductions, net of discounts, and returns, and

divided the sum by the companies' combined gross sales.  IDM at 15; Final Sales

Calculation Mem. at 5–6, Att. 2, PR 287, CR 296.  The resulting ratio was applied

to all gross sales made by Zinus U.S.  IDM at 15; Final Sales Calculation Mem. at

5–6.  This methodology was designed to "tak[e] into consideration the sales

deduction experience of both [Zinus U.S. and Best Price Mattress] during the

[period of investigation]."  IDM at 15.

Commerce agreed with Brooklyn Bedding that a price adjustment was

appropriate because evidence showed that Zinus Indonesia was:

> masking dumping of Indonesian mattresses during the [period of
> investigation] by shifting sales deductions that would have been
> incurred by Zinus U.S. for sales of Indonesian mattresses to sales of
> non-subject merchandise made through a different affiliated reseller,
> [Best Price Mattress], the U.S. reseller at issue in the Mattresses from
> China investigation.

IDM at 13; see also Brooklyn Bedding's Post-Prelim. Cmts. (Nov. 19, 2020) at

7–9, PR 240, CR 265; Brooklyn Bedding's Admin. Case Br. at 7–11.  Commerce's

discussion of this issue focused on reported commissions paid by Zinus U.S. and

Best Price Mattress.  IDM at 13–14.

During the Mattresses from China investigation, commissions were paid on

the sales of mattresses to certain United States customers.  See Brooklyn Bedding's

Post-Prelim. Cmts. at 7–9; Zinus Indonesia's Resp. Brooklyn Bedding's Post-

Prelim. Cmts. (Nov. 30, 2020) at 4–6, PR 243, CR 266; see also Zinus Indonesia's

Sub. Zinus Xiamen's Proprietary Info. Mattresses from China Investigation (Oct.

14, 2020), PR 212, CR 222–27, 247.  During the period of investigation, only

Zinus Korea, Zinus U.S., and Keetsa made sales of subject mattresses to the United

States, though Best Price Mattress continued to sell other mattresses produced by

Zinus affiliates.  Zinus Indonesia's Section A Questionnaire Resp. at A-1–A-2, A-

8–A-9.  Zinus Indonesia claimed that commissions were paid only on non-subject

mattresses during the period of investigation.  See Zinus Indonesia's Resp.

Brooklyn Bedding's Post-Prelim. Cmts. at 5–6.  In response to Commerce's

request to explain the change in commissions policy between the Mattresses from

China investigation, which covered January through June 2018, and the period of

investigation, Zinus Indonesia stated that "Zinus U.S.' customers to whom it paid a

commission in the China investigation simply did not purchase Indonesian

mattresses during the [period of investigation], and thus did not earn commissions

under the terms of the agreements based on sales of subject mattresses." IDM at

13–14; Zinus Indonesia's Post-Prelim. Supp. Questionnaire Resp. at 4. Commerce

also noted one instance in which Zinus U.S. ceased paying commissions without

explanation to a particular customer shortly before that customer began to purchase

subject mattresses. IDM at 14; Zinus Indonesia's Post-Prelim. Supp.

Questionnaire Resp. at 5.

      Corresponding to the apparent change in commissions policy, Commerce

observed disproportionate changes between Best Price Mattress' sales deductions

and revenues between 2018 and 2019. IDM at 14. Commerce noted that these

discrepancies called into question Zinus Indonesia's reporting with regard to Zinus

Indonesia's sales practices. Id. (citing Zinus Indonesia's Post-Prelim. Supp.

Questionnaire Resp. at 11). Plaintiff argues that Best Price Mattress' sales

information for 2018 and 2019 was irrelevant to Commerce's considerations

because Best Price Mattress was not involved in the manufacture and sale of the

subject mattresses. Pl.'s Br. at 42; Pl.'s Reply at 21–23. Best Price Mattress, like

Zinus U.S., was wholly-owned by Zinus Korea and was involved in the selling of

mattresses to customers in the United States. See IDM at 13–14; Zinus

Indonesia's Section A Questionnaire Resp. at A-9, Ex. A-3. Because Zinus U.S.

and Best Price Mattress shared a common parent and were involved in similar or

identical sales of mattresses in the United States under the direction of that parent,

it was reasonable for Commerce to include Best Price Mattress in its consideration

of whether Zinus U.S. was shifting costs in order to mask dumping.

Plaintiff contends that even if Commerce's consideration of Best Price

Mattress was appropriate, the record did not support Commerce's conclusion that

costs were being shifted.  Pl.'s Br. at 42–44.  Commerce relied on information

contained in a chart titled "Total Sales of [Best Price Mattress] by Product Group"

included in Zinus Indonesia's Post-Preliminary Supplemental Questionnaire

Response.  IDM at 14; Zinus Indonesia's Post-Prelim. Supp. Questionnaire Resp.

at 11.  The chart reflected a sizable disparity between the change in total sales

claimed by Best Price Mattress between 2018 and 2019 and the change in sales

deductions during the same period.  IDM at 14; <u>see</u> Zinus Indonesia's Post-Prelim.

Supp. Questionnaire Resp. at 11.  Citing to Zinus Indonesia's Ministerial Error

Comments, Plaintiff alleges that Commerce mischaracterized the chart data in light

of other information on the record.  Pl.'s Br. at 44 (citing Zinus Indonesia's

Ministerial Error Cmts. (Mar. 30, 2021), PR 293, CR 299).

The record included two relevant sources of Best Price Mattress' financial

information in 2018 and 2019: Best Price Mattress' June 2018 Balance Sheet and

Best Price Mattress' 2019 Financial Statement.  Zinus Indonesia's Supp. Section A

Questionnaire Resp. at Ex. SA-4c ("Best Price Mattress' 2019 Financial

Statement"), PR 165, CR 154; Zinus Indonesia's Sub. Zinus Xiamen's Proprietary

Info. Mattresses from China Investigation at Att. 1, Ex. A-10m ("Best Price

Mattress' 2018 Balance Sheet").  Plaintiff contends that a review of these

documents showed that Best Price Mattress' commission payments fell as a

percentage of both merchandise sales and total revenue between 2018 and 2019,

eliminating Commerce's reasoning for applying the price adjustment.  Pl.'s Br. at

43–44; see also Zinus Indonesia's Ministerial Error Cmts. at 11–15.

          The Court observes that Commerce's determination regarding the

inconsistencies in Best Price Mattress' reported sales deductions and revenues

between 2018 and 2019 was based on Zinus Indonesia's submission in direct

response to Commerce's request for information regarding the change in Best Price

Mattress' sales between 2018 and 2019.  See IDM at 14; Zinus Indonesia's Post-

Prelim. Supp. Questionnaire Resp. at 10–11.  The Total Sales of Best Price

Mattress by Product Group chart included in Zinus Indonesia's response to

Commerce showed a significant change between the period of investigation and

the prior year.  IDM at 14; Zinus Indonesia's Post-Prelim. Supp. Questionnaire

Resp. at 11.  Commerce did not discuss the other sources of Best Price Mattress'

financial information available on the record, but those sources covered different

durations of time and treated "sales deductions" differently than the Total Sales of

Best Price Mattress by Product Group chart.  Compare Zinus Indonesia's Post-

Prelim. Supp. Questionnaire Resp. at 11, with Best Price Mattress' 2018 Balance

Sheet, and Best Price Mattress' 2019 Financial Statement.  Because Commerce's

decision to apply a price adjustment was based on record information provided by

Zinus Indonesia in response to Commerce's inquiry into Best Price Mattress' 2018

and 2019 sales experience, the Court concludes that Commerce's determination

was supported by substantial record evidence.

Plaintiff argues that if Commerce's application of the price adjustment was

correct, it should still be required to revise its calculation to consider only mattress-

specific sales and not company-wide sales.  Pl.'s Br. at 45–46.  In Commerce's

calculation, the adjustment to U.S. sales deduction was represented as the variable

DEDUCT and served as the denominator in the ratio applied to the gross unit price

of all sales made by Zinus U.S.  Final Sales Calculation Mem. at 2, 6, Att. 2; see

IDM at 15.  The calculation of the DEDUCT variable incorporated total sales by

Zinus U.S. and Best Price Mattress, including non-mattress merchandise.  IDM at

15; Final Sales Calculation Mem. at Att. 2.

Commerce has discretion in the methodology it adopts in calculating

adjustments under 19 U.S.C. § 1677a(d) but the chosen methodology must be

reasonable.  United States Steel Corp., 34 CIT at 257, 712 F. Supp. 2d at 1337.

Commerce made an adjustment with a goal of "ensur[ing] that all sales allowances

and deductions [were] accounted for in the margin calculation."  IDM at 14.

Commerce expressly rejected a methodology proposed by Brooklyn Bedding

because it used the sales deductions of only one company.  Id. at 14–15.

Commerce instead "calculated a different adjustment that [took] into consideration

the sales deduction experiences of both [Zinus U.S. and Best Price Mattress]

during the [period of investigation]."  Id. at 15.

Selling expenses, such as commissions, are costs incurred by a company as a

whole and are typically not distinguishable to a singular product.  In fact, though

the 2018 and 2019 financial statements provided by Zinus Indonesia for Best Price

Mattress treated commissions differently, neither separated commissions paid or

other sales expenses by type of merchandise.  See Best Price Mattress' 2018

Balance Sheet; Best Price Mattress' 2019 Financial Statement; Zinus Indonesia's

Post-Prelim. Supp. Questionnaire Resp. at Ex. SQ-2.  Commerce's methodology

used the combined sales deductions, net of discounts, and returns of Zinus U.S. and

Best Price Mattress as its numerator.  IDM at 15.  Reducing the denominator to

consider only sales related to mattresses would create a distortion to the allocation.

The Court concludes that Commerce's inclusion of Zinus U.S.' and Best Price

Mattress' company-wide sales was reasonable and supported by substantial

evidence.  The Court sustains Commerce's price adjustment.

## V.    Zinus Korea's Selling Expenses

Brooklyn Bedding contends that Commerce failed to consider record

evidence of Zinus Korea's selling activities and argues for an adjustment to U.S.

price to account for Zinus Korea's selling expenses.  Brooklyn Bedding's Mem.

Points Law Fact Supp. R. 56.2 Mot. J. Agency R. ("Brooklyn Bedding's Br.") at

8–22, ECF No. 24, 25.  Zinus Indonesia and Defendant argue that Commerce

properly limited the selling expenses attributable to Zinus Korea's actual selling

expenses.  Def.'s Resp. at 48–52; Pl.'s Resp. Br. Opp'n Brooklyn Bedding's Mot.

J. Agency R. ("Pl.'s Resp.") at 13–28, ECF Nos. 31, 32.

     Commerce considered Zinus Korea to be an affiliate of Zinus Indonesia and

determined that Commerce's practice is to not view price markups between

affiliates as commissions and to not deduct those adjustments from U.S. price.

IDM at 32; see also Oil Country Tubular Goods from Mexico, 64 Fed. Reg. 13,962

(Dep't of Commerce Mar. 23, 1999) (final results of antidumping duty admin.

review) and accompanying Issues and Decision Mem. at cmt. 4.  Commerce

determined that it is Commerce's practice to deduct only the actual expenses

incurred by the affiliate.  IDM at 32.  Commerce must consistently apply

methodologies across administrative reviews and provide a reasoned explanation

for deviating from its past practice.  Polyethylene Retail Carrier Bag Comm. v.

United States, 29 CIT 1418, 1447 (2005).

     Commerce stated that its calculation included three categories of selling

expenses for Zinus Korea: advertising expenses, rebates, and bank charges.  IDM

at 32 n.213.  Commerce explained that this information was solicited by

Commerce and was considered "consistent with respect to [Zinus Korea's] reportedly limited role as an invoicing party in Zinus' U.S. sales process." Id. at 32; see Commerce's Initial Section C Questionnaire at C-21, PR 67.  Brooklyn Bedding contends that Commerce failed to consider record evidence demonstrating that Zinus Korea had more than a minimal role in the selling of subject mattresses. Brooklyn Bedding's Br. 12–16.  Commerce's determination is not supported by substantial evidence when Commerce fails to consider and address record evidence that clearly supports an alternative result.  See SeAH Steel VINA Corp. v. United States, 40 CIT __, __, 182 F. Supp. 3d 1316, 1336 (2016).

Commerce stated that Zinus Indonesia reported Zinus Korea's actual expenses incurred on behalf of U.S. sales in the U.S. sales database, but Commerce did not cite any record evidence to support this statement.  IDM at 32.  Commerce stated that Zinus Indonesia reported that Zinus Korea's general and administrative expenses were an element of Zinus Indonesia's expenses, citing Zinus Indonesia's questionnaire response at SD-25 and exhibit SD-25.  IDM at 32.  Commerce determined that "the reporting of such expenses [was] also consistent with respect to Zinus [Korea]'s reportedly limited role as an invoicing party in Zinus' U.S. sales process," without citing any evidence to support this statement.  Id.  Notably, the Court observes that Commerce did not provide an explanation or cite record

evidence to support its determination that Zinus Korea had a limited role as an

invoicing party in Zinus U.S.' sales process.

Brooklyn Bedding contends that Commerce ignored potentially contrary

evidence on the record showing that Zinus Korea engaged in more significant

selling activities than the preparation of invoices.  Brooklyn Bedding's Br. at 16–

17.  During the administrative proceeding, Brooklyn Bedding identified several

facts within the record supporting its contention.  For example, Brooklyn Bedding

noted that Zinus Korea and Zinus U.S. shared a common senior official.  Brooklyn

Bedding's Admin. Case Br. at 23–38; see also Zinus Indonesia's Section A

Questionnaire Resp. at Ex. A-6.  In a chart of office locations provided to

Commerce, the functions of both Zinus Korea and Zinus U.S. were identified as

"Sale and Marketing."  Brooklyn Bedding's Admin. Case Br. at 23; Zinus

Indonesia's Section A Questionnaire Resp. at Ex. A-4.  In its Section A

Questionnaire Resp., Zinus Indonesia advised Commerce that "[w]ith respect to

business relationships among the companies, [Zinus Korea] as the parent company,

and its wholly/majority owned subsidiaries, closely coordinate[d] with one another

to manage global manufacturing, operational, and sales activities."  Brooklyn

Bedding's Admin. Case Br. at 24; Zinus Indonesia's Section A Questionnaire

Resp. at Ex. A-11.  Zinus Indonesia also asserted in a response to Commerce

"[a]gain, as Zinus has made clear throughout its responses . . . the Zinus entities

actually making the U.S. sales to unaffiliated customers reported in the sales database are [Zinus Korea] or Zinus U.S."  Brooklyn Bedding's Admin. Case Br. at 24; Zinus Indonesia's 8/20 Rebuttal Cmts. at 5, PR 166, CR 158.

Brooklyn Bedding also suggests that record evidence showed that Zinus Korea was directly responsible for handling sales to unaffiliated customers of mattresses purchased from Zinus Indonesia.  Brooklyn Bedding's Br. at 14–16; see Zinus Indonesia's Section A Questionnaire Resp. at Exs. A-7b (purchase order from customer to Zinus Korea), A-9 (master sales agreement); Zinus Indonesia's Supp. Section A Questionnaire Resp. at Ex. SA-8A (purchase order from customer to Zinus Korea and purchase order from Zinus Korea to Zinus Indonesia). Commerce acknowledged Brooklyn Bedding's arguments in the final determination but did not discuss or consider any of the identified facts or arguments.  See IDM at 30–32.

Commerce determined that Zinus Indonesia provided all requested information relating to Zinus Korea's selling expenses, but Commerce failed to provide sufficient explanations or citations to record evidence to support Commerce's determination that Zinus Korea had a minimal role in the U.S. sales of mattresses.  Moreover, the Court agrees with Defendant-Intervenors that Commerce did not discuss or consider record evidence suggesting that Zinus Korea's role in the sale of the subject mattress was potentially more significant

than the mere processing of invoices.  Because Commerce did not support its

statements with sufficient citations to record evidence and did not consider

potentially contrary record evidence concerning Zinus Korea's selling activities,

the Court concludes that Commerce's determinations regarding Zinus Korea's

selling activities and adjustments to U.S. price to account for Zinus Korea's selling

expenses were not supported by substantial evidence.

Brooklyn Bedding also argues that Commerce failed to apply appropriate

accounting rules to Zinus Korea's financial information.  Brooklyn Bedding's Br.

at 17–19.  Commerce normally calculates costs and expenses using the records of

the party if those records are maintained in accordance with GAAP.  See 19 U.S.C.

§ 1677b(f)(1); Husteel Co. v. United States, 45 CIT __, __, 520 F. Supp. 3d 1296,

1306 (2021).  Commerce may depart from this practice if it determines that the

GAAP-compliant records do not "reasonably reflect the costs associated with the

production and sale of the merchandise."  19 U.S.C. § 1677b(f)(1); Husteel Co., 45

CIT at __, 520 F. Supp. 3d at 1306.

The Korean-version International Financial Reporting Standards ("K-IFRS")

Part 1115 provides:

> An entity is an agent if the entity's performance obligation is to arrange
> for the provision of the specified good or service by another party. . . .
> When (or as) an entity that is an agent satisfies a performance
> obligation, the entity recognises revenue in the amount of any fee or
> commission to which it expects to be entitled in exchange for arranging

> for the specified goods or services to be provided by the other party.
> An entity's fee or commission might be the net amount of consideration
> that the entity retains after paying the other party the consideration
> received in exchange for the goods or services to be provided by that
> party.

K-IFRS, Part 1115; Zinus Indonesia's Section C Supp. Resp. at SC2-5, PR 199,

CR 213.  Brooklyn Bedding contends that under K-IFRS, Zinus Korea qualified as

an agent and that Commerce was obligated to include commissions received for its

role in selling the subject mattresses in calculating selling expenses.  Brooklyn

Bedding's Br. at 18–19.  Specifically, Brooklyn Bedding contends that any markup

to the price of mattresses sold by Zinus Korea that would normally be excluded

from Zinus Korea's actual expenses should be included.  Id.

Commerce did not address Brooklyn Bedding's arguments on the

application of K-IFRS to Zinus Korea's selling expenses and it is unclear how

Commerce accounted for costs considered "commissions and fees" in Zinus

Korea's reporting.  Because Commerce did not provide any explanation, the Court

remands this issue to Commerce for further consideration of record evidence or

explanation regarding the extent of Zinus Korea's involvement in the sale of

subject mattresses and the application of K-IFRS.

## VI.    GTA Import Data Pursuant to the Transactions Disregarded Rule

When calculating cost of production for purposes of normal value,

Commerce may adjust prices between affiliates under the "transactions

disregarded" rule, which permits prices of inputs from affiliated suppliers "if, in the case of any element of value required to be considered, the amount representing that element does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration."  19 U.S.C. § 1677b(f)(2).  Commerce's practice is to adjust the price of the transferred input or service to reflect the market price.  See Rebar Trade Action Coal. v. United States, 42 CIT __, __, 337 F. Supp. 3d 1251, 1259 (2018).  In order to determine "the amount usually reflected in sales of merchandise under consideration in the market under consideration," Commerce looks to any purchases of the same inputs or services by the respondent from an unaffiliated supplier and any sales by the supplier of the same inputs or services to an unaffiliated buyer.  See Unicatch Indus. Co. v. United States, 45 CIT __, __, 539 F. Supp. 3d 1229, 1248–49 (2021); Diamond Sawblades Mfrs. Coal. v. United States, 38 CIT __, __, 2014 WL 5463307 at *2 n.4 (Oct. 29, 2014).  If such transactions are not available, the statute provides that Commerce may consider "information available as to what the amount would have been if the transaction had occurred between persons who are not affiliated."  19 U.S.C. § 1677b(f)(2).

　　　During the period of investigation, Zinus Indonesia received inputs from affiliated suppliers in China.  IDM at 16–17; see Final Cost Calculation Mem. at Att. 1a.  The majority of these inputs were received only from affiliated suppliers.

IDM at 16–17; see Final Cost Calculation Mem. at Att. 1a; Zinus Indonesia's

Supp. Section D Resp. at Ex. SD-8 (schedule of inputs purchased from affiliated

suppliers by item code).  In the Preliminary Determination, for those inputs that

Zinus Indonesia received from both affiliated and unaffiliated suppliers,

Commerce analyzed the prices paid for the same inputs from the unaffiliated

suppliers.  See Prelim. Cost Calculation Mem. at 1–2.  Commerce continued this

approach in the Final Determination.  See Final Cost Calculation Mem. at 1–2.

Commerce was faced with a challenge in analyzing the remaining

transactions that were only sourced from affiliates in China.  Because China is a

non-market economy, Commerce stated that it was not able to consider the

affiliated suppliers' cost of production.  IDM at 17.  In order to make a

determination based on information available, Commerce solicited surrogate input

price information.  Id.  Commerce determined that GTA import data was the most

reliable information for Commerce's purposes because it was "readily available

and reasonably specific to the voluminous number of affiliated [non-market

economy] inputs."  Id.  Commerce requested GTA data from countries considered

economically similar to China: Brazil, Malaysia, Mexico, Romania, Russia, and

Turkey.  Id.  At Commerce's request, Zinus Indonesia also placed GTA data for

Indonesia on the record.  Id.; Zinus Indonesia's Section D Supp. Resp. at SD6–

SD13, Exs. SD-8, SD-9, PR 196, CR 204–05.  In the Preliminary Determination,

Commerce calculated and applied an average of the market prices of GTA import

data for Brazil, Malaysia, Mexico, Romania, Russia, and Turkey.  IDM at 17–18;

Prelim. Cost Calculation Mem. at 1–2.  In the <u>Final Determination</u>, Commerce

changed its approach and considered only GTA data from Indonesia.  IDM at 18.

Commerce explained its change in approach by citing 19 U.S.C.

§ 1677b(f)(2), which states that "[a] transaction . . . between affiliated persons may

be disregarded if . . . the amount representing that element does not fairly reflect

the amount usually reflected in sales of merchandise under consideration in the

market under consideration."  <u>Id.</u> (quoting 19 U.S.C. § 1677b(f)(2)).  Commerce

interpreted this language to direct it to consider only the market under

investigation—Indonesia—when testing an affiliated supplier's price against a

market price.  IDM at 18.  Brooklyn Bedding argues that Commerce's

determination under the Transactions Disregarded Rule is not in accordance with

the law and not supported by substantial evidence.  Brooklyn Bedding's Br. at 27–

37.

Brooklyn Bedding draws a distinction between the two sentences of 19

U.S.C. § 1677b(f)(2).  <u>Id.</u>  The first sentence reads "[a] transaction directly or

indirectly between affiliated persons may be disregarded if, in the case of any

element of value required to be considered, *the amount representing that element*

*does not fairly reflect the amount usually reflected in sales of merchandise under*

*consideration in the market under consideration*."  19 U.S.C. § 1677b(f)(2)

(emphasis added).  The second sentence reads: "[i]f a transaction is disregarded

under the preceding sentence and no other transactions are available for

consideration, *the determination of the amount shall be based on the information*

*available as to what the amount would have been if the transaction had occurred*

*between persons who are not affiliated*."  Id. (emphasis added).  Brooklyn Bedding

argues that the first sentence relates to situations in which the considered inputs

were provided by both affiliated and unaffiliated suppliers and "instructs

Commerce to use the values of 'sales of merchandise under consideration in the

market under consideration' when such data is available on the record."  Brooklyn

Bedding's Br. at 29.  The second sentence concerns situations in which unaffiliated

transactions are not available and "instructs Commerce to determine a market price

based on 'the information available as to what the amount would have been if the

transaction had occurred between persons who are not affiliated.'"  Id.  Brooklyn

Bedding contends that the phrase "in the market under consideration" used in the

first sentence should not be read to limit the "information available" under the

second sentence.  Id. at 30.

    Brooklyn Bedding argues that applying Commerce's limitation to only the

country under investigation was inconsistent with prior investigations in which

Commerce adopted a broader reading of "information available," see Heavy

Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of
Korea, 86 Fed. Reg. 35,060 (Dep't of Commerce July 1, 2021) (final results of
antidumping duty admin. review: 2018–2019) and accompanying Issues and
Decisions Mem. at cmt. 7 (interpreting "information available" to include "an
affiliate's total cost of providing the service [or input]"), and in which it considered
costs of production for affiliates located in a different country from the respondent,
see Stainless Steel Sheet and Strip in Coils from Mexico, 70 Fed. Reg. 3677 (Dep't
of Commerce Jan. 26, 2005) (final results of antidumping duty admin. review) and
accompanying Issues and Decisions Mem. at cmt. 14 (using cost of production of a
United States affiliate to estimate market value transactions with a Mexican
respondent in the context of the major input rule, 19 U.S.C. § 1677b(f)(3)).
Brooklyn Bedding's Br. at 30.  Brooklyn Bedding contends further that
Commerce's approach in this case was inconsistent with its practice of relying on a
supplier's cost of production when unaffiliated transaction data was not available.
Id. at 31–32 (citing Antifriction Bearings (Other Than Tapered Roller Bearings)
and Parts Thereof from France, Germany, Italy, Japan, Singapore, and the United
Kingdom, 62 Fed. Reg. 2081 (Dep't of Commerce Jan. 15, 1997) (final results of
antidumping duty admin. review) and accompanying Issues and Decisions Mem. at
sec. d, cmt. 1).

Plaintiff and Defendant disagree with Brooklyn Bedding's proposed bifurcation of the statutory language.  Pl.'s Resp. at 32; Def.'s Resp. at 57–59. Plaintiff argues for an interpretation of the statute in which the first and second sentences are read together to allow "Commerce to craft a surrogate price based on information available from the same market, in the absence of identical inputs purchased in that market from unaffiliated suppliers."  Pl.'s Resp. at 32.  Plaintiff contends "that the statute directs [Commerce] to assess whether the input purchases reflected market value in Indonesia."  Id. at 32–33.  Plaintiff asserts that Commerce has previously read 19 U.S.C. § 1677b(f)(2) to create a preference for the price that a respondent paid to an unaffiliated supplier.  Id. at 33 (citing Certain Cut-To-Length Carbon-Quality Steel Plate Products from Korea, 64 Fed. Reg. 73,196 (Dep't of Commerce Dec. 29, 1999) (notice of final determination of sales at less than fair value); Low Enriched Uranium from France, 70 Fed. Reg. 54,359 (Dep't of Commerce Sept. 14, 2005) (notice of final results of antidumping duty admin. review) and accompanying Issues and Decisions Mem. at cmt. 3). Defendant argues that reading "in the market under consideration" into the second sentence of the provision allows Commerce to determine the amounts paid by the manufacturer of the subject merchandise and furthers the goal of the provision to allow Commerce to determine the manufacturing and cost experience of the respondent to determine if dumping has occurred.  Def.'s Resp. at 58–59.

This court has considered the Transactions Disregarded Rule as follows:

> Commerce has expressed a preference for how to establish market value. First, it looks at whether respondent purchased the input from an unaffiliated supplier; if unavailable, it looks to sales of the input between an affiliate supplier and an unaffiliated party, and as a final resort, to a reasonable source for market value available on the record.

Rebar Trade Action Coal. v. United States, 43 CIT __, __, 398 F. Supp. 3d 1359, 1372 (2019) (internal citation omitted). The Court has specified that when resorting to a "reasonable source for market value," if "a market price is not available, Commerce has developed a consistent and predictable approach whereby it may use an affiliate's total cost of providing the [good or service] as information available for a market price." Best Mattresses Int'l Co. Ltd. v. United States ("Best Mattresses"), 47 CIT __,__ , 2023 WL 2198803, at *21 (2023) (quoting Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea, 86 Fed. Reg. 35,060 and accompanying Issues and Decisions Mem. at cmt. 24). The Court has explained that the phrase "market under consideration" is purposefully broad to allow Commerce to choose a market that allows for a "reasonable source for market value" to confirm that the affiliated prices reflect arm's length transactions. Id. at __ , 2023 WL 2198803, at *21 (citing Rebar Trade Action Coal., 43 CIT at __, 398 F. Supp. 3d at 1372 and Diamond Sawblades Mfrs. Coal., 38 CIT at __, 2014 WL 5463307, at *2 n.2). Here, Commerce determined that "the statute indicates that the item being tested

should reflect a market price in the country under consideration, which is Indonesia

in the instant case." IDM at 18. The Court concludes that Commerce's

interpretation of "market under consideration" as only the market under

investigation is unreasonably narrow and not in accordance with the law. Similar

to Best Mattresses, in which the Court noted that the "holding does not prevent

Commerce from selecting Cambodia as the 'market under consideration' for

purposes of the Transactions Disregarded Rule on remand," Best Mattresses, 47

CIT at__ , 2023 WL 2198803, at *21, here Commerce might choose Indonesia as

the "market under consideration" on remand after the agency explains its

reasoning.

　　　The Court concludes that Commerce's determination regarding the

Transactions Disregarded Rule was not in accordance with the law or supported by

substantial evidence, and remands for Commerce to provide further explanation or

to reconsider whether Commerce's selection of Indonesia constituted a reasonable

method to confirm that the affiliated prices reflect arm's length transactions under

19 U.S.C. § 1677b(f)(2).

### VII.   Sales Reconciliation

　　　Brooklyn Bedding argues that Commerce erred in not requiring Zinus

Indonesia to submit a sales reconciliation of its reported U.S. sales and its audited

financial statement. Brooklyn Bedding's Br. at 33–42. Plaintiff and Defendant

argue that Brooklyn Bedding waived this argument by failing to raise it in the administrative case brief.  Pl.'s Resp. at 38; Def.'s Resp. at 61–62.

Commerce issued to Zinus Indonesia its standard antidumping questionnaire, which requested that Zinus Indonesia provide "a reconciliation of the sales reported in your U.S. sales databases to the total sales listed in your financial statements (profit and loss/income statement)."  Commerce's Initial Section C Questionnaire at C-4.  In response, Zinus Indonesia provided only reconciliations for Zinus Korea and Zinus U.S.  Zinus Indonesia's Section C Questionnaire Resp. at C-7, Exs. C-2A, C-2B, PR 119–20, CR 117–20.  During the investigation, Brooklyn Bedding raised the lack of Zinus Indonesia's U.S. sales reconciliation multiple times.  Brooklyn Bedding's Deficiency Cmts. re Zinus Section C Questionnaire Resp. at 3–5, 26, PR 147, CR 130–31; Brooklyn Bedding's Resp. Zinus Cmts. at 4–5, PR 170, CR 161; Brooklyn Bedding's Post-Prelim. Cmts. at 11–13.  Brooklyn Bedding did not raise this argument in its administrative case brief.  See Brooklyn Bedding's Admin. Case Br.

A party is generally prohibited from raising arguments with the Court that were not first raised with the administrative agency.  See Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990); Dillinger France S.A. v. United States, 42 CIT __, __, 350 F. Supp. 3d 1349, 1371–72 (2018); see also 28 U.S.C. § 2637(d) ("In any civil action not specified in this section, the Court of

International Trade shall, where appropriate, require the exhaustion of administrative remedies.").  Commerce's regulations provide parties to an antidumping investigation an opportunity to raise arguments through administrative case briefs.  19 C.F.R. § 351.309.  The regulation is clear that administrative case briefs "must present all arguments that continue in the submitter's view to be relevant to [Commerce's] final determination or final results, including any arguments presented before the date of publication of the preliminary determination or preliminary results."  Id. § 351.309(c)(2).

In its Reply Brief filed in this case on appeal, Brooklyn Bedding argues that the futility exception should excuse its failure to exhaust administrative remedies. Brooklyn Bedding's Reply Br. ("Brooklyn Bedding's Reply") at 16–20, ECF No. 35, 36.  The futility exception is narrow and "requires a party to demonstrate that exhaustion would require it to go through obviously useless motions in order to preserve its rights."  Zhongce Rubber Grp. Co. v. United States, 42 CIT __, __, 352 F. Supp. 3d 1276, 1279 (2018).  When additional comment would serve no purpose, exhaustion is not required.  Brooklyn Bedding raised the issue of Zinus Indonesia's U.S. sales reconciliation multiple times throughout the administrative process and Commerce was put on notice of the issue.  Brooklyn Bedding also notes that briefing before Commerce was completed after verification and 30 days before the statutory deadline for Commerce's final determination.  Brooklyn

Bedding's Reply at 16, 19.  Nonetheless, Brooklyn Bedding could have raised the

issue in its administrative case brief, the Court is not convinced that doing so

would have been a fruitless endeavor, and the Court concludes that Brooklyn

Bedding has not met the stringent requirements to apply the narrow exception to

administrative exhaustion.  Because Brooklyn Bedding failed to raise its argument

in its administrative case brief, Brooklyn Bedding's arguments are waived in this

Court by the failure to exhaust its administrative remedies.

Defendant contends that even if the issue were not waived, the argument is

unconvincing.  Def.'s Resp. at 62–63.  Brooklyn Bedding argues that in not

requiring Zinus Indonesia to submit a U.S. sales reconciliation, Commerce broke

from a "longstanding practice" of requiring named parties to submit a

reconciliation of U.S. sales.  Brooklyn Bedding's Br. at 37.  It is true that

Commerce must provide consistent treatment across investigations or provide an

explanation for deviating from established practice.  See Save Domestic Oil, Inc. v.

United States, 357 F.3d 1278, 1283–84 (Fed. Cir. 2004).  Commerce routinely

requests sales reconciliations in its antidumping questionnaire.  See Commerce's

Initial Section C Questionnaire at C-4.  Brooklyn Bedding has not demonstrated

that Commerce has an established practice of requiring a named party to provide a

reconciliation when alternate reconciliations are provided by affiliates responsible

for selling the subject merchandise in the United States.  In this case, Zinus

Indonesia advised Commerce that sales of the subject mattresses within the United

States were performed by Zinus Korea and Zinus U.S.  See Zinus Indonesia's

Section C Questionnaire Resp. at C-7; see also Zinus Indonesia's 8/20 Rebuttal

Cmts. at 5.  Zinus Indonesia provided U.S. sales reconciliations for these entities.

Zinus Indonesia's Section C Questionnaire Resp. at Exs. C-2A, C-2B.  These

reconciliations provided the information requested by Commerce, "a reconciliation

of the sales reported in your U.S. sales databases to the total sales listed in your

financial statements (profit and loss/income statement)."  See Commerce's Initial

Section C Questionnaire at C-4.  Zinus Indonesia notes that in the Mattresses from

China investigation, similar to this case, Commerce was satisfied with only

reconciliations from Zinus Korea and Zinus U.S. and did not require a separate

reconciliation from the named respondent.  Pl.'s Resp. at 39; see also Zinus

Indonesia's Sub. Zinus Xiamen's Proprietary Info. Mattresses from China

Investigation.

Aside from the administrative exhaustion issue, the Court is not convinced

that Commerce deviated from its established practice in not requiring Zinus

Indonesia to provide a financial reconciliation.  Commerce was reasonable in not

requiring Zinus Indonesia to provide a reconciliation of its U.S. sales when

reconciliations were provided for Zinus Korea and Zinus U.S. that supplied the

information sought by Commerce.  Nonetheless, the Court holds that Commerce's

determination to not require Zinus Indonesia to file a U.S. sales reconciliation is not properly before the Court due to Brooklyn Bedding's waiver of the issue through its failure to exhaust its administrative remedies.

## CONCLUSION

Accordingly, it is hereby

**ORDERED** that Plaintiff's motion for judgment on the agency record is granted in part and remanded in part; and it is further

**ORDERED** that Brooklyn Bedding's motion for judgment on the agency record is granted in part and remanded in part; and it is further

**ORDERED** that the Court sustains Commerce's use of a quarterly ratios methodology to determine the quantity of subject mattresses sold; and it is further

**ORDERED** that the Court sustains Commerce's determination to use Emirates Sleep Systems Private's financial information in calculating constructed value; and it is further

**ORDERED** that the Court sustains Commerce's calculation and application of a profit cap; and it is further

**ORDERED** that the Court sustains Commerce's adjustment to reported sales deductions of Zinus U.S.; and it is further

**ORDERED** that the <u>Final Determination</u> is remanded to Commerce to reconsider consistent with this opinion the inclusion of mattresses in-transit from Indonesia at the end of the period of investigation; and it is further

**ORDERED** that the <u>Final Determination</u> is remanded to Commerce to reconsider consistent with this opinion Commerce's adjustments to the selling expenses of Zinus Korea to account for actual selling expenses; and it is further

**ORDERED** that the <u>Final Determination</u> is remanded to Commerce to reconsider consistent with this opinion Commerce's application of the Transactions Disregarded Rule; and it is further

**ORDERED** that that this case shall proceed according to the following schedule:

(1) Commerce shall file its remand determination on or before May 19, 2023;

(2) Commerce shall file the administrative record on or before June 2, 2023;

(3) Comments in opposition to the remand determination shall be filed on or before July 18, 2023;

Consol. Court No. 21-00277                                            Page 78

(4) Comments in support of the remand determination shall be filed on or

  before August 17, 2023; and

(5) The joint appendix shall be filed on or before August 31, 2023.


                                    ___/s/ Jennifer Choe-Groves____
                                     Jennifer Choe-Groves, Judge


Dated: ___March 20, 2023_____
        New York, New York