**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| PT ZINUS GLOBAL INDONESIA, )<br>　　　　　　　　　　　　　　　　)<br>　　　　　　　　　Plaintiff, )<br>　　　　　　　　　　　　　　　　)<br>　　v.　　　　　　　　　　　　　)<br>　　　　　　　　　　　　　　　　)<br>UNITED STATES, )<br>　　　　　　　　　　　　　　　　)<br>　　　　　　　　　Defendant, )<br>　　and　　　　　　　　　　　　)<br>　　　　　　　　　　　　　　　　)<br>BROOKLYN BEDDING, LLC ET AL., )<br>　　　　　　　　　　　　　　　　)<br>　　　　　　　Defendant-Intervenors. )<br>　　　　　　　　　　　　　　　　) | Consol. Ct. No. 21-00277<br><br>**NON-CONFIDENTIAL VERSION**<br>Business Proprietary Information Removed from Brackets on Pages 3-7. |

**DEFENDANT-INTERVENORS' COMMENTS IN PARTIAL OPPOSITION TO THE FINAL RESULTS OF REDETERMINATION**

Yohai Baisburd
Chase J. Dunn
Nicole Brunda

**CASSIDY LEVY KENT (USA) LLP**
900 19th Street, N.W.
Suite 400
Washington, D.C. 20006
(202) 567-2300

*Counsel to Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises Inc., Leggett & Platt, Incorporated, International Brotherhood of Teamsters, United Steel Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO*

Dated:   August 8, 2023

# Table of Contents

    Page

I.    The Department Failed to Demonstrate that Zinus Reported All of Zinus Korea's Actual Selling Expenses ................................................................................... 2

II.   The Department Failed to Explain Its Change of Practice in Applying the Transactions Disregarded Rule ........................................................................................ 9

III.  Conclusion ................................................................................................................... 12

## Table of Authorities

Page(s)

**Statutes**

19 USC § 1677b(f)(2) ................................................................................................................9,12

19 USC § 1677b(f)(3) ..................................................................................................................12

**Court Decisions**

*Best Mattresses Int'l Co. Ltd. v. United States*, 622 F. Supp. 3d 1347
(Ct. Int'l Trade 2023)....................................................................................................................12

*Chung Ling Co., Ltd. v. U.S.,* 805 F. Supp. 56 (Ct. Int'l Trade 1992).............................................5

*Gerald Metals, Inc. v. U.S.*, 132 F.3d 716 (Fed. Cir. 1997)............................................................4

*Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut.
Ins. Co.*, 463 U.S. 29 (1983) .........................................................................................................11

*Nippon Steel Corp. v. U.S. Int'l Trade Comm'n*, 494 F.3d 1371 (Fed.
Cir. 2007) .....................................................................................................................................11

*Unicatch Indus. Co. v. United States,* 539 F. Supp. 3d 1229 (Ct. Int'l
Trade 2021)....................................................................................................................................9

*Universal Camera Corp. v. N.R.L.B,* 340 U.S. 474 (1951) ............................................................4

**Administrative Decisions**

*Bottom Mount Combination Refrigerator-Freezers From the Republic of
Korea: Preliminary Negative Countervailing Duty Determination and
Alignment of Final Determination With Final Antidumping
Determination,* 76 Fed. Reg. 55,044, 55,047 (Sep. 6, 2011)........................................................10

*Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from
the Republic of Korea: Final Results of Antidumping Duty
Administrative Review,* 86 Fed. Reg. 35060 (July 1, 2021).........................................................10

*Notice of Final Determination of Sales at Less Than Fair Value and
Negative Critical Circumstances Determination: Bottom Mount
Combination Refrigerator-Freezers from the Republic of Korea,* 77 Fed.
Reg. 17413 (Mar. 26, 2012) .........................................................................................................10

*Notice of Final Determination of Sales at Less Than Fair Value and
Affirmative Critical Circumstances Determination: Bottom Mount*

*Combination Refrigerator-Freezers From Mexico,* 77 Fed. Reg. 17,422
(Mar. 26, 2012)......................................................................................................................10

*Polyethylene Retail Carrier Bags from Thailand: Final Results of
Antidumping Duty Administrative Review,* 72 Fed. Reg. 1982 (Jan. 17,
2007) .......................................................................................................................................9

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

|  |  |
|---|---|
| PT ZINUS GLOBAL INDONESIA, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> UNITED STATES, ) <br> ) <br> Defendant, ) <br> and ) <br> ) <br> BROOKLYN BEDDING, LLC ET AL., ) <br> ) <br> Defendant-Intervenors. ) <br> ) | Consol. Ct. No. 21-00277 |

**DEFENDANT-INTERVENORS' COMMENTS IN PARTIAL OPPOSITION TO THE FINAL RESULTS OF REDETERMINATION**

Pursuant to the US Court of International Trade's (the "Court") Remand Order (ECF No. 55) ("Remand Order") and amended scheduling order (ECF No. 57), Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises Inc., Leggett & Platt, Incorporated, International Brotherhood of Teamsters, United Steel Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, defendant-intervenors and plaintiffs in the companion case Brooklyn Bedding, LLC et al. v. United States, Court No. 21-00284 (hereinafter "Mattress Petitioners") hereby submit comments in partial opposition to the US Department of Commerce's ("the Department") Final Results of Redetermination Pursuant to Court Remand (ECF No. 59) ("Remand Redetermination"). *See PT Zinus Global Indonesia and Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions, FXI, Inc., Innocor, Inc. Kolcraft Enterprises Inc., Leggett & Platt, Incorporated, International Brotherhood of*

*Teamsters, United Steel Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO v. United States*, Consol. Court No. 21-00277, Slip Op. 23-39 (CIT March 20, 2023).

In its Remand Order, the Court found that the Department had (1) failed to adequately explain or cite to record evidence supporting its determination that PT Zinus Global Indonesia ("Zinus") had accurately reported all of Zinus Inc.'s ("Zinus Korea") selling expenses, *see* Remand Order at 57-63, and (2) failed to explain its departure from prior practice with respect to the transactions disregarded rule, *see id*. at 63-71. The Court therefore remanded for the Department to reconsider its conclusions and support its findings with substantial record evidence. *See id*. at 76-77. With respect to these issues, the Department's Remand Redetermination fails to comply with the Court's instructions. In particular, the Department continues to ignore record evidence demonstrating that Zinus failed to report all of Zinus Korea's selling expenses associated with sales of subject merchandise in the United States. The Department also fails to provide an explanation for the departure from its standard practice of using an affiliated supplier's cost of production ("COP"), or a reasonable surrogate thereof, to calculate a benchmark price in applying its transactions disregarded analysis. Accordingly, the Department's latest determination should again be remanded for reconsideration and clarification of these issues.

**I.   The Department Failed to Demonstrate that Zinus Reported All of Zinus Korea's Actual Selling Expenses**

Zinus' questionnaire responses make clear that its Korean parent company Zinus Inc. (Zinus Korea) played a role in every sale Zinus made to the United States. *See* Letter from Zinus,

"Zinus' Section A Questionnaire Response" (June 19, 2020) ("*AQR*") at A-8 (C.R. 36).[1] For one category of sales (constructed export price ("CEP") sales), Zinus Indonesia sold the merchandise to Zinus Korea, who then re-sold the merchandise to its US selling agent, Zinus, Inc. ("Zinus US") for sale to the unaffiliated US customer. *See id*. at A-18 to A-19. For another category of sales (export price ("EP") sales), Zinus Indonesia sold merchandise to Zinus Korea, which in turn sold the merchandise to the unaffiliated US customer. *Id*. During the period of investigation ("POI"), EP sales accounted for [                    ] of Zinus' US sales. *See id*. at Exhibit A-1 (C.R. 37). Throughout its questionnaire responses, Zinus repeatedly describes these EP sales as "Zinus {Korea}'s sales to unaffiliated US customers," *see, e.g., id*. at A-3 (C.R. 36), and confirms that "Zinus {Korea} made all EP sales" while "Zinus Indonesia made no direct EP sales." Letter from Zinus, "Zinus' Section A Supplemental Questionnaire Response" (Aug. 20, 2020) ("*SAQR*") at 11 (C.R. 149).

The Department's standard antidumping questionnaire makes clear that respondents must report ***all*** actual expenses incurred for US sales. These actual expenses include both: (1) direct selling expenses, which are variable expenses that can be tied to specific sales, including *inter alia* the variable portions of guarantee, warranty, technical assistance, and servicing expenses, ***and*** (2) indirect selling expenses, which are fixed expenses related to the general sales functions, and include salaries of employees involved in sales, administrative overhead, and inventory carrying costs. *See* Letter from the Department (May 14, 2020) at Appendix I, I-6 to I-7 (P.R. 67). The only actual selling expenses of either type reported for Zinus Korea, however, were certain direct selling expenses for advertising, rebates, and bank charges. *See* Remand

---

[1] All citations to the administrative record take the form "P.R.__" or "C.R.__."

3

Redetermination at 15. Zinus reported no salary expenses for Zinus Korea's sales staff or associated administrative overhead.[2]

As Mattress Petitioners have repeatedly demonstrated, the claim that Zinus Korea was the entity actually making sales to the unaffiliated US customer for [          ] Zinus US' sales but somehow was not incurring any expenses for sales staff or administrative overhead simply does not make commercial sense. As discussed below, it is also entirely inconsistent with Zinus Korea's financial accounting which reports substantial "commissions and fees" received from Zinus Indonesia during the POI. *See* Mattress Petitioners' Memorandum of Points of Law and Fact in Support of the Rule 56.2 Motion for Judgment on the Agency Record Filed by Plaintiffs" ("56.2 Brief") (Nov. 10, 2021) at 17-22 (ECF No. 24). Put plainly, it defies logic that Zinus Indonesia would pay Zinus Korea such substantial "commissions and fees" (here, recorded in the form of [          ] Zinus Korea's sales of Zinus Indonesia's merchandise) if Zinus Korea in fact had no role in the sales process. *Id*. Yet, rather than critically evaluating the incongruity of Zinus' statements the Department doubles-down on its faulty reasoning, effectively arguing that Zinus Korea did not incur any expenses because Zinus said it did not incur any. *See* Remand Redetermination at 14 (referencing only Zinus' self-reported selling functions chart). The unsubstantiated claims of a respondent are not substantial evidence. *See, e.g., Gerald Metals, Inc. v. U.S.*, 132 F.3d 716, 720 (Fed. Cir. 1997) (quoting *Universal Camera Corp. v. N.R.L.B*, 340 U.S. 474, 487 (1951)) ("{T}he substantial evidence standard requires

---

[2] Here, Mattress Petitioners clarify that the salary expenses that the Department references, *see* Remand Redetermination at 11-12, are **not** the salaries of Zinus Korea sales staff. Instead, these salaries—which Zinus did not initially report to the Department—reflect only the salaries of Zinus Korea's management staff who undertake administrative activities on behalf of the entire Zinus group, and which are therefore reported as general and administrative ("G&A") expenses, rather than selling expenses.

4

more than a mere assertion of 'evidence which in and of itself justified {the agency's determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.'"); *see also Chung Ling Co., Ltd. v. U.S.*, 805 F. Supp. 56, 62 (Ct. Int'l Trade 1992) ("Under the substantial evidence standard, the absence of information for a thorough analysis may render a determination unsupported by substantial evidence.") (internal marks and citations omitted).

In its Remand Redetermination, the Department cites various record documents that it claims confirm that Zinus Korea reported all the actual expenses associated with US sales. A careful review of these documents, however, demonstrates that they do not support the Department's analysis. The Department points first to an email correspondence between Zinus Indonesia and Zinus Korea provided in Exhibit SA-6a that purportedly shows that Zinus Indonesia prepared and generated invoices on behalf of Zinus Korea. *See* Remand Redetermination at 10-11. Even if true, however, this does not demonstrate that Zinus Indonesia was the lone entity involved in performing order input/processing, or that all of Zinus Korea's actual expenses have been accounted for. To the contrary, the email [


]. These [


], all of which are actual expenses incurred by Zinus Korea that are associated with sales of subject merchandise to the United States and, therefore, must be reported to the Department. *See* Remand Redetermination at 12 (confirming that the Department's antidumping questionnaire "requests that respondents report

5

the actual expenses of any affiliated selling agents, *e.g.*, salaries, electricity, rent, travel for sales purposes, *etc.*").

Although the email in Exhibit SA-6a [

], the Department failed to identify where on the record these expenses are reported. The Department intimates that such [                    ] expenses were reported as "relevant general and administrative expenses," Remand Redetermination at 12, but this cannot be the case. As noted above, Zinus' submissions make absolutely clear that the only "[       ]" Zinus allocated and reported as administrative expenses in its G&A calculation were

[                                                                                       ]" and [

] reported on Zinus Korea's unconsolidated financial statement for 2019. *See* Letter from Zinus, "Zinus' Section D Supplemental Questionnaire Response" (Sep. 23, 2020) ("*SDQR*") at Exhibit SD-25 (C.R. 205); *see also AQR* at Exhibit A-11d(1) (C.R. 38) (Zinus Korea's unconsolidated financial statement for 2019, which reports total [                ] ).

Other "supporting" documents cited by the Department suffer from similar problems:

- *First*, the Department cites documentation provided in Exhibit SA-6b as "an example of the type of personnel training in which Zinus Indonesia participated with respect to one of its major customers." Remand Redetermination at 11. However, the documentation provided in Exhibit SA-6b is [

  ]. *See SAQR* at Exhibit SA-6B (C.R. 155). It thus does not prove that Zinus Indonesia staff participated in this or other trainings on behalf of [       ], nor does it demonstrate that Zinus Korea staff did not.

- *Second*, the Department cites documentation in Exhibit A-7b as "an example of a weekly forecast report prepared by the sales and demand planning teams" of Zinus Indonesia. Remand Redetermination at 11. However, nothing in the referenced report, titled [                                                  ], indicates that the report

was prepared by Zinus Indonesia rather than Zinus Korea or some other Zinus affiliate. *AQR* at Exhibit A-7b (C.R. 37).

- *Third*, the Department cites the purchase order in Exhibit A-7b as evidence that Zinus Indonesia performed "sales-related administrative activities." Remand Redetermination at 11. However, the referenced purchase order [                                                          ], indicating that it was Zinus Korea, not Zinus Indonesia, that is involved in such functions. *AQR* at Exhibit A-7b (C.R. 37).

- *Finally*, the Department cites an email exchange in Exhibit A-7b between Zinus Indonesia and "one of its customers regarding the transmission of a purchaser order between Zinus U.S.'s Enterprise Resource Planning (i.e., ERP) system" as evidence that Zinus Indonesia provided "technical support." Remand Redetermination at 11. Yet again, the cited document does not support this conclusion. In particular, [


  ]. *AQR* at Exhibit A-7b (C.R. 37); *see also SAQR* at Exhibit SA-6A (C.R. 155) ([
                                                  ]). Instead, [                                           ], which [                      ] provided in Exhibit SA-10(a) [                    ]. *See SAQR* at Exhibit SA-10(a) (C.R. 156) ([

   ]).

In its Remand Redetermination, the Department dismisses the above evidence by pointing to Zinus' self-reported selling functions chart, which it claims confirms Zinus Korea's "minimal{}" involvement in Zinus' US sales. Remand Redetermination at 15. But this simply ignores the issue. Mattress Petitioners have never disputed that Zinus *claims* that Zinus Korea was minimally involved in US sales. Instead, Mattress Petitioners have argued that such claims are illogical and unsupported by record evidence, particularly for the [            ] of its sales that Zinus labels "Zinus {Korea}'s sales to unaffiliated US customers." *AQR* at A-3 (C.R. 36). As discussed above, the evidence cited by the Department does not support Zinus' claims about the minimal nature of Zinus Korea's involvement in such sales.

7

Moreover, even if the intensity of activity Zinus self-reported in the selling functions chart were accurate, they still confirm that Zinus failed to report all of Zinus Korea's expenses. Specifically, the Department acknowledges for CEP sales that "Zinus Korea was involved in only one selling activity (*i.e.*, order input/processing)," and for EP sales "Zinus Korea was involved in three selling activities (*i.e.,* sales promotion, order input/processing, and warranty servicing)." Remand Redetermination at 10. Even if minor, the salary and other expenses associated with Zinus Korea's sales staff performing these selling functions are still actual expenses that must be accounted for in the margin calculation. The Department was unable to identify where such expenses were reported because Zinus, in fact, did not report them.

Similarly, the Department's "explanations" with respect to K-IFRS are also lacking. The Department concedes that Zinus Indonesia made transfer payments to Zinus Korea that are appropriately categorized as "commissions and fees" under K-IFRS. *See* Remand Redetermination at 16. The Department then states, however, that it "does not treat such payments as selling expenses in the margin calculation when they occur between affiliated parties." *Id*. Instead, the Department states that it requires respondents to "report the actual expenses of any affiliated selling agents, *e.g.,* salaries, electricity, rent, travel for sales purposes, etc., rather than any commissions paid to those agents." *Id*. at 12. As discussed above, however, **Zinus did not report any staff salaries, electricity, rent, or travel for sales purposes incurred by Zinus Korea**. Thus, even if the Department's practice is to consider actual expenses, rather than commissions and fees, the agency did not follow that practice here.

The Department also indicates that the reason it requires respondents to report actual expenses of a selling agent rather than commissions and fees is because "such intra-company payments are subject to manipulation by a respondent and could distort the reported selling

8

expenses and the dumping calculations." *Id.* at 16. The Department fails to explain how the current scenario—in which the Department blindly accepted Zinus' assertion that Zinus Korea had no sales staff expenses, despite evidence to the contrary—is any less susceptible to manipulation. Just as a respondent could distort intra-company payments to hide selling expenses, it could just as easily hide such selling expenses by ensuring they are incurred on the books of a third-country selling agent. Indeed, Mattress Petitioners believe this is exactly what happened here. In such a scenario, it is unreasonable for the Department to ignore the "commission and fees" reported on Zinus Korea's actual audited books and records, which support Mattress Petitioner's assertions that Zinus performed more substantive activities on behalf of Zinus Indonesia.

## II. The Department Failed to Explain Its Change of Practice in Applying the Transactions Disregarded Rule

The statute instructs that, when reviewing transactions made directly or indirectly through affiliated parties, the Department should disregard purchases that it determines "do{} not fairly reflect…sales of merchandise under consideration in the market under consideration." 19 USC § 1677b(f)(2). In interpreting this mandate, the Department has long held that the relevant market price benchmark is not the price available to purchasers generally, but rather the price that "best represents the respondent's ***own experience*** in the market under consideration." *See Unicatch Indus. Co. v. United States*, 539 F. Supp. 3d 1229, 1249 (Ct. Int'l Trade 2021) (quoting *Polyethylene Retail Carrier Bags from Thailand: Final Results of Antidumping Duty Administrative Review*, 72 Fed. Reg. 1982 (Jan. 17, 2007), IDM at 18) (emphasis supplied). Accordingly, the Department's "consistent and predictable" practice for establishing a fair market price is to first look to the respondent's purchases of the same input from unaffiliated suppliers and, where the record contains no such transactions, to then turn to sales of the input by

9

the affiliated supplier to other unaffiliated parties. *See Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea: Final Results of Antidumping Duty Administrative Review*, 86 Fed. Reg. 35060 (July 1, 2021) ("*Rectangular Pipes from Korea*"), IDM at Comment 7; *see also Notice of Final Determination of Sales at Less Than Fair Value and Negative Critical Circumstances Determination: Bottom Mount Combination Refrigerator-Freezers from the Republic of Korea*, 77 Fed. Reg. 17413 (Mar. 26, 2012), IDM at Comment 17. In the absence of either, the Department looks to the affiliated suppliers COP. *See Rectangular Pipes from Korea*, IDM at Comment 7; *see also* Remand Redetermination at 18 (confirming this well-established hierarchy). This is true even where that affiliate is located in a third country.[3]

Although each of these methodologies is distinct, they all share the Department's long-standing focus on choosing a market benchmark based on the respondent's unique purchasing experiences, as reflected in arm's length transactions or the cost of production of its affiliated suppliers. Yet, in its Remand Redetermination the Department jettisoned this prior reasoning. Instead, the Department concluded that where transactions occur between a respondent and a non-market economy ("NME")-based affiliated supplier, the agency should not focus on the

---

[3] For example, *Bottom Mount Refrigerators from Mexico* involved a Korean conglomerate with affiliates located throughout the globe. Mexican respondent Samsung Electronics Mexico ("SAM") purchased compressors from its Korean affiliate, Samsung Gwangju Electronics Co., Ltd ("SGEC"). *See Notice of Final Determination of Sales at Less Than Fair Value and Affirmative Critical Circumstances Determination: Bottom Mount Combination Refrigerator-Freezers From Mexico*, 77 Fed. Reg. 17,422 (Mar. 26, 2012), IDM at Comment 29; *see also Bottom Mount Combination Refrigerator-Freezers From the Republic of Korea: Preliminary Negative Countervailing Duty Determination and Alignment of Final Determination With Final Antidumping Determination*, 76 Fed. Reg. 55,044, 55,047 (Sep. 6, 2011) (noting that SGEC is a Korean producer of bottom mount refrigerators subject to the CVD investigation). Because SGEC was SAM's only source for compressors (a minor input), when applying Section 1677b(f)(2) Commerce compared the transfer price SAM paid SGEC to SGEC's cost of production ("COP"). *Id.* Thus, the Department used Korean costs to determine the surrogate market price for a Mexican respondent because this reflected the respondent's experience when purchasing compressors.

respondent's own experience in acquiring inputs from an NME, but rather on what prices "could reasonably be expected to be available to the respondent" had the respondent sought to source the inputs in Indonesia. Remand Redetermination at 19-20. The Department's Remand Redetermination failed to explain why its departure from its past policy of basing the market value benchmark on the individual respondent's unique purchasing experiences was reasonable, as is required. *See, e.g., Nippon Steel Corp. v. U.S. Int'l Trade Comm'n*, 494 F.3d 1371, 1377 n.5 (Fed. Cir. 2007*); see also Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Ins. Co*., 463 U.S. 29, 57 (1983) ("{A}n agency changing its course must supply a reasoned analysis.") (internal quotation and citation omitted). There is no doubt that if the affiliate were located in Taiwan instead of China, the Department would have used their Taiwanese affiliates' COP as a benchmark. The Department failed to explain why relying on a proxy for Indonesian market prices is reasonable when Zinus unambiguously purchased the inputs in question from Chinese affiliates.

To be consistent with its prior practice of using the affiliates' COP (regardless of the country in which they are located), the Department should not rely on Global Trade Atlas ("GTA") data for imports into Indonesia to establish a market benchmark, but rather utilize the six-country average of GTA import data from Romania, Russia, Malaysia, Turkey, Mexico, and Brazil (the "GTA 6 data"). During the POI, the Department considered each of these countries to be market economies that were economically comparable to China, *see* "Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Mattresses from Indonesia" (Mar. 18, 2021) at 17 (P.R. 284), and the six-country GTA average is thus a reasonable, market-based proxy for the COP of Zinus' Chinese affiliates. Indeed, the Department adopted—and this Court recently affirmed—an identical approach in the

11

context of the major input rule of 19 USC § 1677b(f)(3), a companion to the transactions disregarded rule in 19 USC § 1677b(f)(2). *See Best Mattresses Int'l Co. Ltd. v. United States*, 622 F. Supp. 3d 1347, 1358 (Ct. Int'l Trade 2023) (finding that the Department's interpretation of 19 USC § 1677b(f)(3) as permitting the use of third country surrogate data as "information available" for determining the COP of a non-market economy supplier "reasonable and warrants deference").

The Department failed to explain why use of an identical methodology to determine the COP of a minor input purchased from an NME-based supplier was not similarly reasonable "information available" for the purposes of applying the transactions disregarded rule in accordance with the Department's established hierarchy. The Department appears to eschew this approach because "the goal of the transactions disregarded analysis is to arrive at a market price for the inputs which would available to the respondent." Remand Redetermination at 23. What the Department fails to recognize is that this is also the goal when applying the major input rule. Moreover, the GTA 6 data are not intended to reflect import prices into other countries. Instead, they are intended be reflect a surrogate of the COP of Zinus' **Chinese affiliate**, the entity from which Zinus Indonesia sourced its inputs. Such an approach is consistent with Zinus' own experience during the POI, which was to shift production from China to Indonesia to avoid Chinese duties while continuing to rely on its existing Chinese input supply stream. *See generally* Mattress Petitioners 56.2 Brief (Nov. 10, 2021) at 3-4 (ECF No. 24). The Department has an opportunity and obligation to ensure that the dumping margin calculation accurately accounts for Zinus' actions, but it has not done so here.

### III. Conclusion

As explained above, the Department's Remand Redetermination failed to comply with the Court's Remand Order by both: (1) failing to support with substantial evidence the

Department's conclusion that Zinus accurately reported all of Zinus Korea's selling expenses related to US sales, and (2) failing to explain its decision to no longer consider the affiliated supplier's COP, or a reasonable surrogate thereof, in applying the transactions disregarded rule. This Court should accordingly remand the Department's Remand Redetermination for reconsideration and further explanation of these issues.

    Respectfully submitted,

    /s/ Yohai Baisburd
    Yohai Baisburd
    Chase J. Dunn
    Nicole Brunda

    **CASSIDY LEVY KENT (USA) LLP**
    900 19th Street, N.W.
    Suite 400
    Washington, D.C. 20006
    (202) 567-2300

    *Counsel to Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises Inc., Leggett & Platt, Incorporated, International Brotherhood of Teamsters, United Steel Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO*

**Certificate of Compliance**

The undersigned hereby certifies that the foregoing submission of "Defendant-Intervenors' Comments in Partial Opposition to the Final Results of Redetermination" filed on August 8, 2023, contains 3,778 words, exclusive of the caption block, table of contents, table of authorities, signature block, and certificates of counsel, and therefore complies with the maximum 10,000 word count limitation set forth in the Court's Standard Chambers Procedures of the U.S. Court of International Trade.

By: /s/ Yohai Baisburd
Yohai Baisburd