**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| PT. ZINUS GLOBAL INDONESIA, | ) |
| | ) |
| Plaintiff, | ) |
| and | ) |
| | ) |
| BROOKLYN BEDDING, LLC ET AL., | ) |
| | ) |
| Consolidated Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| PT. ZINUS GLOBAL INDONESIA and | ) |
| BROOKLYN BEDDING, LLC ET AL., | ) |
| | ) |
| Defendant-Intervenors. | ) |
| | ) |

NON-CONFIDENTIAL
VERSION

Court No. 21-00277
(Consol.)

Business Proprietary
Information removed from
pages: 6, 9-12, 14-16, 19,
and from the Attachment.

**PLAINTIFF PT. ZINUS GLOBAL INDONESIA'S COMMENTS**
**IN PARTIAL OPPOSITION TO COMMERCE'S REMAND DETERMINATION**

ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 942-5000
Fax: (202) 942-5999

J. David Park
Henry D. Almond
Daniel R. Wilson
Kang Woo Lee
Gina M. Colarusso

*Counsel to PT. Zinus Global Indonesia*

Eric Johnson

*Consultant to PT. Zinus Global Indonesia*
*Plaintiff*

Dated: August 8, 2023

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     BACKGROUND ....................................................................................................3

III.    STANDARD OF REVIEW .....................................................................................8

IV.     ARGUMENT .........................................................................................................9

        A.      Commerce Fails to Comply with This Court's Order to Demonstrate
               How Record Evidence Supports the Inclusion of In-Transit Mattresses in
               Commerce's Quarterly Ratio Calculation Used to Identify Subject CEP
               Inventory Sales ...................................................................................................11

        B.      Commerce's Redetermination Rests on an Unlawful Application of
               Adverse Facts Available ....................................................................................17

V.      CONCLUSION ....................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### <u>Federal Cases</u>

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
   992 F. Supp. 2d 1285 (Ct. Int'l Trade 2014), *aff'd*, 802 F.3d 1339 (Fed. Cir.
   2015) ..................................................................................................................8

*Agro Dutch Indus. v. United States*
   31 CIT 2047 (2007) ...........................................................................................17

*Çelik Fabrikalari T.A.Ş. v. United States*,
   308 F. Supp. 3d 1297 (Ct. Int'l Trade 2018) ....................................................18

*Consol. Edison Co. of New York v. N.L.R.B.*,
   305 U.S. 197 (1938)..............................................................................................8

*Hoogovens Staal Bv v. United States*,
   24 CIT 44 (2000) ................................................................................................18

*Hyundai Heavy Indus. Co., Ltd. v. United States*,
   485 F. Supp. 3d 1380 (Ct. Int'l Trade 2020) ................................................8, 13

*Nippon Steel Corp. v. United States*,
   458 F.3d 1345 (Fed. Cir. 2006)............................................................................8

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
   659 F.3d 1142 (Fed. Cir. 2011)............................................................................8

*Sterling Fed. Sys., Inc. v. Goldin*,
   16 F.3d 1177 (Fed. Cir. 1994)..............................................................................8

*Universal Camera Corp. v. N.L.R.B.*,
   340 U.S. 474 (1951)..............................................................................................8

### <u>Federal Statutes</u>

19 U.S.C. § 1516a(b)(1)(B)(i)......................................................................................8

19 U.S.C. § 1677e(a)..................................................................................................17

19 U.S.C. § 1677m(d)......................................................................................17, 18, 19

### <u>Administrative Determination</u>

*Mattresses from Indonesia: Final Affirmative Determination of Sales at Less Than
   Fair Value*, 86 Fed. Reg. 15,899 (Dept. Comm., Mar. 25, 2021)..........................1

## I.  <u>INTRODUCTION</u>

PT. Zinus Global Indonesia ("Plaintiff" or "Zinus"), an Indonesian producer and exporter of mattresses, submits these comments in opposition to the June 9, 2023 redetermination on remand by the U.S. Department of Commerce ("Commerce") in the antidumping duty investigation of Mattresses from Indonesia.  Final Results of Redetermination Pursuant to Court Remand, June 9, 2023, ECF Nos. 59-1 and 60-1 (hereinafter "Remand Results").  Specifically, Zinus addresses Commerce's insufficient explanation for its determination to include mattresses <u>in-transit from Indonesia</u> in the quarterly ratio calculations used to determine the total quantity of Indonesian-origin mattresses <u>sold from U.S. inventory</u>.

This Court held that Commerce initially failed to provide sufficient explanation or citations to record evidence to support its determination regarding in-transit mattresses as constructed export price ("CEP") inventory sales.  Slip Op. 23-39 at 23 (Mar. 20, 2023), ECF No. 55.  Instead, as this Court explained, Commerce stated only that it agreed with petitioners and thus would include the in-transit merchandise as sold from inventory.  *Id*. (citing *Mattresses from Indonesia: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 15,899 (Dept. Comm., Mar. 25, 2021) ("Final Determination"), accompanying Issues and Decision Memorandum ("Final Decision Memo") at 8-9.  That is, during the investigation, Commerce failed to provide any justification whatsoever for its conclusion regarding in-transit mattresses.  This Court therefore remanded the issue to Commerce, ordering the agency to consider the matter further, provide an actual rationale for its conclusion, and demonstrate how record evidence supports the agency's rationale.  *Id*.

Commerce's remand results fail to comply with this Court's Order.  While Commerce has managed to put together a few paragraphs, its explanation for continuing to include in-transit to the United States mattresses as sales made from U.S. inventory during the period of investigation

**NON-CONFIDENTIAL VERSION**

("POI") continues to be unreasonable and unsupported by substantial record evidence. Moreover, in order for Commerce's explanation to make any sense, the agency has assumed that Zinus U.S. had zero mattresses in inventory at the start of the POI.  Record evidence does not support such an assumption.  If Commerce had any doubts or believed there to be gaps in the factual record regarding beginning inventory, it had an obligation to ask Zinus for additional information.  It did not do so.  The Court should remand this issue once more to Commerce with instruction to exclude the in-transit mattresses from CEP inventory sales or, should the Court view the record as incomplete on this matter, with instruction to ask Zinus for additional information, such as its beginning U.S. inventory at the start of the POI.

In the comments that follow, we go through in detail the fallacies and shortcomings in Commerce's analysis, and the record evidence that directly contradicts Commerce's conclusions. However, at the outset, we stress that Commerce's reasoning and conclusions rest on fanciful and theoretical possibilities that have no support in the record.  Commerce concludes that Zinus U.S. could have sold merchandise out of U.S. warehouse inventory while that merchandise was still *en route* to the United States.  At a most basic level, this is inconsistent with the obvious fact that merchandise cannot be sold out of U.S. inventory before it enters U.S. inventory.  In order to try to support this impossible conclusion Commerce contorts itself and the facts, and, in particular, Commerce's theory hinges on two factual assumptions:

1.  That Zinus U.S. could have sold mattresses out of U.S. inventory before the merchandise enters the United States; and

2.  That Zinus U.S. held no inventory at the beginning of the calendar year 2019 period of investigation.

However, there is no support for either of these factual predicates.  Rather, Commerce points to a supposed *lack* of evidence on the record to disprove its theories.  In doing so, Commerce turns the substantial record evidence standard on its head – sustaining Commerce's remand would result in Commerce not needing to support its decisions with substantial evidence so long as there is no conclusive evidence to prove that the agency's decision is incorrect.  While this approach is inconsistent with the standard of review, as discussed below in these comments, it is also inconsistent with substantial record evidence which directly undermines Commerce's illogical conclusions.

For the reasons discussed herein, the Court should remand this issue for a second time so that Commerce can properly consider the record evidence and modify its calculations accordingly.

## II.   <u>BACKGROUND</u>

From the outset of the underlying investigation, Zinus notified Commerce that it could not definitively link the country of origin to sales from U.S. inventory due to co-mingling of merchandise within that inventory.  *See e.g.*, Zinus' Section A Response (June 18, 2020) ("Zinus Section A Response") at A-5 (P.R. 97, C.R. 36).  In this regard, Zinus reported all of its U.S. sales out of U.S. inventory of models produced in Indonesia in either (a) the primary Section C U.S. sales database or (b) a secondary non-subject U.S. sales database.  *See* Zinus' Section C Response (July 13, 2020) ("Zinus Section C Response") at C-2-C-3 (P.R. 119, C.R. 117) (discussing the two databases).  For purposes of this segregation, Zinus used a "first in first out" (or "FIFO") methodology to identify sales as either subject (Indonesia-origin) or non-subject (non-Indonesia-origin).

Following standard Commerce reporting methodologies, for CEP inventory sales, Zinus identified the date of sale as the earlier of shipment date out of U.S. inventory or the Zinus U.S. invoice date to the unaffiliated customer.  Zinus Section C Response at C-27 (P.R. 119, C.R. 117).  There were no CEP inventory sales invoiced during the period that had not yet shipped out of inventory, thus, the date of sale was equal to the date on which the merchandise left the U.S. warehouse.[1]  Importantly, all of the U.S. inventory sales had shipment dates between January 1, 2019 and December 31, 2019, meaning that all such sales shipped out of U.S. inventory within the POI.  Zinus also reported a U.S. warehouse code for each CEP inventory sale, further demonstrating that the merchandise sold through this sales channel was physically in the United States during the POI.

In response to allegations from the Petitioners that Zinus' FIFO methodology undercounted subject CEP inventory sales, Zinus thoroughly explained that the correct starting point for the CEP inventory analysis is Zinus' inventory in the United States during the POI, not the number of mattresses Zinus KR sold to Zinus, Inc. ('Zinus US") in the POI, as Petitioners suggested, which necessarily includes a quantity of mattresses still in transit (*i.e.*, *en route* from Indonesia via ocean freight to the United States).  *See* Zinus' Section C Supplemental Questionnaire Response (part 2) (Sept. 28, 2020) ("Zinus Supp. Section C Response (Pt. 2)") at Exhibit SC-5c (C.R. 213).  Moreover, Zinus' responses addressing (1) Zinus KR's total sales to Zinus US and (2) Zinus US's imports of Indonesian-origin units for U.S. warehousing demonstrated how the reported quantities reconciled to Zinus KR's and Zinus US' financial

---

[1] The databases themselves contain thousands of rows and are only submitted to the agency in electronic SAS file format.  Though these database files do not lend themselves well to presentation through the court's record appendix submission process, a simple review of the files confirms that all reported U.S. inventory sales had shipment dates (from the U.S. warehouse) between January 1, 2019, and December 31, 2019.

statements, respectively.  Further, Zinus provided a detailed, line-item-specific list of all merchandise in transit as of December 31, 2019.  *See id*. at Exhibit SC-5c, item 4 (C.R. 213). This listing included the purchase order number, product code, and quantity in pieces accounting for each of the mattresses in transit on December 31, 2019.  The exhibit also included U.S. Customs and Border Protection Entry Summary Form 7501 documentation for selected shipments showing that the merchandise sold by Zinus KR to Zinus US did not enter the United States until January 2020 (*i.e.*, after the POI).  *Id*.

In its preliminary determination, Commerce chose not to use Zinus' FIFO methodology to identify the universe of Zinus' CEP inventory sales because "{q}uestions remain{ed} about the accuracy" of Zinus' FIFO methodology.  Memorandum to Jeffrey I. Kessler from James Maeder, *Decision Memorandum for the Preliminary Affirmative Determination and Postponement of Final Determination in the Less-Than-Fair-Value Investigation of Mattresses from Indonesia* (Oct. 27, 2020) ("Preliminary Decision Memo") at 10 (P.R. 226).  Commerce instead used an allocation methodology proposed by Petitioners whereby it calculated an overall ratio, by calendar quarter, to approximate the share of U.S. inventory sales which were of product produced in Indonesia.  Commerce's methodology first identified a ratio of subject and non-subject CEP inventory sales on the basis of the overall inventory quantities reported in Zinus' Exhibit SC2-1, and then increased the number of Indonesian mattresses to include those mattresses that were in transit from Indonesia to the CEP inventory warehouses (*i.e.*, mattresses which had not entered the United States as of the end of the period of investigation).  *See* Preliminary Calc. Memo at 2 (C.R. 258), and Attachment 1 (C.R. 259).  This methodological decision was a significant factor resulting in the above de minimis 2.61 percent preliminary dumping margin Commerce calculated for Zinus.  *See* Preliminary Decision Memo at 9-10 (P.R.

226); *see also* Memorandum to the File, *Preliminary Determination Margin Calculation for PT Zinus Global Indonesia* (Oct. 27, 2020) ("Preliminary Calc. Memo") at 1-3 (P.R. 229, C.R. 258).

In its Preliminary Decision Memorandum Commerce stated that it would "continue to examine this issue for purposes of the final determination." Preliminary Decision Memo at 10 (P.R. 226). Subsequent to the preliminary determination, Commerce issued an additional supplemental questionnaire to Zinus (as well as a questionnaire in lieu of verification), in which it asked one additional question regarding Zinus' ability to track sales of mattresses by country of origin prior to the POI. Commerce did not ask any questions or request any additional documentation specific to the FIFO methodology, shipments in transit at the end of the POI, or any questions about Zinus' inventories held in the United States at the start of the POI. Specifically, Commerce's one follow-up question was:

> Explain the degree to which Zinus US and Best Price Mattresses (BPM) were able to track sales of mattresses by country of origin prior to the POI. Specifically, indicate the degree to which these affiliates commingled mattresses produced by various manufacturers prior to the POI. Provide documentation to support your response.

Letter from U.S. Department of Commerce to PT. Zinus Global Indonesia c/o Arnold & Porter LLP, *Antidumping Duty Investigation of Mattresses from Indonesia: Zinus Post-Preliminary Supplemental Questionnaire* (Dec. 2, 2020) ("Post-Prelim Supp. QR") at 3 (P.R. 249). In response, with respect to Zinus U.S., Zinus explained:

> As an initial matter, Zinus Indonesia did not begin producing mattresses until February 2019. Thus, it would have been impossible for either Zinus US or BPM to have purchased subject merchandise prior to the POI. Further, prior to the POI, Zinus US only purchased mattresses from Zinus Xiamen. Thus, the country of origin (China) was clear, and there was no need for Zinus US to segregate the country of origin of mattresses. Please refer to Exhibit A-11b(2), Zinus US' 2018 audit report submitted on June 18, 2020, wherein [
>
>                                                                        ].

Zinus' Post-Preliminary Supplemental Questionnaire Response (questions 1-4) (Dec. 14, 2020)

("Zinus Post-Prelim Supp. QR (Pt. 1)") at 6 (C.R. 271) (providing screen shots of Zinus U.S.'

2018 audit report).  Commerce did not ask any additional questions regarding Zinus' FIFO

methodology or CEP inventory sales.

     In its final determination, Commerce continued to apply the quarterly ratio sales

methodology proposed by Petitioners rather than utilizing Zinus' FIFO methodology.  Final

Decision Memo at 8-9 (P.R. 284).  Commerce also continued to use the intercompany sales

figure inclusive of product in transit (rather than product in U.S. inventory) and did not make an

adjustment to account for the number of units in transit at the end of the POI.  *Id.*  Commerce did

not engage with record evidence or Zinus' extensive briefing on the topic, instead stating:

> We therefore agree with the petitioners that the quarterly ratio sales reporting
> methodology used in the *Preliminary Determination*, along with the quantity of
> mattresses that Zinus US purchased from Zinus KR, is preferable in this case.
> Because it applies quarterly ratios grounded in purchase data to the full universe
> of Zinus US's sales from inventory during the POI, it is neutral in terms of
> determining which sales to report as subject merchandise sales.

*Id.* at 9.  In support of this position, Commerce cited only to Petitioners' pre-preliminary

comments.  In doing so, Commerce essentially cited to no record evidence, as those comments

could not include any new factual information.

     This Court found that Commerce failed to provide sufficient explanation or citations to

record evidence to support its inclusion of in-transit pre-importation mattresses in the quarterly

ratio calculations used to determine the total quantity of Indonesian-origin mattresses sold from

inventory.  Slip Op. 23-39 at 23.  In recognition of the fact that Commerce "did not provide

express reasons for or specific record evidence in support of rejecting {Zinus'} argument, stating

only that '{w}e therefore agree with the petitioners that the quarterly ratio sales reporting

methodology used in the Preliminary Determination, along with the quantity of mattresses that

Zinus U.S. purchased from {Zinus Korea} is preferable in this case'" this Court remanded this issue to Commerce for further consideration and explanation of how its determination is supported by substantial evidence. *Id*.

In response to the Court's instruction, on remand Commerce continues to provide an inadequate explanation but with citations to two record documents: Exhibit C-2B of Zinus' Section C Response and Exhibit SA-5 of Zinus' Supplemental Section A Response. Remand Results at 6-9. These exhibits do not support Commerce's provided justification for concluding that there must have been some U.S. sales to unaffiliated customers of mattresses from U.S. inventory that were in transit at the end of the POR.

## III.   <u>STANDARD OF REVIEW</u>

The Court will hold Commerce's determinations unlawful in an antidumping duty proceeding where they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938). Importantly, "{t}he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951). The substantial evidence standard of review essentially asks whether, given the evidence on the record as a whole, the agency's conclusion was reasonable. *See Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006). Moreover, Commerce may not base its decision on speculation, as it is well established that speculation does not constitute substantial evidence. *Hyundai Heavy Indus. Co., Ltd. v. United States*, 485 F. Supp. 3d 1380, 1399 (Ct. Int'l Trade 2020) (citing *Lucent Techs., Inc. v. Gateway, Inc.* 580 F.3d 1301, 1327 (Fed. Cir. 2009). The

Court reviews determinations made on remand for compliance with the Court's remand order.
*Ad Hoc Shrimp Trade Action Comm. v. United States*, 992 F. Supp. 2d 1285, 1290 (Ct. Int'l
Trade 2014), *aff'd*, 802 F.3d 1339 (Fed. Cir. 2015).

When reviewing an agency decision for abuse of discretion, the Court examines whether
the decision: "1) is clearly unreasonable, arbitrary or fanciful; 2) is based on an erroneous
conclusion of law; 3) rests on clearly erroneous fact findings; or 4) follows from a record that
contains no evidence on which the {agency} could rationally base its decision." *Sterling Fed.
Sys., Inc. v. Goldin*, 16 F.3d 1177, 1182 (Fed. Cir. 1994) (quoting *Gerritsen v. Shirai*, 979 F.2d
1524, 1529 (Fed. Cir. 1992)); *see also Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142,
1147–48 (Fed. Cir. 2011) (noting that "A clear error of judgment occurs when" an agency action
is "arbitrary, fanciful, or clearly unreasonable.").

## IV.   **ARGUMENT**

Commerce's remand determination fails to adequately address the Court's Remand Order,
as it does not demonstrate how record evidence supports the inclusion of [          ] mattresses in-
transit at the end of the POI in its quarterly ratio calculation of subject CEP inventory sales.  As
this Court recognized, in its final determination Commerce did not provide any justification for
its inclusion of in-transit mattresses in its quarterly ratio calculation.  Slip Op. 23-39 at 23.  On
remand, Commerce has provided some explanation for its decision, but its explanation is
unreasonable, fails to address the substantial record evidence that belies Commerce's
explanation, and is premised on an incorrect assumption rather than fact.  With reference to just
two record documents, neither of which support Commerce's contention, Commerce's rationale
on remand is that the record shows the purchased quantity that entered U.S. inventory was less
than the quantity Zinus reported that it sold out of U.S. inventory during the POI and, Commerce

claims, the difference "could only be accounted for by the mattresses in transit." Remand Results at 6 (alleging a difference of **[          ]** mattresses).

Record evidence demonstrates that all of Zinus' reported inventory sales had shipped out of U.S. inventory by December 31, 2019. Thus, mattresses still in-transit to the United States on December 31, 2019 could not have been sold from U.S. inventory as they had not yet even entered the United States, let alone a U.S. warehouse. This fact alone wholly undermines Commerce's stated rationale. The obvious alternative to Commerce's unsupported theory is that Zinus had mattresses in inventory at the start of the POI, which allowed it to sell more mattresses than had entered inventory during the POI. Commerce rejects this logical conclusion, stating that Zinus did not provide evidence of beginning period inventories. Remand Results at 7. Zinus demonstrates below how the record supports its logical deduction. If Commerce perceived there to be a gap in the record, it had an obligation to notify Zinus and request additional information to fill that gap. Commerce cannot fill in allegedly missing information, that it never asked for, with its own unfavorable assumptions.

Commerce's remand results on this issue are therefore wholly insufficient and do not comply with the Remand Order. The Court should further remand this issue with clear instruction for Commerce to exclude the in-transit mattresses from its quarterly ratio calculation. While Zinus believes the record currently contains substantial evidence to support its position, should the Court find that the record is not complete, short of instructing Commerce to exclude the in-transit merchandise, the Court should instruct Commerce to collect additional information regarding Zinus' beginning period U.S. inventories.

**A.** **Commerce Fails to Comply with This Court's Order to Demonstrate How Record Evidence Supports the Inclusion of In-Transit Mattresses in Commerce's Quarterly Ratio Calculation Used to Identify Subject CEP Inventory Sales**

The aim of Commerce's quarterly ratio calculations was to identify the proportion of sales out of U.S. inventory that were of Indonesia-origin mattresses (versus those of other origins). The reason an allocation methodology was used at all was because Zinus could not link the country of origin to prior sales due to co-mingling of merchandise within U.S. inventory. *See* Zinus Section A Response at A-5 (P.R. 97, C.R. 36). By definition, the relevant universe of sales at issue *were those physically held in U.S. inventory and thus available for sale out of inventory to unaffiliated U.S. customers*.[2] Merchandise in-transit necessarily should not be included in the analysis or any quarterly ratios to assign a country of origin to the sales out of inventory, because this in-transit merchandise *was not held in U.S. inventory* during the POI. Moreover, there is no question as to the country of origin of products in transit from Indonesia directly to the United States, and therefore the quantity of merchandise in transit from Indonesia should never be included in the quarterly ratio calculation given its indisputable country of origin.

Despite the flaws in its theory, Commerce continues to include the quantity of in-transit mattresses in its quarterly ratio calculation. Commerce states:

> The data included in the AQR and CQR clearly indicate that certain models of subject mattresses in transit should be included in the quarterly ratio calculation given that the quantity of mattresses with subject merchandise model numbers that Zinus purchased for inventory during the POI (*i.e.*, **[          ]**) is less than the

---

[2] Despite this important context -- *i.e.*, that the sales at issue are those made from U.S. inventory and not all CEP sales -- Commerce continues to argue that the statute does not require a product be imported and actually physically in inventory in the warehouse before it is considered to be "in inventory" to be sold and included in a CEP sales database. Remand Results at 3-4 (citing 19 U.S.C. 1677a(b), which defines "constructed export price"). The definition of a CEP sale is irrelevant to this discussion: the existence of more than one type of CEP sales distribution channel does not change the fact that Commerce applied its allocation methodology specifically to CEP sales made out of U.S. inventory. Thus, Zinus has focused its comments only on relevant issues.

quantity of subject merchandise mattresses Zinus sold from inventory during the POI (*i.e.*, [        ]).

Remand Results at 6 (citing Zinus' Supplemental Section A Response at Exhibit SA-5 and Zinus' Section C Response at Exhibit C-2b).  Commerce states that the difference (of [        ]) "could only be accounted for by the mattresses in transit."  *Id*.  Commerce's underlying premise for including the merchandise in transit in the calculations is Commerce's speculation that some of those mattresses that were being shipped to Zinus U.S. and had not yet entered the United States, could have somehow been among the sales reported in the U.S. sales databases.  However, Zinus' reporting, consistent with standard reporting as required by Commerce, was to include only those sales that were sold during the POI in the reporting.  This means that with regard to these CEP inventory sales, only those sales that were invoiced or shipped from the U.S. warehouse during the 2019 period of investigation were included in the reported transactions.  *See* Zinus Section A Response at A-18-A-19 (P.R. 97, C.R. 36).

Indeed, in the non-subject database, Zinus reported shipment dates from the U.S. warehouse ranging from January 1, 2019 through December 31, 2019.  In the subject sales database for CEP inventory sales (Channel 1 sales), Zinus reported shipment dates from the U.S. warehouse ranging from [        ] to December 31, 2019.  That is, all of the reported inventory sales had shipped out of U.S. inventory by December 31, 2019.  This simple fact alone wholly undermines Commerce's reasoning and logic in including the in-transit merchandise, as those products had not yet even entered the United States -- by definition, those mattresses could not have been among the reported sales because they had not arrived in the United States prior to January 1, 2020, and thus could not have been shipped out of U.S. inventory prior to that time.  *See* Zinus Supp. Section C Response (Pt. 2) at Exhibit SC-5c (C.R. 213).

Moreover, Zinus U.S.'s sales reconciliation materials confirm that all sales that were invoiced during the POI were included in the reported databases, as the materials tie the company's financial statements to its sales system for the period of investigation.  Zinus Section C Response at Exhibit C-2B (C.R. 117).  Thus, all U.S. inventory sales that were either shipped or invoiced during the POI were included in the reported sales databases – and all such sales were shipped from the U.S. warehouse prior to December 31, 2019.  In response to this documented fact, Commerce argues that Zinus "is not correct," repeats its theory that Zinus "sold more of the relevant mattresses during the POI than it had in inventory," and claims that "whether or not invoiced, Zinus made such U.S. sales during the POI that must be included in the calculations."  Remand Results at 7.  Commerce's theory rests on the possibility that CEP inventory sales could have been invoiced prior to entering the United States or else that Zinus U.S. was treating in-transit products as inventory.  There is no evidence to support either theory and Commerce cannot base its decision on speculation.  *Hyundai Heavy Indus*, 485 F. Supp. 3d at 1399.  Further, Commerce's claim that mattresses that were still on the water at the end of 2019 were sold to unaffiliated customers "whether or not invoiced" is belied by (1) the sales reconciliation materials that show all POI invoices were captured in the reporting, and (2) the sales databases that show that all pertinent sales were shipped out of a U.S. warehouse prior to December 31, 2019.  That is, there are no unaccounted for sales and therefore no basis to include the in-transit merchandise.

Commerce also claims that "Zinus own data demonstrate that it sold more of the relevant mattresses from its warehouse <u>than were contained</u> in its warehouse during the POI."  Remand Results at 6.  There is no evidence to support this statement -- indeed, Commerce does not cite any record documents to support this statement.  Commerce never asked Zinus for the quantity

of mattresses in inventory at the start of the POI, so it cannot claim to know the total quantity of mattresses "contained in" the U.S. warehouse during the POI.  Commerce unreasonably makes a leap from "shipped to" to "contained in" but these are not the same thing.  Commerce's whole theory relies on two exhibits: Zinus' U.S. sales reconciliation and a table detailing Zinus U.S.'s purchases for inventory.  However, neither of these exhibits anywhere includes the total number of mattresses held in Zinus' U.S. warehouse.  The first exhibit, Zinus' Section C Response at Exhibit C-2B, includes a total <u>sales</u> figure during the period of investigation.  The second exhibit, Zinus' Section A Supp. Response at Exhibit SA-5, includes a summary of all mattresses Zinus U.S. <u>purchased</u> during the period.  Commerce, again, points to these exhibits as absolute proof that in-transit quantities were sold in the period because the sales volume is greater than the volume in inventory.  This does not constitute anything approximating adequate support for its unsubstantiated assertion.

Indeed, one monumental mathematical problem here is that neither of these exhibits address <u>inventory already held at the beginning of the period of investigation</u>.  The figure for purchases in the period (the total from Exhibit SA-5 is **[          ]**) is the number of mattresses purchased during the period, and not mattresses in inventory during the period, because this figure does not include mattresses that were already in the warehouse at the beginning of the period of investigation.  Zinus U.S. did not begin its U.S. sales and inventory operations to coincide with the period of investigation or even with the commencement of its production operations in Indonesia, a fact of which Commerce should be well aware.  *See e.g.*, Submission of Zinus Xiamen's Proprietary Information from the Mattresses from the People's Republic of China Investigation (Oct. 14, 2020), Attachment 1 (Zinus' Feb. 13, 2019 Section A Response), at A-5 (C.R. 222) (explaining that Zinus US imported mattresses during the 1/1/2018 - 6/30/2018

period of investigation); *id*. at Attachment 3 (Zinus' March 28, 2019 Supplemental Section A

Questionnaire Response) at 14 (C.R. 229) (explaining that Zinus US made CEP inventory sales

from its US warehouse during the 1/1/2018 - 6/30/2018 period of investigation).  Indeed, Zinus

U.S.'s 2018 financial statements show a balance sheet asset amount of $[          ] in net

inventories as of December 31, 2018 (which corresponds to the beginning net inventories as of

January 1, 2019).  *See* Zinus Section A Response at Exhibit A-11b(2) (C.R. 38).  Data submitted

to Commerce pursuant to Zinus' in-lieu-of verification questionnaire response also demonstrate

that Zinus had stock from other countries at the beginning of the POI.  Zinus' Response to

Supplemental Questionnaire in Lieu of Verification (Jan 27, 2021) at Exhibit V-1a (C.R. 279).

Commerce may not ignore this irrefutable evidence of existing inventory, as simple logic

necessitates that it be considered prior to making any conclusion regarding the accuracy of the

sales quantities sold and reported by Zinus in the investigation.

        For example, assume Zinus U.S. held 100 mattresses in inventory as of January 1, 2019

and imported zero mattresses during 2019 (or after).  If the company sold 100 mattresses during

the period, this would not mean that the sales quantity of 100 was "in-transit."  It would just

mean that the sales from inventory had been imported prior to the POR.  Commerce's purported

proof of sales of "in-transit" merchandise is therefore misguided.  Moreover, even if there were

any such sales of in-transit merchandise, they would not be reportable transactions because they

could not have shipped out of U.S. inventory prior to importation.

        Moreover, record evidence demonstrates that Commerce's assumptions are incorrect.

Using Zinus' non-subject database and Exhibit SC2-1 (purchase data), a comparison of the

model-specific shipment quantity (*i.e.*, shipment out of U.S. warehouse) for January 2019 to the

model/month-specific purchase data demonstrates that in January 2019 for many models there

were more mattresses shipped out of the U.S. warehouse than Zinus had purchased for U.S

inventory.  *See* **Attachment 1** (providing an analysis of record evidence).  The only way such

shipments could be made out of the U.S. warehouse is if Zinus had existing inventory of such

products.  Zinus U.S. could not physically ship product from U.S. inventory to unaffiliated

customers in the United States if it had not yet purchased the products.  Logically, *Zinus had*

*mattresses in inventory at the start of the POI.*

Finally, Commerce's explanation also ignores the accounting treatment of Zinus' CEP

inventory sales and shipments.  As Zinus has previously explained, at the time the merchandise

ships from Indonesia, Zinus U.S. takes title and records the purchases in a temporary

merchandise in-transit account.  Zinus' Second Section C Supplemental Questionnaire Response

(Sept. 28, 2020) ("Zinus Second Supp. CQR") at 1-2 (P.R. 200, C.R. 214); *see also* Zinus

Section A Response at Exhibit A-10 (C.R. 37) (providing Zinus U.S.'s chart of accounts, which

includes account number **[          ]** for "**[                    ]**").  Only upon arrival and

verification at the U.S. warehouse locations does Zinus U.S. reclassify the merchandise as

finished goods inventory.  Zinus Second Supp. CQR at 1-2.  Commerce's theory that some of

Zinus' U.S. inventory sales were physically not in inventory at the time of sale would have

merchandise invoiced and sold prior to being classified as finished goods inventory.  This theory

ignores the simple fact that if Zinus U.S. had sold the product, it would no longer be classified as

either merchandise in-transit or finished goods inventory – it would be sold merchandise and

classified as such.  The fact that the goods are recognized as merchandise in-transit confirms that

the merchandise has not been sold by Zinus U.S. to any U.S. customer, which directly undercuts

Commerce's hypothetical scenario.

Commerce's remand results fail to address any of these irrefutable facts, which amount to substantial evidence that weighs against Commerce's determination. Commerce's proffered explanation is unreasonable in that it does not (nor can it) cite to record evidence that actually supports its explanation. Commerce's remand merely relies on the same unsupported theory put forth before the court. Commerce, therefore, fails to comply with the court's *Remand Order*. Because there is no record evidence to support Commerce's conclusion to include mattresses in-transit in the quarterly ratio calculations used to determine the total quantity of Indonesian-origin mattresses sold from inventory, the Court must order Commerce to reconsider its determination. The Court should instruct Commerce to use quarterly ratios exclusive of merchandise that had not yet entered the United States (or simply use the FIFO reporting that Zinus originally reported).

### B.  Commerce's Redetermination Rests on an Unlawful Application of Adverse Facts Available

Commerce's remand results are also inconsistent with this Court's precedent regarding the use of adverse facts available. During the underlying investigation, Commerce did not assert that Zinus withheld requested information, failed to timely provide requested information, impeded the proceeding in any way, or provided unverifiable information. On remand, Commerce states that "Zinus has provided no evidence that it had sufficient mattresses in inventory to satisfy the number of the relevant types of mattresses sold during the POI." Remand Results at 7. Commerce argues that "it is therefore reasonable for it to presume that some of the mattresses that were invoiced during the POI must have been shipped and were destined for the U.S. warehouse during the POI." *Id*. Commerce here is effectively conceding that its conclusion, a presumption, is based on speculation rather than evidence. Further, Commerce is effectively saying that it believes information necessary to reach a reasonable

conclusion is missing from the record (*i.e.,* beginning inventories), so it made a presumption (*i.e.*, filled a record gap) that resulted in an AD margin above *de minimis*.  This Court should reject Commerce's results-orientated presumption, adverse to Zinus, for failure to adhere to the law and this Court's precedent.

The statute, at 19 U.S.C. § 1677e(a), allows Commerce to apply facts otherwise available in instances in which "necessary information is not available on the record" or "an interested party or any other person" a) withholds requested information; b) fails to provide requested information by the deadlines in the form and manner requested; c) "significantly impedes a proceeding under this subtitle," or d) provides unverifiable information.  This Court has been clear that Commerce may not apply facts available where information is missing from the record because Commerce failed to ask for that information.  For example, in *Agro Dutch Indus. v. United States*, the Court held that, if Commerce was unclear about the information submitted by the responding party or needed more information, "it was incumbent upon Commerce to ask relevant questions," rather than fall back on the facts available statute.  31 CIT 2047, 2054-59 (2007).

As explained above, substantial evidence makes clear that there were mattresses held in U.S. inventory at the start of the POI.  If Commerce had any doubt, or considered this information missing from the record, it had an obligation to ask Zinus for this information.  It failed to do so.  *Even if* it were the case that Zinus had failed to provide necessary information or otherwise satisfied 19 U.S.C. § 1677e(a), Commerce failed to observe the notice requirements of 19 U.S.C. § 1677m(d).  Section 1677m(d) establishes that Commerce cannot lawfully use facts available without first "promptly inform{ing}" the party of the apparent deficiency and providing an opportunity to cure or explain the deficiency.  *See Ereğli Demir ve Çelik*

*Fabrikalari T.A.Ş. v. United States,* 308 F. Supp. 3d 1297 (Ct. Int'l Trade 2018) (remanding Commerce's final determination because it failed to address the requirements of § 1677m(d));

*Hoogovens Staal Bv v. United States*, 24 CIT 44, 58 (2000) (remanding Commerce's final results for clarification on whether it properly applied facts otherwise available).

Despite this Court's consistent precedent, Commerce did not provide Zinus notice of any reporting deficiencies throughout the investigation.  Although Commerce stated in its preliminary determination that it intended to "continue to examine" how best to calculate the universe of Zinus' U.S. inventory sales for purposes of the final determination, in its post-preliminary questionnaire, Commerce did not ask any questions specific to this issue.  *See* Post-Prelim Supp. QR (Dec. 2, 2020) at 3 (P.R. 249).  Commerce's only question even tangentially related to this issue pertained to Zinus US's and affiliate Best Price Mattresses' ability to track sales of mattresses by country of origin prior to the POI.  Now, in its remand results, Commerce claims that "Zinus provided no evidence that it had sufficient mattresses in inventory to satisfy the number of the relevant types of mattresses sold during the POI."  Remand Results at 7.  Yet, Commerce never asked Zinus to provide such information.

Moreover, as explained above, record evidence, such as Zinus' sales reconciliation and Zinus U.S.'s 2018 financial statements that show a balance sheet asset amount of $[          ] in net inventories as of December 31, 2018 (which corresponds to the beginning net inventories as of January 1, 2019), demonstrate that Zinus had mattresses in U.S. inventory at the start of the POI.  *See e.g.*, Zinus Section A Response at Exhibit A-11b(2) at 3 (C.R. 38).  Zinus also fully briefed this issue before the agency, explaining and demonstrating with record evidence that Commerce's adoption of petitioners' quarterly ratios, which included in-transit merchandise, was not reasonable.

Despite all of the information available on the record, Commerce is now telling the Court that it perceives a gap in the record and it has decided to fill that gap with an assumption unfavorable to Zinus.  Rather than reach the reasonable and logical conclusion that Zinus had the relevant types of mattresses sold during the POI in inventory at the start of the POI, Commerce concludes that mattresses still in-transit as of the end of the POI were sold from U.S. inventory during the POI.  Commerce reaches this conclusion without proper adherence to the requirements of 19 U.S.C. § 1677m(d).  This Court should therefore remand this issue once more with instruction to Commerce to exclude the in-transit mattresses or else seek additional information regarding Zinus' beginning period U.S. inventories.

## V.   <u>CONCLUSION</u>

For the foregoing reasons, Commerce's remand results with respect to the inclusion of in-transit mattresses in its quarterly ratio calculation does not satisfy the Court's remand order, as the decision to include merchandise in-transit remains unreasonable and unsupported by substantial record evidence.  Thus, Commerce's remand results cannot be sustained.  This Court should remand this matter with instruction for Commerce to recalculate the dumping margin for Zinus without including mattresses in-transit in its quarterly ratio calculation used to determine the total quantity of Indonesian-origin mattresses sold from inventory.

NON-CONFIDENTIAL VERSION

Finally, should the Court find that the existing record is not sufficiently clear on this matter, it should instruct Commerce to ask Zinus for the information regarding the mattresses held in U.S. inventory at the start of the POI.

Respectfully submitted,

 /s/ J. David Park
J. David Park
Henry D. Almond
Daniel R. Wilson
Kang Woo Lee
Gina M. Colarusso
*Counsel to PT. Zinus Global Indonesia*
*Plaintiff*

Eric Johnson
*Consultant to PT. Zinus Global Indonesia*
*Plaintiff*

ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20001
Phone:  (202) 942-5000

**Dated: August 8, 2023**

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JENNIFER CHOE-GROVES**

| | |
|---|---|
| PT. ZINUS GLOBAL INDONESIA,<br><br>Plaintiff,<br>and<br><br>BROOKLYN BEDDING, LLC ET AL.,<br><br>Consolidated Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>PT. ZINUS GLOBAL INDONESIA and<br>BROOKLYN BEDDING, LLC ET AL.,<br><br>Defendant-Intervenors. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Court No. 21-00277<br>(Consol.) |

## CERTIFICATION OF COMPLIANCE WITH CHAMBERS PROCEDURE 2(B)(1)

The undersigned hereby certifies that the attached Comments in Partial Opposition to Commerce's Remand Determination, filed on August 8, 2023, contains 6,293 words, exclusive of the table of contents, table of authorities, and counsel's signature block, according to the word count function of the word-processing system used to prepare this brief, and inclusive of the words in the embedded images, counted manually. The comments therefore comply with the maximum 10,000 word count limitation set forth in the Court's Chambers Procedures.

By:   /s/ Henry D. Almond
      Henry D. Almond

**Dated:  August 8, 2023**

# Attachment 1

NON-CONFIDENTIAL VERSION

| | From Non Subj. Database | From Exhibit SC2-1 | |
|---|---|---|---|
| Model | January 2019 Shipment Qty | January 2019 Purchases for Zinus US Inventory (Qty) | Shipped from US Inventory Before Purchased During the POI |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |

**NON-CONFIDENTIAL VERSION**

| Model | January 2019 Shipment Qty | January 2019 Purchases for Zinus US Inventory (Qty) | Shipped from US Inventory Before Purchased During the POI |
|---|---|---|---|
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |

NON-CONFIDENTIAL VERSION

| Model | January 2019 Shipment Qty | January 2019 Purchases for Zinus US Inventory (Qty) | Shipped from US Inventory Before Purchased During the POI |
|---|---|---|---|
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |

**NON-CONFIDENTIAL VERSION**

| Model | January 2019 Shipment Qty | January 2019 Purchases for Zinus US Inventory (Qty) | Shipped from US Inventory Before Purchased During the POI |
|---|---|---|---|
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |

**NON-CONFIDENTIAL VERSION**

| Model | January 2019 Shipment Qty | January 2019 Purchases for Zinus US Inventory (Qty) | Shipped from US Inventory Before Purchased During the POI |
|---|---|---|---|
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |