# UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

|  |  |
|---|---|
| PT ZINUS GLOBAL INDONESIA, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> UNITED STATES, ) <br> ) <br> Defendant, ) <br> and ) <br> ) <br> BROOKLYN BEDDING, LLC ET AL., ) <br> ) <br> Defendant-Intervenors. ) <br> ) | Court No. 21-00277 <br><br> **NON-CONFIDENTIAL VERSION** <br> Business Proprietary Information Removed from Brackets on Pages 4, 5, 7, 9, and 12. |

## DEFENDANT-INTERVENORS' COMMENTS IN PARTIAL SUPPORT OF THE FINAL RESULTS OF REDETERMINATION

Yohai Baisburd
Chase J. Dunn
Nicole Brunda

**CASSIDY LEVY KENT (USA) LLP**
900 19th Street, N.W.
Suite 400
Washington, D.C. 20006
(202) 567-2300

*Counsel to Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises Inc., Leggett & Platt, Incorporated, International Brotherhood of Teamsters, United Steel Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO*

Dated: September 22, 2023

**Table of Contents**

|      |                                                                                                                                  | Page |
| ---- | -------------------------------------------------------------------------------------------------------------------------------- | ---- |
| I.   | Background.........................................................................................................................2 |      |
| II.  | Standard of Review............................................................................................................5 |      |
| III. | Argument.............................................................................................................................6 |      |
|      | A. Commerce Reasonably Explained Its Decision to Include In-Transit Merchandise In its Quarterly Ratios Calculations..........................6 | |
|      | B. Zinus' Alternative Theories Do Not Undercut the Reasonableness of the Department's Conclusion.........................................8 | |
| IV.  | Conclusion........................................................................................................................14 |      |

## Table of Authorities

Page(s)

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ...................................................................................................5

19 U.S.C. § 1677a(b) ............................................................................................................6-8

19 U.S.C. § 1677e(a) ...............................................................................................................12

**Court Decisions**

*Aristocraft of America, LLC v. United States*, 331 F. Supp. 3d 1372 (Ct. Int'l Trade 2018) .................................................................................................................13

*Catfish Farmers of Am. v. United States,* 37 CIT 717 (Ct. Int'l Trade 2013) ........................................................................................................................................10

*Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938) .........................................................5

*Consolo v. Fed. Mar. Comm'n,* 383 U.S. 607, 620 (1966) ............................................6, 8, 11

*DuPont Teijin Films USA v. United States,* 407 F.3d 1211 (Fed. Cir. 2005) .......................................................................................................................................5

*JA Solar International Limited v. United States,* 606 F. Supp. 3d 1370 (Ct. Int'l Trade 2022) .................................................................................................................6

*Jinxiang Hejia Co., Ltd. v. U.S.,* 35 C.I.T. 1190 (Ct. Int'l Trade 2011) .......................................10

*Lifestyle Enter., Inc. v. United States,* 768 F.Supp.2d 1286 (Ct. Int'l Trade 2011) ........................................................................................................................................10

*Matsushita Elec. Indus. Corp. v. United States,* 750 F.2d 927, 936 (Fed. Cir. 1984) ...............................................................................................................................10, 11

*Mid Continent Steel & Wire, Inc. v. United States,* 940 F.3d 662 (Fed. Cir. 2019) .......................................................................................................................................11

*Mitsubishi Heavy Indus. Ltd. v. United States,* 275 F.3d 1056 (Fed. Cir. 2001) .......................................................................................................................................13

*QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) .......................................13

*Sidenor Indus. SL v. United States,* 664 F. Supp. 2d 1349 (Ct. Int'l Trade 2009) .........................................................................................................................................9

*U.S. Steel Group v. U.S.*, 96 F.3d 1352 (Fed. Cir. 1996) .........................................................11

**Administrative Decisions**

*Mattresses from Indonesia: Final Affirmative Determination of Sales at
Less than Fair Value*, 86 Fed. Reg. 15,899 (Mar. 5, 2021) ........................................................ 2-3

NON-CONFIDENTIAL VERSION

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| PT ZINUS GLOBAL INDONESIA, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> UNITED STATES, ) <br> ) <br> Defendant, ) <br> and ) <br> ) <br> BROOKLYN BEDDING, LLC ET AL., ) <br> ) <br> Defendant-Intervenors. ) <br> ) | Court No. 21-00277 |

**DEFENDANT-INTERVENORS' COMMENTS IN PARTIAL SUPPORT OF THE FINAL RESULTS OF REDETERMINATION**

Pursuant to the US Court of International Trade's (the "Court") Remand Order (ECF No. 55) ("Remand Order") and amended scheduling order (ECF No. 57), Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises Inc., Leggett & Platt, Incorporated, International Brotherhood of Teamsters, United Steel Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, defendant-intervenors and plaintiffs in the companion case Brooklyn Bedding, LLC et al. v. United States, Court No. 21-00284 (hereinafter "Mattress Petitioners") hereby submit comments in partial support of the US Department of Commerce's ("the Department's") Final Results of Redetermination Pursuant to Court Remand (ECF No. 59) ("Remand Redetermination"). *See* Slip Op. 23-39 (March 20, 2023) (ECF No. 55) ("Opinion").

In its Opinion, the Court found that the Department had failed to adequately explain its determination to include mattresses in-transit from Indonesia in its quarterly ratio calculations

used to determine the total quantity of Indonesian-origin mattresses sold from US inventory. As explained below, the Department's Remand Redetermination provides the requisite explanation and demonstrates that the Department's decision in this regard was both reasonable and supported by substantial evidence. As also explained below, Zinus' opposition comments do not undermine the reasonableness of the Department's conclusions. *See* "Plaintiff PT. Zinus Global Indonesia's Comments in Partial Opposition to Commerce's Remand Redetermination" (Aug. 8, 2023) (ECF No. 64) ("Zinus Comments"). While Zinus clearly would prefer that the Department interpret the available evidence differently, its desires are not the standard of review. The Court should therefore affirm the Department's Remand Redetermination as reasonable and supported by substantial evidence.

I. **Background**

Throughout the underlying investigation, Zinus claimed that its US sales affiliate, Zinus, Inc. ("Zinus US"), was unable to identify the country of origin of certain constructed export price ("CEP") sales it made to unaffiliated customers during the period of investigation ("POI"). *See* Zinus' Section A Response (June 18, 2020) ("Zinus AQR") at A-5 (C.R. 36) (claiming that Zinus US "is not able to trace the country of origin of a particular sale using the company's normal books and records"); *see also* Zinus Comments at 3 (confirming the same). As it was unable to identify which of Zinus US' sales were sales of Indonesian mattresses in its normal sales records, Zinus proposed to use a "first in first out" ( "FIFO") methodology, under which it assumed that mattresses entering its inventory earlier were sold first. Zinus AQR at A-7 (C.R. 36). Petitioners pointed out both that (i) Zinus' claims of inability to track the country of origin of each sale were inconsistent with its claims that it offered commissions only on sales of non-Indonesian merchandise and (ii) that the assumptions inherent in Zinus' FIFO methodology resulted in a dramatic under-reporting of Indonesian merchandise. *See generally Mattresses from Indonesia:*

*Final Affirmative Determination of Sales at Less than Fair Value*, 86 Fed. Reg. 15,899 (Mar. 5, 2021) ("Final Determination") (P.R. 292), and accompanying Issues and Decision Memorandum ("IDM") (P.R. 284) at 8-9.

In its Final Determination, the Department agreed that Zinus' claims that it lacked knowledge about the country of origin of merchandise sold from Zinus US' inventory was "inconsistent" with its reporting that Zinus US only paid commissions on sales of non-subject (*i.e.* non-Indonesian) mattresses during the POI. IDM (P.R. 284) at 9. As the Department put it:

> Either Zinus is aware of the country of origin of merchandise in inventory, and can grant commissions on the sales of certain {origin} merchandise based on that knowledge, or it does not, and therefore should not be able to grant commissions based on the country of origin of the merchandise. *Id*.

Particularly in light of such noted inconsistencies, the Department determined that it was not appropriate to rely on Zinus' proposed FIFO-methodology, which it agreed "does not accurately or appropriately capture a sufficient number of sales of subject merchandise" and instead chose to rely on a quarterly purchase ratio allocation methodology that it determined was "less susceptible to manipulation" because it could be "grounded in ***purchase*** data." *Id*. (emphasis supplied). In other words, because Zinus US claimed it could not identify sales of Indonesian mattresses in its own records, the Department went to the only reconcilable sales information it had available: Zinus US's purchases of Indonesian mattresses from Zinus KR. As Zinus US purchased every mattress it sold in the United States during the POI from Zinus KR, the Department determined it was reasonable to allocate Zinus US' POI ***sales*** to Indonesia and other countries based on Zinus US' verifiable, country-specific POI ***purchases*** of mattresses from Zinus KR during the POI. As this POI purchase data could be reconciled to audited financial statements, the Department determined such a methodology was "neutral" and "less susceptible

3

to manipulation" than other alternative estimation methodologies, including Zinus' preferred FIFO approach. *Id*. at 8-9.

      Thus, for each quarter of the POI the Department calculated a quarterly ratio based on the share of Zinus US' documented purchases of mattresses from Indonesia vs. other sources, and then applied this ratio to the sales for which Zinus US was unable to identify the country of origin. IDM (P.R. 284) at 8-9. For example, if in a given quarter 50 percent of Zinus US' documented purchases of mattresses were from Indonesia, then under the quarterly sales methodology the Department would also attribute 50 percent of Zinus US' sales in that quarter to Indonesia. Of course, the actual share of Indonesian-sourced mattresses in Zinus US' total sales for the quarter could have been greater than 50 percent or it could have been less. Because Zinus claims not to have documented this information, there is no way of knowing for sure. Lacking such information, the Department reasonably determined that the share of Zinus US' purchases of mattresses for CEP inventory in a given quarter was a reasonable and "neutral" means of estimating the share of its sales from CEP inventory. *Id*.

      In calculating the quarterly ratios, the Department used [     ] as the total number of mattresses Zinus US purchased from Indonesia for CEP inventory because this was the number of Indonesian mattresses Zinus US actually purchased from Zinus KR and this quantity of Zinus KR's sales/Zinus US's purchases could be reconciled to audited financial statements. *See* IDM (P.R. 284) at 9; *see also* Zinus' Section C Response (July 13, 2020) ("Zinus CQR") at Exhibit C-2A (C.R. 118). The Department selected the [     ] figure over Zinus' proffered [     ], which excluded [     ] mattresses that Zinus claimed that Zinus US had purchased but remained in-transit at the end of the POI, *see* Zinus Comments at 9, because the [     ] figure was "grounded in purchase data," and thus reconcilable to the audited sales records of

4

Zinus KR.  IDM (P.R. 284) at 9; *see also* Zinus CQR at Exhibit C-2A (C.R. 118) (Zinus KR sales reconciliation).  By contrast, Zinus was unable to reconcile its [     ] to either the sales data of Zinus US or Zinus KR.  Particularly in light of outstanding questions as to some of Zinus' reporting, the Department found that relying on purchase data that had been reconciled to Zinus KR sales, as reported in its audited financial statements, was "less susceptible to manipulation."  IDM (P.R. 284) at 9.

On appeal, Zinus claimed that both the Department's decision to forgo Zinus' preferred FIFO methodology and its decision to rely on Zinus US purchase data in calculating quarterly ratios were unsupported by substantial evidence.  *See* Opinion at 14-17.  While the Court found that Commerce's decision to rely on a quarterly ratios methodology "grounded in Zinus U.S.' purchase data" was reasonable, *see* Opinion at 21, it found that Commerce had failed to provide a "sufficient explanation" of its decision not to adjust that purchase data to exclude in-transit merchandise, *see* Opinion at 23.  The Court therefore remanded to the Department for further explanation.  Opinion at 23.  In its Remand Redetermination, Commerce provided this explanation citing to evidence available to it at the time of its determination.   Remand Redetermination at 3-9.

**II. Standard of Review**

In reviews of the Department's determinations in antidumping duty proceedings, the Court will sustain Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *DuPont Teijin Films USA v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Critically, "the possibility of drawing two inconsistent

5

conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). Rather, when addressing a substantial evidence issue raised by a party, the Court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." *JA Solar International Limited v. United States*, 606 F. Supp. 3d 1370, 1373 (Ct. Int'l Trade 2022) (quoting 8A West's Fed. Forms, National Courts § 3.6 (5th ed. 2022)).

### III. Argument

#### A. Commerce Reasonably Explained Its Decision to Include In-Transit Merchandise In its Quarterly Ratios Calculations

In its Opinion, the Court found that the Department failed to provide any explanation of its decision to include mattresses still in-transit from Indonesia at the end of the period of investigation in its Final Determination. Opinion at 23. In particular, while the Court recognized that "inclusion of goods sold or agreed to be sold in-transit prior to importation might be permissible under 19 U.S.C. § 1677a(b)," it found that "Commerce failed to provide sufficient explanation or citations to record evidence to support its inclusion of in-transit pre-importation goods sold in this case." *Id*. The Court accordingly remanded to the Department "for further consideration and explanation of its determination to include mattresses in-transit in the calculation of constructed export price." *Id*.

In its Remand Redetermination, the Department provided the requisite explanation. In particular, the Department explained that the statute contained "no requirement that a product be imported and actually physically in inventory in the warehouse before it is considered to be 'in inventory' to be sold and included in a CEP database." Remand Redetermination at 3. Indeed, as the Department observed, the statute specifically contemplates CEP sales to include subject

6

merchandise that is sold to an unaffiliated party "*before* or after importation." *Id*. (quoting 19 U.S.C. § 1677a(b)).

The Department also explained that during the POI Zinus US reported making various CEP sales, which "were included in Commerce's calculations as CEP sales even though the mattresses were imported after sale to the unaffiliated customer," and that it would be thus be "internally inconsistent for Commerce to treat the in-transit, 'in inventory' mattresses different from the in-transit, 'direct shipment to the customer' mattresses." *Id.* at 4.  Put differently, if the record confirms Zinus US could purchase mattresses from Zinus Indonesia, through Zinus KR, and sell them to unaffiliated US customers at the time of shipment from Indonesia, then it would be internally inconsistent to conclude that Zinus US could not similarly sell the same mattress one, two, or even twenty days later while in transit to Zinus' US warehouse.  In either case, Zinus US held title to the mattress and was thereby capable of selling those mattresses.  *See* Zinus Comments at 16 ("As Zinus has previously explained, at the time the merchandise {for CEP inventory sales} ships from Indonesia, Zinus U.S. takes title…").  Moreover, record evidence demonstrates that Zinus US' [                                        ], *see* Zinus AQR at A-18 to A-19 (C.R. 36), indicating there was clearly no [                    ] prohibition on sales of mattresses prior to their entry into the United States.

Finally, the Department observed that available record data demonstrated that the purchased quantity that Zinus reported physically holding in its warehouse was less than the quantity that Zinus reported selling out of inventory during the POI.  Based on this data the Department concluded that it was "reasonable to presume" that some of the mattresses that were invoiced during the POI were in-transit during the POI.  *Id*. at 7.

7

In short, the Department provided a thorough explanation for its decision to include merchandise in-transit in calculating quarterly ratios and demonstrated that this decision was reasonable and supported by substantial evidence.

**B. Zinus' Alternative Theories Do Not Undercut the Reasonableness of the Department's Conclusion**

In its Remand Comments, Zinus takes issue with the Department's explanations, claiming that they are unsupported by substantial evidence because other evidence could have led the Department to reach a different conclusion. *See generally* Zinus Comments. But, as the Supreme Court has made clear, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo*, 383 U.S. 607 at 620. As explained below, none of Zinus' arguments undercut the reasonableness of the Department's conclusions.

*First*, Zinus claims that "{b}y definition" CEP inventory sales include only those "physically held in U.S. inventory and thus available for sale out of inventory to unaffiliated U.S. customers." Zinus Comments at 11. Yet, Zinus points to nothing in the statute or Department practice that requires CEP inventory items to be "physically held" by the seller at the time of sale. Indeed, as the Department correctly explained, the statute explicitly defines constructed export price ("CEP") sales as those where "subject merchandise is first sold (or agreed to be sold) in the United States *before* or after importation" by an affiliated seller to an unaffiliated buyer. 19 U.S.C. § 1677a(b) (emphasis supplied). Moreover, as discussed above, the record confirmed that during the POI, Zinus US in fact did make CEP sales to unaffiliated customers before such merchandise entered the United States.

While Zinus places considerable emphasis on the fact that the goods were not held physically in Zinus' US warehouse during the POI, the mattresses in question were undeniably

8

purchased by Zinus US and part of Zinus US' inventory under applicable accounting standards, as Zinus KR's sales reconciliation confirms that Zinus US purchased [      ] mattresses from Zinus KR for its CEP inventory during the POI.  *See* CQR at Exhibit C-2A (C.R. 118).   Zinus itself unambiguously acknowledges that it takes title from Zinus KR at the time of shipment from Indonesia, meaning that it owned the mattresses while in-transit and thus was fully capable of selling those mattresses to customers.  *See* Zinus Comments at 16 (confirming that "at the time the merchandise {for CEP inventory sales} ships from Indonesia, Zinus U.S. takes title…").  Indeed, the fact that Zinus US has title to the mattresses in-transit also means that such mattresses are considered part of Zinus US' inventory for purposes of end of year valuations and financial statement reporting.  *See generally* Zinus AQR at Exhibit A-11(b)(1) (C.R. 38) at [          ] ( [


                  ]).[1]  Just as Zinus' accounting practices would not allow Zinus US to decline to count the such mattresses as part of its "inventory" in its year end reporting, Commerce declined to allow Zinus to discount those mattresses as part of Zinus US' inventory for purposes of calculating quarterly ratios.  Put another way, Zinus US' purchases are Zinus US's purchases whether those mattresses are in a warehouse or in transit.  The fact that the [

      ] figure could be reconciled to Zinus KR's audited financial statement also gave the Department some assurance of their accuracy.  *See Sidenor Indus. SL v. United States*, 664 F. Supp. 2d 1349, 1357 (Ct. Int'l Trade 2009) (noting that without a sales reconciliation the

---

[1] [

          ], Note 13 of the Zinus Group's consolidated financial statements makes clear that the Zinus companies—including Zinus US—report in-transit merchandise as part of inventories for balance sheet reporting.  *See* AQR at Exhibit A-11e(1) (C.R. 39-40).

9

Department has "no support or assurance that the quantity of {the product} reported as merchandise under consideration is complete and accurate").

*Second*, Zinus claims that Commerce's conclusion that Zinus sold in-transit mattresses because its sales were greater than its inventory purchases was entirely "speculation" with no evidentiary support. Zinus Comments at 13. Zinus evidently confuses "speculation," which this Court has defined as conclusions with "<u>no</u> factually-grounded basis," *see Catfish Farmers of Am. v. United States*, 37 CIT 717, 733 (Ct. Int'l Trade 2013) (emphasis supplied), with a reasonable inference drawn from record data. While Commerce, of course, "cannot base its analysis on mere speculation, {it} may draw reasonable inferences from the record." *Jinxiang Hejia Co., Ltd. v. U.S.*, 35 C.I.T. 1190, 1197 (Ct. Int'l Trade 2011) (quoting *Lifestyle Enter., Inc. v. United States*, 768 F.Supp.2d 1286, 1309 (Ct. Int'l Trade 2011). Indeed, this Court has recognized that "Commerce's mandate requires it to assess often conflicting or unclear evidence, {and} that judicial review refrains from re-weighing the evidence leading to an administrative determination." *Catfish Farmers,* 37 CIT at 742 (citing *Matsushita Elec. Indus. Corp. v. United States*, 750 F.2d 927, 936 (Fed.Cir.1984)). Here the Department concluded that evidence indicating that Zinus US sold more mattresses than it physically held in physical inventory reasonably indicated that it made sales from its "in transit" stock and thus that it should include all of Zinus US' POI purchases when calculating its quarterly ratios. Remand Redetermination at 7. While this may not be the only conclusion that could be drawn, it is certainly a reasonable one and there is thus no basis for the Court to overturn the Department's reasoned analysis.

*Third*, Zinus claims that Commerce's determination cannot be supported by substantial evidence because other record facts could support an alternative conclusion. *See* Zinus Comments at 10 ("{t}he obvious alternative to Commerce's unsupported theory is that Zinus had

mattresses in inventory at the start of the POI, which allowed it to sell more mattresses than had entered inventory during the POI"). However, even if true, the courts have long been clear that the existence of another reasonable conclusion does not render a Commerce determination as unsupported by substantial evidence. *Mid Continent Steel & Wire, Inc. v. United States*, 940 F.3d 662, 669 (Fed. Cir. 2019) (quoting *Consolo*, 383 U.S. at 620) ("{T}he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.") Indeed, the Federal Circuit has observed that the fact that a party "can point to evidence of record which detracts from the evidence which supports {an agency's} decision and can hypothesize a reasonable basis for a contrary determination is neither surprising nor persuasive." *Matsushita Elec.,* 750 F.2d at 936. This is because, under the substantial evidence standard, "{i}t is not the function of a court to decide {whether}…it would have made the same decision on the basis of the evidence." *Id*; *see also U.S. Steel Group v. U.S.*, 96 F.3d 1352, 1356-57 (Fed. Cir. 1996) (noting that under the substantial evidence standard, the question for the Court "is not whether we agree with {the agency's} decision, nor whether we would have reached the same result as the {agency} had the matter come before us for decision in the first instance"). Put simply, the fact that Zinus can point to record evidence that could support an alternative inference in no way renders the Department's conclusions unreasonable.

*Fourth*, Zinus claims that that Department ignored "irrefutable evidence of existing inventory," as evidenced by Zinus US' 2018 financial statements. Zinus Comments at 15. The Department did not ignore such data. The Department clearly explained that Zinus' claims in this regard were misguided as Commerce is "concerned here only with the mattresses that meet the definition of the scope of the investigation, regardless of the country of origin." Remand

Redetermination at 7-8.  The "inventories" value reported in Zinus' 2018 financial statement are not limited to only mattresses that meet the definition of the scope of the investigation, [

].  As Zinus US' annual sales reconciliation clearly indicates [

].  *See* Zinus CQR at Exhibit C-2B (C.R. 118).  There is thus no evidence that the "existing inventory" reported in Zinus US' 2018 financial statements is in any way limited to mattresses subject to the investigation.   Moreover, as explained above, under applicable accounting rules the "inventories" reported in Zinus US financial statement also included all inventory merchandise that was "in-transit" at the close of the year.  Zinus' contention that Commerce should somehow rely on Zinus US' financial statements—which value inventory based on all holdings whether in warehouse or in transit—as evidence of its "stock" of inventory at the beginning of the POI but not at the end of the POI only underscores the incongruity of its arguments.

*Finally*, Zinus claims that the Department's pointing out that the record contained no evidence on mattress inventory in its warehouses at the beginning of the POI somehow meant that the Department was applying "facts available."  Zinus Comments at 17.  This is simply not the case.  In no instance did the Department cite to 19 U.S.C. § 1677e(a) or otherwise indicate that it was relying on anything but Zinus' own reporting in reaching its conclusions.  *See generally* Remand Redetermination at 3-9.  Indeed, as this very Court found with respect to similar arguments, Zinus "has not identified what facts Commerce relied upon that were not in the administrative record." Opinion at 45.  Instead, as explained above, the Department's conclusion was based on reasonable inferences it made based on the record facts it had before it.

12

The Department's statement that "Zinus has cited no record data to show that there was inventory of relevant mattresses that were not accounted for by Commerce's calculation," Remand Redetermination at 8, was in no way an indication that the Department "believes information necessary to reach a reasonable conclusion is missing from the record," Zinus Comments at 17-18.  Instead, the Department was merely underscoring that, contrary to Zinus' contentions, the record did not contain factual information confirming Zinus' purported hypothesis, meaning that the evidence available in no way refutes the Department's alternative reading of the facts.

To this end, this Court has been clear that it "cannot…direct Commerce to favor Plaintiffs' preferred evidentiary inference over another reasonable inference." *See Aristocraft of America, LLC v. United States*, 331 F. Supp. 3d 1372, 1380 (Ct. Int'l Trade 2018) (citing *Mitsubishi Heavy Indus. Ltd. v. United States*, 275 F.3d 1056, 1062 (Fed. Cir. 2001)).  For example, in *Aristocraft* this Court considered whether Commerce's conclusion that a set of poor quality and caption-less photographs depicted machinery could be used for any type of coiled materials, rather that exclusively for wire rod, as the Plaintiff's preferred, was reasonable.  *Id.* at 1379-1381.  The Court found that as both inferences "seem plausible" it had no basis to require Commerce to accept one over the other.  *Id*.  The Court also noted that the "issue ultimately boils down to a problem of proof for the Plaintiffs," who were the foreign respondents in the underlying Commerce proceeding*. Id.*  The Court observed that "Plaintiffs could have done much more to remove doubts about the photographs (and undermine any competing inferences)" as ultimately "the burden to develop the administrative record rests on interested parties like Plaintiffs." *Id.* at 1380 (citing *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir.

2011)). Here too, Zinus cannot fault the Department for reaching conclusions based on the evidence it had before it.

## IV. Conclusion

As explained above, the Department's Remand Redetermination fully complied with the Court's remand order by providing a thorough explanation of its determination to include mattresses from Indonesia in its quarterly ratio calculations. The Court should therefore affirm the Department's Remand Redetermination with respect to this issue.

Respectfully submitted,

/s/ Yohai Baisburd
Yohai Baisburd
Chase J. Dunn
Nicole Brunda

**CASSIDY LEVY KENT (USA) LLP**
900 19th Street, N.W.
Suite 400
Washington, D.C. 20006
(202) 567-2300

*Counsel to Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises Inc., Leggett & Platt, Incorporated, International Brotherhood of Teamsters, United Steel Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO*

**Certificate of Compliance**

The undersigned hereby certifies that the foregoing submission of "Defendant-Intervenors' Comments in Partial Support of the Final Results of Redetermination" filed on September 22, 2023, contains 4,037 words, exclusive of the caption block, table of contents, table of authorities, signature block, and certificates of counsel according to the word count function of the word-processing system used to prepare this brief.  These comments, combined with the "Defendant-Intervenors' Comments in Partial Opposition to the Final Results of Redetermination," filed separately on August 8, 2023 and which contained 3,778 words, are collectively less than the maximum 10,000 word count limitation set forth in the Court's Standard Chambers Procedures of the U.S. Court of International Trade.

By:     /s/ Yohai Baisburd
         Yohai Baisburd