**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| **PT. ZINUS GLOBAL INDONESIA,**<br><br>**Plaintiff,**<br>**and**<br><br>**BROOKLYN BEDDING, LLC ET AL.,**<br><br>**Consolidated Plaintiff,**<br><br>**v.**<br><br>**UNITED STATES,**<br><br>**Defendant,**<br><br>**and**<br><br>**PT. ZINUS GLOBAL INDONESIA and BROOKLYN BEDDING, LLC ET AL.,**<br><br>**Defendant-Intervenors.** | **Court No. 21-00277 (Consol.)** |

**PT. ZINUS GLOBAL INDONESIA'S COMMENTS IN PARTIAL SUPPORT OF COMMERCE'S REMAND DETERMINATION**

**ARNOLD & PORTER KAYE SCHOLER LLP**
**601 Massachusetts Avenue, N.W.**
**Washington, D.C. 20001**
**Phone: (202) 942-5000**
**Fax: (202) 942-5999**

**J. David Park**
**Henry D. Almond**
**Kang Woo Lee**
**Gina M. Colarusso**

***Counsel to PT. Zinus Global Indonesia***

**Eric Johnson**

***Consultant to PT. Zinus Global Indonesia Plaintiff***

**Dated: September 22, 2023**

## TABLE OF CONTENTS

**I. INTRODUCTION** ........................................ 1

**II. STANDARD OF REVIEW** ........................................ 2

**III. ARGUMENT** ........................................ 2

A. Commerce's Additional Explanation Regarding Zinus Korea's Selling Expenses is Reasonable, Supported by Substantial Evidence, and Compliant with the Court's Remand Order ........................................ 3

B. Commerce's Additional Explanation Regarding its Use of Indonesian GTA Import Data as a Surrogate Market Price for its Transactions Disregarded Adjustments is Reasonable and Compliant with the Court's Remand Order ........................................ 9

**V. CONCLUSION** ........................................ 13

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Ad Hoc Shrimp Trade Action Comm. v. United States*, 992 F. Supp. 2d 1285 (Ct. Int'l Trade 2014), *aff'd*, 802 F.3d 1339 (Fed. Cir. 2015)....................2, 4, 9

*Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197 (1938)....................2

*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006)....................2

*Trust Chem Co. v. United States*, 819 F. Supp. 2d 1373 (2012) ....................2

**Federal Statutes and Regulations**

19 U.S.C. § 1677b(c)(4)....................11

19 U.S.C. § 1677b(f)(2) ....................8

19 U.S.C. § 1516a(b)(1)(B)(i)....................2

19 U.S.C. § 1677b(f)(2) ....................8, 9

19 C.F.R. § 351.408(c)(2)....................11

**Administrative Determinations**

*Mattresses from Indonesia: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 15,899 (Mar. 25, 2021) ....................3

*Oil Country Tubular Goods From Mexico: Final Results of Antidumping Duty Administrative Review*, 64 Fed. Reg. 13,962 (Mar. 23, 1999)....................8

*Polyethylene Terephthalate Film, Sheet, and Strip from the Republic of Korea; Final Results of Antidumping Duty Administrative Reviews and Notice of Revocation in Part*, 61 Fed. Reg. 35,177 (July 5, 1996)....................8

## I. **INTRODUCTION**

Pursuant to the U.S. Court of International Trade's (the "Court") Remand Order (ECF No. 55), PT. Zinus Global Indonesia ("Plaintiff" or "Zinus") hereby submits comments in partial support of the U.S. Department of Commerce's ("Commerce" or "the Department") Final Results of Redetermination Pursuant to Court Remand (ECF Nos. 59, 60) ("Remand Results") in the antidumping duty investigation of Mattresses from Indonesia. Specifically, Zinus addresses two issues: *first*, Commerce's additional explanation for its reasonable conclusion that, based on record evidence, Zinus Indonesia's reporting of Zinus Korea's selling expenses was consistent with Zinus Korea's limited role in selling merchandise subject to the underlying investigation. *Second*, Zinus addresses Commerce's additional explanation regarding its use of Indonesian Global Trade Atlas ("GTA") import data as a surrogate market price for its transactions disregarded adjustments.

In its Remand Order, this Court found that Commerce did not provide sufficient explanation or citations to record evidence in support of its finding that Zinus had provided all requested information relating to Zinus Korea's selling expenses and did not consider potentially contrary record evidence concerning Zinus Korea's selling activities. Slip Op. 23-39 at 61-62 (Mar. 20, 2023), ECF No. 55. The Court also found that Commerce did not sufficiently explain its selection of Indonesian GTA import data for its application of the transactions disregarded rule. *Id*. at 71. The Court therefore remanded these issues to Commerce, with instruction for Commerce to provide additional explanation in support of its conclusions or to reconsider its findings. *Id*. at 63 and 71. With respect to these two issues, Commerce's Remand Results provide additional, reasonable explanation, and such explanations are supported by substantial evidence. Accordingly, the Court should sustain Commerce's Remand Results with respect to these issues.

## II. STANDARD OF REVIEW

The Court will sustain Commerce's determinations in an antidumping duty proceeding, including redeterminations made pursuant to remand, where such determinations are supported by substantial evidence, are otherwise in accordance with law and, in the case of redeterminations, are consistent with the court's remand order. 19 U.S.C. § 1516a(b)(1)(B)(i). *Ad Hoc Shrimp Trade Action Comm. v. United States*, 992 F. Supp. 2d 1285, 1290 (Ct. Int'l Trade 2014), *aff'd*, 802 F.3d 1339 (Fed. Cir. 2015); *Trust Chem Co. v. United States*, 819 F. Supp. 2d 1373, 1378 (2012). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938); *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006).

## III. ARGUMENT

Consistent with the Court's instruction, in its Remand Results Commerce provides additional explanation and citations to record evidence in support of its finding that Zinus provided all requested information relating to Zinus Korea's selling expenses and in support of its lawful application of the transactions disregarded rule. Commerce also addresses the arguments advanced by Brooklyn Bedding, et al.[1] (hereinafter the "Mattress Petitioners") in briefing before the Court and in their comments on the draft remand, as well as the record evidence that Mattress Petitioners allege weighs against Commerce's findings. Thus, as

[1] Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises Inc., Leggett & Platt, Incorporated, International Brotherhood of Teamsters, United Steel Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, defendant-intervenors and plaintiffs in the companion case Brooklyn Bedding, LLC et al. v. United States, Court No. 21-00284 (hereinafter "Mattress Petitioners")

demonstrated below, with respect to these issues, Commerce's Remand Results comply with the Court's Remand Order and the Court should sustain Commerce's conclusions.

### A. Commerce's Additional Explanation Regarding Zinus Korea's Selling Expenses is Reasonable, Supported by Substantial Evidence, and Compliant with the Court's Remand Order

In its final determination in the underlying investigation, consistent with long-standing practice, Commerce included in the margin calculation the expenses that Zinus Korea actually incurred to sell the subject merchandise. *Mattresses from Indonesia: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 15,899 (Mar. 25, 2021) ("*Final Determination*") (P.R. 292), accompanying Issues and Decision Memorandum ("Final IDM") at 32-33 (P.R. 284). In its Remand Results Commerce provides additional explanation for its conclusion that, based on record evidence, Zinus Indonesia's reporting of Zinus Korea's selling expenses was consistent with Zinus Korea's limited role in selling merchandise subject to the underlying investigation. Remand Results at 9-16. Commerce also addresses Mattress Petitioners' arguments raised in response to Commerce's Draft Remand, as well as in briefing before the Court, regarding the treatment of Zinus Korea's selling expenses under Korean International Financial Reporting Standards ("K-IFRS"), as well as how Commerce accounted for costs that Mattress Petitioners alleged were commissions and fees in Zinus Korea's reporting. *Id*. at 12 and 16. Commerce's explanations are reasonable and supported by substantial record evidence.

As Commerce explains, with citations to the relevant supporting record evidence, Zinus Indonesia provided documentation to demonstrate that, during the period of investigation ("POI"), Zinus Korea's role in the sales process was limited to document and invoice management. *Id*. at 9-12, 14-16 (citing Zinus' Section A Response (June 18, 2020) at A-15 and Exhibit A-7a; Zinus' Supp. Section A Response (Aug. 20, 2020) at 9-10 and Exhibit SA-6b;

Zinus' Section C Response (July 13, 2020) at Exhibits C-16 and C-17). Specifically, Commerce explains that record evidence, provided in Zinus' section A and supplemental section A responses, proves that Zinus Indonesia generated and provided the invoice between Zinus Indonesia and Zinus Korea, and the invoice between Zinus Korea and the U.S. customer, thus demonstrating that Zinus Indonesia was the entity performing order input/processing. *Id*. at 10 (citing Zinus' Section A Response at A-15 and Zinus' Section A Supp. Response at 9-10). Commerce also explains that Zinus' selling functions chart and supporting documentation further supports its finding that Zinus Korea's role in the sales process is minimal. *Id*. (citing Zinus' Section A Response at Exhibit A-7a). Commerce walks through each supporting document that demonstrates that Zinus Indonesia, rather than Zinus Korea, was responsible for other selling activities listed in the selling functions chart. *Id*. at 10-11. Commerce's Remand Results therefore comply with the Court's instruction to provide additional explanation or citations to record evidence to support Commerce's determination that Zinus Korea had a minimal role in the U.S. sales of mattresses. *Ad Hoc Shrimp Trade Action Comm.*, 992 F. Supp. 2d at 1290 (Ct. Int'l Trade 2014).

Commerce next addresses Mattress Petitioners' arguments -- raised before the agency in the underlying investigation and in briefing before the Court, which the Court found Commerce had ignored in its Final Decision Memorandum -- concerning potentially contrary evidence on the record allegedly showing that Zinus Korea engaged in more significant selling activities than the preparation of invoices, therefore complying with the Court's instruction that it do so. *See* Slip Op. 23-39 at 60-62 (citing Mattress Petitioners' Mem. Points Law Fact Supp. R. 56.2 Mot. J. Agency R. ("Mattress Petitioners' Br.") at 16-17 (ECF No. 24, 25) and Mattress Petitioners' Admin. Case Br. (Feb. 9, 2021) at 23-38 (P.R. 274, C.R. 291)). Mattress Petitioners argued that

the following facts within the record support its contention: that Zinus Korea and Zinus U.S. shared a common senior official; in Zinus' chart of office locations provided to Commerce, the functions of both Zinus Korea and Zinus U.S. were identified as "Sale and Marketing"; Zinus' explanation that Zinus Korea as the parent company closely coordinated with its subsidiaries to manage global manufacturing, operational, and sales activities; and Zinus' explanation that the entities making the U.S. sales to unaffiliated customers reported in the sales database are Zinus Korea or Zinus U.S. Slip Op. 23-39 at 60-61 (citing Mattress Petitioners' Admin. Case Br. and briefing before the Court). During the underlying investigation, and in their comments on the draft remand, Mattress Petitioners also suggested that select documents on the record somehow show that Zinus Korea was directly responsible for handling sales to unaffiliated customers of mattresses purchased from Zinus Indonesia. *Id*. at 61 (citing Mattress Petitioners' Br. at 14-16); *see also* Remand Results at 12-13 (summarizing Mattress Petitioners' comments in response to the draft remand). Pursuant to the Court's Remand Order, in its Remand Results, Commerce addresses these arguments and potentially contrary evidence, explaining that the Mattress Petitioners' arguments are pure speculation and not supported by the record. Remand Results at 14.

Commerce also reasons that Mattress Petitioners did not explain the relevance of certain facts, such as that Zinus Indonesia and Zinus Korea share a common senior official, or how such select statements could undermine the agency's conclusions. *Id*. at 11-12 and 14-15. After addressing the potentially contrary record evidence, Commerce correctly concluded that Mattress Petitioners "have not identified a single record document that impugns the validity of the submitted statement" - *i.e.*, that Zinus Indonesia, rather than Zinus Korea, was responsible for various sales activities. *Id*. at 14. Moreover, Commerce correctly recognizes that Zinus Korea

reported all sales expenses associated with U.S. sales and all relevant general and administrative expenses (*e.g.*, salary expenses for key management personnel), as requested by Commerce, and refutes Mattress Petitioners' baseless arguments concerning allegedly contrary evidence on the record. *Id*. at 14-16. ("There is no record evidence indicating that the documents in this exhibit {Exhibit SA-6a} are not an accurate portrayal of the sales process."). Commerce's explanation for each of these points is supported by record evidence. *See* Zinus Section A Response (June 18, 2020) at A-14 –A-15 (P.R. 97, C.R. 36); Zinus Section C Response (July 13, 2020) at C-45 to C-52, C-57, and C-59 (P.R. 119, C.R. 117); Zinus Supp. Section A Response (Aug. 20, 2020) at 9-10 (P.R. 165, C.R. 149); *see also* Pl.'s Resp. Br. Opp'n Consol. Pl.'s Mot J. Agency R. ("Pl.'s Resp.") at 14-19 (ECF Nos. 31, 32) (addressing the substantial record evidence, including Zinus' own books and records, that support Commerce's determination that Zinus reported all relevant expenses, including those incurred by Zinus Korea).

Commerce also addresses Mattress Petitioners' argument that it is allegedly unclear how Commerce accounted for costs considered to be "commissions and fees" according to Korean-version International Financial Reporting Standards ( "K-IFRS"). Remand Results at 12 and 16. As Commerce explains, regardless of how the K-IFRS treats such items, Commerce does not treat such payments as selling expenses in the margin calculation when they occur between affiliated parties, as is the case here. *Id*. at 12. As Commerce explained, Commerce only uses actual expenses in such situations and does not include the affiliated party transfers of commissions and fees, or price mark-ups, in its calculations even if the accounting rules the respondent relies on do include them. *Id*. While Zinus agrees with Commerce's ultimate conclusion and that it is well-established Commerce practice to use only the actual expenses of an affiliated selling entity, rather than any commissions paid to those entities, Zinus would like to

clarify that Zinus Indonesia did not pay or incur any commission expenses during the POI. *See* Zinus Post-Preliminary Supplemental Questionnaire Response (Dec. 14, 2020) at 1 and Exhibit SQ-1 (P.R. 256, C.R. 271); *see also* Zinus Admin. Rebuttal Brief (Feb. 16, 2021) ("Zinus Rebuttal Br.") at 32-38 (P.R. 277, C.R. 294).

In their comments to the Court, Mattress Petitioners continue to cite the same record documentation they have cited previously to claim that Zinus Korea had a more active role in the sales process, and therefore must have incurred related expenses. *See* Mattress Petitioners' Comments in Partial Opposition to the Final Results of Redetermination (Aug. 8, 2023) at 6-8, ECF No. 62. However, Commerce correctly rejected these arguments as speculative and concluded that the cited documentation did not demonstrate the existence of any unreported expenses, let alone any unreported expenses that Commerce would take into account in the dumping margin calculations. Indeed, even if indicative of sales activity, the cited materials at best indicate the receipt of documents and communications. Such activities are similar to the "mere processing of invoices" that the Court previously indicated may not be indicative of anything more than a "minimal role" in the sales process. Slip Op. 23-39 at 61-62.

As Zinus explained during the investigation, and demonstrated using its books and records, Zinus Korea's recognition of revenue for its resales of products purchased from Zinus Indonesia and sold to the U.S., either to Zinus U.S. or to an unaffiliated U.S. customer, does not make it a commissioned agent; to the contrary, it simply means that Zinus Korea earned a profit by purchasing and reselling Zinus Indonesia's product. *See e.g.,* Letter from Zinus to Commerce, "Response to Petitioners' Pre-Preliminary Comments" (Oct. 19, 2020) ("Zinus Rebuttal Pre-Prelim Cmts.") at 25-28 (P.R. 221, C.R. 253); Letter from Zinus to Commerce, "Response to Petitioners' Post-Preliminary Comments" (Nov. 27, 2020) ("Zinus' Rebuttal Post-

Prelim Cmts.") at 4-6 (P.R. 243, C.R. 266); Zinus Rebuttal Br. at 26-38 (P.R. 277, C.R. 294). The financial statements and account details Zinus provided during the investigation confirm that Zinus Indonesia did not pay any sales commissions. *See* Zinus Post-Prelim Supp. Response at Exhibit SQ-1 (C.R. 271). Commerce has consistently determined that price mark-ups between affiliates do not qualify as "commissions." Final IDM at 32 (P.R. 284) (citing *Oil Country Tubular Goods From Mexico: Final Results of Antidumping Duty Administrative Review*, 64 Fed. Reg. 13,962, 13,968 (Cmt. 4) (Mar. 23, 1999) and *Polyethylene Terephthalate Film, Sheet, and Strip from the Republic of Korea; Final Results of Antidumping Duty Administrative Reviews and Notice of Revocation in Part*, 61 Fed. Reg. 35,177, 35,181 (Cmt. 6) (July 5, 1996)).

The fact that Zinus Korea recognizes the revenue from its intra-company sales in accordance with K-IFRS does not turn its revenues into commissions nor does it turn Zinus Korea into a commissioned sales agent. The use of the word "agent" in K-IFRS also does not mean that there is a commission paid. The text of the K-IFRS simply indicates that for purposes of financial statement presentation, when a company has back-to-back sales it should only report the profit (*i.e.*, markup) as a revenue – and, to do so, the company simply eliminates the purchase price from the cost of goods sold and likewise reduces the revenue amount by the same amount. *See* Zinus' Supp. Section C Resp. (Pt. 2) (Sept. 28, 2020) at SC2-5 (P.R. 199, C.R. 213). This standard accounting rule does not change Zinus Korea's sales and accounting ledgers that show that Zinus Korea in fact had sales at the full invoice price; nor does the accounting rule transform Zinus Korea into a commissioned sales agent. Nonetheless, Commerce has correctly concluded, and sufficiently explained, that price mark-ups between affiliated parties are not treated as selling expenses in the margin calculation. Commerce's Remand Results therefore adequately address

Mattress Petitioners' arguments on the relevancy of K-IFRS to Zinus Korea's selling expenses. The Court should therefore sustain Commerce's Remand Results on this issue.

**B. Commerce's Additional Explanation Regarding its Use of Indonesian GTA Import Data as a Surrogate Market Price for its Transactions Disregarded Adjustments is Reasonable and Compliant with the Court's Remand Order**

In the underlying investigation Commerce determined that Indonesian Global Trade Atlas (GTA) import data was the best available information to use as a surrogate market price for its transactions disregarded adjustments. Final IDM at 16-18 (P.R. 284). In its Remand Order, the Court found Commerce had insufficiently explained why its selection of Indonesia import data constituted a reasonable method to confirm that the prices Zinus paid to affiliated suppliers reflect arm's length transactions under 19 U.S.C. § 1677b(f)(2). Slip Op. 23-39 at 71. The Court also found that Commerce's interpretation of "market under consideration," as used in 19 U.S.C. § 1677b(f)(2)), as only the market under investigation (*i.e.*, the Indonesian market) was "unreasonably narrow." *Id*. In its Remand Results, Commerce provides additional explanation for its decision to rely on Indonesia GTA import data and why its methodology was reasonable under the statute. Remand Results at 17-22. As fully addressed below, Commerce's explanation is reasonable and supported by substantial evidence; thus, Commerce has complied with the Court's Remand Order and its Remand Results, with respect to this issue, should be sustained. *Ad Hoc Shrimp Trade Action Comm.*, 992 F. Supp. 2d at 1290 (Ct. Int'l Trade 2014) ("The court will sustain Commerce's . . . redeterminations made pursuant to remand, so long as such determinations are . . . consistent with the court's remand order.").

As Commerce states, the goal of the transactions disregarded analysis is to arrive at a market price for the inputs purchased from affiliated suppliers that would be available to the respondent to the extent such information is available. Remand Results at 19. The statute does

not prescribe a specific methodology by which Commerce is to select the "information available" to use. 19 U.S.C. § 1677b(f)(2). As Commerce explains in its Remand Results, "Commerce's preference is to determine a market value based on the respondent's own purchases of the input from unaffiliated suppliers." Remand Results at 18. When market prices are not available to test affiliated party transactions, Commerce looks to the affiliated supplier's sales of the input to unaffiliated parties, and, lacking that, to the cost of production ("COP") of the affiliated supplier. *Id*. In this case, because these transactions were between Zinus Indonesia and non-market economy ("NME")-based affiliated suppliers, Commerce determined that it was unable to use the NME-based affiliated suppliers' sales or COP as a substitute for market price. *Id*. (citing Final IDM at 16-19). Therefore, Commerce requested market-based surrogate price information that would allow it to conduct an arm's-length analysis under the statute.

Commerce has on the record Indonesian GTA data that reflect market economy imports of the relevant inputs into Indonesia which could reasonably be expected to be available to the respondent and it has GTA import data for Brazil, Malaysia, Mexico, Romania, Russia, and Turkey. Remand Results at 17; Final IDM at 16-18 (P.R. 284). Commerce explains in its Remand Results that "{i}t is clearly less reflective of the respondent's experience to use prices and/or costs in other countries which are not necessarily available to the respondent. However, record data limitations may require the use of such data." Remand Results at 19. In this case, Commerce reasons, "because actual market import prices into Indonesia are more likely to be available to our Indonesian respondent than market import prices into other countries, we continue to find it appropriate to use the market import data for the relevant inputs into Indonesia, rather than an average of Indonesia's import data with that of other countries." *Id*. at 19-20. Commerce's explanation is reasonable and in line with the purpose of the transactions

disregarded test to determine whether an affiliated input price is fair when compared to an unaffiliated input price in the market under consideration. Indeed, given that Zinus has no affiliates based in any of the other countries for which Commerce demanded GTA import data in the course of the investigation, it is impractical and unreasonable to assume imported products into any of those countries would be just as available to Zinus as those being imported into Indonesia. *See* Zinus' Section A Response at Exhibit A-3 (P.R. 97, C.R. 36).

Moreover, despite the fact that the materials at issue were sourced from a NME, Commerce's decision to utilize exclusively Indonesian import data implicitly recognizes the fundamental differences between a market-economy country and a NME country such as the People's Republic of China. Specifically, the applicable law established a unique methodology for calculating normal value in a NME country, in which the foreign respondent company's actual costs for inputs sourced from non-market suppliers are valued, to the extent possible, from a single third (market economy) country. *See* 19 U.S.C. § 1677b(c)(4); 19 C.F.R. § 351.408(c)(2). That selected surrogate country, by statute, must be economically comparable to the NME at issue. Thus, there is no consideration for the actual geographical situation of the primary surrogate country, because there is no legal requirement that the company located in that NME be able to access the inputs in that primary surrogate country. In this case, in contrast, Zinus operates in a market economy, and the calculation of normal value is not governed by the special statutory scheme with respect to NMEs. Indeed, with very limited exceptions – as relevant here, establishing market value for inputs sourced from affiliated suppliers – the statute directs Commerce to rely on costs derived from the company's records, as long as those costs are maintained under the local country's accounting principles. Thus, rather than constructing a normal value on a theoretical basis independent from the geographical location of the surrogate

country as is performed under the special NME methodology, Commerce is obliged to calculate a normal value that considers the company's actual geographical location. In this case, the company is located in Indonesia, a market economy. Therefore, the most reasonable surrogate cost for the materials at issue becomes the relative availability of those materials to that company.

In its Remand Results, Commerce recognizes that although it has a preference to use the data available to the respondent in the country in which its production is located, there are circumstances under which such data may not be available or may be flawed and cannot be used. Remand Results at 19 and 22-23. That is, Commerce recognizes the flexibility permitted by the statute. However, in this case, given the available information and the absence of any flaws or distortions in the Indonesian GTA data, Commerce correctly chose to rely on the import prices that are more likely to be available to the respondent in the country in which its production is located rather than prices available in other, unrelated countries (or an average of all available prices). *See* Final IDM at 18-19 (P.R. 284) (explaining, with citations to record evidence, that the Indonesian GTA import data provided by Zinus exclude imports from China based on Commerce's instructions). Thus, Zinus believes that Commerce's explanation is reasonable and sufficiently complies with the court's Remand Order.

## V. CONCLUSION

For the foregoing reasons, Commerce's remand results with respect to Zinus Korea's selling expenses and Commerce's reliance on Indonesian GTA import data in its application of the transactions disregarded rule is compliant with the Court's remand order and should be sustained by this Court.

Respectfully submitted,

/s/ J. David Park
J. David Park
Henry D. Almond
Kang Woo Lee
Gina M. Colarusso
*Counsel to PT. Zinus Global Indonesia Plaintiff*

Eric Johnson
*Consultant to PT. Zinus Global Indonesia Plaintiff*

ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 942-5000

**Dated: September 22, 2023**

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JENNIFER CHOE-GROVES**

| | | |
|---|---|---|
| **PT. ZINUS GLOBAL INDONESIA,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Court No. 21-00277 (Consol.)** |
| **UNITED STATES,** | ) | |
| **Defendant,** | ) | |
| **and** | ) | |
| **BROOKLYN BEDDING, LLC ET AL.,** | ) | |
| **Defendant-Intervenors.** | ) | |

**CERTIFICATION OF COMPLIANCE WITH CHAMBERS PROCEDURE 2(B)(1)**

The undersigned hereby certifies that the attached Comments in Partial Support of Commerce's Remand Determination, filed on September 22, 2023, contains 3,641 words, exclusive of the table of contents, table of authorities, and counsel's signature block, according to the word count function of the word-processing system used to prepare these comments. Zinus' Comments in Partial Opposition to Commerce's Remand Determination, filed on August 8, 2023, contained 6,293 words, exclusive of the table of contents, table of authorities, and counsel's signature block. These comments therefore comply with the maximum 10,000 word count limitation set forth in the Court's Chambers Procedures.

By: /s/ Henry D. Almond
Henry D. Almond

**Dated: September 22, 2023**