UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

|  |  |  |
|---|---|---|
| PT ZINUS GLOBAL INDONESIA, | ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Court No. 21-00277 |
| UNITED STATES, | ) ) | **NONCONFIDENTIAL** |
| Defendant, | ) ) | **VERSION** |
| and | ) ) | Business Proprietary Information |
| BROOKLYN BEDDING, LLC ET AL., | ) ) | Removed from Brackets on Pages 6-8, 10-12, 14, and 17-22. |
| Defendant-Intervenors. | ) ) | |

## DEFENDANT-INTERVENORS' COMMENTS IN OPPOSITION TO THE DEPARTMENT'S REMAND REDETERMINATION

Yohai Baisburd
Nicole Brunda

**CASSIDY LEVY KENT (USA)** LLP
2112 Pennsylvania Ave NW
Suite 300
Washington, D.C. 20037
(202) 567-2300

*Counsel to Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises Inc., Leggett & Platt, Incorporated, International Brotherhood of Teamsters, United Steel Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO*

Dated:  July 15, 2024

## <u>Table of Contents</u>

<u>Page</u>

I.   Background ................................................................................................ 2

    1.   In-Transit Mattresses ........................................................................ 2

    2.   Zinus Korea Selling Expenses .......................................................... 4

II.  Standard of Review .................................................................................. 5

III. In-Transit Mattresses .............................................................................. 6

    1.   The Department's Second Remand Redetermination is Based on Clearly Erroneous Findings of Fact That Compel Remand ................................ 6

    2.   The Department's Second Remand Redetermination Was Unsupported by Substantial Evidence .......................................................................... 9

        i.   The Department's Decision to Remove In-Transit Mattresses from the Quarterly Ratio Calculation Was Unsupported by Substantial Evidence ......................................................................... 10

        ii.  Department's Rationale for Rejecting the Quarterly Ratios Used in its Draft Remand Redetermination Was Unsupported by Substantial Evidence ......................................................................... 12

        iii. The Department's Decision to Rely on Inventory-Based Quarterly Ratios Was Unsupported by Substantial Evidence ........................ 13

    3.   As Any Rationale Offered by the Government Would be Post Hoc Rationalization, Remand for Explanation by the Department is Required .......... 16

IV.  ZINUS KOREA'S SELLING EXPENSES ................................................ 17

    1.   The Department's Conclusion that Parent G&A Expenses Must Be "Related to Production" Is Unreasonable as It Diverges from Prior Department Conclusions Without Explanation ........................................ 17

    2.   By the Department's Own Reasoning, Zinus' Allocation Methodology is "Nonsensical" and Cannot be Upheld By this Court ............................ 21

    3.   The Department's Erroneously Treated Zinus Korea's Indirect Selling Expenses as "Indirect Selling Expenses Incurred in the Country of Manufacture" ......................................................................... 23

V.   Conclusion ......................................................................................... 25

# Table of Authorities

Page(s)

Statutes

19 U.S.C. § 1516a(b)(1)(B)(i) ............................................................................5, 9, 25

19 U.S.C. § 1677e(a) ...................................................................................................3

19 U.S.C. § 1677m(d) .................................................................................................3

19 U.S.C. § 1677m(e)(2) ...........................................................................................14

19 U.S.C. § 1677m(i) .................................................................................................14

Court Decisions

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281
(1974) .........................................................................................................................24

*Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197 (1938) ...........................5

*Florida Citris Mut. v. United States*, 550 F.3d 1105 (Fed. Cir. 2008)......................24

*Gerritsen v. Shirai*, 979 F.2d 1524 (Fed. Cir. 1992).................................................9

*Greater Boston Television Corp. v. FCC*, 444 F.2d 841 (D.C. Cir. 1970) .................21

*Huvis Corp. v. United States*, 570 F.3d 1347 (Fed. Cir. 2009).....................................5

*Jiaxing Brother Fastener Co., Ltd. v. United States*, 380 F. Supp 3d
1342 (Ct. Int'l Trade 2019)......................................................................................5, 6

*Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530 (Fed.
Cir. 2019) ..................................................................................................................24

*Paralyzed Veterans of America v. Secretary of Veterans Affairs*, 354
F.3d 1334 (Sep. 22, 2003).........................................................................................21

*Qingdao Taifa Group Co., Ltd. v. United States*, 637 F. Supp. 2d 1231
(Ct. Int'l Trade 2009)..................................................................................................4

*Rautaruukki Oy v. United States*, 19 CIT 438 (Ct. Int'l Trade 1995)..........................20

*SKF USA Inc. v. United States*, 254 F.3d 1022 (Fed. Cir. 2001)................................16

*SolarWorld Ams., Inc. v. United States*, 910 F.3d 1216 (Fed. Cir. 2018)...............................16, 17

*Sterline Fed. Sys., Inc. v. Goldin*, 16 F.3d 1177 (Fed. Cir. 1994)....................................................9

*Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978 (Fed. Cir. 1994).......................................................................................................................5

*Torrington Co. v. United States*, 68 F.3d 1347 (Fed. Cir. 1995) ..................................................24

*Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) ............................................................16

*U.S. Steel Group, et al v. United States*, 998 F. Supp 1151 (Ct. Int'l Trade 1998)..................................................................................................................................20

*Zinus Global Indonesia v. United States*, 628 F. Supp. 3d 1252 (Ct. Int'l Trade 2023)..................................................................................................................................13

Administrative Determinations

*Mattresses from Indonesia: Final Affirmative Determination of Sales at Less than Fair Value*, 86 Fed. Reg. 15,899 (Mar. 5, 2021) ........................................................13

*Prestressed Concrete Steel Wire Strand From Tunisia: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 18508 (Apr. 9, 2021)..............................................................................................................................20

## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| PT ZINUS GLOBAL INDONESIA, ) | |
| Plaintiff, ) | |
| v. ) | Court No. 21-00277 |
| UNITED STATES, ) | |
| Defendant, ) | |
| and ) | |
| BROOKLYN BEDDING, LLC ET AL., ) | |
| Defendant-Intervenors. ) | |

## DEFENDANT-INTERVENORS' COMMENTS IN OPPOSITION TO
## THE DEPARTMENT'S REMAND REDETERMINATION

Pursuant to the US Court of International Trade's (the "Court") Remand Order ("Second Remand Order") (ECF 82) and amended scheduling order (ECF 86), Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises Inc., Leggett & Platt, Incorporated, International Brotherhood of Teamsters, United Steel Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, defendant-intervenors and plaintiffs in the companion case *Brooklyn Bedding, LLC et al. v. United States*, Court No. 21-00284 (hereinafter "Mattress Petitioners") hereby submit comments in opposition to the US Department of Commerce's ("the Department") Final Results of Redetermination Pursuant to Court Remand ("Second Remand Redetermination") (ECF 87).

The Second Remand Redetermination suffers from at least two fatal flaws. *First*, the Department adopted a new methodology to address Zinus' failure to maintain adequate inventory

1

records.  No party was given an opportunity to comment on that new methodology prior to the Department's submission of its final Second Remand Redetermination and so any explanation provided to the Court will be impermissible *post-hoc* rationalization.  *Second*, in adopting the new methodology, the Department relied on demonstrably false factual premises and unreliable inventory records to address the gap in the record created by Zinus' failure to track the country of origin of Zinus US' inventory sales.  Neither the Department's misguided analysis nor its use of Zinus' flawed inventory records are supported by substantial evidence and remand is therefore required.

Remand is also warranted because the Department failed to explain how Zinus Korea's various expenses—which are now documented on the record—were accounted for in its margin calculation.  Indeed, on various issues the Department's stated rationale is either nonsensical or a wholly unexplained departure from its reasoning in other contemporaneous determinations.

## I.    Background

### 1.    In-Transit Mattresses

Despite the fact that Zinus' Chinese-origin mattresses were already being investigated by the Department during the POI of this investigation, Zinus US did not physically segregate mattresses by country of origin in its warehouse and did not separately track sales of mattresses by origin.  Put simply, Zinus lacks the ability to identify Indonesian-origin sales for any CEP inventory sales of mattresses sourced from Indonesia and another country.  All parties acknowledge that it falls on the Department to adopt a methodology to account for Zinus' shortcomings.

In its Second Remand Order, the Court held that the Department's determination to use in transit mattress information in its quarterly ratio calculation as facts otherwise available was neither in accordance with law nor supported by substantial evidence because the Department

had failed to comply with its statutory obligations under 19 U.S.C. § 1677e(a) and 19 U.S.C. § 1677m(d). Second Remand Order at 12 (ECF 82). Specifically, the Court found that the Department had failed to provide Zinus with an opportunity to provide Zinus US' missing inventory records before relying on facts otherwise available to address the gap in the record. *Id*. at 12-13. The Court remanded the issue for further consideration and explanation and suggested that the Department re-open the record to collect the missing information. *Id*. at 13-14.

On remand, the Department issued a supplemental questionnaire to Zinus in which it *inter alia* requested that Zinus provide a model-specific accounting of the quantity and value of Zinus US' inventory as of January 19, 2019, the start of the period of investigation. *See* "Supplemental Questionnaire" (Mar. 6, 2024) ("Remand Supp Questionnaire") (Second Remand C.R. 1). In its Draft Second Remand Redetermination, the Department presented data on total beginning inventory, entries into inventory, and sales and determined that Zinus US had sufficient inventory to support its sales during the POI on an aggregate basis. *See* "Draft Results of Redetermination Pursuant to Court Remand" (Apr. 19, 2024) ("Draft Second Remand Redetermination") at 6 (Second Remand C.R. 13); *see also* "Draft Remand Results Calculation Memorandum for PT Zinus Indonesia (Zinus Indonesia)" at Attachment 1 (Second Remand C.R. 15). Based on this aggregate data, in its Draft Second Remand Redetermination the Department determined that there is no longer a basis to include the in-transit quantity in the quarterly ratio calculation. Draft Second Remand Redetermination at 6-7 (Second Remand C.R. 13). However, the Department also concluded that it was appropriate to also adjust the quarterly ratios to include only the specific model numbers that were produced and sold by Zinus Indonesia during the POI. *Id*. at 7-8. This resulted in a weighted-average dumping margin of 2.35 percent, which is above the de-minimis threshold. *Id*. at 13.

NONCONFIDENTIAL VERSION

However, in its final Second Remand Redetermination, the Department abruptly changed course, adopting its third approach to addressing the gap in the record caused by Zinus' failure to record the country of origin of its sales.  Without providing Mattress Petitioners an opportunity to comment on its validity, the Department adopted an entirely new quarterly ratios calculation proffered by Zinus that was based on both the purchase and existing inventory data, which resulted in a weighted-average dumping margin of 0.00 percent.  Second Remand Redetermination at 12 and 23 (ECF 87).  Had Mattress Petitioners been provided an opportunity to review the Department's revised calculations, or the various new attachments that the Department cited as supporting "evidence", they would have noted the all too obvious flaws and inconsistencies in the Department's reasoning which render the third modification utilized by the Department not supported by record evidence and not in accordance with law.   Absent such an opportunity, Mattress Petitioners are providing such comments for the first time before this Court.[1]  *See generally Qingdao Taifa Group Co., Ltd. v. United States*, 637 F. Supp. 2d 1231, 1237 (Ct. Int'l Trade 2009) ("A party, however, may seek judicial review of an issue it did not raise in a case brief if Commerce did not address the issue until its final decision, because in such circumstance the party would not have had a full and fair opportunity to raise the issue at the administrative level.").

## 2.   Zinus Korea Selling Expenses

During the period of investigation ("POI"), Zinus's parent company, Zinus Korea, played a role in every sale of subject merchandise to the United States.  "Zinus' Section A

---

[1] Mattress Petitioners note that even Zinus anticipated that it would be problematic for the Department to adopt a remand methodology "after hearing from only one side in the litigation." *See* "Zinus' Comments on the Department's Draft Results of Redetermination Pursuant to Court Remand" (Apr. 26, 2024) at 5-6 (Second Remand C.R. 21).  Yet this is precisely what the Department did in its Second Remand Redetermination.

Questionnaire Response" (Jun. 18, 2020) ("Zinus AQR") at A-8 (Investigation C.R. 36).   Yet during the investigation, Zinus failed to report any of Zinus Korea's associated indirect selling expenses to the Department.  On remand, the Department issued a supplemental questionnaire in which it requested that Zinus report such expenses.  *See* Remand Supp Questionnaire (Second Remand C.R. 1).  The additional documentation provided by Zinus demonstrated that Zinus Korea incurred various expenses on behalf of Zinus Indonesia during the POI that had not been previously reported to the Department.  These included both the aforementioned indirect selling expenses ("ISE"), as well as additional parent general and administrative ("parent G&A") expenses incurred by Zinus Korea in its role as the parent company in Zinus' global production and sales network.  While these expenses are now documented on the record, the Department failed to properly account for them in its margin calculation.

## II.   Standard of Review

Pursuant to 19 U.S.C. § 1516a(b)(1)(B)(i), the Court "shall hold unlawful any determination, finding, or conclusion found…to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  Substantial evidence means "more than a mere scintilla" and includes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994) (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  Accordingly, "'the substantiality of evidence must take into account whatever in the record fairly detracts from its weight,' including 'contradictory evidence or evidence from which conflicting inferences could be drawn.'"  *Huvis Corp. v. United States*, 570 F.3d 1347, 1351 (Fed. Cir. 2009) (quoting *Suramerica*, 44 F.3d at 985).  Where the Department "fails to consider or discuss record evidence which, on its face, provides significant support for an alternative conclusion, the Department's determination is unsupported by substantial evidence."

*Jiaxing Brother Fastener Co., Ltd. v. United States*, 380 F. Supp 3d 1342, 1360-61 (Ct. Int'l Trade 2019) (internal marks removed).

### III. In-Transit Mattresses

**1. The Department's Second Remand Redetermination is Based on Clearly Erroneous Findings of Fact That Compel Remand**

Remand is warranted because the Department's Second Remand Redetermination rests on an erroneous finding of fact. In the Second Remand Redetermination, the Department stated—for the first time—that Zinus US's model-specific inventory established two "very important facts" that "directly impact the accuracy and reliability of the quarterly ratio calculation performed in the *Final Determination*." Second Remand Redetermination at 10-11 (ECF 87). The second of these alleged "facts," which was central to the Department's entire remand analysis, was that "Zinus U.S. had a sufficient number of the Indonesia model numbers that were in common with other countries in its physical inventory to support the U.S. sales of such products reported as non-subject merchandise in its U.S. sales database."[2] *Id*. Remarkably, the Department's own analysis shows that was not the case.

The model-specific data the Department presented as supporting "evidence" for the first time in its Final Remand Redetermination—demonstrates that this alleged "fact" ***is categorically false***. Indeed, there were in fact [

]. In particular, in the "Ratio Application" worksheet in Attachment 5 of the Department's Second Remand Calculation

---

[2] The other "fact" was the unremarkable observation that in-transit, on the water, inventory, was not physically on land in a Zinus warehouse. Second Remand Redetermination at 10-11 (ECF 87). As discussed further in section III.2.i, just because those mattresses were on the water does not mean they were not sold [

].

Memorandum, the Department provided a summary, by model number, of: (1) beginning POI inventory values (column C), sourced from Zinus' Exhibit RS-10, (2) total purchases entered into inventory from **all** sources in quarter 1 (column D), quarter 2 (column L), quarter 3 (column V), and quarter 4 (column AF), sourced from Zinus' Exhibit SC2-1, and (3) total sales from all sources during the POI (column BD), sourced from Zinus "Indonesia" and "Non-Indonesia" US sales databases.[3] "Final Remand Results Calculation Memorandum for PT Zinus Global Indonesia (Zinus Indonesia)" (May 16, 2024) ("Second Remand Calc Memo") at Attachment 5 (Second Remand C.R. 30).

Logically, for the Department's aforementioned "fact" to be accurate, [

].[4] Yet, the evidence prepared and presented by the Department in the "Ratio Application" worksheet of Attachment 5—which is summarized in the table below—shows that for various model numbers this is simply not the case. *See* Second Remand Calc Memo at Attachment 5 ("Ratio Application" worksheet) (Second Remand C.R. 30). [5]

---

[3] Importantly, each of these figures above are ***actual*** total figures reported in Zinus' record submissions, prior to the use of a quarterly ratio methodology to estimate Indonesian sales.

[4] Indeed, this must be true because Zinus reported that it had no returns during the POI and its sales quantities were reported net of any sales cancellations. *See* "Zinus' Section C Questionnaire Response" (Jul. 13, 2020) ("Zinus CQR") at C-32 (Investigation C.R. 117) ("Zinus reports the invoiced quantity in number of mattress units in the field QTYU. Zinus records returns as negative sales in its general ledger and sales ledger. There were no returns in the POI. However, there were sales cancellations. For the purpose of this response, Zinus reports it U.S. sales net of any cancellations.")

[5] While Attachment 5 shows a similar pattern for model number [                    ], Mattress Petitioners' review of the cited record evidence shows this was an error and thus have not included it in the table.

**Table 1. Model Numbers for Which the Total Sold [          ]
the Total Volume in Inventory During POI**

| | Model Number | Beginning Inventory Quantity | Total Quantity Entered into Inventory During POI from All Sources | Total Available for Sale in POI (Beginning Inventory + Entries) | Total Quantity Sold in POI from All Sources | Quantity for Which POI Sales [          ] | |
|---|---|---|---|---|---|---|---|
| [ | | | | | | | ] |
| [ | | | | | | | ] |
| [ | | | | | | | ] |
| [ | | | | | | | ] |
| [ | | | | | | | ] |
| [ | | | | | | | ] |
| [ | | | | | | | ] |

For example, for model number [              ] (highlighted above), Zinus reported that Zinus US had [      ] units in its inventory at the start of the POI.  *Id*. (Column C).  Zinus elsewhere reported that during the POI Zinus US purchased and entered into its US inventory an additional [        ] units of this model number from all country sources.  *Id*. (including [      ] units in quarter 1 (Column D), [          ] units in quarter 2 (Column L), [    ] units in quarter 3 (Column V), and [        ] units in (Column AF)).  This means that there was a [

                                      ] of model number [                  ] that were physically present in Zinus US' inventory during the POI.  However, the sales data in Attachment 5 show that Zinus US sold a total of [          ] units of model number [

              ] during the POI.  *Id*. (Column BD).[6]  ***This is [        ] units [                    ] Zinus US***

---

[6] This included sales of [        ] units reported in Zinus' "Indonesia US Sales Database" (column AU) and sales of [          ] units reported in Zinus' "Non-Indonesia US Sales Database" (column BC).  These databases do not reflect the actual country of origin for the sales, which

*(footnote continued on next page)*

***had available for sale in its physical inventory during the POI.*** Plainly, and contrary to the

Department's stated "fact," Zinus US ***did not*** have "a sufficient number of the Indonesia model

numbers that were in common with other countries in its physical inventory to support the U.S.

sales of such products reported as non-subject merchandise in its U.S. sales database." *See*

Second Remand Redetermination at 11 (ECF 87).

     The fact that the Department's entire analysis was based on demonstrably false factual

findings renders its entire determination unreasonable and thus unsupported by substantial

evidence. The same fact separately renders the Department's determination an abuse of

discretion and thus otherwise not in accordance with law. *See Sterline Fed. Sys., Inc. v. Goldin*,

16 F.3d 1177, 1182 (Fed. Cir. 1994) (quoting *Gerritsen v. Shirai*, 979 F.2d 1524, 1529 (Fed. Cir.

1992)) (finding that an agency abuses its discretion when its decision *inter alia* "rests on clearly

erroneous fact findings"). This alone renders the Department's determination unlawful and

requires remand. *See* 19 U.S.C. § 1516a(b)(1)(B)(i) (requiring that the Court "find unlawful and

determination, finding, or conclusion found…to be unsupported by substantial evidence on the

record, or otherwise not in accordance with law").

    **2.**    **The Department's Second Remand Redetermination Was Unsupported by Substantial Evidence**

     As discussed above, the fact that the Department's factual conclusions are contradicted

by the data in its own attachments requires remand. However, the data presented in Attachment

5 of the Department's Second Remand Redetermination also renders the Department's

determinations to disregard in-transit mattresses, reject the revised quarterly ratios used in the

Draft Second Remand Redetermination, and rely on inventory data to calculate new quarterly

---

Zinus was unable to determine, but rather the designated country of origin after application of
Zinus' proffered FIFO methodology. Zinus CQR at C-2 (Investigation C.R. 117).

ratios as unsupported by substantial evidence because each of these determinations were based in whole or in part on the erroneous factual conclusion discussed in Section III.1. Because each of these determinations was based on a demonstrably false factual premise, each separately necessitates remand.

      i.    ***The Department's Decision to Remove In-Transit Mattresses from the Quarterly Ratio Calculation Was Unsupported by Substantial Evidence***

Throughout this proceeding Zinus and its counsel have repeatedly avowed that Zinus could not have sold in-transit mattresses during the POI because it was impossible for Zinus US to sell merchandise from inventory before it was physical present in its US warehouse. *See, e.g.,* "Plaintiff PT. Zinus Global Indonesia's Comments in Partial Opposition to Commerce's {First} Remand Determination" (Aug. 8, 2023) ("Zinus First Remand Comments") at 2 (ECF 64) ("At a most basic level, {the Department's conclusion to use in-transit inventory} is inconsistent with the obvious fact that merchandise cannot be sold out of U.S. inventory before it enters U.S. inventory."). However, the model-specific accounting of Zinus US' inventory discussed above demonstrate that sales of mattresses not physically present in Zinus US' inventory were not only possible, [                                               ] during the period of investigation. To return to the example of model number [              ], discussed *supra*, if Zinus only had a [             ] units in its physical inventory during the POI, then it simply could not have sold [     ] units of this model number during the POI ***unless it sold some units before they entered U.S. inventory***. This is not complex accounting, but rather a matter of simple arithmetic that directly contradicts statements Zinus has made to the Department and this Court throughout this proceeding. *See id.* at 2, 13-14.

However, in its Second Remand Redetermination, the Department either overlooked or swept aside such obvious inconsistencies, concluding that it was irrefutable "fact" that Zinus had

sufficient comingled inventory on-hand to support its sales during the period of investigation. Second Remand Redetermination at 11 (ECF 87). While this may be true on an aggregate basis, it is not true on a model-specific basis, which is the only level on which a comparative analysis can reasonably be done. This is because mattress models are not interchangeable: just as a grocer cannot create sales of apples from its inventory of oranges, Zinus cannot create mattress sales of a specific model number from its inventory of an entirely different model number.[7]

Thus, contrary to the Department's conclusions, Zinus' inventory records—and in particular the data presented in the Attachment 5 of its calculation memorandum—***do not*** support the exclusion of in-transit mattresses from the quarterly ratio calculations. Instead, they support the ***inclusion*** of such in-transit mattresses as they demonstrate that, [



]. Indeed, the factual information collected during the second remand proceeding provides the concrete record evidence necessary to support the Department's conclusion in its First Remand Redetermination, specifically that "Zinus' own data demonstrate that it sold more of the relevant mattresses from its warehouse than were contained in its warehouse during the POI." *See* "Final Results of Redetermination Pursuant to Court Remand" ("First Remand Redetermination") at 6 (ECF 60). Given this factual evidence it was unreasonable for the Department to exclude in-transit mattresses from the quarterly ratio calculation as its stated reason for doing so is contradicted by record evidence.

---

[7] Zinus elsewhere explained that its model numbers, also called product codes, are used by Zinus US and other Zinus entities to "record production, inventories, and sales in U.S. markets." *See* Zinus AQR at A-27 (Investigation C.R. 36).

ii.    ***Department's Rationale for Rejecting the Quarterly Ratios Used in its Draft Remand Redetermination Was Unsupported by Substantial Evidence***

The data in Attachment 5 also renders the Department's determination to reject the revised quarterly ratios utilized in the original Draft Second Remand Redetermination unsupported by substantial evidence.  In its Second Remand Redetermination, the Department's sole stated reason for rejecting these draft quarterly ratios was that "it is indisputable that applying the revised quarterly ratios (based on purchase data only) results in an adjusted sales quantity for multiple Indonesia model numbers that is greater than the quantity Zinus U.S. has in inventory for those model numbers."  Second Remand Redetermination at 12 (ECF 87).  Based on this observation, the Department concluded that continuing to use the draft quarterly ratios used in its Draft Second Remand Redetermination was inappropriate because the calculation yields such "impossible results."  *Id*.

However, such a conclusion was unreasonable and unsupported by substantial evidence when—as discussed above—Attachment 5 demonstrates that [


].  *See* supra at Table 1.  To quote its own reasoning, the Department cannot "simply disregard this information in good faith," Second Remand Redetermination at 11 (ECF 87), much less base its justification for selecting a quarterly ratio methodology on erroneous conclusions about what was possible with regard to Zinus' sales.  As the Department's rationale for rejecting the draft quarterly ratios utilized in its Draft Second Remand Redetermination is inconsistent with record evidence, remand is required.

iii. ***The Department's Decision to Rely on Inventory-Based Quarterly Ratios Was Unsupported by Substantial Evidence***

After erroneously rejecting the inclusion of in-transit mattresses and use of the draft quarterly ratio methodology utilized in its Draft Second Remand Redetermination, the Department chose to instead calculate new quarterly ratios based on a combination of purchase and "inventory" data.  Second Remand Redetermination at 14 (ECF 87).  Under this approach, the Department estimated how many Indonesian and third-country mattresses were sold out of inventory in a given quarter based on the proportionate number of mattresses in inventory from each country in that quarter.  *Id*.  These estimated Indonesian and third-country sales became the basis of new inventory calculations in subsequent quarters, such that each quarter's calculations dependent implicitly on how many mattress sales were assigned to Indonesia in the previous quarter.

While Zinus proffered this approach as a "new" methodology on remand it is, in fact, nothing more than a thinly veiled attempt to reintroduce Zinus' previously rejected FIFO methodology, which is also based on inherent assumptions about the timing of inventory movements.  Indeed, one of the key reasons the Department found the quarterly ratio methodology to be superior to the FIFO methodology and "less susceptible to manipulation" is that it is based on known, verifiable ***purchase*** data and thus do not require any assumptions about inventory turn.  *Mattresses from Indonesia: Final Affirmative Determination of Sales at Less than Fair Value*, 86 Fed. Reg. 15,899 (Mar. 5, 2021) ("Final Determination") (P.R. 292), and accompanying Issues and Decision Memorandum ("IDM") at 9 (P.R. 284); *see also PT. Zinus Global Indonesia v. United States*, 628 F. Supp. 3d 1252, 1264 (Ct. Int'l Trade 2023) (upholding the Department's determination in this regard).  By contrast, the inventory-based quarterly ratios require the Department to assign to Indonesia a set number of sales each quarter,

reintroducing a problem—namely Zinus' inability to identify the country of origin of its inventory sales—that the quarterly ratios were designed specifically to address.

Perhaps more importantly, the Department's inventory-based quarterly ratios require the Department to rely on inventory records that—according to both Zinus and the Department's reasoning—should be "impossible" because they demonstrate that [

            ].  The fact that Zinus US' inventory records [                              ] allows for only one of two possible conclusions: either (1) it is not "impossible" for Zinus US to have sold a greater quantity of mattresses than it had in its inventory records, rendering baseless the Department's stated reasoning for excluding in-transit mattresses and rejecting the quarterly ratio calculation used in Draft Remand Redetermination, *see* sections III.2.i and III.2.ii, or (2) it is, in fact, "impossible," meaning that Zinus US' inventory records [                          ] cannot be reasonably relied upon to calculated inventory-based quarterly ratios, as the Department did in its Second Remand Redetermination.  Indeed, in the later case the Department's reliance on such figures would be contrary to the express terms of the statute as [            ] inventory records are—by definition—unverifiable.  The statute is clear that such plainly unverifiable information may not be relied upon by the Department in reaching its determinations.  19 U.S.C. § 1677m(i) ("The administering authority shall verify all information relied upon in making a final determination in an investigation."); *see also* 19 U.S.C. § 1677m(e)(2) (permitting the Department to rely on information submitted by an interested party only where "the information can be verified").  In either case, the Department's reliance on inventory-based quarterly ratios was unreasonable, unsupported by substantial evidence, and requires remand.

The entire reason the Department utilized purchase data in its original quarterly ratios—which includes *all* purchases by Zinus US from Zinus KR during the POI, not just those purchases Zinus claims entered its Zinus US' warehouse—was that this purchase data could be readily reconciled to Zinus Korea's sales records.  IDM at 9 (P.R. 284) (noting that quarterly ratios calculated based on the quantity of mattresses Zinus US purchased from Zinus KR was preferable because it was "grounded in purchase data").  Because Zinus claimed—despite certain evidence to the contrary—to be unable to identify the country of origin of Zinus US' inventory sales, the Department determined it was appropriate to use Zinus Korea's POI sales of Indonesian mattresses to Zinus US to estimate Zinus US' POI sales of Indonesian mattresses to final customers.  *See id*. (raising questions as to "how Zinus US can be reimbursed by the manufacturer for warranty claims or grant commissions on its sales if it does not know the origin of the merchandise sold out of inventory").

Mattress Petitioners believe this, in and of itself, was sufficient justification for relying on purchase data.  However, the additional data gathered on remand underscore the necessity of the approach as they demonstrate that Zinus' inventory reporting yield results that Zinus has throughout this proceeding claimed are an impossibility.  *See, e.g.,* Zinus First Remand Comments") at 2 (ECF 64).  Despite the Department providing Zinus with an additional opportunity for clarification on remand, serious questions thus remain about the accuracy and reliability of the inventory reporting, which—unlike the purchase data used in the original determination—are not reconciled to anything other than Zinus' say so.  The Department cannot simply ignore that Zinus' inventory records are demonstrably unreliable.

**3.    As Any Rationale Offered by the Government Would be Post Hoc Rationalization, Remand for Explanation by the Department is Required**

As discussed above, the Department utilized the inventory-based quarterly ratios for the

first time in its Second Remand Redetermination submitted to this Court on May 16, 2024.

*Compare* Second Remand Redetermination (ECF 87) *with* Draft Second Remand

Redetermination (Second Remand C.R. 13).  The Second Remand Redetermination was also the

first time that the Department presented and relied upon the data in Attachment 5 as so-called

"evidence" supporting its determinations.  *Id*.  As detailed above, the discrepancies between this

data and the factual conclusions reached by the Department are self-evident, yet appear not to

have been considered—and certainly were not addressed—in the Department's explanations.

Instead, as explained about, the Department based its entire determination on the truthfulness of

an alleged "fact," that is readily contradicted by its own proffered evidence.

As the Department failed to acknowledge or discuss such contradictory information in its

Final Second Remand Redetermination, remand is required.  Given the Department's complete

failure to address this issue, any explanations proffered by the Department of Justice would be

nothing more than *post hoc* attempts to explain the Department's actions.  It is well accepted that

reviewing courts may not accept such *post hoc* rationalizations proffered by appellate counsel.

*See SKF USA Inc. v. United States,* 254 F.3d 1022, 1028 (Fed. Cir. 2001) (quoting *Burlington*

*Truck Lines, Inc. v. United States,* 371 U.S. 156, 168 (1962) ("Although counsel sought to justify

the agency's choice…the Supreme Court rejected this argument because 'courts may no accept

appellate counsel's post hoc rationalizations for agency action.'").  Remand is thus required so

that the Department can consider and address all record evidence, "including evidence that

supports as well as evidence that fairly detracts from the substantiality of the evidence" cited in

16

support of its conclusions.  *See SolarWorld Ams., Inc. v. United States*, 910 F.3d 1216, 1222 (Fed. Cir. 2018).

## IV. Zinus Korea's Indirect Selling Expenses

In its remand order, the Court agreed that the Department's "determinations with respect to the exclusion of Zinus Korea's selling expenses are not supported by substantial evidence" and granted the Department's request for voluntary remand to reopen the record to collect additional information on this issue.  Second Remand Order at 16-17 (ECF 82).  The additional documentation provided by Zinus in the remand proceeding confirms two points: (1) Zinus failed to report [                          ] of Zinus KR's parent G&A to the Department and (2) Zinus KR incurred indirect selling expenses on behalf of Zinus Indonesia in selling subject merchandise in the United States during the POI, which remain unaccounted for in the margin calculations.  In its Second Remand Redetermination the Department failed to substantively address these issues, offering rationales that are either nonsensical or in contrast with its own recent explanations of its treatment of parent G&A.  As the Department's conclusions are unsupported by substantial evidence, remand is required.

> ### 1. The Department's Conclusion that Parent G&A Expenses Must Be "Related to Production" Is Unreasonable as It Diverges from Prior Department Conclusions Without Explanation

In its original supplemental section D questionnaire response, the Department asked Zinus to confirm that the G&A expenses reported to the Department included an amount for all administrative services performed on Zinus Indonesia's behalf by Zinus Korea and, if not, to provide a recalculated G&A expense ratio to include such amounts.  "Zinus' Section D Supplemental Questionnaire Response" (Sep. 23, 2020) at SD-25 (Investigation C.R. 207).  In response, Zinus claimed that "Zinus KR does not perform any administrative services for the subsidiary companies" and thus only revised the G&A ratio to include a portion of the salaries of

Zinus KR's key management personnel. Id. at SD-26.  However, the additional information

Zinus provided on remand demonstrates that there are [                 ] G&A expenses that Zinus

KR incurred on behalf of its subsidiaries that Zinus failed to report to the Department.  In

particular, in the "Calculation of indirect selling expense of Zinus KR" summary table of Exhibit

RS-7, Zinus [                             ] expenses—an amount that accounts for nearly

[                                                                                                    ]—

because they are allegedly "{e}xpenses related to Zinus KR only."  *See* "Zinus' Remand

Supplemental Questionnaire Response" (Mar. 20, 2024) ("Zinus Remand SQR") at Exhibit RS-7

(Second Remand C.R. 8); *see also* Zinus AQR at Exhibit A-11d(1), pg. 8 (Investigation C.R. 38)

(Zinus KR's unconsolidated 2019 income statement showing total SG&A of 24.973 billion

KRW).  Zinus provides a further breakdown ("Details of indirect selling expenses that are related

to Zinus Korea function only") that shows [

        ].  Zinus Remand SQR at Exhibit RS-7 (Second Remand C.R. 8). The [


                                    ] and which Zinus thus should have included as part of its parent

G&A.  *See id*.

        The factual record supports such a classification.  Zinus was clear in its questionnaire

responses that Zinus KR and its subsidiaries (including Zinus Indonesia) "closely coordinate

with one another to manage global manufacturing, operational, and sales activities."  Zinus AQR

at A-11 (Investigation C.R. 36).  The expenses in question relate to Zinus KR's role as a parent

corporation.  Indeed, the [

].  Zinus' prior questionnaire responses similarly confirm that [

].  For example, notes 18(1) and 36(4)

of Zinus KR's 2019 audited financial statements show that Zinus KR had more than 45 billion

KRW invested in Zinus Indonesia during the 2019 POI and also provided guarantees for nearly

$60 million in Zinus Indonesia's external financing that year.  Zinus AQR at Exhibit A-11d(1),

pg. 58, 85 (Investigation C.R. 38).  The record thus simply does not support Zinus' claim that

[

].  *See* Zinus Remand SQR at Exhibit RS-7 (Second Remand C.R. 8).  Instead,

these are clearly general and administrative expenses incurred by Zinus KR in its role as a parent

company, which Zinus should have included—as instructed—as part of its parent G&A.

While Mattress Petitioners raised this issue in their administrative remand comments, *see*

"Mattress Petitioners' Comments on the Department's Draft Results of Redetermination" (Apr.

26, 2024) ("Mattress Petitioners Draft Second Remand Comments") at 13-16 (Second Remand

C.R. 20), the Department failed to substantively address this record evidence in the Second

Remand Redetermination and instead attempts to dismiss it with broad-stroke justifications that

are either unwarranted or directly contradicted by its reasoning in other contemporaneous

determinations.

In attempting to explain why such expenses are not parent G&A, the Department first

faults Mattress Petitioners for allegedly raising "a new topic not at issue in this litigation, *i.e.*,

whether the Column E expenses (i.e., [            ] Korean Won) incurred by Zinus Korea

should be considered part of Zinus Indonesia's G&A expenses."  Second Remand

Redetermination at 21 (ECF 87).  The Department ignores that Zinus presented an accounting of

19

Zinus Koreas selling expenses—including the [                    ] Korean Won in Column E that Zinus claims are "expenses related to Zinus KR only"—for the first time on remand.  Mattress Petitioners thus had no opportunity to evaluate Zinus' classification of those expenses until the remand proceeding.  The Department cannot reasonably fault Mattress Petitioners for not earlier challenging the reasonableness of Zinus submissions that were not previously on the record.

The Department next argues that the expenses in question cannot be parent G&A expenses because Zinus Korea is "not a production entity, such that the G&A expenses it incurs at its headquarters in Seoul, South Korea, are not production-related."  Second Remand Redetermination at 22 (ECF 87).  Such a conclusion—*i.e.* that parent G&A expenses must be "related to production"—is unreasonable when the Department has emphatically declared the opposite in other recent determinations.  For example, in its 2021 final determination in *Steel Wire Strand from Tunisia*, in which the Department similarly considered whether to allocate parent G&A to a respondent, the Department stated: "{t}he U.S. Court of International Trade (CIT) has agreed with Commerce *that G&A expenses are those expenses which relate to the general operations as a whole rather than to the production process*."  *Prestressed Concrete Steel Wire Strand From Tunisia: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 18508 (Apr. 9, 2021), IDM at Comment 3 (citing *U.S. Steel Group, et al v. United States*, 998 F. Supp 1151, 1154 (Ct. Int'l Trade 1998) (citing *Rautaruukki Oy v. United States*, 19 CIT 438, 444 (Ct. Int'l Trade 1995)) (emphasis supplied).  The Department made clear that where, as here, evidence demonstrated that a parent company incurred G&A expenses on behalf of the respondent—including through "supporting {the respondent's} general operations"—those expenses are properly treated as parent G&A and included with the G&A of the respondent.  *Id*. at Comment 3.  The Department's failure to apply the same treatment here—

or meaningfully explain why the facts compel a different outcome—renders its determination

unsupported by substantial evidence.  *See generally Greater Boston Television Corp. v. FCC*,

444 F.2d 841, 852 (D.C. Cir. 1970) (quoted in *Paralyzed Veterans of America v. Secretary of*

*Veterans Affairs*, 354 F.3d 1334, 1352 (Sep. 22, 2003)) ("{A}n agency changing its course must

supply a reasoned analysis indicating that prior policies and standards are being deliberately

changed, not casually ignored, and if an agency glosses over or swerves from prior precedents

without discussion it may cross the line from the tolerably terse to the intolerably mute.").

### 2.   By the Department's Own Reasoning, Zinus' Allocation Methodology is "Nonsensical" and Cannot be Upheld By this Court

In its remand proceeding, the Department reopened the record and asked Zinus to report

"all indirect selling expenses incurred by Zinus Korea associated with Zinus Indonesia's U.S.

sales."  Second Remand Redetermination at 2-3 (ECF 87).  While Zinus reported certain

expenses, its method of allocating these expenses to Zinus KR—which the Department

ultimately relied upon in its Final Second Remand Redetermination—is distortive.  Indeed, the

Department itself confirmed that Zinus' allocation ratio—which "divid{ed} an expense that does

not include intercompany transactions by a sales revenue figure that does factor in such

transactions"—is "nonsensical." *Id*. at 22.

In the "{i}dentification of Zinus KR's Indirect Selling Expenses that are only related to

Zinus Indonesia" portion of Exhibit RS-7, Zinus proposed that the Department use an allocation

ratio based on "{t}otal revenue before elimination of inter-company transactions in 2019."

Zinus Remand SQR at Exhibit RS-7 (Second Remand C.R. 8).  Mattress Petitioners explained

that such an approach is clearly distortive because it ignored the fact that many of the Zinus

group companies—including Zinus KR itself—[

]. *See* Mattress Petitioners Draft Second Remand Comments at 16-19 (Second Remand C.R. 20).   As Zinus' proffered allocation ratio was based on the [



].  *Id*.  The distortion in such an approach is self-evident as the total revenue of all Zinus entities that is used as the denominator in Exhibit RS-7 (*i.e.* [                    ] is [                        ] the total revenue reported for all Zinus entities in Zinus KR's consolidated financial statement ( ₩817,137,676,913 ).  *Id*. at 17 (citing Zinus AQR at Exhibit A-11(e)(1), pg. 6 (Investigation C.R. 39)).  Mattress Petitioners explained that the Department should correct the allocation by using the total Zinus group revenue reported in Zinus Korea's consolidated 2019 financial statement as this consolidated total [                        ].  *Id*. at 16-19.

In its Second Remand Redetermination, the Department declined to make this correction, concluding that the approach proffered by Zinus was reasonable.  But, rather than affirming its conclusions, the Department's explanations do precisely the opposite and demonstrate why the adjustment proffered by Mattress Petitioners is necessary.  In particular, the Department correctly notes that "it would be ***nonsensical*** to calculate an allocation ratio by dividing an expense that does not include intercompany transactions by a sales revenue figure that does factor in such transactions."  Second Remand Redetermination at 22 (ECF 87) (emphasis supplied).  But such a nonsensical calculation is precisely what the Department relied upon.  In particular, there is no question that the sales revenue denominator used in the allocation ratio relied upon by the Department ***included*** intercompany transactions (*i.e.* they were sales revenues

reported ***before elimination of inter-company transactions***).[8]  As the Department correctly observed, there is also no question that "Zinus Korea's expenses ***do not include*** expenses incurred by other related companies."  *Id*.  By the Department's own stated reasoning an allocation ratio that divides "an expense that does not include intercompany transactions by a sales revenue figure that does factor in such transactions" is nonsensical and therefore cannot be supported by substantial evidence.  *Id*.  As the Department's conclusions do not match its stated reasoning they cannot be supported by substantial evidence.  Remand is therefore required.

### 3.   The Department's Erroneously Treated Zinus Korea's Indirect Selling Expenses as "Indirect Selling Expenses Incurred in the Country of Manufacture"

In calculating a revised margin calculation the Department treated indirect selling expenses incurred in Korea as "DINDIRSU," a category the Department's standard questionnaire—and margin program—treat as "indirect selling expenses incurred in the country of manufacture."  "Antidumping Questionnaire" (May 14, 2020) at C-26 (Field Number 49.1) (P.R. 67).  This classification is important because, as the Department itself recognized, treating Zinus Korea's ISE as DINDIRSU, means that these expenses have "no effect on the margin results."  Second Remand Redetermination at 19 (ECF 87).  This is because the Department's standard margin program does not include DINDIRSU in the calculation of either US price or normal value, meaning that indirect selling expenses incurred in the country of manufacture are effectively ignored in the margin calculation.  While such an approach is sensible when considering the indirect selling expenses of a home market exporter/producer that incurs selling

---

[8] While the Department appears to confuse the issue, a sales revenue figure calculated "<u>before</u> elimination of inter-company transactions" must, by definition, <u>include</u> those inter-company transactions in the total because they have not yet been eliminated.  Thus the Department's apparent conclusion that revenue reported "before elimination of inter-company transactions" somehow "does not include intercompany transactions" is plainly erroneous.

expenses on behalf of both home market and US sales, it does make sense here when Zinus acknowledges that Zinus Korea "did not have sales of subject merchandise to the home market or to third country markets" during the POI.  *See* Zinus AQR at A-3 (Investigation C.R. 36).   Put differently, any indirect selling expenses incurred by Zinus Korea on behalf of Zinus Indonesia were necessarily related to its sales of subject merchandise in the United States.

The Department's failure to account for these expenses in either US price or normal value (here based on constructed value) results in a clear mismatch that prevents the Department from achieving "a fair 'apples-to-apples' comparison' between US price and foreign market value" as envisioned under the statute.  *See Florida Citris Mut. v. United States*, 550 F.3d 1105, 1110 (Fed. Cir. 2008) (quoting *Torrington Co. v. United States*, 68 F.3d 1347, 1352 (Fed. Cir. 1995)).  In its Second Remand Redetermination Department entirely failed to address this concern, instead simply stating that it had a "general practice to treat such expenses…the same as indirect expenses incurred in the country of manufacture."  Second Remand Redetermination at 23 (ECF 87).  Blind reliance on a "general practice" does not constitute substantial evidence, particularly where record evidence establishes that—in contrast to past cases—the relevant third country expenses at issue were incurred by Zinus Korea only for sales of subject merchandise in the United States, as it did not have any sales in the home market.  As the Department failed to provide adequate reasoning for its determination, the Court must find it unsupported by substantial evidence and remand for further explanation.  *See, e.g., Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530, 537-38 (Fed. Cir. 2019) (citing *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)) (holding that to be supported by substantial evidence, Commerce's path of reasoning must be capable of being reasonably discerned).

## V.  Conclusion

For the reasons detailed above, the findings and conclusions reached by the Department in its Final Second Remand Redetermination were unsupported by substantial evidence. Pursuant to 19 U.S.C. § 1516a(b)(1)(B)(i), the Court must find them unlawful and remand to the Department for further consideration.

Respectfully submitted,

/s/ Yohai Baisburd__
Yohai Baisburd
Nicole Brunda

**CASSIDY LEVY KENT (USA) LLP**
2112 Pennsylvania, N.W.
Suite 300
Washington, D.C. 20037
(202) 567-2300

*Counsel to Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises Inc., Leggett & Platt, Incorporated, International Brotherhood of Teamsters, United Steel Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO*

**Certificate of Compliance**

The undersigned hereby certifies that the foregoing submission of "Defendant-Intervenors' Comments in Opposition to the Department's Second Remand Redetermination," filed on July 15, 2024, contains 7,386 words, exclusive of the caption block, table of contents, table of authorities, signature block, and certificates of counsel, according to the word count function of the work-processing system used to prepare these comments.  These comments therefore comply with the maximum 10,000 word count limitation set forth in the Court's Standard Chambers Procedures.


By:     /s/ Yohai Baisburd
             Yohai Baisburd