**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | | |
|---|---|---|
| PT. ZINUS GLOBAL INDONESIA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | |
| | ) | Consol. Court No. 21-00277 |
| Defendant, | ) | PUBLIC VERSION |
| and | ) | Confidential Information Bracketed |
| | ) | |
| BROOKLYN BEDDING *ET AL.*, | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |
| | ) | |

---

**DEFENDANT'S RESPONSE TO COMMENTS ON
SECOND REMAND REDETERMINATION**

---

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. McCARTHY
Director

L. MISHA PREHEIM
Assistant Director

OF COUNSEL

KARA M. WESTERCAMP
Trial Attorney
U.S. Department of Justice
Trade Civil Division
U.S. Department of Justice
Civil Division
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 305-7571

DAVID RICHARDSON
Senior Counsel
Office of the Chief Counsel for
Enforcement and Compliance
U.S. Department of Commerce

August 26, 2024

*Attorneys for Defendant*

## <u>TABLE OF CONTENTS</u>

BACKGROUND ............................................................................................................2

    I.    The Court's First Remand Order And Commerce's First Remand
         Redetermination ...................................................................................2

    II.   The Court's Second Remand Order .........................................................3

    III.  Commerce's Second Remand Redetermination.......................................4

ARGUMENT .............................................................................................................4

    I.    Standard Of Review .................................................................................4

    II.   Substantial Evidence Supports Commerce's Decision To Exclude Zinus
         Indonesia's "In Transit" Mattresses Available For Sale During The POI ...............5

         A.  Substantial Evidence Demonstrates That Zinus USA Had Enough Indonesian
             Mattresses In Inventory .............................................................5

         B.  Brooklyn Bedding's Arguments Do Not Undermine Commerce's Data
             Selection In The Quarterly Ratio Methodology................................10

    III.  Substantial Evidence Supports Commerce's Decision On What Portion Of
         Zinus Korea's Selling Expenses To Include In The Indirect Selling Expense
         Calculation ..........................................................................................16

CONCLUSION..........................................................................................................24

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                          **Page(s)**

*Bowe Passat Reinigungs-Und Waschereitechnik GmbH v. United States*,
    951 F. Supp. 231 (Ct. Int'l Trade 1996) .................................................................. 10

*Consol. Edison Co. v. NLRB*,
    305 U.S. 197 (1938) ........................................................................................................ 5

*Consolo v. Fed. Mar. Comm'n*,
    383 U.S. 607 (1996) ........................................................................................................ 5

*Government of Argentina v. United States*,
    542 F. Supp. 3d 1380 (Ct. Int'l Trade 2021) ........................................... 13, 14, 15

*MacLean-Fogg Co. v. United States*,
    100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015) .............................................................. 4

*Potela-Gonzale v. Sec'y of the Navy*,
    109 F.3d 74 (1st Cir. 1997) .......................................................................................... 12

*PT Ecos Jaya Indonesia v. United States*,
    Consol. No. 24-00001 (Ct. Int'l Trade, May 20, 2024) ............................................ 4

*PT. Zinus Global Indonesia v. United States*,
    628 F. Supp. 3d 1252 (Ct. Int'l Trade 2023) ................................................. 2, 9, 15

*PT. Zinus Global Indonesia v. United States*,
    686 F. Supp. 3d 1349 (Ct. Int'l Trade 2024) ................................................. *passim*

**Statutes**

19 U.S.C. § 1516a(b) ............................................................................................................ 4

19 U.S.C. § 1677a(a) .......................................................................................................... 23

19 U.S.C. § 1677a(b) .......................................................................................................... 23

19 U.S.C. § 1677m(d) ........................................................................................................... 3

**Regulations**

19 C.F.R. § 351.401(g) ................................................................................. 10, 14, 15

**ADMINISTRATIVE DETERMINATIONS**

*Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel from Italy*,
    87 Fed. Reg. 71 (Dep't of Commerce Jan. 3, 2022) ................................................ 23

*Certain Orange Juice from Brazil*,
    77 Fed. Reg. 63,291 (Dep't of Commerce Oct. 16, 2012) ....................................... 17

*Circular Welded Non-Alloy Steel Pipe from the Republic of Korea*,
    78 Fed. Reg. 35,248 (Dep't of Commerce June 12, 2013) ....................................... 17

*Mattresses From Indonesia*,
    86 Fed. Reg. 15,899 (Dep't of Commerce Mar. 25, 2021) ......................................... 2

*Prestressed Concrete Steel Rail Tie Wire from Thailand*,
    79 Fed. Reg. 25,574 (Dep't of Commerce May 5, 2014) ......................................... 17

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | | |
|---|---|---|
| PT. ZINUS GLOBAL INDONESIA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | |
| | ) | Consol. Court No. 21-00277 |
| Defendant, | ) | PUBLIC VERSION |
| and | ) | Confidential Information Bracketed |
| | ) | |
| BROOKLYN BEDDING *ET AL.*, | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |
| | ) | |

**DEFENDANT'S RESPONSE TO COMMENTS ON**
**SECOND REMAND REDETERMINATION**

Defendant, the United States, respectfully submits this response to the comments filed by

Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions, FXI, Inc.

Innocor, Inc., Kolcraft Enterprises Inc., Leggett & Platt, Incorporated, International Brotherhood

of Teamsters, United Steel Paper and Forestry, Rubber Manufacturing, Energy, Allied Industrial

and Service Workers Internation Union, AFL-CIO (collectively, Brooklyn Bedding), ECF Nos.

91 and 92, regarding the final results of the second redetermination filed by the United States

Department of Commerce (Commerce) in accordance with this Court's decision and remand

order in *PT. Zinus Global Indonesia v. United States*, 686 F. Supp. 3d 1349 (Ct. Int'l Trade, Feb.

20, 2024) (*PT. Zinus II*).  *See* Final Results of Redetermination Pursuant to Court Remand, May

17, 2024, ECF No. 87-1 (Confidential) and ECF No. 87-2 (Public) (Second Remand

Redetermination).[1]  For the reasons explained below, we respectfully request that the Court sustain Commerce's Second Remand Redetermination.

## BACKGROUND

### I.    The Court's First Remand Order And Commerce's First Remand Redetermination

On March 20, 2023, this Court remanded the final determination of the less-than-fair-value investigation covering mattresses from Indonesia.  *PT. Zinus Global Indonesia v. United States*, 628 F. Supp. 3d 1252 (Ct. Int'l Trade 2023) (*PT. Zinus I*); *see also Mattresses From Indonesia*, 86 Fed. Reg. 15,899 (Dep't of Commerce Mar. 25, 2021) (final LTFV determ.), and accompanying Issues and Decision Memorandum (IDM) (P.R. 284).  The Court remanded Commerce's determination on three issues.

First, the Court held that Commerce had not provided an adequate explanation to support its decision to include Zinus Indonesia's mattresses in transit to the Zinus U.S.A. (Zinus U.S.) warehouse as part of the mattresses available for sale.  *PT. Zinus I*, 628 F. Supp. 3d at 1265.  Second, the Court held that Commerce did not provide sufficient record cites and did not address some of the petitioners' arguments in accepting Zinus Korea's reported selling expenses.  *Id*. at 1281-82.  Third, the Court held that in applying the transactions disregarded rule, Commerce's interpretation of the term "market under consideration" was incorrect.  *Id*. at 1285.

On June 9, 2023, Commerce issued the first remand redetermination.  First Remand Redetermination, ECF No. 60 (Confidential) and ECF No. 59 (Public) (Remand Redetermination).  In the first remand redetermination, Commerce 1) provided an explanation

---

[1] Citations to public documents from the original administrative record are identified as "P.R. XX," while citations to confidential record documents are identified as "C.R. XX." Citations to the administrative records for the remands are "First R.P.R. XX" and "Second R.P.R. XX," for the public documents and "First R.C.R. XX" and "Second R.C.R. XX" for the confidential record documents.

with cites to the relevant record evidence concerning the in-transit sales, Remand
Redetermination at 3-4, 6-9; 2) addressed all of Brooklyn Bedding's arguments regarding Zinus
Korea's reported selling expenses and cited supporting record evidence, *id.* at 9-12,14-16; and
3) reconsidered its interpretation of the transaction disregarded rule to be consistent with recent
Court precedent. *Id.* at 22-23.

## II.    **The Court's Second Remand Order**

On February 20, 2024, the Court sustained-in-part and remanded-in-part Commerce's
first remand redetermination. First, the Court sustained Commerce's application of the
transactions disregarded rule and held that "Commerce's reliance on the Indonesian GTA data
was reasonable." *PT. Zinus II*, 686 F. Supp. 3d at 1358.

Second, the Court held that substantial evidence supported Commerce's determination
that data was missing from Zinus Indonesia's response, which could support use of in-transit
mattresses as facts otherwise available, but that Commerce failed to comply with its statutory
obligations to inform Zinus Indonesia of the nature of the deficiency in its response. *Id.* at 1354-
56. Consequently, the Court "suggest{ed} that on remand, Commerce should consider reopening
the record to address the missing sales data, inventory, and in transit mattress issues as
Commerce fulfills its obligations under 19 U.S.C. § 1677m(d)," to calculate the number of
mattresses in inventory attributable to Indonesian sales during the period of investigation (POI).
*Id.* at 1356.

Third, the Court granted Commerce's request for a voluntary remand to reopen the
administrative record to address deficiencies and contradictions in the record concerning Zinus
Korea's selling expenses. *Id.* at 1355-57.

III.    **Commerce's Second Remand Redetermination**

As explained further below, pursuant to the Court's instructions, Commerce collected and incorporated the opening inventory of relevant mattresses at Zinus U.S. at the beginning of the POI in its calculation for estimating the number of Indonesian mattresses available for sale during the POI based on opening inventory and POI purchases.  *See* Second Remand Redetermination at 3-14.  Commerce also collected and analyzed more detailed information concerning the selling expenses of Zinus Indonesia's parent company, Zinus Korea, and adjusted the calculations based on its findings during the second remand proceeding.  *See id.* at 15-23; *see also* Second Remand Supplemental Questionnaire (Second R.C.R. 1); Second Remand Supplemental Questionnaire Resp. (Second R.C.R. 2-9).  As a result of these changes, Commerce calculated a zero percent weighted average dumping margin for PT. Zinus Global Indonesia.[2]  Second Remand Redetermination at 23.

## ARGUMENT

I.    **Standard Of Review**

In remand proceedings, the Court will sustain Commerce's determinations if they are "in accordance with the remand order," are "supported by substantial evidence, and are otherwise in accordance with law."  *MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1355 (Ct. Int'l Trade 2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)). "Substantial evidence"

---

[2]  Should the Court sustain Commerce's second remand redetermination, then Commerce intends to revoke the antidumping duty order covering mattresses from Indonesia.  Second Remand Redetermination at 24.  This could affect the first administrative review of the antidumping duty order.

The timing of Commerce filing the second remand redetermination on May 17, 2024, was near-simultaneous with the plaintiffs filing their opening briefs in the first administrative review of the order covering mattresses from Indonesia in *PT Ecos Jaya Indonesia v. United States*, Consol. No. 24-00001 (Ct. Int'l Trade), on May 20, 2024.

means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence may be "less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1996).

## II. Substantial Evidence Supports Commerce's Decision To Exclude Zinus Indonesia's "In Transit" Mattresses Available For Sale During The POI

### A. Substantial Evidence Demonstrates That Zinus USA Had Enough Indonesian Mattresses In Inventory

In the Court's second remand order, the Court remanded Commerce's quarterly calculation for estimating the number of mattresses sold from out of Zinus USA's warehouse attributable to Indonesian origin. *PT. Zinus II*, 686 F. Supp. 3d at 1354-56. Specifically, the Court suggested Commerce reopen "the record to address the missing sales data, inventory and in transit mattress issues." *Id.* at 1356.

On remand Commerce reopened the administrative record and requested the opening inventory figures which were not on the records of the original investigation or first remand results. *See* Commerce's Mar. 6, 2024 Questionnaire at 5 (Second R.P.R. 1). Commerce determined that when the opening inventory balances were included in the calculation, there were sufficient mattresses in the U.S. warehouse to cover the Indonesian sales. Second Remand Redetermination at 6. For example, Chart 1 in Attachment 1 to the second remand redetermination "shows that Zinus U.S. had [███████] mattresses with Indonesia model numbers that either were in common with other countries or were unique to Indonesia" and this "inventory quantity was more than sufficient to support the [███████] sales quantity of Indonesia mattress model numbers." *Id.* Based on this conclusion, Commerce found that "there is no

longer a basis to include the Indonesian in-transit quantity of mattresses in the quarterly ratio calculation." *Id.* at 7.

To understand the selection of data for the quarter ratio methodology, we first lay out the calculation methods used in the underlying investigation and in the first remand redetermination, and the second remand redetermination.

**Investigation and First Remand Redetermination**

**Step 1:  Calculation of total quantity of mattresses in the Zinus warehouse plus Indonesian quantities in-transit to the Zinus U.S. warehouse based on purchases**

On a quarterly basis, Commerce determined the total quantity of ***all models*** of mattresses from all Zinus Korea affiliates which Zinus U.S. ***purchased*** from Zinus Korea for each quarter of the POI that were ***in the Zinus U.S. warehouse*** during the POI based on Brooklyn Bedding's submitted calculation.  IDM at 9; *see also* Brooklyn Bedding's Oct. 9, 2020 Pre-Prelim. Comments at 16 (C.R. 218.)

Zinus Indonesia reported purchases based on an account which only included mattresses purchased and ***in inventory***.  Section C Suppl. Resp., Sept. 28, 2020 at 1-2 (C.R. 214).  To those totals, Commerce added into the appropriate quarters the ***in-transit*** mattresses from Indonesia, purchased during the POI but which had ***not entered*** the warehouse during the POI.  IDM at 9.

**Step 2:  Calculation of the percentage of mattress quantities in Step 1 attributable to Zinus Indonesia by quarter**

Commerce determined the quarterly percentages of the total quarterly quantities calculated in Step 1 attributable to Zinus Indonesia by taking the total number of Indonesian mattresses Zinus Korea purchased and entered into the Zinus U.S. warehouse plus the Zinus Indonesia in-transit sales and dividing the sum of the two by the total number of mattresses determined in Step 1 for all models.  *Id*.

**Step 3:  Calculation of the U.S. sales attributable to Zinus Indonesia**

Commerce then took the Indonesian percentage for each quarter calculated in Step 2 and applied it to all Zinus U.S.'s reported constructed export price (CEP) inventory sales in each quarter regardless of country of origin to derive the sales quantity for each of these sales transactions attributable to Indonesia origin mattresses on a CONNUM[3] specific basis.  *Id.* Commerce used the resulting quantities and the reported quarterly net average unit price of each CONNUM from this calculation to calculate Zinus Indonesia's dumping margin.  Computer Program, Lines 978-985 (part of program to apply quarterly ratios QTYU2) (C.R. 302); Output Log of the Program n.89 (QTYU2 which is the quarterly quantity from the application of the quarterly ratio method and USNETPRI which is the U.S. Net Price by CONNUM to calculate margin for the sale, EMARGIN) (C.R. 304).

**Second Remand Redetermination**

**Step 1a:  How Many of the Relevant Mattresses are in Inventory**

Commerce did a similar calculation to Step 1 in the investigation and the first remand redetermination, as explained above.  However, there were two key differences in the second remand redetermination.  First, Commerce excluded the Indonesian "in-transit" sales and included the pre-existing inventory in the first quarter of the calculation.  Second Remand Redetermination at 6-8.  Second, Commerce excluded from the ratio calculations all product codes which Zinus Indonesia did not sell during the POI.  Second Remand Redetermination Attachment 5, Ratio Calculations Tab.

---

[3] A CONNUM is a control number which Commerce uses for the dumping program to identify, based on selected physical characteristics of products, U.S. sales and normal value sales of identical or similar products to make the dumping calculation.  A CONNUM may cover more than one model of a product.

Commerce also removed for the first time, based on evidence submitted in the second remand proceeding, some additional quantities for eight mattress models purchased from Indonesia and included only in the in-transit quantity which Zinus Indonesia had demonstrated did not enter the Zinus U.S. warehouse during the POI.  *See* Second Remand Attachment 5, Summary Results Tab, Ratio Calculations Tab and the Ratio Application Tabs (Second R.C.R. 30); Zinus Indonesia's Mar. 20, 2024, Second Remand Suppl. Questionnaire Resp., Exhibit RS-11 nns. 27-28 (Second R.C.R. 8).

**Step 2a:  Ratio Calculation**

Commerce performed the same quarterly calculations as Step 2 in the investigation and the first remand redetermination, as explained above.  However, Commerce used the new quantities calculated in Step 1a to calculate the percentage of sales by quarter attributable to Zinus Indonesia.  Second Remand Attachment 5, Ratios Calculations Tab.

**Step 3a:  Application of Ratio to Sales**

Commerce performed the same quarterly calculation as in Step 3 in the investigation and the first remand redetermination, as explained above.  Second Remand Attachment 5, Ratios Application Tab.

As can be seen from the above comparison, Commerce used the same basic calculations for each step.  The only things that changed from the investigation to the second remand redetermination were that Commerce 1) excluded CONNUMs which Zinus Indonesia did not produce during the POI (thereby eliminating CONNUMs irrelevant to Zinus Indonesia's actual production experience), Second Remand Redetermination at 13-14; 2) excluded Zinus Indonesia's in-transit quantities which had not entered Zinus U.S.'s warehouse, *id.*; and

3) included pre-existing inventory quantities of CONNUMs at the beginning of the first quarter which were identical to Zinus Indonesia mattresses. *Id.* at 8.

*     *     *

Thus, the record demonstrates that after 1) including the pre-existing inventory in the first quarter; 2) including the POI purchases; and 3) excluding the in-transit sales, overall, there are [████████████████████████████████████████████████████████

████████████████████████████████████████████]. Remand Attachment 5, Ratio Application Tab. Commerce did not change the methodology; rather, what changed was which mattress CONNUMs Commerce included in the calculations. Specifically, the relevance of the in-transit quantities changed once the pre-existing inventory for the first quarter was added to the remand record.

As Commerce explained, "{g}iven the fact that Zinus U.S. did not keep track of the country of origin of mattresses once they entered the warehouse," Commerce determined that the quarterly ratio methodology "provides a reasonable method for estimating how many Zinus Indonesia mattresses were sold from the warehouse during the POI because the number is proportionate to the number of mattresses in inventory from each of the affiliates in other countries for each quarter of the POI." Second Remand Redetermination at 14. "The actual data do not exist because Zinus Indonesia did not keep track of it," and Commerce consequently devised this reasonable method to estimate the number of sales from the Zinus U.S. warehouse that are attributable to Zinus Indonesia to perform the dumping calculation. *Id.* The Court previously sustained Commerce's quarterly ratio methodology. *PT. Zinus I*, 628 F. Supp. 3d at 1264-65. The Court only remanded for Commerce to reconsider the *data* it selected to use in the methodology, specifically, the inclusion of in-transit sales and pre-existing inventory data, and

9

*not* the quarterly ratio methodology itself. *Id.* at 1265. And "given that the beginning inventory and purchase data are now well-established and documented on this record," such that "these data must be incorporated in the quarterly ratio calculation," Second Remand Redetermination at 11, the Court should sustain Commerce's second remand redetermination regarding the exclusion of in-transit mattresses in the quarterly ratio calculations.

      **B.**     **Brooklyn Bedding's Arguments Do Not Undermine Commerce's Data Selection In The Quarterly Ratio Methodology**

Brooklyn Bedding primarily argues that the record evidence proves that after the application of Commerce's quarterly ratio calculation, there are [█████████████████████ █████████████████]. Brooklyn Bedding Cmnts. at 6-17. However, Brooklyn Bedding inappropriately characterizes inherent anomalies in any estimating methodology as unacceptable deviations.

To begin with, although Brooklyn Bedding points to [███████████████████ ███████████████████] of mattresses, *id.* at 7-9, this is merely the effect caused by applying Commerce's quarterly ratio methodology *estimating* the appropriate allocation of U.S. sales from the warehouse to Zinus Indonesia mattresses. *See* Second Remand Redetermination at 11-12. To wit, the *exact* number of Zinus Indonesia mattresses sold from the Zinus U.S. warehouse is absent from the record because during the POI, Zinus U.S. apparently had no business reason to track the country of origin through the warehouse at that time. *Id.* at 14; *see, e.g.*, 19 C.F.R. § 351.401(g) (explaining that Commerce shall consider "the records maintained by the party in question in the ordinary course of its business"); *Bowe Passat Reinigungs-Und Waschereitechnik GmbH v. United States*, 951 F. Supp. 231, 239 (Ct. Int'l Trade 1996) (finding it unreasonable to penalize failure to submit data that do not exist). Companies are not required to keep their

books and records in a certain way in the anticipation of a future Commerce antidumping

investigation.  *See* 19 C.F.R. § 351.401(g).

    In other words, any estimating methodology Commerce used will only result in a guess

(in this case a reasonable, educated guess based on the number of Indonesian mattresses in

inventory in the Zinus U.S. warehouse during each quarter) as to the number of Zinus Indonesia

mattresses Zinus U.S. sold from its warehouse.  Second Remand Redetermination at 11-14.

When estimating, there will be anomalies such as too few or too many for a particular model,

and the estimated data will likely fall short in a comparison with actual data because it is an

estimate and cannot be held to an exactly matching requirement.  Moreover, Brooklyn Bedding

omits in its comments that, just as there are [ █████████████████████████

██████████████████████████████████████████████████████

████████████████ ].  Brooklyn Bedding Cmnts. at 8.  Commerce addressed this in the

second remand redetermination when it explained that "although this approach results in sold

quantities being greater than purchased quantities for some models, these seemingly incongruous

results are smoothed out when cumulated, such that the aggregate adjusted sales quantity for all

Indonesia mattress sales is less than the total purchase quantity of these mattress model numbers

from Indonesia."  Second Remand Redetermination at 13.

    Even Brooklyn Bedding's proposed application of the quarterly ratios on a model-

specific basis and, based only on purchases of all models, results in a [ █████████████

██████████████████████████████████████████████████ ].

Remand Exhibit Attachment 3, Ratio Application Tab.  On the other hand, Commerce's

application of the quarterly ratios results in an [ ████████ ] of [ ██████ ] Indonesian

mattresses, with only [ ███████████████████████████████████ ].

Remand Exhibit Attachment 5, Ratio Application Tab.  These deviations are nothing more than the manifestation of the inexact nature of using a methodology to estimate data in the absence of the actual data itself.

Relatedly, the application of a quarterly ratio methodology, suggested consistently by Brooklyn Bedding during the investigation and the remands, could also result in quantity anomalies based on the fact that purchases made during one quarter may not be sold in the quarter purchased but in another quarter due to timing in the estimate calculations, *i.e.*, by dividing the POI into quarters, based on the date of purchase, a sale in a different quarter would not be matched with the purchase because they are in different quarters.  Although Brooklyn Bedding now backtracks on the accuracy of the quarterly ratio methodology, Brooklyn Bedding repeatedly and consistently championed its use in the underlying administrative proceeding.  *See Potela-Gonzale v. Sec'y of the Navy*, 109 F.3d 74, 78 (1st Cir. 1997) ("Equitable doctrines of estoppel apply in administrative and judicial fora . . . and a party cannot take one position in an underlying administrative proceeding and then disclaim it in a subsequent suit arising out of the agency proceeding").

At bottom, the fact that such anomalies will *always* exist with any estimating methodology is not a basis for remand.  Indeed, Brooklyn Bedding has merely drilled down deep enough into the calculations to identify anomalies which will always be there in any estimate, but Commerce was aware of this issue and addressed it in the second remand redetermination. Second Remand Redetermination at 13.  Effectively, Brooklyn Bedding seeks to impose a standard on Commerce that requires the estimated data to have no anomalies: this is an impossible standard to meet and the Court should reject it.

Second, Brooklyn Bedding argues that the anomalies it identified are a basis to include the "in-transit" Indonesian mattresses to inflate the number of mattresses sold from the warehouse attributable to Zinus Indonesia. Brooklyn Bedding Cmnts. at 9-11. Again, Brooklyn Bedding's silence about the anomalies in the quarterly ratio methodology which result in [█████████ ████████████████████████████] is telling. To adjust the results for the [███████████████████████████████████████████] without adjusting for the anomalies which [█████████████████████████] would arbitrarily distort the results of the test. *See, e.g.*, Second Remand Redetermination at 13. Brooklyn Bedding cannot cherry pick the results in its alternative calculation.

Third, Brooklyn Bedding argues that Commerce should have continued to use only purchases as it did in the draft second remand redetermination and not included the pre-existing inventory in the calculation. Brooklyn Bedding Cmnts. at 12. To Brooklyn Bedding, there is insufficient record evidence to justify Commerce's "rationale for rejecting the draft quarterly ratios utilized" in the draft second remand redetermination. *Id.* This meritless argument ignores that Commerce is allowed flexibility to change its position from the draft remand redetermination to the final remand redetermination. *Gov't of Argentina v. United States*, 542 F. Supp. 3d 1380, 1395 (Ct. Int'l Trade 2021). Indeed, "even where the record does not change between the preliminary and final determinations, Commerce may change its analysis of the same factual record evidence before the final determination." *Id.* at 1395 n.4 (citation omitted).

And here, Commerce explained that it made the change because the model-specific analysis "overwhelmingly show a pattern of sales greater than purchases for specific Indonesian mattress model numbers . . ." Second Remand Redetermination at 12. So much so, in fact, that it resulted in a "total aggregate sales quantity greater than the number of mattresses Zinus U.S.

purchased from Indonesian and had available for sale during the POI." *Id*.  Commerce found

that by adding the pre-existing inventory to the calculation, the number of Indonesian mattresses

sold overall did not exceed the total quantity purchased and in pre-existing inventory.  *Id*.

Therefore, under the methodology including the pre-existing sales, the number of overall sales

fell to a number that was less than the total number the quarterly ratio methodology assigned

overall to Indonesian mattresses in inventory.  *Id*.

Fourth and relatedly, Brooklyn Bedding argues that after the draft remand results were

issued and commented on, Commerce inappropriately decided to combine purchases and pre-

existing inventory.  Brooklyn Bedding Cmnts. at 13-15.  More pointedly, Brooklyn Bedding

again relies on the [███████████████████████████████████

███████████████] to try to inject doubt as to Zinus U.S. inventory figures by speculating

about impossible outcomes from relying on the pre-existing inventory.  *Id*. at 14.  But the basis of

this argument is another unsupported attack on the anomalies inherent in any estimating

methodology and ignores that Commerce can change its analysis from draft results to final

results.  *See Gov't of Argentina*, 542 F. Supp. 3d at 1395.

For example, Brooklyn Bedding argues that Commerce's methodology now is somehow

a *de facto* adoption of Zinus's long-rejected first-in-first-out (FIFO) methodology and that Zinus

U.S.'s failure to have tracked the country of origin of mattresses somehow relates to the

anomalies inherent in an estimating methodology.  Brooklyn Bedding Cmnts. at 13-14.  The fact

of the matter is that there is no dispute that Zinus U.S. knew what it purchased and the countries

from which the shipments came when the merchandise entered the U.S. warehouse, but Zinus

U.S. did not track the country of origin of the mattresses through the warehouse, nor was it

required to.  *See* 19 C.F.R. § 351.401(g).

Brooklyn Bedding then proffers two "impossible" alternative scenarios based on the anomalies inherent in any estimating methodology, in a flawed attempt to prove either Zinus U.S. could have sold more mattresses than in its inventory or that the inventory records are flawed and unreliable. Brooklyn Bedding Cmnts. at 14. As we explained above, anomalies are to be expected and are not a basis to reject a methodology because all estimating methodologies are subject to them. *See* Second Remand Redetermination at 11-14. Moreover, Brooklyn Bedding offers no support that Zinus U.S.'s inventory records are unreliable because the anomalies are features of the estimating methodology and *not* Zinus U.S.'s inventory records. *See* 19 C.F.R. § 351.401(g).

Brooklyn Bedding also questions how Zinus can pay commissions and warranties if it does not know the country of origin of the mattresses coming out of inventory, knowledge which it needs to know to make its commission payments and warranty payments. Brooklyn Bedding Cmnts. at 15. But this unexplained commission and warranty methodology was, in part, a basis for why Commerce rejected the FIFO methodology based on Zinus U.S.' books and records, in favor of the quarterly ratio method already sustained by this Court. *See PT Zinus I*, 628 F. Supp. at 1276. Moreover, Commerce compensated for the commission and other inconsistent or suspicious sales allowances by making an adjustment to constructed export price sales which this Court also already sustained. *Id.* at 1276-80; IDM at 14-15.

Finally, Brooklyn Bedding argues that a remand is required because any explanation given by Commerce to justify the "contradictory information" in the data it selected would be *post hoc* rationale. Brooklyn Bedding Cmnts. at 16. This is incorrect. As Commerce explained in the second remand redetermination, the alleged anomalies upon which Brooklyn Bedding's entire argument rests existed in the original methodology and would exist in any estimating

methodology for that matter.  *See* Second Remand Redetermination at 11-14.  It was not error for Commerce to utilize the inventory-based quarterly ratios for the first time in its second remand redetermination because substantial evidence supports Commerce's explanation for why that information was more accurate.  *Id.*; *see also Gov't of Argentina*, 542 F. Supp. 3d at 1395.

Accordingly, this Court should sustain Commerce's exclusion of the "in transit" mattresses in utilizing the quarterly ratio methodology.

### III.    Substantial Evidence Supports Commerce's Decision On What Portion Of Zinus Korea's Selling Expenses To Include In The Indirect Selling Expense Calculation

After the Court granted Commerce's request for a voluntary remand, Commerce reopened the record to collect additional information on Zinus Korea's expenses which were attributable to Zinus Indonesia mattresses, and substantial evidence supports Commerce's adjustment of the selling expenses calculation based on the new record evidence.  Second Remand Redetermination at 15-23; *PT. Zinus I*, 686 F. Supp. 3d at 1356-57.

 Brooklyn Bedding, however, claims that Commerce erred in three ways.  First, it contends that in allocating Zinus Korea expenses to Zinus Indonesia, Commerce improperly omitted many of Zinus Korea's general and administrative (G&A) expenses.  Brooklyn Bedding Cmnts. at 17-21.  Second, that Commerce errored in its calculation by dividing the numerator and expense figure without intercompany transfers with a sales revenue figure that included intercompany transfers.  *Id.* at 21-23.  And third, that Commerce treated the Zinus Korea indirect selling expenses as in country indirect expenses of Zinus Indonesia, thereby improperly removing them from the price used in the dumping calculation.  *Id.* at 23-24.  As we demonstrate below, Brooklyn Bedding's arguments are meritless.

As an initial matter, Brooklyn Bedding argues that Commerce inappropriately applied a new test that the G&A expense be associated with production with no explanation of the change

16

in practice.  *Id.* at 17-21.  Although we concede that Commerce may have used incorrect language when referring to a production relationship requirement, this does not change the outcome of the analysis.

The standard for allocating parent company G&A to an affiliate is that it be associated with a specific service to the affiliate.  *See Prestressed Concrete Steel Rail Tie Wire from Thailand*, 79 Fed. Reg. 25,574 (Dep't of Commerce May 5, 2014) (final LTFV determ.), and IDM at comment 4.; *Circular Welded Non-Alloy Steel Pipe from the Republic of Korea*, 78 Fed. Reg. 35,248 (Dep't of Commerce June 12, 2013) (final admin. review), and accompanying IDM at Comment 9 (Circular Welded Steel Pipe from Korea); *Certain Orange Juice from Brazil*, 77 Fed. Reg. 63,291 (Dep't of Commerce Oct. 16, 2012) (final admin. review), and accompanying IDM at Comment 15.  When Commerce used the language requiring an association with production, Commerce meant that a specific administrative service that Zinus Korea performed for Zinus Indonesia, who is the producer under the circumstances of this case.  *See* Second Remand Redetermination at 21.  Commerce simply erred when it referred to "production operations" expenses when it otherwise expressly cited G&A expenses, that is, "[███████████

████████████████████████████████████████████]" in the same sentence.  *Id.*  In any event, this error on Commerce's part was harmless because Brooklyn Bedding has identified no record evidence that a *particular* administrative service to Zinus Indonesia was omitted.  *See generally* Brooklyn Bedding Cmnts. at 17-21.

Second, Brooklyn Bedding argues that the Zinus Korea expenses Zinus Indonesia submitted during the second remand proceeding show that there [██████████████████

████████████████████████████████████████████████████

███████████████████████████].  *Id.* at 18.  Then, without citing any

record evidence, Brooklyn Bedding argues that part of Zinus Korea's G&A expenses should be allocated to the numerator of Zinus Indonesia's G&A ratio because Brooklyn Bedding believes that the [███████████████████████████████████████████████████

███████]  *Id*.  This position, based on speculation, ignores the detailed record evidence that Zinus Indonesia provided during the second remand proceeding about the *actual* services Zinus Korea provides and on which Commerce relied in the second remand redetermination.  *See* Second Remand Redetermination at 15-19.

Indeed, Brooklyn Bedding has not cited any record evidence that indicates the Zinus Korea G&A expenses which it claims are associated with specific services that Zinus Korea provides to Zinus Indonesia are actually so associated.  In the second remand redetermination, Commerce relied on the additional information submitted during the second remand proceeding that definitively demonstrates that Zinus Korea only had a minor role in the sales of Zinus Indonesian mattresses.  *Id.*  Other than the Zinus Korea administrative expense (*i.e.*, management salaries) already included in the numerator of Zinus Indonesia's G&A expenses ratio, Zinus Indonesia explained that only [███] Zinus Korea employees spent a portion of their time on Zinus Indonesia invoicing once a month.  *Id*. at 15-16.

Second, Zinus Korea had already reported that its warranty services include defective allowances paid once a year.  *Id*. at 16.  "Zinus Korea did not provide logistical services, training services, or technical support for Zinus Indonesia's U.S. sales" and there is no record information that shows that Zinus Korea provided any such services.  *Id.*  Rather, Zinus Korea only provided one sales promotion program to one customer during the period of investigation involving one or two people.  *Id*. at 16-17.

Regarding selling functions, Zinus Indonesia provided an indirect selling expense worksheet that lists by account code G&A expenses and calculated the indirect selling expenses incurred for receiving and forwarding invoices, and Zinus Korea reconciled the data in this expense calculation worksheet to its accounting records.  *Id*. at 17-18.  Zinus Korea explained that expenses such as computer usage, electricity, internet, and email correspondence are included in account codes assigned to, for example, supplies, communication, and depreciation G&A expenses.  *Id*. at 18.  This explanation responded directly to the deficiencies that Brooklyn Bedding had identified in their comments to this Court on the first remand redetermination and on which Commerce requested a remand of this issue.  Brooklyn Bedding Cmnts on First Remand at 3-9, ECF No. 63.

Perhaps recognizing that the additional record evidence Commerce considered supports its calculation of Zinus Korea's selling expenses, *see* Second Remand Redetermination at 15-23, Brooklyn Bedding pivots and focuses on the Zinus Korea G&A expenses *not* attributable to specific services provided to Zinus Indonesia, that is, the [███████████████ ███████] cost centers.  Brooklyn Bedding Cmnts. at 17-21.  Although Brooklyn Bedding claims that the very names imply that these cost centers are associated with service to their affiliated producers which should be attributable, in part, to Zinus Indonesia, it cites no record evidence to suggest anything other than Zinus Korea's limited role in Zinus Indonesia's sales or evidence of any specific service provided by the parent company Zinus Korea to Zinus Indonesia.  *See id.*

Moreover, when looking specifically at the [███████████], Brooklyn Bedding argues that Zinus Korea's financial statement shows a 45 billion Korean won investment in and a $60 million U.S. dollar loan guarantees for Zinus Indonesia.  *Id.* at 18-19.  The Court should reject Brooklyn Bedding's conclusion that, therefore, some of Zinus Korea's G&A expense were

removed from the Zinus Korea G&A expense pool to calculate indirect selling expenses and must be included in the Zinus Korean G&A expenses attributable to Zinus Indonesia. *Id*. That is because, overall, there appears to be a misunderstanding of different Zinus entities. For example, the $60 million U.S. dollar loan guarantee is not for Zinus Indonesia but is for Zinus U.S. Zinus Section A Questionnaire Resp., Exhibit A11d(1), p. 85 (P.R. 98) (Zinus AQR). Zinus, Inc. (with a comma after Zinus) is the name of the Zinus affiliate located in the United States (Zinus U.S.). Zinus AQR at A-1 (P.R. 97). Whereas Zinus Inc. with *no* comma after Zinus is the name of the parent company located in Korea (Zinus Korea). *Id*. The financial statement uses Zinus, Inc. (with a comma) for the $60 million U.S. dollar loan guarantee. *See* Zinus AQR. These are different companies. Thus, Brooklyn Bedding is incorrect that the loan guarantee was for Zinus Indonesia.

Turning to the 45 billion Korean won investment, the record shows that Zinus Indonesia has $57 million in loans from Indonesian banks. Zinus AQR, Exhibit A11d(1), p. 85. This is approximately 77 billion Korean won. Although Zinus Korea provided a loan guarantee, it is not necessarily an administrative burden and there is no evidence of financial administrative expenses under the financial cost center for Zinus Korea associated with the servicing of Zinus Indonesia's loan. *See id.* Simply put, Brooklyn Bedding has failed to identify anything in Zinus Korea's consolidated financial statements that indicates it has loans for Zinus Indonesia. Moreover, Zinus Indonesia's financial expense rate (INTEX rate) already captures any financial activities because it relied on Zinus Korea's consolidated financial statements. Zinus Section D Suppl. Questionnaire Resp. at Exhibit SD-28b (C.R. 205). Thus, there is no evidence that any additional Zinus Korea financial G&A expense should be allocated to Zinus Indonesia.

Third, Brooklyn Bedding accuses Commerce of improperly performing the ratio calculation that determines the part of the Zinus Korea's indirect selling expenses allocated to Zinus Indonesia by dividing the indirect expenses (which includes intercompany transfers) with a total revenue figure (which does not include intercompany transfers).  Brooklyn Bedding Cmnts. at 21-23.  This assertion is incorrect.

We concede that the second remand redetermination erroneously indicates that the numerator did not include intercompany transfers, but the calculation did, in fact, include intercompany transfers in the numerator.  For example, Commerce explained that it intended to use figures with the intercompany transactions in both.  Second Remand Redetermination at 22 (". . . it would be nonsensical to calculate an allocation ratio by dividing an expense that does not include intercompany transactions by a sales revenue figure that does factor in such transactions.").  The numerator is the indirect selling expenses that Zinus Korea incurred for transactions during the POI which includes the intercompany transactions.  *Id.*  The indirect selling expenses calculated by Zinus Indonesia in the second remand proceeding are in Exhibit RS-7 of the Second Remand Redetermination.  *See* Second Remand Redetermination at RS-7.  It is apparent that the intercompany expenses are included in that amount because the reconciliation worksheets, which tie the total SG&A expenses of Zinus Korea to the financial statements, show no adjustment for expenses associated with intercompany transactions.  *Id.* Also, the total expenses include expenses for intercompany transfers because the figure in the financial statement represents the total amount of Zinus Korea's expenses without any adjustment, including expenses for intercompany transfers.  *Id.*  This is confirmed by review of the total amount of SG&A expenses which includes intercompany transfers from Zinus Korea's unconsolidated financial statement.   Zinus AQR, Exhibit A11(d)(1), p.8.

In addition, the reconciliation of the total amount of Zinus Korea's SG&A to the financial statement shows no adjustment for intercompany transfers to the SG&A expenses.[4]  Second Remand Redetermination, Exhibit RS-7, Tab 1.  The total SG&A expense figure is then adjusted to exclude expenses for:

> (1) certain expenses which were not incurred on behalf of the sale process with Zinus Indonesia, *i.e.*, professional fees (*i.e.*, column B); (2) expenses incurred by Zinus Korea that it included in Zinus Indonesia's G&A expenses (*i.e.*, column C); (3) expenses related to home market (Korea) sale activities (*i.e.*, column D); (4) direct expenses incurred for sales to the United States (reported in Zinus U.S.' sales database) (*i.e.*, Column E); (5) direct expenses on exports to countries other than the United States (*i.e.*, Column F); and (6) expenses only associated with Zinus Korea's business operations (*i.e.*, Column G).

Second Remand Redetermination at 20-21.  Pointedly, none of these adjustments are for intercompany transactions.  The resulting amount of indirect selling expenses therefore includes the indirect selling expenses associated with intercompany transfers.  *Id.*  In addition, Zinus Korea provided an excerpt from its trial balance which shows all expenses and income by account which demonstrates no adjustment for intercompany transfers.  Second Remand Redetermination, Exhibit RS-7, Tab 2.  Thus, there is simply no indication in the Zinus Korea unconsolidated financial statement or reconciliation documentation, that an adjustment was made for expenses associated with intercompany transactions.

It is also important to explain how the denominator figure matters.  The denominator is the total revenue which includes intercompany transfers.  For example, Section A Questionnaire, Exhibit A-11e(1) p.10 Note 1(3):  "(3) Summarized statements of financial position and summarized statements of comprehensive income of which amounts are before elimination of

---

[4]  The only adjustment is for insurance which is not relevant to the issue before the Court. Second Remand Redetermination, Exhibit RS-7, Tab 1.

inter-company transactions . . .") reflects the total revenue of all affiliates including intercompany transactions.  *Id*.  Commerce added to this Zinus Korea's total revenue to get the total revenue for the Zinus group including intercompany transfers.  Second Remand Determination, Exhibit RS-7, Tab 3.

    Ideally, Commerce would prefer to have both numerator and denominator free of intercompany transfers, but the record does not contain information to enable it to remove the intercompany transfers from the total revenue denominator.  Therefore, Commerce included intercompany transfers in both the numerator and denominator to avoid an artificial distortion of the calculations.  *See id.*

    Finally, Brooklyn Bedding argues that the Zinus Korea indirect selling expenses attributable to Zinus Indonesia should not be added to the Zinus Indonesia indirect selling expenses because the indirect selling expenses of Zinus Korea are not incurred in the country of manufacture.  Brooklyn Bedding Cmnts. at 23-24.  Brooklyn Bedding cites no authority for the requirement that indirect selling expenses associated with sales of subject merchandise must be only from the country of manufacture.  *Id.*

    Indeed, Commerce's general practice is to treat such expenses as foreign indirect selling expenses (*i.e.*, the same as indirect selling expenses incurred in the country of manufacture).  *See* Second Remand Redetermination; *Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel from Italy*, 87 Fed. Reg. 71 (Dep't of Commerce Jan. 3, 2022) (final admin. determ.), and accompanying IDM at Comment 4.  Specifically, Commerce "calculate{s} foreign indirect selling expenses as the sum of the respondent's indirect selling expenses in its own country and the indirect selling expenses of its third country affiliates."  Second Remand Redetermination at 23.  The entire exercise of the dumping calculation is to include all of the expenses associated

directly and indirectly with the sale of the subject merchandise, to make the adjustments required by the statute to isolate the price of the product, and to make sure they are not being sold below cost and not being sold at different prices in different markets.  *See* 19 U.S.C. § 1677a(a), (b). Excluding indirect selling expenses associated with the U.S. sales would distort that calculation and Brooklyn Bedding has identified no authority or reason why the third country indirect selling expenses should be excluded from indirect selling expenses, or explained how Commerce's determination here is inconsistent with its practice.

## <u>CONCLUSION</u>

For these reasons, we respectfully request that the Court sustain Commerce's second remand redetermination.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. McCARTHY
Director

/s/ L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

OF COUNSEL:

DAVID RICHARDSON
Senior Counsel
Office of the Chief Counsel for
Enforcement and Compliance
U.S. Department of Commerce

/s/ Kara M. Westercamp
KARA M. WESTERCAMP
Trial Attorney
U.S. Department of Justice
Trade Civil Division
U.S. Department of Justice
Civil Division
P.O. Box 480
Ben Franklin Station
Washington, D.C.  20044
Tel: (202) 305-7571

August 26, 2024

*Attorneys for Defendant*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Standard Chambers Procedure ¶ 2(B)(2), I hereby certify that this brief contains 6,701 words.  In making this certification, I have relied upon the word count function of the Microsoft Word processing system used to prepare this brief.

*/s/Kara M. Westercamp*

KARA M. WESTERCAMP

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| PT. ZINUS GLOBAL INDONESIA,                    ) | |
|                                                ) | |
|                               Plaintiff,       ) | |
|            v.                                  ) | |
|                                                ) | |
| UNITED STATES,                                 ) | |
|                                                )    Consol. Court No. 21-00277 | |
|                               Defendant,       ) | |
|            and                                 ) | |
|                                                ) | |
| BROOKLYN BEDDING *ET AL.*,                     ) | |
|                                                ) | |
|                     Defendant-Intervenors.     ) | |

## **<u>ORDER</u>**

Upon consideration of plaintiff's and defendant-intervenors' comments regarding the remand redetermination, defendant's response thereto, and all other pertinent papers, it is hereby ORDERED that the second remand redetermination is sustained.

.

Date:_____                    _____

    New York, NY                                    Judge