UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | | |
|---|---|---|
| PT. ZINUS GLOBAL INDONESIA, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **and** | ) | **Court No. 21-00277** |
| | ) | **(Consol.)** |
| BROOKLYN BEDDING, LLC ET AL., | ) | |
| | ) | |
| **Consolidated Plaintiff,** | ) | **NONCONFIDENTIAL** |
| | ) | **VERSION** |
| **v.** | ) | |
| | ) | **Confidential Business** |
| UNITED STATES, | ) | **Proprietary Information** |
| | ) | **removed from pages:** |
| **Defendant,** | ) | **i, 4, 6, and 9-13** |
| | ) | |
| **and** | ) | |
| | ) | |
| PT. ZINUS GLOBAL INDONESIA and | ) | |
| BROOKLYN BEDDING, LLC ET AL., | ) | |
| | ) | |
| **Defendant-Intervenors.** | ) | |
| | ) | |

## PT. ZINUS GLOBAL INDONESIA'S COMMENTS IN SUPPORT OF COMMERCE'S SECOND REMAND REDETERMINATION

ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 942-5000
Fax: (202) 942-5999

J. David Park
Henry D. Almond
Gina M. Colarusso

*Counsel to PT. Zinus Global Indonesia*

Eric Johnson

*Consultant to PT. Zinus Global Indonesia Plaintiff*

Dated: August 26, 2024

**<u>TABLE OF CONTENTS</u>**

I.    **INTRODUCTION** ................................................................................................1

II.   **STANDARD OF REVIEW** ...............................................................................3

III.  **ARGUMENT** .....................................................................................................3

    A.    With Inventory Data Now On the Record, Commerce Has Correctly
        Concluded that there is No Basis to Include In-Transit Mattresses in the
        Calculation Used to Estimate the Quantity of CEP Inventory Sales ......................6

        1.    *The Identified Mattress Models Sold In [         ] of Beginning Inventory*
                *and Imports are Consistent with Record Information Regarding Zinus US'*
                *Inventory Levels and Management* ............................................................ 10

        2.    *The Identified Mattress Models Sold In [         ] of Beginning Inventory*
                *and Imports do Not Support Reinstating In-Transit Merchandise in*
                *Commerce's Calculations* ......................................................................... 12

        3.    *The Identified Mattress Models Sold In [         ] of Beginning Inventory*
                *and Imports do Not Call Into Question the Reasonableness of Commerce's*
                *Methodology* ............................................................................................ 13

    B.    Commerce's Conclusion Regarding Zinus Korea's Selling Expenses is
        Reasonable, Supported by Substantial Evidence, and Compliant with the
        Court's Remand Order .........................................................................................14

IV.   **CONCLUSION** .................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
    992 F. Supp. 2d 1285 (Ct. Int'l Trade 2014), *aff'd*, 802 F.3d 1339 (Fed. Cir.
    2015) ......................................................................................................................3

*Consol. Edison Co. of New York v. N.L.R.B.*,
    305 U.S. 197 (1938) ..............................................................................................3

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006) .............................................................................3

*Trust Chem Co. v. United States*,
    819 F. Supp. 2d 1373 (2012) ................................................................................3

*PT. Zinus Global Indonesia v. United States,*
    686 F. Supp. 3d 1349 (Ct. Int'l Trade 2024) ............................................. *passim*

**Federal Statutes and Regulations**

19 U.S.C. § 1516a(b)(1)(B)(i) ........................................................................................3

**Administrative Determinations**

*Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel from Italy:*
    *Final Results of Antidumping Duty Administrative Review; 2019-2020*, 87
    Fed. Reg. 71 (Jan. 3, 2022) ................................................................................19

*Mattresses from Indonesia: Final Affirmative Determination of Sales at Less Than*
    *Fair Value*, 86 Fed. Reg. 15,899 (Mar. 25, 2021) .......................................5, 13, 14

*Prestressed Concrete Steel Wire Strand From Tunisia: Final Affirmative*
    *Determination of Sales at Less Than Fair Value*,
    86 Fed. Reg. 18,508 (Apr. 9, 2021) .....................................................................17

NONCONFIDENTIAL VERSION

## I.   <u>INTRODUCTION</u>

Pursuant to the U.S. Court of International Trade's (the "Court") Second Remand Order,[1] PT. Zinus Global Indonesia ("Plaintiff" or "Zinus") hereby submits comments in support of the U.S. Department of Commerce's ("Commerce" or "the Department") Final Results of Redetermination Pursuant to Court Remand, ECF No. 87-1 (Confidential) and ECF No. 87-2 (Public) ("Second Remand Results") in the antidumping duty investigation of Mattresses from Indonesia.[2]  There are two issues remaining in this litigation: (1) mattresses in-transit at the end of the period of investigation ("POI") included in the calculation of CEP inventory sales, and (2) the treatment of selling expenses incurred in a third country by the parent company of mandatory respondent Zinus Indonesia.  In its Second Remand Results, Commerce has reached correct, lawful conclusions with respect to both issues and its conclusions are supported by substantial evidence.  The Court should therefore affirm Commerce's Second Remand Results.

*First*, Commerce has correctly determined that there is no basis to include the mattress quantity in-transit at the end of the POI in the quarterly ratio calculations used to determine the quantity of Indonesia-origin CEP inventory sales.  Second Remand Results at 6-7 and 10-14.  In the second remand proceeding, Commerce gathered missing information that unequivocally demonstrates that the sum of Zinus U.S.' beginning inventory quantity and purchased quantity of mattresses entering its inventory during the POI is greater than its inventory sales of Indonesia mattress model numbers during the POI, such that there is no basis to resort to the inclusion of in-transit mattresses in the calculation of CEP inventory sales.  *Id*. at 6-9.  Commerce has

---

[1] *PT Zinus Global Indonesia v. United States*, 686 F. Supp. 3d 1349 (Ct. Int'l Trade, Feb. 20, 2024) (*Second Remand Order*).

[2] Citations to the original administrative record are identified as "P.R. xx," for public documents and "C.R. xx" for confidential documents.  Citations to the administrative record for the second remand proceeding are "Second R.P.R. xx" for public documents and "Second R.C.R. xx" for confidential documents.

therefore acted in accordance with the Court's *Second Remand Order*, collecting inventory data and concluding, based on that data and supporting documentation, that it is not reasonable to include in-transit mattresses in the calculation used to estimate CEP inventory sales. Second Remand Results at 13-14. Commerce therefore revised its margin calculation accordingly, resulting in a *de minimis* dumping margin for Zinus. *Id*. at 23. As discussed herein, Commerce's conclusion is supported by substantial evidence and thus should be upheld by this Court.

*Second*, after reopening the record and gathering additional information, Commerce has affirmed its initial determination that Zinus Korea had a limited role in the sale of Zinus Indonesia's mattresses in the United States. Second Remand Results at 21. In its First Remand Order, this Court found that Commerce did not provide sufficient explanation or citations to record evidence in support of its finding that Zinus had provided all requested information relating to Zinus Korea's selling expenses and did not consider potentially contrary record evidence concerning Zinus Korea's selling activities. Slip Op. 23-39 at 61-62 (Mar. 20, 2023), ECF No. 55. Commerce requested, and the Court granted, a remand so that it could gather additional information regarding Zinus Korea's selling activities and correct alleged deficiencies in the record. *See Second Remand Order* at 16-17. On remand, Commerce reopened the record and gathered additional information regarding Zinus Korea's sales-related activities, invoicing system, and all indirect selling expenses incurred by Zinus Korea associated with Zinus Indonesia's U.S. sales. Second Remand Results at 15-19. Commerce also incorporated a newly created domestic indirect selling expense variable, DINDIRS2U, in which Zinus reports per-unit indirect selling expenses incurred in Korea, in its final margin calculation. *Id*. at 22-23. Commerce's conclusion and its methodology for capturing indirect selling expenses incurred in

NONCONFIDENTIAL VERSION

Korea in its margin calculation is reasonable, consistent with law, and supported by substantial evidence.  Accordingly, the Court should sustain Commerce's Second Remand Results.

## II.    STANDARD OF REVIEW

The Court will sustain Commerce's determinations in an antidumping duty proceeding, including redeterminations made pursuant to remand, where such determinations are supported by substantial evidence, are otherwise in accordance with law and, in the case of redeterminations, are consistent with the court's remand order.  19 U.S.C. § 1516a(b)(1)(B)(i). *Ad Hoc Shrimp Trade Action Comm. v. United States*, 992 F. Supp. 2d 1285, 1290 (Ct. Int'l Trade 2014), *aff'd*, 802 F.3d 1339 (Fed. Cir. 2015); *Trust Chem Co. v. United States*, 819 F. Supp. 2d 1373, 1378 (2012).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938); *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006).

## III.    ARGUMENT

With respect to the first issue remaining in this litigation:  whether Commerce's inclusion of mattresses in-transit as facts otherwise available in the calculation of constructed export price ("CEP") was in accordance with law and supported by substantial evidence, Zinus and the Commerce Department now agree that the record currently before the agency clearly demonstrates that there is no basis to resort to inclusion of such mattresses in Commerce's analysis.  Consistent with the Court's *Second Remand Order*, in the second remand proceeding Commerce reopened the record and gathered additional information regarding the quantity of mattresses in Zinus U.S.' inventory at the beginning of the POI and its purchase quantity of in-transit CEP inventory mattresses at the end of the POI, both on a model-specific and aggregate basis, as well as documentation to support such data.  Second Remand Results at 5-6 and

Attachment 1.  In its final redetermination, Commerce concluded that such data "shows on a model-specific level that Zinus U.S.' total inventory quantity of Indonesia model numbers that either were in common with other countries or were unique to Indonesia was sufficient to support its sales of such mattresses during the POI . . . there is no longer a basis to include the in-transit quantity in the quarterly ratio calculation" (used to estimate the total quantity of CEP inventory sales).  *Id*. at 6-7.  Specifically, Commerce explained that:

> Zinus U.S.' accounting records clearly demonstrate that the in-transit quantity of Indonesian mattress model numbers (*i.e.*, [        ]) did not enter Zinus U.S.'s inventory during the POI and Zinus U.S. had sufficient inventory at the beginning of the POI to make up the difference between its sales and purchases with respect to the co-mingled model numbers in common with the Indonesian model numbers.

> Consequently, if the [        ] in-transit mattress quantity of Indonesia-origin mattresses did not enter Zinus U.S.' inventory during the POI, and the sum of Zinus U.S.' beginning inventory quantity and purchased quantity of mattresses entering its inventory during the POI is greater than its inventory sales of Indonesia mattress model numbers during the POI, then there is no longer a basis to include the in-transit quantity in the quarterly ratio calculation.

*Id*. at 6-7 (citing *See* Zinus' Remand Supplemental Questionnaire Response (March 20, 2024) at Exhibit RS-11 ("Zinus Remand SQR")).  Now that it has beginning inventory data and detailed data regarding the mattresses in-transit at the end of the POI, Commerce has correctly concluded that there is no basis to include mattresses in-transit at the end of the POI in the ratio calculations to determine the origin of CEP inventory sales.  Zinus wholly supports Commerce's conclusion and submits that the Court should too, as it is supported by substantial evidence now on the record.  As explained in detail below, Brooklyn Bedding, et al.[3] (hereinafter the "Mattress

---

[3] Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises Inc., Leggett & Platt, Incorporated, International Brotherhood of Teamsters, United Steel Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, defendant-intervenors and plaintiffs in the companion case Brooklyn Bedding, LLC et al. v. United States, Court No. 21-00284.

Petitioners" or "Petitioners")'s plea for Commerce to revert to its prior quarterly ratio calculations, which included the in-transit mattresses, is faulty, unreasonable, and should be rejected.

Commerce also gathered additional information regarding Zinus Korea's sales-related activities, invoicing system, and all indirect selling expenses incurred by Zinus Korea associated with Zinus Indonesia's U.S. sales.  Second Remand Results at 15-19.  Commerce found that the additional information and documentation further substantiates Zinus' reporting with respect to Zinus Korea's minimal involvement in U.S. sales.  *Id.* at 21.  Moreover, Commerce included per-unit indirect selling expenses incurred in Korea by Zinus KR (reported in the newly created DINDIRS2U field) in its margin calculation, utilizing the same methodology applied in the subsequent first administrative review (which neither Zinus nor Mattress Petitioners have fought on appeal).  *Id.* at 19 and 22-23.

In its Second Remand Results, Commerce thoroughly explains the basis for its conclusions and addresses the arguments advanced by Mattress Petitioners in their comments on the draft second remand results, as well as the record evidence that Mattress Petitioners allege weighs against Commerce's findings.  Thus, for the detailed reasons provided in Commerce's Second Remand Results, and as demonstrated below, Commerce's Second Remand Results are supported by substantial evidence and comply with the Court's *Second Remand Order*.  Nothing in Mattress Petitioners' comments to the Court in opposition to Commerce's Second Remand Results undermine Commerce's conclusions.  Thus, the Court should sustain Commerce's Second Remand Results.

**A.     With Inventory Data Now On the Record, Commerce Has Correctly Concluded that there is No Basis to Include In-Transit Mattresses in the Calculation Used to Estimate the Quantity of CEP Inventory Sales**

In its *Second Remand Order* issued in the appeal of the Department's Final Determination in the underlying investigation, the court remanded the Department's inclusion of mattresses in-transit from Indonesia at the end of the POI in the quarterly ratio calculations used to estimate the total quantity of Indonesia-origin mattresses sold from inventory during the period. *Second Remand Order* at 11-14.  Having found that the use of in-transit mattress information as facts otherwise available was unlawful and unsupported by substantial evidence, the court suggested that Commerce reopen the record and gather additional information regarding Zinus' starting inventories. *Id*. at 11-14.  On remand, Commerce issued a supplemental questionnaire to Zinus requesting the total quantity and value of Zinus U.S.'s opening inventory on January 1, 2019 (the start of the POI) (Second R.C.R. 1).  On March 20, 2024, Zinus filed its response to Commerce's remand supplemental questionnaire in which it provided the requested information. *See* Zinus Remand SQR (Second R.C.R. 2-9).

The materials in this submission showed that as of January 1, 2019, Zinus U.S. held

[          ] mattresses meeting the physical description of the scope of the investigation. *See* Zinus Remand SQR at 13-14 and Exhibit RS-10 (Second R.C.R. 6, 8).  Regardless of how one counted these mattresses held in inventory – whether counting all in-scope mattresses or only those of model numbers identified in the prior Exhibit SA-5 and imported during the period of investigation – these data conclusively demonstrated that Zinus' beginning inventory plus imports during the POI were sufficient in the aggregate to cover the total number of mattresses sold out of inventory. *Id.*  With Commerce in the first remand results having said that "{t}he record facts demonstrate that Zinus U.S. actually sold more mattresses of the type that are subject merchandise than they had in inventory during the POI," Commerce needed to revisit its

methodology, as its prior assumption regarding the total inventory levels was now demonstrably incorrect.  *See* First Remand Results, ECF No. 60 at 3.

In short, with Zinus' response and the data contained therein, the record now definitively proves that (1) Zinus held mattresses in inventory at the start of the POI, and (2) the mattresses that remained in-transit from Indonesia to the United States at the end of the POI could *not* have been sold out of U.S. inventory during the POI.  Commerce could have simply remedied this issue by revising its prior calculations to remove the in-transit quantities from its prior quarterly ratio calculations.  Here, Zinus reminds the Court that the quarterly ratio methodology was originally one proposed by Mattress Petitioners, with the primary question in the first remand proceeding being whether the inclusion of the in-transit quantities was proper and supported by substantial record evidence.

However, rather than simply removing the in-transit quantities from the calculation, in its *Draft Remand*, Commerce adopted a new methodology first proposed by Mattress Petitioners in comments on Zinus' supplemental response.  *See* Mattress Petitioners' Comments On Zinus' Supplemental Questionnaire Response (April 2, 2024) (Second R.C.R. 11).  That methodology calculated quarterly ratios based on the imports in each quarter of only models sourced from Indonesia.  *Id.* at 9-10.  In advance of Commerce issuing its *Draft Remand*, Zinus identified that Mattress Petitioners' latest proposal suffered from the same fundamental flaw as Commerce's prior quarterly ratios – namely, that it failed to account for beginning inventory balances present at the start of the period of investigation, January 1, 2019.  While Zinus attempted to bring this issue to Commerce's attention prior to the issuance of the *Draft Remand*, Commerce rejected as untimely Zinus' comments prior to the issuance of the *Draft Remand*.  *See* Letter from the

Department to Zinus "Rejection of Unsolicited Comments" (April 15, 2024).[4]  There, the Department expressly noted that parties would have an opportunity to submit comments once Commerce issued its *Draft Remand*.

Accordingly, once Commerce issued its *Draft Remand* adopting Mattress Petitioners' April 2, 2024 suggested methodology, Zinus submitted comments detailing the flaws in Mattress Petitioners' proposal and offering a revised quarterly ratio methodology that (1) limited the analysis to those models imported from Indonesia during the period (just as Mattress Petitioners proposed), but (2) also accounted for beginning inventory balances.  *See* Zinus' Comments on the Department's Draft Results of Redetermination Pursuant to Court Remand (April 26, 2024) (Second R.C.R. 18-19, 21).  These comments demonstrated that the methodology proposed by Mattress Petitioners and adopted by Commerce in the *Draft Remand* yielded illogical and impossible results.  *Id.* at 11-16 and Exhibit 1 (Second R.C.R. 18, 21).  Further, Zinus provided revised quarterly ratio calculations which corrected these flaws and also accounted for beginning inventory balances.  *Id.* at 16-19 and Exhibit 2 (Second R.C.R. 19, 21).

In its final remand redetermination, Commerce largely agreed with the logic presented in Zinus' comments, concluding that "there is no longer a basis to include the in-transit quantity in the quarterly ratio calculation."  Second Remand Results at 7.  Commerce's decision to exclude the in-transit mattresses from its analysis of subject mattresses sold from Zinus' U.S. inventory is reasonable, lawful, and supported by substantial evidence, and thereby sufficient to comply with the court's *Second Remand Order*.  So too is the overall methodology Commerce adopted, as it

---

[4] Zinus submitted a full copy of the previously-rejected comments at Exhibit 4 of its April 26, 2024, comments on Draft Remand (Second R.C.R. 18-19, 21).

accounts for beginning inventory balances and imports during the period.  On this basis, the

Court should sustain Commerce's Second Remand Results.

In their comments in opposition to the Second Remand Results, Mattress Petitioners

claim that the reasoning underlying Commerce's final redetermination is "flawed and

inconsistent."  Defendant-Intervenors' Comments in Opposition to the Department's Remand

Redetermination (July 15, 2024) at 4, 6-9, ECF No. 91 (Confidential) and 92 (Public)

("Petitioners Opposition Comments").  Specifically, Mattress Petitioners' claim that for certain

mattress models, "[

                                   ]" thus allegedly undermining Commerce's conclusion that there is no basis to

include in-transit mattresses in the calculation of CEP inventory sales.  *Id*. at 6.  Mattress

Petitioners provide [ ] model numbers for which the total sold allegedly [          ] the total

volume in inventory during the POI.  *Id*. at 8.  Mattress

In this respect, despite the issues that Mattress Petitioners' take with Commerce's Second

Remand Results, Zinus does not read Mattress Petitioners' comments to take issue with the

overall model and methodology that the Department adopted in accounting for beginning

inventory and period imports to calculate quarterly ratios (again, the idea of using a quarterly

ratio was first proposed by Mattress Petitioners).  Rather, the only issue Mattress Petitioners

identify in their comments is with respect to a mere [ ] models, accounting for a total of [          ]

mattresses.

Specifically, as highlighted in Mattress Petitioners' Opposition Comments, Petitioners

allege the quantity of POI sales [          ] the total volume in inventory during the POI.  For ease

of reference Zinus provides below a copy of the chart on page 8 of Mattress Petitioners'

Opposition Comments, which illustrates the crux of Petitioners' argument:

**Table 1. Model Numbers for Which the Total Sold [          ]
the Total Volume in Inventory During POI**

|  | Model Number | Beginning Inventory Quantity | Total Quantity Entered into Inventory During POI from All Sources | Total Available for Sale in POI (Beginning Inventory + Entries) | Total Quantity Sold in POI from All Sources | Quantity for Which POI Sales [          ] |  |
|---|---|---|---|---|---|---|---|
| [ |  |  |  |  |  |  | ] |
| [ |  |  |  |  |  |  | ] |
| [ |  |  |  |  |  |  | ] |
| [ |  |  |  |  |  |  | ] |
| [ |  |  |  |  |  |  | ] |
| [ |  |  |  |  |  |  | ] |
| [ |  |  |  |  |  |  | ] |

*See* Petitioners Opposition Comments at 8.

As discussed below, these insignificant purported anomalies, which are consistent with the administrative record regarding Zinus U.S.'s period of investigation inventory balances and methodologies, do not justify the inclusion of "in transit" mattresses from the end of the period of investigation, and do not call into question the overall reasonableness or accuracy of the Department's revised quarterly ratio calculations.

      1.     *The Identified Mattress Models Sold In [          ] of Beginning Inventory and Imports are Consistent with Record Information Regarding Zinus US' Inventory Levels and Management*

Petitioners point to these [ ] models and claim that the existence of models for which the total volume of sales [          ] the beginning inventory balances plus period imports is an impossibility which calls the entire exercise into question. This position overstates the consequence of these models and ignores the possibility, as supported by the record, of in-period inventory adjustments and movements.

Specifically, as explained in Zinus' initial Section A response, during the POI there were instances in which mattresses are added to inventory "for a reason other than a normal purchase"

such as "through a reflection of inventory stock-taking differences."  Zinus' Section A

Questionnaire Response (June 19, 2020) at A-7 ("Zinus AQR") (explaining that when such

instances occurred, Zinus' reporting methodology was to "assume{} that the number of

mattresses are segregated by the proportion of the mattresses' beginning inventory balance by

country of origin on that day.") (P.R. 36).  Also, in Zinus' Supplemental Section A response, the

company explained that the account [                                                                            ] was

used "for recognizing inventory adjustments that are not segregated at the detailed product code

level.  This account mostly related to human data entry errors."  Zinus' Section A Supplemental

Questionnaire Response (Aug. 20, 2020) at 7 (C.R. 149).

        In other words, during the POI, Zinus personnel regularly conducted physical inventory

checks and made adjustments to the system data, as necessary, whenever differences occurred

between the physical inventory data and the system inventory data.  Thus, in order to fully and

most accurately account for all mattresses that could have been available to fulfill a CEP

inventory sale, such physical inventory adjustments (accounted for in Zinus' system as Other

Good Receipt and Good Issue or "GR/IR (Others)") would need to be accounted for in Mattress

Petitioners' calculus in addition to mattresses in beginning inventory and purchases during the

POI.  *See* Zinus AQR at Exhibit A-10 (providing Zinus' Chart of Accounts) (C.R. 37).

        Here, Commerce only has, and only asked for, data pertaining to beginning inventory

values.  That is, Commerce did not ask for any and all data pertaining to inventory adjustments

or reclassifications that may have taken place during the period in its Remand Supplemental

Questionnaire (or otherwise, as Commerce rejected Zinus' first-in-first out (FIFO) methodology,

for which this data would have been relevant) and, Zinus submits, these insignificant examples

identified by Mattress Petitioners do not undermine Commerce's final analysis in its Second

Remand Results.  In short, the existence of a few models for which the period sales slightly

exceed the beginning inventory plus period imports is not inconsistent with the record, which

confirms that there can be in-period inventory adjustments (increases) for reasons other than

imports entering inventory, as explained in Zinus' Section A response cited above.  Moreover, in

developing an overall ratio calculation methodology Commerce acted reasonably in relying on

import and beginning inventory as this methodology accounts for overall inventory and import

levels.

> 2.    *The Identified Mattress Models Sold In [       ] of Beginning Inventory
>       and Imports do Not Support Reinstating In-Transit Merchandise in
>       Commerce's Calculations*

Petitioners point to these [       ] models to claim that the sales volume in [       ] of

beginning inventory and in-period shipments justify the inclusion of in-transit merchandise in the

calculations.  However, Mattress Petitioners' argument is completely inapposite because record

evidence demonstrates that none of the models identified in their Opposition Comments were

among Zinus U.S.'s purchases in-transit at the end of the POI.  *See* Zinus' Section C

Supplemental Questionnaire Response (part 2) (Sept. 28, 2020) at Exhibit SC-5c (providing a

reconciliation of Zinus KR's sales quantity to the total quantity reported in Zinus' U.S. sales

database, which includes a product-code specific list of subject merchandise in-transit as of the

end of the POI; none of the model numbers identified by Petitioners appear in this list, meaning

that these models were not in-transit at the end of the POI) (C.R. 213); *see also* Zinus Remand

SQR at Exhibit RS-11 (providing additional information regarding merchandise in-transit at the

end of the POI pursuant to Commerce's request) (Second R.C.R. 8).  That is, if their theory is

that mattresses in-transit and the end of the POI must be included in the quarterly ratio

calculation of CEP inventory sales because Zinus' inventory data allegedly demonstrate that

there were not enough mattresses to support the sales quantities for **[ ]** models, the models at issue must be among those in-transit at the end of the POI for the theory to make sense.

The **[ ]** models Mattress Petitioners identify were not in-transit at the end of the POI, as demonstrated by the model-specific data provided in Exhibit SC-5c (and Exhibit RS-11). Thus, Mattress Petitioners' entire theory is flawed and fails to provide any basis for the Court to overturn Commerce's conclusion to exclude the in-transit mattresses in the ratio calculations and issue a third remand.

      3.     *The Identified Mattress Models Sold In [     ] of Beginning Inventory and Imports do Not Call Into Question the Reasonableness of Commerce's Methodology*

At bottom, Petitioners' focus on these **[   ]** models reveals the weakness in their argument. Specifically, they do not, and reasonably cannot, suggest that a methodology that accounts for shipments during the period and inventory levels is unreasonable or problematic. Indeed, it is essentially consistent with the methodology they first proposed, in so far as it results in quarterly ratios applied to total sales, and is based on in-period shipments and the mattresses that are actually available for sale, but is corrected to account for the flaws in their initial proposal. Instead, they are left pointing to a few transactions and identified mattress models which they view as anomalous. As described above, however, the record includes an explanation as to why such situations could occur, and does not support the conclusion that Commerce should re-introduce in-transit merchandise into the calculations.

More fundamentally, such few and narrow purported "anomalies," even if they were unexplained in the record, would not impugn the overall reasonableness of Commerce's chosen path and calculations. Specifically, these isolated datapoints account for a total of **[    ]** mattresses. Here, Zinus emphasizes that the total sales subject to the ratio calculations is **[    ]** mattresses. Second Remand Results at 6. Thus, these claimed anomalous transactions

are *equal to 0.16 percent* of the total inventory sales volume.  This is truly an insignificant

quantity that hardly rises to the level of a rounding error.  Even if one assumes these are entirely

unaccounted for (which they are not, as indicated in Zinus' questionnaire responses describing

inventory adjustments) the disposition of these sales in the calculations would have no impact on

the underlying quarterly ratio calculations or Commerce's overall calculations.  In short, such an

insignificant volume of sales is not indicative of an overall flaw in Commerce's methodology,

nor does it call into question the overall reasonableness of Commerce's calculations.

### B.  Commerce's Conclusion Regarding Zinus Korea's Selling Expenses is Reasonable, Supported by Substantial Evidence, and Compliant with the Court's Remand Order

In its final determination in the underlying investigation, consistent with long-standing

practice, Commerce included in the margin calculation the expenses that Zinus Korea actually

incurred to sell the subject merchandise.  *Mattresses from Indonesia: Final Affirmative*

*Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 15,899 (Mar. 25, 2021) ("*Final*

*Determination*") (P.R. 292), accompanying Issues and Decision Memorandum ("Final IDM") at

32-33 (P.R. 284).  In its First Remand Results Commerce provided additional explanation for its

conclusion that, based on record evidence, Zinus Indonesia's reporting of Zinus Korea's selling

expenses was consistent with Zinus Korea's limited role in selling merchandise subject to the

underlying investigation.  First Remand Results at 9-16, ECF No. 60 (Confidential) and ECF No.

59 (Public).  Though Zinus found the reasoning proffered in Commerce's First Remand Results

sufficient and based on substantial record evidence, prior to the Court's *Second Remand Order*,

Commerce requested, and the Court granted, a voluntary second remand so that it could gather

additional information regarding Zinus Korea's selling activities and correct alleged deficiencies

in the record.  *See Second Remand Order* at 16-17.

In the second remand proceeding, Commerce gathered additional information regarding Zinus Korea's sales-related activities, invoicing system, and all indirect selling expenses incurred by Zinus Korea associated with Zinus Indonesia's U.S. sales. Second Remand Results at 15-19. Commerce correctly found that the additional information and documentation further substantiates Zinus' reporting with respect to Zinus Korea's minimal involvement in U.S. sales. Second Remand Results at 21. Pursuant to the Department's request, Zinus also provided a calculation worksheet for Zinus KR's selling expenses and applied the resulting domestic indirect selling expense ratio by Zinus' reported gross unit prices to calculate the reported per-unit amounts (reported in a newly created data field called DINDIRS2U, referring to a second domestic indirect selling expense field for U.S. sales). Zinus Remand SQR at 11-12 and Exhibit RS-7 (Second R.C.R. 6, 8). In its Second Remand Results, Commerce incorporated this variable in its margin calculation program. Second Remand Results at 22-23.

Zinus' reporting, and Commerce's conclusion based on Zinus' reporting, is accurate, reasonable, and supported by substantial evidence. As noted, Zinus submits that Commerce's explanation and conclusion on this issue were previously sufficient and supported by substantial evidence and did not require additional documentation from Zinus. However, Commerce's conclusion is now further substantiated by additional supporting documentation and the final margin calculation accounts for per-unit indirect selling expenses incurred in Korea. Second Remand Results at 15-19 (explaining the additional supporting information and documentation provided in Zinus' Remand Response); *id*. at 19 and 22-23 (explaining how Commerce has included the per-unit indirect selling expenses incurred in Korea in its margin calculation). Thus, Commerce's Second Remand Results comply with the Court's *Second Remand Order*, in which the Court concluded that remand was appropriate because "Commerce's determinations with

respect to the exclusion of Zinus Korea's selling expenses are not supported by substantial evidence," as Commerce has now included Zinus Korea's selling expenses in its margin calculation. *Second Remand Order* at 17.

Moreover, as Commerce recognized, Zinus' methodology for reporting indirect selling expenses incurred by Zinus KR in the supplemental response is consistent with Zinus' reporting, as verified by the Department, in the first administrative review proceeding. Zinus Remand SQR at 12 and Exhibit RS-14 (Second R.C.R. 6, 8-9); Second Remand Results at 19 and 23. Accordingly, Commerce has accepted Zinus' reporting and afforded it the same treatment in the margin calculations as the Department did in the first administrative review. The Court should sustain Commerce's conclusions as they are lawful, consistent with past practice, supported by substantial evidence, and compliant with the *Second Remand Order*.

Nonetheless, in their comments in opposition to Commerce's Second Remand Results filed with the Court, Mattress Petitioners primarily present the same arguments that Commerce has already rejected. As in their comments on Commerce's draft remand redetermination, Mattress Petitioners spend a considerable amount of their comments focusing not on Zinus KR's indirect selling expenses, but whether certain expenses incurred by Zinus KR should be considered as part of Zinus Indonesia's G&A expenses. Petitioners Opposition Comments at 17-21. The issue of Zinus Indonesia and Zinus KR's G&A expense calculation is not at issue in this litigation, and the only question is the involvement of Zinus KR in the *sales* process and the potential inclusion of *sales* expenses incurred by Zinus KR in relation to *sales* of Zinus Indonesia product. *See* Second Remand Results at 21 ("The specific instructions from the Court in the *Second Remand Order* asked Commerce to consider whether the exclusion of Zinus Korea's selling expenses from the calculation of normal value was supported by substantial record

evidence.  In their comments on the Draft Remand, the Petitioners no longer argue that Zinus

Korea's selling expenses associated with Zinus Indonesia's sales to the United States were not

appropriately reported in the Remand Response, but now focus on a new topic not at issue in this

litigation: whether {certain direct expenses} incurred by Zinus Korea should be considered part

of Zinus Indonesia's G&A expenses.").

     Nonetheless, Commerce addressed Mattress Petitioners' arguments in its Second Remand

Results, explaining that none of the expenses identified by Petitioners relate to the production

operations of Zinus Indonesia.  Rather, they relate to Zinus Korea's-specific business operations,

and are properly excluded from the G&A expense calculation.  Second Remand Results at 22.

Mattress Petitioners claim that Commerce has included such expenses in the G&A of the

respondent in similar past cases, citing *Steel Wire Strand from Tunisia*.  *Id*. (citing *Prestressed

Concrete Steel Wire Strand From Tunisia: Final Affirmative Determination of Sales at Less Than

Fair Value*, 86 Fed. Reg. 18508 (Apr. 9, 2021), IDM at Comment 3).  This case does not support

Mattress Petitioners' contention.

     In *Steel Wire Strand from Tunisia*, Commerce refused to adjust the respondent's G&A

expenses to include a portion of the parent company's G&A expenses because there was "no

evidence on the record that suggests that {the respondent's} parent participated in day-today

{sic} operations of {the respondent}."  *Prestressed Concrete Steel Wire Strand From Tunisia:

Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 18,508 (Apr. 9,

2021), IDM at Comment 3.  As Commerce recognized in its Second Remand Results, Zinus

Korea is not involved in the day-to-day operations of Zinus Indonesia.  *See* Second Remand

Results at 15-19.  As the record has demonstrated since the underlying investigation, Zinus

Korea has a limited role in the sale of Zinus Indonesia's mattresses in the United States and is not

involved at all in the production of subject merchandise.  *See id*. at 21-22.  Moreover, as

Commerce explained, "{t}he fact that Zinus Korea and its subsidiaries coordinate with one

another to manage global manufacturing, operational, and sales activities does not change the

fact that the expenses at issue are selling expenses as opposed to G&A expenses related to

production."  *Id*. at 22.  In sum, Mattress Petitioners' arguments continue to be irrelevant to the

actual outstanding issue before the Court and their assertions rest on a single prior case that does

not support their contention.

With respect to Mattress Petitioners' argument that Zinus' method of allocating the

indirect selling expenses incurred by Zinus Korea associated with Zinus Indonesia's U.S. sales is

distortive, Commerce disagreed and its reasoned conclusion is supported by substantial evidence

and its uncontested conclusion in the subsequent administrative review.  Second Remand Results

at 22.  As Commerce explained:

> Using the sales revenues of each entity as a basis for deriving an allocation ratio
> to apply to Zinus KR's total selling expenses is an appropriate allocation method
> for purposes of determining Zinus KR's indirect selling expenses associated with
> sales of subject merchandise produced by Zinus Indonesia and sold through Zinus
> KR to the United States during the POI.  The record demonstrates that Zinus
> Korea's expenses do not include expenses incurred by other related companies.
> Similarly, the sales revenue figures are unadjusted for intercompany transactions.
> Therefore, it would be nonsensical to calculate an allocation ratio by dividing an
> expense that does not include intercompany transactions by a sales revenue figure
> that does factor in such transactions.

*Id*. at 22.  Commerce cites to Zinus' Section A response, including a Zinus Korea unconsolidated,

audited financial statement included therein, and Zinus' Remand SQR at Exhibit RS-7.

Commerce's conclusion is reasonable and supported by substantial evidence.  Moreover, Zinus

used similar allocation methodologies to those in the first administrative review, which

Commerce accepted and no party has contested.  Petitioners provided no logical reason for

Commerce to reach a different conclusion in this proceeding.  While Zinus submits that its

classification and exclusion of these expenses was accurate and reasonable, ultimately, there is nothing to suggest that these expenses relate to the general and administrative operations of Zinus Indonesia as a production entity. Indeed, in Petitioners' proposed calculations they treat all of the expenses Zinus identified as related to Zinus KR only as G&A expenses, yet the expenses relate to a range of activities including salaries, freight expenses, travel expenses, professional fees, rent, and other expenses. Such expenses are unrelated to Zinus Indonesia's production operations, but instead relate to Zinus KR's operations and are properly excluded. Even if Commerce were to consider these expenses, there is no basis to include any (let alone all) of the expenses as a G&A expense related to the production operations of Zinus Indonesia.

Finally, Mattress Petitioners again take issue with Commerce's treatment of Zinus Korea's indirect selling expenses in the final margin calculation. However, as Commerce explained in its Second Remand Results, it is only logical to include Zinus Korea's indirect selling expenses as foreign indirect selling expenses, as such expenses were incurred in a third country. It is Commerce's practice to calculate foreign indirect selling expenses as the sum of the respondent's indirect selling expenses in its own country and the indirect selling expenses of its third country affiliates. Second Remand Results at 23 (citing *Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel from Italy: Final Results of Antidumping Duty Administrative Review; 2019-2020*, 87 Fed. Reg. 71 (Jan. 3, 2022)). Thus, consistent with Commerce's practice, it has continued to include domestic indirect selling expenses in the data fields DINDIRSU and DINDIRS2U as foreign indirect selling expenses in its margin calculation. Mattress Petitioners' arguments to the contrary are unconvincing and unreasonable given the record evidence regarding the expenses incurred by Zinus Korea. The Court should therefore affirm Commerce's Second Remand Results.

IV.    <u>**CONCLUSION**</u>

For the foregoing reasons, Commerce's Second Remand Results with respect to the exclusion of in-transit mattresses from the calculation used to estimate the quantity of CEP inventory sales and Zinus Korea's selling expenses is compliant with the Court's *Second Remand Order* and should be sustained by this Court.

Respectfully submitted,

 /s/ J. David Park
J. David Park
Henry D. Almond
Gina M. Colarusso
*Counsel to PT. Zinus Global Indonesia*
*Plaintiff*

Eric Johnson
*Consultant to PT. Zinus Global Indonesia*
*Plaintiff*

ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20001
Phone:  (202) 942-5000

**Dated: August 26, 2024**

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE JENNIFER CHOE-GROVES

| | |
|---|---|
| PT. ZINUS GLOBAL INDONESIA, | ) |
| | ) |
| **Plaintiff,** | ) |
| **and** | ) |
| | ) |
| BROOKLYN BEDDING, LLC ET AL., | ) |
| | ) |
| **Consolidated Plaintiffs,** | ) |
| | ) |
| v. | ) **Court No. 21-00277** |
| | ) **(Consol.)** |
| UNITED STATES, | ) |
| | ) |
| **Defendant,** | ) |
| | ) |
| **and** | ) |
| | ) |
| PT. ZINUS GLOBAL INDONESIA and | ) |
| BROOKLYN BEDDING, LLC ET AL., | ) |
| | ) |
| **Defendant-Intervenors.** | ) |
| | ) |

## CERTIFICATION OF COMPLIANCE WITH CHAMBERS PROCEDURE 2(B)(1)

The undersigned hereby certifies that the attached Comments in Support of Commerce's Second Remand Redetermination, filed on August 26, 2024, contains 5,808 words, exclusive of the table of contents, table of authorities, and counsel's signature block, according to the word count function of the word-processing system used to prepare this brief, and inclusive of the words in the embedded images, counted manually. The brief therefore complies with the maximum 10,000 word count limitation set forth in the Court's Chambers Procedures.

By:   /s/ Henry D. Almond
      HENRY D. ALMOND

**Dated:  August 26, 2024**