Slip Op. 25-15

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| PT. ZINUS GLOBAL INDONESIA, **Plaintiff,** and BROOKLYN BEDDING, LLC, CORSICANA MATTRESS COMPANY, ELITE COMFORT SOLUTIONS, FXI, INC., INNOCOR, INC., KOLCRAFT ENTERPRISES INC., LEGGETT & PLATT, INCORPORATED, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AND UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, **Consolidated Plaintiffs,** v. UNITED STATES, **Defendant,** | Before: Jennifer Choe-Groves, Judge Consol. Court No. 21-00277 |

**and**

**BROOKLYN BEDDING, LLC, CORSICANA MATTRESS COMPANY, ELITE COMFORT SOLUTIONS, FXI, INC., INNOCOR, INC., KOLCRAFT ENTERPRISES INC., LEGGETT & PLATT, INCORPORATED, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AND UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO,**

        **Defendant-Intervenors.**

## OPINION AND ORDER

[Sustaining the U.S. Department of Commerce's Second Final Results of Redetermination Pursuant to Court Order in the antidumping duty investigation of mattresses from Indonesia.]

Dated:  February 18, 2025

J. David Park, Henry D. Almond, Gina Marie Colarusso, Kang Woo Lee, and Lynn M. Fischer Fox, of Arnold & Porter Kaye Scholer, LLP, Washington, D.C., for Plaintiff PT. Zinus Global Indonesia.  With them on the brief was Eric Johnson.

Yohai Baisburd, Nicole Brunda, Chase J. Dunn, Mary Jane Alves, Sarah E. Shulman, Thomas M. Beline, and Ulrika Kristin Skitarelic Swanson, of Cassidy Levy Kent (USA) LLP, Washington, D.C., for Consolidated Plaintiffs and Defendant-Intervenors Brooklyn Bedding, LLC, Corsicana Mattress Company,

Elite Comfort Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises Inc., Leggett & Platt, Inc., International Brotherhood of Teamsters, and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO.

L. Misha Preheim, Assistant Director, and Kara M. Westercamp, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant United States.  With them on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, and Patricia M. McCarthy, Director.  Of counsel on the brief was David W. Richardson, Senior Counsel, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

Choe-Groves, Judge:  Before the Court is the U.S. Department of Commerce's ("Commerce") second remand redetermination in the antidumping duty investigation of mattresses from Indonesia, filed pursuant to the Court's Remand Order in PT. Zinus Global Indonesia v. United States ("PT. Zinus II"), 48 CIT __, 686 F. Supp. 3d 1349 (2024).  See Final Results of Redetermination Pursuant to Court Remand ("Second Remand Redetermination"), ECF Nos. 87-1, 87-2; see also Mattresses from Indonesia ("Final Determination"), 86 Fed. Reg. 15,899 (Dep't of Commerce Mar. 25, 2021) (final affirmative determination of sales at less than fair value), accompanying Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Market Value Investigation of Mattresses from Indonesia ("IDM"), ECF No. 15-4.

In PT. Zinus II, the Court remanded for Commerce to reconsider its inclusion of mattresses in transit from Indonesia at the end of the period of investigation in the calculation of constructed export price and adjustments made to the selling expenses of Plaintiff PT. Zinus Global Indonesia's ("Plaintiff" or "Zinus Indonesia") parent company, Zinus Inc. ("Zinus Korea"). PT. Zinus II, 48 CIT at __, 686 F. Supp. 3d at 1354–57. Commerce addressed both issues on remand. See Second Remand Redetermination. Consolidated Plaintiffs and Defendant-Intervenors Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises Inc., Leggett & Platt, Inc., International Brotherhood of Teamsters, and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO ("Defendant-Intervenors") filed Defendant-Intervenors' Comments in Opposition to the Department's Remand Redetermination. Def.-Intervs.' Cmts. Opp'n Dep't's Remand Redetermination ("Def.-Intervs.' Br."), ECF Nos. 91, 92. Defendant United States ("Defendant") filed Defendant's Response to Comments on Second Remand Redetermination. Def.'s Resp. Cmts. Second Remand Redetermination ("Def.'s Br."), ECF Nos. 93, 94. Plaintiff filed Plaintiff's Comments in Support of Commerce's Second Remand Redetermination. Pl.'s Cmts. Supp. Commerce's Second Remand Redetermination ("Pl.'s Br."), ECF Nos. 95, 96. Defendant-Intervenors filed

Defendant-Intervenors' Reply to Defendant's Comments on the Second Remand Redetermination.  Def.-Intervs.' Reply Def.'s Cmts. Second Remand Redetermination ("Def.-Intervs.' Reply"), ECF Nos. 102, 103.

For the following reasons, the Court sustains Commerce's <u>Second Remand Redetermination</u>.

## ISSUES PRESENTED

This case presents the following issues:

1.    Whether Commerce's exclusion of in-transit mattresses from the calculation of constructed export price was in accordance with law and supported by substantial evidence; and

2.    Whether Commerce's exclusion of Zinus Korea's selling expenses from the calculation of normal value was supported by substantial record evidence.

## BACKGROUND

The Court presumes familiarity with the underlying facts and procedural history of this case and recites the facts relevant to the Court's review of the <u>Second Remand Redetermination</u>.  <u>See</u> <u>PT. Zinus II</u>, 48 CIT at __, 686 F. Supp. 3d at 1352–54; <u>PT. Zinus Global Indonesia v. United States</u> ("<u>PT. Zinus I</u>"), 47 CIT __, __, 628 F. Supp. 3d 1252, 1258–59 (2023).

On March 30, 2020, an antidumping duty petition concerning imports of

mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of

Turkey, and the Socialist Republic of Vietnam was filed with Commerce by

Brooklyn Bedding, LLC, Corsicana Mattress Company, Elite Comfort Solutions,

FXI, Inc., Innocor, Inc., Kolcraft Enterprises, Inc., Leggett & Platt, Inc., the

International Brotherhood of Teamsters, and the United Steel, Paper and Forestry,

Rubber, Manufacturing, Energy, Allied Industrial and Service Workers

International Union, AFL-CIO.  Antidumping Countervailing Duty Pet.

("Petition") (Mar. 31, 2020), PR 1–4, CR 1–10.[1]  In response to the Petition,

Commerce initiated on April 24, 2020 an antidumping investigation on mattresses

imported from Indonesia.  Mattresses from Cambodia, Indonesia, Malaysia, Serbia,

Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam, 85 Fed.

Reg. 23,002 (Dep't of Commerce Apr. 24, 2020) (initiation of less-than-fair-value

investigations).  The period of investigation was January 1, 2019 through

December 31, 2019, the four most recent financial quarters prior to the filing of the

March 2020 Petition.  Id. at 23,003; Commerce's Decision Mem. Prelim.

Affirmative Determination and Postponement Final Determination Less-Than-

---

[1]  Citations to the administrative record reflect the public record ("PR"), public
remand record ("PRR"), confidential record ("CR"), and confidential remand
record ("CRR") document numbers filed in this case, ECF Nos. 39, 40, 76, 77, 97,
98.

Fair-Value Investigation Mattresses from Indonesia ("PDM") at 5, PR 226; see also 19 C.F.R. § 351.204(b)(1).  Zinus Indonesia was selected as the sole mandatory respondent in the investigation.  Less-Than-Fair-Value Investigation Mattresses Indonesia Resp. Selection Mem., PR 66, CR 32.

Because Plaintiff was unable to identify the country of origin of imported mattresses after merchandise entered Plaintiff's United States warehouse, Commerce applied a quarterly ratio sales methodology to determine the quantity of Zinus Indonesia's U.S. sales for purposes of calculating constructed export price. IDM at 8–9; PDM at 9–10; see also Commerce's Prelim. Determination Margin Calculation Zinus Indonesia at 1–3 (Oct. 27, 2020), PR 229, CR 258.  The quarterly ratio was applied to the full universe of Zinus, Inc.'s ("Zinus U.S.") mattresses, including those mattresses that were in transit and had not yet entered the United States at the conclusion of the period of investigation.  IDM at 8–9. Commerce calculated Zinus Indonesia's antidumping duty margin rate at 2.22 percent.  Final Determination, 86 Fed. Reg. at 15,900.

The Court remanded for Commerce to explain and support its inclusion of mattresses in transit from Indonesia in its quarterly ratio calculations, Commerce's adjustments to the selling expenses of Zinus Korea, and Commerce's application of the Transactions Disregarded Rule.  PT. Zinus I, 47 CIT at __, 628 F. Supp. 3d. at 1287–88.  On remand, Commerce continued to include in-transit mattresses in

its calculation of constructed export price and to exclude affiliated party transfer payments from its margin calculations.  Final Results of Redetermination Pursuant to Court Remand ("Remand Redetermination"), ECF Nos. 59-1, 60-1.  This Court held that information relating to Plaintiff's inventory was missing from the administrative record, and Commerce failed to comply with the requirements of 19 U.S.C. § 1677m(d) to notify Plaintiff of the deficiency and allow an opportunity to cure.  PT. Zinus II, 48 CIT at __, 686 F. Supp. 3d at 1355–56.  Defendant requested that Commerce's determination with respect to the exclusion of Zinus Korea's selling expenses be remanded to address deficiencies and contradictions in the administrative record.  Id. at __, 686 F. Supp. 3d. at 1356–57.  The Court sustained Commerce's application of the Transactions Disregarded Rule and remanded the remaining issues of Commerce's treatment of in-transit mattresses and Zinus Korea's selling expenses.  Id. at __, 686 F. Supp. 3d at 1358.

On second remand, Commerce issued a supplemental questionnaire to Plaintiff.  Remand Suppl. Questionnaire, PRR 1, CRR 1.  The supplemental questionnaire requested Plaintiff to provide data on the quantity and value of the mattresses in Zinus U.S.' inventory at the beginning and end of the period of investigation and Zinus Korea's indirect selling expenses.  Id.  Plaintiff provided a response to the supplemental questionnaire.  Pl.'s Remand Suppl. Questionnaire Resp. ("Plaintiff's Supplemental Questionnaire Response" or "Pl.'s Suppl.

Questionnaire Resp."), PRR 4–5, CRR 2–9.  Defendant-Intervenors submitted

comments in response to Plaintiff's Supplemental Questionnaire Response.  Def.-

Intervs.' Cmts. Pl.'s Remand Suppl. Questionnaire Resp. ("Defendant-Intervenors'

Supplemental Questionnaire Comments" or "Def.-Intervs.' Suppl. Questionnaire

Cmts."), PRR 11, CRR 11.  Commerce released on April 19, 2024 its Draft Second

Remand Redetermination.  Draft Second Remand Redetermination, PRR 15, CRR

13.  In the Draft Second Remand Redetermination, Commerce concluded that the

quantity of mattresses in Zinus U.S.' inventory during the period of investigation

exceeded the quantity of mattresses sold during the same period and that the in-

transit mattresses from Indonesia did not enter Zinus U.S.' inventory during the

period of investigation.  Id. at 5–7.  Commerce excluded the in-transit mattresses

from its calculation and adjusted its quarterly ratio calculation to include only the

specific model numbers produced and sold by Zinus Indonesia during the period of

investigation.  Id. at 6–8.  Commerce also calculated a new variable representing

U.S. indirect selling expenses incurred in Korea based on additional data provided

by Plaintiff.  Id. at 8–12.  This variable was incorporated into the margin

calculation but did not affect the results.  Id. at 12.  Based on these changes,

Commerce calculated a weighted-average dumping margin of 2.35 percent.  Id. at

13.  Plaintiff and Defendant-Intervenors provided comments on the Draft Second

Remand Redetermination.  Pl.'s Cmts. Commerce's Draft Results Redetermination

Consol. Court No. 21-00277                                    Page 10

Pursuant Court Remand, PRR 22, CRR 18–19, 21; Def.-Intervs.' Cmts. Draft
Results Redetermination, PRR 21, CRR 20.

In the <u>Second Remand Redetermination</u>, Commerce again changed its
quarterly ratio methodology for allocating sales to include both Indonesian
mattresses purchased during the period of investigation and Zinus U.S.' existing
inventory.  <u>Second Remand Redetermination</u> at 8.  Commerce did not change its
methodology for calculating Zinus Korea's selling expenses.  <u>Id.</u> at 15–23.
Commerce calculated Plaintiff's remand weighted-average dumping margin at zero
percent.  <u>Id.</u> at 23.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction under 19 U.S.C. § 1516a(a)(2)(B)(i) and 28
U.S.C. § 1581(c), which grant the Court authority to review actions contesting the
final determination in an antidumping duty investigation.  The Court shall hold
unlawful any determination found to be unsupported by substantial evidence on the
record or otherwise not in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).
The Court also reviews determinations made on remand for compliance with the
Court's remand order.  <u>Ad Hoc Shrimp Trade Action Comm. v. United States</u>, 38
CIT 727, 730, 992 F. Supp. 2d 1285, 1290 (2014), <u>aff'd</u>, 802 F.3d 1339 (Fed. Cir.
2015).

## DISCUSSION

### I.    Legal Framework

Commerce imposes antidumping duties on foreign goods if: (1) it determines that the merchandise "is being, or is likely to be, sold in the United States at less than its fair value;" and (2) the International Trade Commission determines that the sale of the merchandise at less than fair value materially injures, threatens, or impedes the establishment of an industry in the United States. 19 U.S.C. § 1673.  Antidumping duties are calculated as the difference between the normal value of subject merchandise and the export price or the constructed export price of the subject merchandise.  Id.

Normal value is ordinarily determined using the sales price of the subject merchandise in the seller's home market.  19 U.S.C. § 1677b(a)(1)(B)(i).  If Commerce determines that normal value cannot be reliably calculated using home market or third-country sales, Commerce may use the subject merchandise's constructed value as an alternative to normal value.  Id. § 1677b(a)(4).  The method for calculating constructed value is defined by statute.  Id. § 1677b(e).  When calculating constructed value, Commerce must utilize the respondent's actual selling, general, and administrative expenses, and profits in the respondent's home market or a third-country market.  Id. § 1677b(e)(2)(A).  If Commerce cannot rely on those data, it may look to:

> (i) the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for selling, general, and administrative expenses, and for profits, in connection with the production and sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise,
>
> (ii) the weighted average of the actual amounts incurred and realized by exporters or producers that are subject to the investigation or review (other than the exporter or producer described in clause (i)) for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country, or
>
> (iii) the amounts incurred and realized for selling, general, and administrative expenses, and for profits, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise.

Id. § 1677b(e)(2)(B).

Commerce must also calculate export price or constructed export price.

Export price is:

> the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States,

subject to certain adjustments. Id. § 1677a(a). Constructed export price is:

> the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a

seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter,

subject to certain adjustments. Id. § 1677a(b). The price used to calculate constructed export price is reduced by commissions, selling expenses, further manufacturing expenses, and the profit allocated to these expenses. Id. § 1677a(d).

## II.    In-Transit Mattresses

On remand, Commerce determined that record evidence established "two very important facts," that: (1) a certain quantity of in-transit Indonesian mattress models that Zinus Korea sold to Zinus U.S. during the period of investigation did not enter Zinus U.S.' inventory until after the period of investigation had concluded; and (2) "Zinus U.S. had a sufficient number of the Indonesia model numbers that were in common with other countries in its physical inventory to support the U.S. sales of such products reported as non-subject merchandise in its U.S. sales database." Second Remand Redetermination at 10–11. Based on these facts, Commerce adopted a quarterly ratio calculation based on both Zinus U.S.' purchase data and existing inventory data for Indonesian model numbers in common with other countries. Id. at 8, 12–13. Defendant-Intervenors argue that Commerce's decision to exclude in-transit mattresses from the quarterly ratio calculation is not in accordance with the law and is unsupported by substantial evidence. Def.-Intervs.' Br. at 6–17.

### A.    Methodology

As this Court observed in its prior opinion in this case, the "[c]alculation of

constructed export price requires Commerce to identify sales of subject

merchandise in the United States during the period of investigation[, but] [t]he

relevant statutes and regulations provide little guidance on how to allocate

merchandise within an inventory that comingles subject and non-subject

merchandise." PT. Zinus I, 47 CIT at __, 628 F. Supp. 3d at 1263 (citing Fujitsu

Gen. Ltd. v. United States, 88 F.3d 1034, 1039 (Fed. Cir. 1996)).  The

methodology adopted by Commerce to allocate merchandise within an inventory

must be a reasonable means of effectuating Commerce's statutory directives.  Tri

Union Frozen Prods., Inc. v. United States, 40 CIT __, __, 163 F. Supp. 3d 1255,

1300 (2016), aff'd, 741 F. App'x 801 (Fed. Cir. 2018) (citing Ceramica

Regiomontana, S.A. v. United States, 10 CIT 399, 404–05, 636 F. Supp. 961, 966

(1986), aff'd, 810 F.2d 1137, 1139 (Fed. Cir. 1987)).

In the Draft Second Remand Redetermination, Commerce based its quarterly

ratio calculation on only Indonesian model number purchase data.  Draft Second

Remand Redetermination at 5–8.  In the Second Remand Redetermination,

Commerce changed its methodology to "include not just the purchase data but also

the existing inventory data for Indonesian model numbers in common with other

countries." Second Remand Redetermination at 8, 12–13; Mattresses from

Indonesia: Final Remand Results Calculation Mem. PT Indonesia ("Final Results Calculation Memorandum" or "Calculation Mem.") at Att. 4, PRR 24–29, CRR 27–30.  In explaining its reasoning for changing the methodology, Commerce stated that "applying quarterly ratios calculated using only the Indonesian mattress models purchased during the [period of investigation] and applying those ratios to the total sales reported in both U.S. sales databases yields an impossible result" of the total sales quantity of Indonesian mattresses significantly exceeding the quantity of purchased Indonesian mattresses.  Second Remand Redetermination at 8, 11–12; Calculation Mem. at Att. 3.  Commerce represented that a quarterly ratio methodology based only on purchase data would result in Zinus U.S. possessing an insufficient inventory to satisfy its sales for multiple model numbers of Indonesian mattresses.  Second Remand Redetermination at 12; Calculation Mem. at Att. 3.

 Commerce may change its methodology between the draft and final version of a determination but must explain the basis for the change and the change must be supported by substantial evidence and in accordance with the law.  Hyundai Steel Co. v. United States, 42 CIT __, __, 319 F. Supp. 3d 1327, 1343 (2018).  Commerce explained that the problematic results from using only purchase data were resolved through the inclusion of the quantity of mattresses Zinus U.S. held in inventory at the beginning of the period of investigation.  Second Remand Redetermination at 12–13.  Commerce determined that this approach "results in a

total sales quantity of Zinus U.S.' Indonesian-produced mattresses that is less than

the total quantity of such mattresses that were available for sale from its inventory

during the [period of investigation]." Id. at 13; Calculation Mem. at Att. 4.

Commerce acknowledged that:

> although this approach results in sold quantities being greater than
> purchased quantities for some models, these seemingly incongruous
> results are smoothed out when cumulated, such that the aggregate
> adjusted sales quantity for all Indonesia mattress sales is less than the
> total purchase quantity of these mattress model numbers from
> Indonesia. Therefore, unlike a quarterly ratio calculation based on
> purchase data only, a quarterly ratio calculation based on both purchase
> and inventory data applied to Zinus U.S.' [constructed export price]
> sales transactions results in a sales quantity assigned to Indonesia that
> is less than its total purchase quantity on an aggregate level, which is a
> more plausible result than we reached in the draft remand results.

Second Remand Redetermination at 13.

The Court concludes that the Second Remand Redetermination provides a

reasonable justification for changing Commerce's methodology and not limiting

the quarterly ratio calculation to only purchase data. See Hyundai Steel Co., 42

CIT at __, 319 F. Supp. 3d at 1343. Commerce's determination to include the

mattresses held by Zinus U.S. in inventory at the beginning of the period of

investigation resulted in the more plausible result that Zinus U.S.' sales quantity

was less than its total quantity purchased from Zinus Korea on the aggregate level.

Id. The Court concludes this to be a reasonable means of allocating U.S. sales for

purposes of calculating constructed export price. Tri Union Frozen Prods., Inc., 40

CIT at __, 163 F. Supp. 3d at 1300. The Court concludes that Commerce's

quarterly ratio methodology incorporating purchase and inventory data is in

accordance with law.

## B.    Exclusion of In-Transit Mattresses

Defendant-Intervenors argue that Commerce's determination that "Zinus

U.S. had a sufficient number of the Indonesia model numbers that were in common

with other countries in its physical inventory to support the U.S. sales of such

products reported as non-subject merchandise in its U.S. sales database," is not

supported by substantial evidence. Def.-Intervs.' Br. at 6–11. Defendant-

Intervenors further argue that Commerce's decision to change its quarterly ratio

methodology between the Draft Second Remand Redetermination and the Second

Remand Redetermination was unsupported by substantial evidence. Id. at 12–15.

In support of both of these arguments, Defendant-Intervenors point to examples of

individual mattress model numbers for which the quantity of sales from Zinus

U.S.' inventory during the period of investigation exceeded the quantity of

mattresses in inventory. Id. at 6–15.

On remand, Commerce considered data submitted by Zinus Indonesia

regarding Zinus U.S.'s quantity of mattresses in inventory at the start of the period

of investigation and purchase quantity of in-transit constructed export price

mattresses at the end of the period of investigation on a model-specific and

aggregate basis.  Second Remand Redetermination at 5–6; see Pl.'s Suppl.

Questionnaire Resp. at Exs. RS-10, RS-11.  Based on this data, Commerce

determined that "Zinus U.S.' total inventory of relevant mattresses during the

[period of investigation] was sufficient to support its mattress sales during the

[period of investigation]."  Second Remand Redetermination at 6.  Commerce

further determined that, on a model-specific level, the number of Indonesian model

numbers that were either in common with those used by manufacturers in other

countries or were unique to Indonesia exceeded the quantity of sales of Indonesian

mattress model numbers.  Id. at 6; Calculation Mem. at Att. 1 at Chart 2.

Commerce considered the accounting of mattresses in transit at the end of the

period of investigation provided by Zinus Indonesia and determined that Zinus

U.S. had sufficient inventory at the beginning of the period of investigation to

account for the differences between sales and purchases during the period of

investigation.  Second Remand Redetermination at 6–7; see Pl.'s Suppl.

Questionnaire Resp. at Ex. RS-11.

     Defendant-Intervenors contend that Commerce's "Ratio Application"

worksheet attached to its calculation memoranda shows that for seven model

numbers, the quantity of sales during the period of investigation exceeded the

quantity of mattresses available in inventory.  Def.-Intervs.' Br. at 6–9; Calculation

Mem. at Att. 5 at Chart 2.  Defendant-Intervenors argue that the existence of these

discrepancies undermines Commerce's determinations to exclude in-transit

mattresses and to alter its quarterly ratio methodology.  Def.-Intervs.' Br. at 9–12.

Commerce determined that an allocation methodology was necessary in this

case because Plaintiff did not maintain records of the country of origin for

mattresses after the merchandise entered Plaintiff's domestic warehouse.  See IDM

at 8–9.  In attempting to recreate an estimated allocation of mattresses within Zinus

U.S.' inventory, Commerce relied upon the data available on the record.  See

Second Remand Redetermination at 5–9.  Commerce is not required to use perfect

data but must explain why its choice was reasonable on the record.  Tenaris Bay

City, Inc. v. United States, 48 CIT __, __, 2024 WL 5056271, at *4 (Dec. 2, 2024)

(citing PT Pindo Deli Pulp and Paper Mills v. United States, 36 CIT 394, 414, 825

F. Supp. 2d 1310, 1327–28 (2012)).  In making its determination, Commerce

acknowledged that its methodology resulted in sold quantities being greater than

purchased quantities for some models, explaining that "these seemingly

incongruous results are smoothed out when cumulated, such that the aggregate

adjusted sales quantity for all Indonesia mattress sales is less than the total

purchase quantity of these mattress model numbers from Indonesia."  Second

Remand Redetermination at 13.

Plaintiff notes that the identified anomalies constitute only 0.16 percent of

the hundreds of thousands of mattresses sold from Zinus U.S.'s inventory during

the period of investigation and that none of the anomalous mattress models were among those in transit at the end of the period of investigation.  Pl.'s Br. at 12–14; compare Calculation Mem. at Att. 5 with Pl.'s Suppl. Questionnaire Resp. at Ex. RS-11.  Considering the relatively minor scale of the discrepancies and the fact that the anomalies were balanced out when mattress sales were considered in the aggregate, the Court concludes that Commerce's methodology is reasonable under the circumstances of this case and would result in only very minor distortions of less than one percent (0.16 percent of hundreds of thousands of mattresses) in the calculation of constructed export price.  Cf. 19 C.F.R. § 351.401(g) ("The Secretary may consider allocated expenses and price adjustments when transaction-specific reporting is not feasible, provided the Secretary is satisfied that the allocation method used does not cause inaccuracies or distortions.").

    Because Commerce based its choice of methodology on record evidence and provided a reasonable explanation for any minor discrepancies, the Court concludes that Commerce's determination that Zinus U.S. had a sufficient number of Indonesian model number mattresses in inventory to satisfy its sales during the period of investigation was reasonable and supported by substantial evidence.  The Court also concludes that Commerce's determination to base its quarterly ratio calculation on purchase data and existing inventory data was supported by

substantial evidence.  The Court sustains Commerce's quarterly ratio methodology and its exclusion of in-transit mattresses.

### III.    Zinus Korea's Selling Expenses

In the <u>Final Determination</u>, Commerce considered Zinus Korea to be an affiliate of Zinus Indonesia and deducted only the actual selling expenses incurred by Zinus Korea in its margin calculation.  <u>See</u> IDM at 32; <u>PT. Zinus I</u>, 47 CIT at __, 628 F. Supp. 3d. at 1280.  The Court found that Commerce did not support its determination that Zinus Korea's involvement in Zinus Indonesia's U.S. sales was limited and that Commerce did not address arguments raised by Defendant-Intervenors challenging the application of Korean accounting rules.  <u>PT. Zinus I</u>, 47 CIT at __, 628 F. Supp. 3d. at 1280–82.  On remand, Commerce again determined that Zinus Korea's involvement in the sale of subject mattresses was minimal and continued to treat costs considered "commissions and fees" as payments between related parties and not as selling expenses.  <u>Remand Redetermination</u> at 9–16; <u>see PT. Zinus II</u>, 48 CIT at __, 686 F. Supp. 3d at 1356–57.  Defendant-Intervenors continued to object to Commerce's determination, arguing that record evidence supported Zinus Korea having a more active role in Zinus Indonesia's U.S. sales.  Def.-Intervs.' Cmts. Part. Opp'n Final Results Redetermination at 2–4, ECF Nos. 62, 63.  Defendant acknowledged inconsistencies in the record related to Zinus Korea's selling functions and

requested a remand of the issue to allow for the record to be reopened for

additional information.  Def.'s Resp. Cmts. Remand Redetermination at 15–17,

ECF No. 74, 75.  The Court remanded the issue.  PT. Zinus II, 48 CIT at __, 686 F.

Supp. 3d at 1357.

On second remand, Commerce solicited additional information through its

supplemental questionnaire "regarding Zinus Korea's sales-related activities,

invoicing system, and all indirect selling expenses incurred by Zinus Korea

associated with Zinus Indonesia's U.S. sales." Second Remand Redetermination at

15; Remand Suppl. Questionnaire.  In its response to Commerce's supplemental

questionnaire, Plaintiff reported that some Zinus Korea employees were involved

in receiving invoices from Zinus Indonesia and forwarding those invoices to

customers in the United States.  Second Remand Redetermination at 15.  These

employees had other responsibilities beyond invoicing for Zinus Indonesia, which

accounted for only a portion of their time.  Id. at 15–16.  Commerce determined

that while Zinus Indonesia determined the sales terms for both export price and

constructed export price sales to U.S. customers, "Zinus Korea's role was limited

to receiving invoices from Zinus Indonesia and forwarding them to affiliated and

unaffiliated U.S. customers."  Id. at 16; Pl.'s Suppl. Questionnaire Resp. at 2–3.

Commerce further determined that Zinus Korea's role in warranty services

was minimal.  Second Remand Redetermination at 16–17.  Zinus Korea did not

provide "logistical services, training services, or technical support" and received

requests for defective allowances from U.S. customers only once a year.  Id. at 16.

Commerce acknowledged that a few Zinus Korea employees provided monthly

sales promotion programs to export price customers in the United States, but

determined that only one program concerning a single customer was in effect

during the period of investigation.  Id. at 16–17; see Pl.'s Sec. C Questionnaire

Resp. at Ex. C-13, PR 119–20, CR 117–20.

Based on Plaintiff's reporting, Commerce concluded that Zinus Korea was

not involved in the basic selling functions that were performed by Zinus Indonesia

and Zinus U.S., such as providing training services, technical support, inventory

management, and logistical services.  Second Remand Redetermination at 17; see

Pl.'s Suppl. Questionnaire Resp. at Ex. RS-5 at ## 6–9.  In support of this

determination, Commerce relied on sample internal emails and emails with U.S.

customers.  Second Remand Redetermination at 17; see Pl.'s Suppl. Questionnaire

Resp. at Ex. RS-5 at ## 6–9.

Commerce also reviewed a worksheet provided by Plaintiff reconciling

Zinus Korea's indirect selling expenses with Zinus Korea's financial statements.

Second Remand Redetermination at 17–18; see Pl.'s Suppl. Questionnaire Resp. at

Ex. RS-7; Pl.'s Sec. A. Questionnaire Resp. at Ex. A-11d(1).  The worksheet

reflected Zinus Korea's selling, general, and administrative expenses in six

categories:

> (1) certain expenses which were not incurred on behalf of the sale
> process with Zinus Indonesia, *i.e.*, professional fees (*i.e.*, column B);
> (2) expenses incurred by Zinus Korea that it included in Zinus
> Indonesia's general and administrative [] expenses (*i.e.*, column C);
> (3) expenses related to home market (Korea) sale activities (*i.e.*,
> column D); (4) direct expenses incurred for sales to the United States
> (reported in Zinus U.S.' sales database) (*i.e.*, Column E); (5) direct
> expenses on exports to countries other than the United States (*i.e.*,
> Column F); and (6) expenses only associated with Zinus Korea's
> business operations (*i.e.*, Column G).

Second Remand Redetermination at 18, 20–21; Pl.'s Suppl. Questionnaire Resp. at

Ex. RS-7.  Plaintiff excluded the expenses from its total expense pool during the

period of investigation and identified the portion of its total selling expenses

related to global sales operations, which involved multiple subsidiaries of Zinus

Korea.  Second Remand Redetermination at 18; Pl.'s Suppl. Questionnaire Resp. at

Ex. RS-7.  Plaintiff allocated the total global sales expenses between the various

subsidiaries based on their respective unconsolidated sales revenue and calculated

an indirect selling expenses ratio of Zinus Indonesia's mattresses in the United

States of less than one percent.  Second Remand Redetermination at 18; Pl.'s

Suppl. Questionnaire Resp. at Ex. RS-7.  The ratio was applied to the gross unit

prices reported in Plaintiff's U.S. sales database to determine a new expense

variable.  Second Remand Redetermination at 18; Pl.'s Suppl. Questionnaire Resp.

at Ex. RS-7.  The variable was incorporated into Commerce's margin calculation but did not impact the margin result.  Second Remand Redetermination at 18. Commerce determined that Zinus Korea had only a limited role in the U.S. sale of Zinus Indonesia's mattresses during the period of investigation.  Id. at 21.

Defendant-Intervenors contend that another remand of this issue is appropriate for three reasons.  First, Defendant-Intervenors argue that Commerce improperly excluded certain categories of expenses incurred by Zinus Korea on behalf of Zinus Indonesia and deviated from prior practice.  Def.-Intervs.' Br. at 17–21.  Second, Defendant-Intervenors contend that Plaintiff's allocation methodology is "nonsensical" and distortive.  Id. at 21–23.  Third, Defendant-Intervenors argue that Commerce treated Zinus Korea's indirect selling expenses as in-country selling expenses incurred by Zinus Indonesia.  Id. at 23–24.

## A.    Exclusion of Zinus Korea's Expenses

In the Second Remand Redetermination, Commerce explained that "Zinus Korea is a trading company, not a production entity, such that the [general and administrative] expenses it incurs at its headquarters in Seoul, South Korea, are not production-related."  Second Remand Redetermination at 22.  Defendant-Intervenors argue that this justification is inconsistent with prior determinations by Commerce and U.S. Court of International Trade decisions that have held that general and administrative expenses are those expenses that relate to the general

operations as a whole rather than to the production process.  Def.-Intervs.' Br. at

20 (quoting Prestressed Concrete Steel Wire Strand From Tunisia, 86 Fed. Reg.

18,508 (Dep't of Commerce Apr. 9, 2021)) (final affirmative determination of

sales at less than fair value)); see also U.S. Steel Grp. v. United States, 22 CIT 104,

106, 998 F. Supp. 1151, 1154 (1998).  Defendant concedes that Commerce's

language was imprecise but argues that Commerce's application was consistent

with its existing practice.  Def.'s Br. at 16–17.

Zinus Indonesia submitted additional information to Commerce regarding

"Zinus Korea's sales-related activities, invoicing system, and all indirect selling

expenses incurred by Zinus Korea associated with Zinus Indonesia's U.S. sales."

Second Remand Redetermination at 15; see Pl.'s Suppl. Questionnaire Resp.

Defendant-Intervenors have not identified any record evidence that contradicts the

validity of this data or suggests that particular expenses were improperly excluded

based on a determination that they were related to production rather than sales.

See Def.-Intervs.' Br. at 17–21.

In the Second Remand Redetermination, Commerce considered Zinus

Indonesia's Supplemental Questionnaire Response and other financial documents

provided by Zinus Indonesia.  Second Remand Redetermination at 16–23.  With

respect to Zinus Indonesia's invoicing, Commerce observed that a small number of

Zinus Korea employees were involved in receiving invoices from Zinus Indonesia

and forwarding the invoices to customers in the United States.  Second Remand
Redetermination at 15; see Pl.'s Suppl. Questionnaire Resp. at 1.  Commerce noted
that these employees had other responsibilities for Zinus Korea and other Zinus
Korea affiliates and spent only a portion of their time on Zinus Indonesia's
invoicing.  Second Remand Redetermination at 15; see Pl.'s Suppl. Questionnaire
Resp. at 1.  Commerce also observed that Zinus Korea's role was limited to
receiving and forwarding invoices and that Zinus Korea processed orders only
once a month.  Second Remand Redetermination at 16; see Pl.'s Suppl.
Questionnaire Resp. at 1–3, 9.

        With regard to other services performed by Zinus Korea, Commerce
determined that Zinus Korea's United States customer requested defective
allowances once per year.  Second Remand Redetermination at 16 (citing Pl.'s
Suppl. Questionnaire Resp. at Ex. RS-5 at # 3-1).  Commerce further determined
that a small number of Zinus Korea employees were involved in certain sales
promotion programs to customers in the United States, but only one of those
programs, pertaining to one customer, was in operation during the period of
investigation.  Id. at 16–17; see Pl.'s Sec. C Questionnaire Resp. at Ex. C-13.
Commerce also considered documents related to the sales functions performed by
Zinus Indonesia and Zinus U.S.  Second Remand Redetermination at 17 (citing
Pl.'s Suppl. Questionnaire Resp. at Ex. RS-5 at ## 7–9).

Commerce reviewed the worksheet provided by Zinus Indonesia reconciling the indirect selling expenses incurred by Zinus Korea with Zinus Korea's financial statements.  Second Remand Redetermination at 18, 20–21; Pl.'s Suppl. Questionnaire Resp. at Ex. RS-7.  Zinus Korea provided a breakdown of its total selling expenses pool by account code and calculated the portion of its total expenses related to global sales by its subsidiaries.  Second Remand Redetermination at 18.  A portion of Zinus Korea's global selling expenses was allocated to Zinus Indonesia based on Zinus Indonesia's total unconsolidated revenue relative to the combined total unconsolidated sales revenue of all of Zinus Korea's subsidiaries.  Id. at 19.  The resulting value was used to calculate Zinus Indonesia's indirect selling expense ratio and a per unit value.  Id.

The only argument offered by Defendant-Intervenors to challenge the data provided by Zinus Indonesia was that the worksheet provided by Zinus Indonesia on remand breaking down Zinus Korea's expenses included within its excluded expenses two cost centers with titles suggesting a role in global business operations.  Def.-Intervs.' Br. at 17–21.  Defendant-Intervenors contend that because Zinus Indonesia acknowledged in its questionnaire responses to Commerce that Zinus Korea and its subsidiaries "closely coordinate with one another to manage global manufacturing, operational, and sales activities," that the identified expenses should be attributed to Zinus Korea's general and

administrative expenses due to its role as a parent company. Id. at 18–19 (citing
Pl.'s Sec. A Questionnaire Resp. at A-11). This argument amounts to nothing
more than speculation on behalf of Defendant-Intervenors.

Zinus Indonesia provided additional information on its sales-related
activities, invoicing system, and indirect selling-expenses incurred by Zinus Korea
in response to Commerce's request on remand. Based on the best available
information on the record, Commerce allocated selling expenses in order to
calculate a dumping margin. Second Remand Redetermination at 19. Defendant-
Intervenors have identified no record evidence challenging Zinus Indonesia's
reporting. For these reasons, the Court concludes that Commerce properly
excluded expenses incurred by Zinus Korea on behalf of Zinus Indonesia and its
determination was supported by substantial evidence.

### B.    Allocation Methodology

Defendant-Intervenors argue that Plaintiff's methodology for allocating
expenses to Zinus Korea was distortive. Def.-Intervs.' Br. at 22–23. Defendant-
Intervenors contend that Commerce's allocation ratio divided an expense
improperly that did not include intercompany transactions by a total revenue that
did include intercompany transactions. Id.

In calculating a constructed export price, Commerce begins with "the price
at which the subject merchandise is first sold (or agreed to be sold) in the United

Consol. Court No. 21-00277                                                    Page 30

States before or after the date of importation" and makes certain statutory

adjustments.  19 U.S.C. § 1677a(b), (d).  Among the reductions expressly provided

by statute is the amount of selling expenses "incurred by or for the account of the

producer or exporter, or the affiliated seller in the United States, in selling the

subject merchandise."  Id. § 1677a(d).  In allocating selling expenses, Commerce

must adopt an allocation method that does not result in inaccuracies or distortions.

19 C.F.R. § 351.401(g)(1).

      In the Second Remand Redetermination, Commerce explained its allocation

methodology as:

> [u]sing the sales revenues of each entity as a basis for deriving an
> allocation ratio to apply to [Zinus Korea's] total selling expenses is an
> appropriate allocation method for purposes of determining [Zinus
> Korea's] indirect selling expenses associated with sales of subject
> merchandise produced by Zinus Indonesia and sold through [Zinus
> Korea] to the United States during the [period of investigation].  The
> record demonstrates that Zinus Korea's expenses do not include
> expenses incurred by other related companies.  Similarly, the sales
> revenue figures are unadjusted for intercompany transactions.
> Therefore, it would be nonsensical to calculate an allocation ratio by
> dividing an expense that does not include intercompany transactions by
> a sales revenue figure that does factor in such transactions.

Second Remand Redetermination at 22.  Defendant argues that Commerce erred in

stating that "[t]he record demonstrates that Zinus Korea's expenses do not include

expenses incurred by other related companies" and that Commerce's calculations

actually included intercompany transactions in both the numerator and

denominator of the allocation ratio. Def.'s Br. at 20–21. Defendant cites Exhibit RS-7 to Zinus Indonesia's Supplemental Questionnaire Response in support of its contention. Id. (citing Pl.'s Suppl. Questionnaire Resp. at Ex. RS-7). Defendant notes that the amount reconciliation worksheet reconciles Zinus Korea's total selling, general, and administrative expenses to the financial statements without an adjustment to remove intercompany transactions. Id. at 21 (citing Pl.'s Suppl. Questionnaire Resp. at Ex. RS-7; Pl.'s Sec. A Questionnaire Resp. at A11(d)(1) at 8). Defendant also notes that intercompany transactions were not among the categories of expenses excluded by Plaintiff. Id. at 22 (citing Pl.'s Suppl. Questionnaire Resp. at 20–21). Based on this documentation, Defendant contends that Commerce did include intercompany transfers in the numerator of the allocation ratio and that doing so was necessary because the record did not contain sufficient data to allow for intercompany transfers to be excluded from the denominator. Id.

Although Commerce stated that "[t]he record demonstrates that Zinus Korea's expenses do not include expenses incurred by other related companies," the subsequent sentences and the data relied upon indicate that Commerce utilized data that included intercompany transfers for both the numerator and denominator of the allocation ratio. See Second Remand Redetermination at 22; Pl.'s Suppl. Questionnaire Resp. at Ex. RS-7; Pl.'s Sec. A Questionnaire Resp. at A11(d)(1) at

8.  Because intercompany transactions were included in both the numerator and

denominator of the allocation ration, the approach is not distortive to the

constructed export price calculation.  <u>See</u> 19 C.F.R. § 351.401(g).  Therefore, the

Court concludes that Commerce's methodology is reasonable and supported by

substantial evidence.

<b>C.    Treatment of Zinus Korea's Expenses as In-Country<br>Expenses</b>

Defendant-Intervenors argue that Commerce treated Zinus Korea's indirect

selling expenses improperly as in-country selling expenses incurred by Zinus

Indonesia.  Def.'s Br. at 23–24.

In the <u>Second Remand Redetermination</u>, Commerce treated U.S. indirect

selling expenses incurred in Korea and U.S. indirect selling expenses incurred in

Indonesia the same in calculating the dumping margin.  <u>Second Remand</u>

<u>Redetermination</u> at 22–23.  Commerce explained that its "general practice is to

treat such expenses as foreign indirect selling expenses (<i>i.e.</i>, the same as indirect

selling expenses incurred in the country of manufacture)."  <u>Id.</u> at 23 (citing <u>Certain</u>

<u>Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel from Italy</u>, 87 Fed.

Reg. 71 (Dep't of Commerce Jan. 3, 2022) (final admin. determination), and

accompanying Issues and Decisions Memorandum at comment 4).

Commerce is obligated to treat similar situations in a consistent manner and must reasonably explain any deviation from an established practice.  See SKF USA, Inc. v. United States, 263 F.3d 1369, 1382 (Fed. Cir. 2001) ("An agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently." (internal citation omitted)); M.M. & P. Mar. Advancement, Training, Educ. & Safety Program v. Dep't of Commerce, 729 F.2d 748, 755 (Fed. Cir. 1984) ("An agency is obligated to follow precedent, and if it chooses to change, it must explain why."); Cinsa, S.A. de C.V. v. United States, 21 CIT 341, 349, 966 F. Supp. 1230, 1238 (1997) ("Commerce can reach different determinations in separate administrative reviews but it must employ the same methodology or give reasons for changing its practice.").

In the Second Remand Redetermination, Commerce explained that its "general practice" is to "calculate foreign indirect selling expenses as the sum of the respondent's indirect selling expenses in its own country and the indirect selling expenses of its third country affiliates."  Second Remand Redetermination at 23.  Commerce took the same position in the prior administrative review of Mattresses from Indonesia.  Mattresses From Indonesia, 88 Fed. Reg. 85,240 (Dep't of Commerce Dec. 7, 2023) (final results of antidumping duty administrative review; 2020–2022) and accompanying issues and decisions memorandum at comment 6 ("For [constructed export price] sales, we continued to

treat [Zinus Korea's indirect selling expenses] in the same manner as indirect selling expenses incurred in the domestic market (DINDIRSU) in the margin program, both of which represent expenses incurred on behalf of the U.S. sales in either the country of manufacture or third country.").

In Certain Cold-Drawn Mechanical Tubing and Alloy Steel from Italy, Commerce treated the indirect selling expenses reported for two of the respondent's foreign affiliates as indirect selling expenses incurred in the country of manufacture and explained its:

> general practice [] to treat such expenses as foreign indirect selling expenses (*i.e.*, the same as indirect selling expenses incurred in the country of manufacture).  Specifically, we calculate foreign indirect selling expenses as the sum of the respondent's indirect selling expenses in its own country and the indirect selling expenses of its third country affiliates.

Second Remand Redetermination at 23 (citing Certain Cold-Drawn Mechanical Tubing and Alloy Steel from Italy, 87 Fed. Reg. 71 (Dep't of Commerce Jan. 3, 2022) (final results of antidumping administrative review; 2019–2020), and accompanying issues and decisions memorandum at comment 4).  Commerce applied the same practice in Dioctyl Terephthalate from the Republic of Korea. See Dioctyl Terephthalate from the Republic of Korea, 82 Fed. Reg. 28,824 (Dep't of Commerce June 26, 2017) (final determination of sales at less than fair value and final negative determination of critical circumstances), and accompanying

issues and decisions memorandum at comment 5 ("Thus, for this final

determination, we have continued to calculate indirect selling expenses incurred in

the country of manufacture for AKP's U.S. sales as the sum of the [indirect selling

expenses] incurred in AKP and its third-country affiliates.").

An established agency practice exists "when a uniform and established

procedure exists that would lead a party, in the absence of notification of a change,

reasonably to expect adherence to the [particular action] or procedure." SeAH

Steel VINA Corp. v. United States, 40 CIT __, __, 182 F. Supp. 3d 1316, 1327

(2016) (quoting Huvis Corp. v. United States, 31 CIT 1803, 1811, 525 F. Supp. 2d

1370, 1378 (2007)).  In its submissions to Commerce, Zinus Indonesia expressed

its expectation that reported indirect selling expenses would be "treated in the same

manner as indirect selling expenses incurred in the domestic market."  Pl.'s Suppl.

Questionnaire Resp. at 12.  Based on Commerce's prior actions, including

consistent determinations that created Zinus Indonesia's expectation upon which it

reasonably relied, the Court finds that Commerce has an established practice to

treat U.S. indirect selling expenses incurred by a third-country affiliate the same as

U.S. indirect selling expenses incurred in the country of manufacture.

In Commerce's margin calculation, U.S. indirect selling expenses incurred

in the country of manufacture were reflected in the field DINDIRSU.  Calculation

Mem.  In the Final Results Calculation Memorandum, Commerce explained that

Zinus Indonesia's reporting included a new variable, DINDIRS2U, "representing indirect selling expenses incurred in Korea." Id. at 2. To calculate DINDIRS2U, Zinus Indonesia allocated a portion of Zinus Korea's total expense pool related to its global sales for all subsidiaries to Zinus Indonesia's operations, based on total combined unconsolidated sales revenue. Second Remand Redetermination at 18–19. The resulting expense figure was divided by the total sales of Zinus Indonesia's mattresses to the United States to calculate an indirect selling expense ratio for U.S. sales made by Zinus Indonesia. Id. at 19. The selling expense ratio was then multiplied by the gross unit prices reported in the U.S. sales database to obtain the pre-unit figures reported in DINDIRS2U. Id. Commerce added the DINDIRS2U variable to DINDIRSU in its margin calculation. Calculation Mem. at 2; Second Remand Redetermination at 23. The Court concludes that Commerce's treatment of Zinus Korea's U.S. indirect selling expenses as U.S. indirect selling expenses incurred in Indonesia was consistent with its established practice.

Defendant-Intervenors argue that following Commerce's normal practice is unreasonable in this case because Zinus Korea did not have sales of subject mattresses to the home market or to third-country markets during the period of investigation and any indirect expenses occurred were necessarily related to sales within the United States. Def.-Interv.'s Br. at 23–24. Defendant contends that

because Commerce's standard margin calculation did not include indirect selling expenses in the country of manufacture in the calculation of U.S. price or normal value, the expenses incurred by Zinus Korea were effectively ignored.  Id.

In calculating constructed export price, Commerce makes adjustments to the price at which goods are sold, or agreed to be sold, for exportation to the United States in order to achieve a fair comparison between U.S. price and foreign market value.  19 U.S.C. § 1677a(b)–(d).  Zinus Korea's indirect selling expenses were incurred during the sale of the subject mattresses and excluding them from Commerce's constructed export price calculation would have distorted the comparison between U.S. price and the foreign market value of the goods. Commerce's statement that inclusion of the DINDIRS2U variable with U.S. indirect selling expenses incurred in the country of manufacture "had no effect on the margin results" did not mean that the data was ignored, merely that it had an inconsequential impact on the calculation as a whole.  See Second Remand Redetermination at 19.  Because Commerce's inclusion of Zinus Korea's U.S. indirect selling expenses with Zinus Indonesia's in-country U.S. indirect selling expenses was reasonable and consistent with Commerce's established practice, the Court concludes that Commerce's determination was in accordance with law.  For the reasons discussed above, the Court sustains Commerce's treatment of Zinus Korea's selling expenses.

Consol. Court No. 21-00277                                                              Page 38

## CONCLUSION

For the foregoing reasons, the Court sustains Commerce's <u>Second Remand</u>
<u>Redetermination</u> as supported by substantial evidence and in accordance with law.

Accordingly, it is hereby

**ORDERED** that the <u>Final Results of Redetermination Pursuant to Court</u>
<u>Remand</u>, ECF Nos. 87-1, 87-2, are sustained.

Judgment will be entered accordingly.

<u>     /s/ Jennifer Choe-Groves     </u>
Jennifer Choe-Groves, Judge

Dated:  <u>   February 18, 2025   </u>
New York, New York